**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | On Motion to Compel Enforcement of Subpoena *Duces Tecum* |
| COMPUCREDIT CORPORATION and JEFFERSON CAPITAL SYSTEMS, LLC, Five Concourse Parkway, Suite 400, Atlanta, GA 30328 | U.S. District Court for the Northern District of Georgia, Atlanta Division No. 1:08-CV-1976 |
| Defendants. | |

**COMPUCREDIT CORPORATION'S MOTION TO COMPEL PRODUCTION OF
DOCUMENTS BY THE FEDERAL DEPOSIT INSURANCE CORPORATION**

Pursuant to Fed. R. Civ. P. 45(c)(2)(B)(i), CompuCredit Corporation ("CompuCredit") respectfully asks this Court to order the Federal Deposit Insurance Corporation ("FDIC") to produce documents responsive to CompuCredit's subpoena *duces tecum*. The reasons for granting the motion are set forth fully in the accompanying Memorandum of Points and Authorities of CompuCredit Corporation in Support of Its Motion to Compel Production.

Pursuant to Local Rule 7(f), CompuCredit Corporation requests oral argument on this motion.

Respectfully submitted,

Attorneys for Defendant CompuCredit:

Daniel T. Donovan
Rebecca R. Anzidei
Michael F. Williams
KIRKLAND & ELLIS LLP

655 15th Street, N.W.
Washington, DC  2005
Tel: (202) 879-5000
Fax: (202) 879-5200

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | On Motion to Compel Enforcement of Subpoena *Duces Tecum* |
| COMPUCREDIT CORPORATION and JEFFERSON CAPITAL SYSTEMS, LLC, Five Concourse Parkway, Suite 400, Atlanta, GA 30328 | U.S. District Court for the Northern District of Georgia, Atlanta Division No. 1:08-CV-1976 |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES OF COMPUCREDIT
CORPORATION IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION**

Although the Federal Deposit Insurance Corporation ("FDIC") reviewed and confirmed in writing that the credit card solicitations and materials at issue in the above-captioned matter complied with federal law for years and years, the FDIC and the Federal Trade Commission ("FTC") recently brought parallel enforcement actions pursuant § 5 of the Federal Trade Commission Act alleging that CompuCredit Corporation ("CompuCredit") engaged in deceptive practices with respect to credit cards issued by banks to which CompuCredit served as independent contractor and service provider. To be clear, the FDIC conducted examinations and visitations of CompuCredit and these banks for years and reviewed the very credit card programs at issue in the FTC's lawsuit. (*See, e.g.,* March 16, 2004 K. Porter Letter (Ex. A (redacted)).) Indeed, the FDIC repeatedly determined that *the same credit card materials* now challenged by the FTC complied with all applicable consumer protection laws. (*See, e.g.,* Jan. 13, 2005 E. Prindle Letter (Ex. B (redacted)).)

The FDIC is now refusing to produce the documents and related materials that show the FDIC's consistent position for years that the solicitation materials at issue in *FTC v. CompuCredit* complied with all federal laws. On July 3, 2008, CompuCredit served a subpoena on the FDIC requesting documents relating to the FDIC's review of the materials, but the FDIC has refused to comply. Although the subpoena was served over six weeks ago, the FDIC has not produced a single document in response. The FDIC originally agreed to produce documents, but then raised assorted procedural obstacles to their production. After that, the FDIC retained outside counsel and refused to produce any documents. As the defendant in a case brought by an agency of the United States government, CompuCredit is entitled to these documents and cannot afford the discovery delays that have resulted from the FDIC's refusal. Accordingly, CompuCredit respectfully asks this Court to compel production of responsive documents.

## FACTUAL BACKGROUND

CompuCredit is a specialty finance company that works with banks and other institutions to facilitate access to credit for financially underserved consumers. To accomplish this purpose, CompuCredit acts as a contractor to banks who issue credit cards to consumers. Pursuant to contracts with the banks, CompuCredit provides services on behalf of the banks, including marketing, administration, and customer service for the banks' credit card accounts. Under the contracts, the banks own the credit card accounts and charge the consumers fees, and CompuCredit purchases the receivables on the accounts. The banks are responsible for reviewing and approving the contractual services that CompuCredit provides on their behalf. The banks with which CompuCredit has contracted include Columbus Bank & Trust ("CB&T"), First Bank of Delaware ("FBoD"), and First Bank & Trust ("FBT") (collectively "the Banks").

2

*The FTC's Lawsuit Against CompuCredit.* On June 10, 2008, the FTC filed a lawsuit in the United States District Court for the Northern District of Georgia claiming that credit card programs administered by the Banks violated § 5 of the FTC Act. (*See* Compl., *FTC v. CompuCredit* (U.S.D.C. N.D. Ga., Case No. 1:08-CV-1976) (Ex. C).) Although the credit cards were issued by the Banks, the FTC seeks restitution from CompuCredit. In its Complaint, the FTC alleges that disclosures about the terms and fees—disclosures that the FTC admits were truthful—may have been "misleading" to consumers. The FTC's lawsuit is proceeding on an expedited basis before United States District Judge Beverly Martin. The close of all discovery, fact discovery and expert discovery, is set for December 15, 2008.

*The FDIC's Regulation of the Banks and CompuCredit.* Since long before the FTC's lawsuit was filed, the FDIC has been the federal agency with regulatory authority over the Banks. Under a comprehensive regime established by Congress, the FDIC regulates banks to ensure safety and soundness and compliance with applicable laws. It has authority to enforce consumer protection laws such as § 5 of the FTC Act, the Truth in Lending Act ("TILA"), and Regulation Z with respect to the Banks. The FDIC is authorized by statute to pursue these objectives through an array of enforcement mechanisms, including bank examinations, site visits, document requests, cease-and-desist orders, and other proceedings.

One of the mechanisms by which the FDIC enforces consumer protection laws is its Consumer Response Center. The Consumer Response Center was created as a result of amendments to the FTC Act that required the FDIC to "establish a separate division of consumer affairs, which shall receive and take appropriate action upon complaints with respect to [unfair or deceptive] acts or practices by banks ...." 15 U.S.C. § 57a(f)(1). The Consumer Response Center describes its statutory mandate to enforce consumer protection laws as follows:

3

> Our statutory mandate is to promote and enforce compliance by FDIC supervised banks with federal consumer protection laws, including those relating to fair lending and unfair and deceptive practices. We carry out our mission by:
>
> - Investigating consumer complaints involving the banks we supervise.
> - Responding to inquiries from the public and from financial institutions about consumer protection and fair lending matters.
> - Educating consumers about their rights under federal consumer protection laws and regulations through outreach.
> - Monitoring the public's perception of banking and consumer protection matters, and identifying trends that may affect consumer rights and protections.
> - Participating in the formulation of consumer related regulations, policies, and procedures.

(*See* Fostering Consumer Confidence in Banking, What is the Role of Consumer Affairs?, *available at* http://www.fdic.gov/consumers/questions/consumer/role.html (last visited Aug. 15, 2008). (Ex. D).)

*The FDIC's Review of the Programs Now Challenged by the FTC.* The FDIC is quite familiar with the solicitation and marketing materials that the FTC now challenges. Significantly, the very solicitation and marketing materials that are now challenged as deceptive by the FTC were repeatedly reviewed by the FDIC's Consumer Response Center over the time period at issue in the FTC's Complaint. Whenever the Consumer Response Center received correspondence from consumers about the credit card programs, it consistently determined that the solicitation and marketing materials complied with all applicable laws, including consumer protection laws. (*See, e.g.*, July 13, 2005 K. Porter Letter (Ex. E) (redacted).) The documents relating to the FDIC's determinations that the solicitations and marketing materials complied with the disclosure requirements of federal banking law and all applicable consumer protection laws, as well as other consumer inquiries and responses, is plainly relevant to the FTC's more recently that these same materials are somehow "deceptive."

4

Furthermore, the FDIC regularly reviewed the materials at issue and consistently found them to be in compliance with applicable laws. For instance, the FDIC conducted regular on-site examinations and visitations of the Banks, including extensive reviews of the Banks' solicitation and marketing activities. Indeed, the FDIC also conducted examinations of CompuCredit relating to the services it provided on behalf of the Banks, which included extensive document review and even interviews with CompuCredit employees. These examinations—during which the FDIC, as federal banking regulator, reviewed the same credit card programs that the FTC now claims were deceptive—are plainly relevant to the issues in the FTC's lawsuit.

*CompuCredit's Document Subpoena to the FDIC.* Because the FDIC had a longstanding, prominent role in reviewing the solicitation and marketing materials that are now challenged by the FTC, CompuCredit served a subpoena *duces tecum* on the FDIC on July 3, 2008. (*See* July 3, 2008 Subpoena to Executive Secretary, FDIC, *FTC v. CompuCredit* (U.S.D.C. N.D. Ga., Case No. 1:08-CV-1976) (Ex. F).) The subpoena seeks production of documents in the exclusive possession of the FDIC that are central to the issues raised by the FTC. These documents include: (1) documents relating to the Consumer Response Center's review of the solicitation and marketing materials challenged by the FTC, during which the FDIC determined that the materials complied with all applicable laws; (2) documents relating to the FDIC's examinations, visitations, and other reviews of the solicitation and marketing materials at issue, during which the FDIC determined that the materials complied with all applicable laws; and (3) documents setting forth the FDIC's standards for reviewing credit card programs for compliance with § 5 of the Federal Trade Commission Act, TILA, and other consumer protection laws.

5

***The FDIC's Refusal to Respond to CompuCredit's Subpoena.*** In the six weeks since CompuCredit served its subpoena, the FDIC has not produced a single page in response. Instead, the FDIC engaged in a pattern of delay that continues to this day.

Based on CompuCredit's initial discussions with FDIC counsel after serving the subpoena and receiving the FDIC's initial objections, (*see* July 17, 2008 M. Sagatelian Letter to M. Williams (Ex. G)), FDIC counsel (recently supplemented by outside counsel) initially represented during a meet-and-confer call that it would start collecting documents so that it could begin a rolling document production. When CompuCredit pressed the FDIC for a date when it could expect to receive documents, the FDIC responded that—notwithstanding the issuance of a valid subpoena—CompuCredit would not receive any documents until it complied with various internal FDIC procedures. When CompuCredit referred the FDIC to precedent of the D.C. Circuit holding that the imposition of the FDIC's internal requirements was inappropriate, the FDIC complained that it would not produce documents because there was no valid protective order in place. When CompuCredit referred the FDIC to the protective order that had been agreed upon and entered, the FDIC retained a law firm to represent it, without giving CompuCredit any indication that it had decided to retain outside lawyers to act on its behalf. (*See* Aug. 7, 2008 K. Sanchez Letter D. Donovan and M. Williams (Ex. H).)

Upon entering the case, the FDIC's new lawyers started insisting that the agreed-upon protective order—which the FDIC's counsel had conferred about with the FTC before it was agreed to—is not adequate, and that the FDIC would not produce documents until changes were made. The FDIC's new outside counsel also requested another meet-and-confer, notwithstanding the many hours that CompuCredit's lawyers had already spent discussing the subpoena with the FDIC's in-house lawyers. (*See id.* at 1 (Ex. H).) The FDIC's outside counsel

served specific objections to CompuCredit's subpoena on August 11, 2008—nearly four weeks after the objections to the subpoena were due. These specific objections simply re-stated more general objections that the FDIC asserted just after CompuCredit served its subpoena. Indeed, the FDIC has even resurrected various objections that counsel had resolved during their meet-and-confer calls. This latest set of objections makes clear that the FDIC has no intention of producing documents in the absence of a court order.

## ARGUMENT

The Court should enter an order compelling the FDIC to comply with CompuCredit's document subpoena. The courts of this District have consistently held that refusal to comply with a subpoena "is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005). The FDIC cannot show that any such extraordinary circumstances excusing prompt compliance with the subpoena are present here. Clearly, no such extraordinary circumstances are present here. To the contrary, there is no legitimate basis for the FDIC to produce responsive documents. This is a case in which one agency of the United States government is challenging certain credit card solicitation and marketing materials in federal court as deceptive and unlawful, but only after another federal agency—an expert banking agency at that—had reviewed the same materials and determined that they complied with all applicable laws for years and years. At the very least, the FDIC should now turn over responsive documents so that CompuCredit can develop its defense.

The FDIC cannot plausibly contend that the documents sought by the subpoena are not "relevant to any party's claim or defense" in the FTC's lawsuit against CompuCredit. Fed. R. Civ. P. 26(b)(1). It bears emphasis that the standard of relevance is to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear

on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Indeed, the standard of relevance "is so liberal that relevant information sought need not even 'be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.'" *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 6 (D.D.C. 2007). This lenient standard is relaxed even further when, as in this case, a subpoena calls for documents relating to an action that is pending before a different federal court. Because a "court with jurisdiction over a discovery dispute for an action pending in a different district generally has limited exposure to and understanding of the primary action," the courts in this District recognize the need to "be cautious in determining [the] relevance of evidence, and in case of doubt should err on the side of permissive discovery." *Flanagan*, 231 F.R.D. at 103.

The documents sought by the subpoena are not plainly relevant but go to the heart of the FTC's lawsuit against CompuCredit. Indeed, by the FDIC's own admission, the documents are relevant to the pending federal action. The FDIC has initiated three related administrative proceedings against CompuCredit and two of the Banks that are based upon the same factual allegations in the FTC's lawsuit, under the same legal theories, and that seek restitution on behalf of the same consumers. In a hearing before the ALJ presiding over these administrative proceedings on July 17, 2008, the FDIC made clear that a large universe of documents would be responsive and relevant in both the FTC and the FDIC matters. Specifically, Mr. Feeney of the FDIC stated "we think there's going to be a fair overlap in the documents disclosed or discovered in [the FTC case] and [the FDIC matters], and I am assuming that we will work with [CompuCredit's counsel] to limit the double burdens that potentially could happen because of that." (*See* July 17, 2008 Scheduling Conference Tr., *In re First Bank of Del.,* (FDIC Case Nos. 07-256b and 07-357k), at 64 (Ex. I).) Ms. Sagatelian of the FDIC, who was involved in the meet

8

and confers with CompuCredit's counsel, confirmed that this overlap applied to both fact and expert discovery. (*Id.* at 65 (Ex. I).) She went on to acknowledge "that there is considerable overlap between the issues in the FTC case and the three cases here and … while there are three administrative proceedings, the most complex issue is probably the Section 5 issue and that pervades all three cases." (*Id.* at 68 (Ex. I).)

The FDIC has no valid justification for its continuing delay in producing documents responsive to CompuCredit's subpoena, and the Court should compel the FDIC to produce all non-privileged, responsive documents. The subpoena is valid and seeks documents that go to the heart of the FTC's claims against CompuCredit. CompuCredit is entitled to these relevant documents from the FDIC's files. Representative categories of the relevant documents include, but are not limited to:

- FDIC training manuals used to train its examiners to make compliance determinations such as those they made when they examined the Banks and CompuCredit, which contain relevant information about not only Banks' and CompuCredit's compliance but the standards against which their compliance was judged;

- FDIC files in which it determined the solicitations and marketing materials at issue complied with federal law and informed consumers of this conclusion on behalf of the United States government;

- FDIC examiner work papers, which contain highly relevant factual information about the Banks' credit card programs gathered in the FDIC's reviews of the Banks and CompuCredit; and

- FDIC's internal guidance and memoranda about enforcing Section 5, which will contain relevant information about the standards applied when the FDIC made compliance determinations.

Each of these categories of documents, which contain relevant information detailed above, are in the FDIC's possession, and CompuCredit is entitled to them to defend itself in the FTC action.

The FDIC has simply run out of reasons to justify its delay in producing documents responsive to CompuCredit's subpoena. The FDIC's objection based on its internal regulations,

12 C.F.R. Part 309, which are also known as *Touhy* regulations, provides no protection against production since, as the FDIC now knows, this Court has held that "[a] federal-court litigant [such as CompuCredit] . . . can seek to obtain the production of documents from a federal agency by means of a federal subpoena" without resort to the agency's regulations. *Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208, 1212 (D.C. Cir. 1996).

Likewise, the FDIC can no longer point to the lack of a protective order as a basis for delaying production since protective orders have now been entered in both the FTC action, (*see* Aug. 6, 2008 Stipulated Protective Order, *FTC v. CompuCredit* (U.S.D.C. N.D. Ga., Case No. 1:08-CV-1976) (Ex. J)), and in the FDIC's administrative proceeding, (*see* July 28, 2008 Stipulated Protective Order, *In re CompuCredit Corp.,* (FDIC Case Nos. 08-139b and 08-140k) (Ex. K)). Outside counsel's most recent attempt to argue that the Protective Order entered in this case needs to be amended before any documents are produced is nothing more than a last ditch effort to delay production. (*See* Ex. H.) The FDIC had ample opportunity to review the draft protective order before it was agreed to by the parties, and in fact commented on the draft. To now come back and argue the Protective Order is deficient in some way is clearly nothing more than a delay tactic. Moreover, paragraphs 7 and 13 of the Protective Order specifically address the very issue the FDIC says requires amendment—the use and impact on admissibility of documents collected in this case and in the related FDIC proceedings. So there is no merit to the FDIC's request for an amendment. Additionally, the FDIC's concern regarding the use and admissibility of the documents produced in the FTC case and in the FDIC matters only reaffirms the overlap in issues between the two cases, and confirms their relevance here.

## CONCLUSION

For the reasons stated above, CompuCredit respectfully requests the Court order the FDIC to produce to all non-privileged documents responsive to CompuCredit's subpoena.

Dated: August 15, 2008

Respectfully Submitted,

Daniel T. Donovan
Rebecca R. Anzidei
Michael F. Williams
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 879-5000
Fax: (202) 879-5200

*Attorneys for CompuCredit Corporation*

11

# EXHIBIT A



**FDIC**

**Federal Deposit Insurance Corporation**
Division of Supervision and Consumer Protection
2345 Grand Boulevard, Suite 100
Kansas City, MO 64108

Consumer Response Center
1-800-378-9581

March 16, 2004
Ref. No.: SCC2004F-000289-0

# REDACTED

Re:    Columbus Bank and Trust Company
       Columbus, Georgia

Dear Ms. Johnson:

We completed our review of your correspondence and information provided to this office by Aspire regarding the Aspire credit card account established in your name. Columbus Bank and Trust Company (bank) issues the Aspire credit card.

As part of its supervisory responsibility, the FDIC assists consumers with complaints by informing them of their rights under federal consumer protection laws and by reviewing the bank's actions to assess whether the bank has complied with such rules. The FDIC is not authorized to intervene, however, when the dispute relates to the terms and conditions of the consumer's contractual agreement with the bank.

The Federal Reserve Board's Regulation Z, which implements the federal Truth in Lending Act, requires creditors to disclose certain terms and conditions of credit card accounts to new accountholders. The required disclosures must be made in accordance with timeframes and other guidelines prescribed by the regulation. Aspire routinely provides a Bank Credit Card Agreement to its accountholders when a card is issued. The agreement contains the terms and conditions of the account, including notice of an annual fee, account opening fee, and account maintenance fee. A copy of the pertaining section of the Bank Credit Card Agreement is enclosed for your review.

It appears Aspire responded directly to you regarding this matter on            Aspire assessed the fees in question on your account in accordance with the Bank Credit Card Agreement. Aspire closed your account per your request. Additionally, Aspire waived the fees in question.

Thank you for bringing this matter to our attention. The enclosed brochure provides helpful information about credit cards. We trust this addresses your concerns.

Sincerely,

*Karen Porter*

Karen Porter
Consumer Affairs Specialist

Enclosures (3)

REDACTED

# EXHIBIT B



**FDIC**
**Federal Deposit Insurance Corporation**
Division of Supervision and Consumer Protection
2345 Grand Boulevard, Suite 100
Kansas City, MO  64108

Consumer Response Center
1-800-378-9581

January 13, 2005

# REDACTED

Re:     Columbus Bank and Trust Company
        Columbus, Georgia

    We have completed our review of your correspondence and the information provided to this office by Aspire Visa. Columbus Bank and Trust Company is the issuer of this credit card. We have enclosed a copy of Aspire's response, dated January 6, 2005, for your review.

    The Federal Reserve Board's Regulation Z (Regulation Z), which implements the federal Truth in Lending Act, does not restrict the type or amount of fees and service charges that a creditor may impose on a credit card account.   It does require that creditors disclose certain terms and conditions of credit card accounts to accountholders. The disclosures must be made in accordance with timeframes and other guidelines prescribed by the regulation. Aspire complies with these requirements when a Credit Card Agreement is provided to accountholders at the time a card is issued. The agreement contains the terms and conditions of the account, including annual fee, account opening fee, and monthly maintenance fee. Use of the card constitutes acceptance of those terms and conditions. These fees are considered to be contractual issues between you and Aspire. The FDIC is unable to adjudicate such disputes.

    However, it appears Aspire has investigated this matter and resolved your complaint. The 2004 annual fee has been waived and the credit balance of       refunded to you on
Your account is now closed with a zero balance.

    We trust this is responsive to your concerns. Please be assured the FDIC takes the concerns of consumers very seriously. Complaints such as yours are a vital component of the examination process, not only helping the FDIC tailor its examinations to focus on areas of concern, but also providing comment to banks on practices and policies. Your complaint will become a part of the permanent file and will be made available to examiners prior to the next FDIC examination of the bank. Thank you for bringing your concerns to our attention.

                        Sincerely,

                        Emi Prindle
                        Consumer Affairs Specialist

Enclosure

REDACTED

# EXHIBIT C

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| _____ | ) | |
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. |
| COMPUCREDIT CORPORATION | ) | |
| and JEFFERSON CAPITAL | ) | |
| SYSTEMS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**COMPLAINT FOR PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its

undersigned attorneys, alleges as follows:

1.    This is an action under Sections 5(a) and 13(b) of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a) and 53(b); and Sections 806-807

and 814 of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§

1692d-1692e and 1692*l*.  Through this action, the Commission requests permanent

injunctive relief and other equitable relief, including rescission and reformation of

contracts, restitution, and disgorgement, against CompuCredit Corporation and

Jefferson Capital Systems, LLC ("Defendants"), for engaging in unfair or

deceptive acts or practices in violation of Section 5(a) of the FTC Act, as amended,

and for engaging in acts or practices in violation of the FDCPA, 15 U.S.C. §§

1692-1692p, as amended.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this matter pursuant to

15 U.S.C. §§ 45(a), 53(b) and 1692*l*, and 28 U.S.C. §§ 1331, 1337(a) and 1345.

3.    Venue is proper in the United States District Court for the Northern

District of Georgia under 28 U.S.C. §§ 1391(b) and (c), and 15 U.S.C. § 53(b).

## PARTIES

4.    Plaintiff, the FTC, is an independent agency of the United States

Government created and given statutory authority and responsibility by the FTC

Act, as amended, 15 U.S.C. §§ 41-58.  The Commission is charged, inter alia, with

enforcing Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or

deceptive acts or practices in or affecting commerce, and with enforcing the

FDCPA, 15 U.S.C. §§ 1692-1692p.  The Commission is authorized by Section

2

13(b) of the FTC Act, 15 U.S.C. §§ 53(b), and Section 814 of the FDCPA, 15

U.S.C. § 1692*l*, to initiate federal district court proceedings through its own

attorneys to enjoin violations of the FTC Act and the FDCPA, and to secure such

equitable relief as may be appropriate in each case, including but not limited to,

rescission and reformation of contracts, restitution, and disgorgement.

5.    Defendant CompuCredit Corporation ("CompuCredit") is a Georgia

corporation that maintains its principal place of business in Atlanta, Georgia.

CompuCredit transacts or has transacted business in the Northern District of

Georgia.

6.    Defendant Jefferson Capital Systems, LLC ("Jefferson Capital") is a

Georgia limited liability company that maintains its principal place of business in

St. Cloud, Minnesota.  Jefferson Capital is a wholly-owned subsidiary of

CompuCredit that transacts or has transacted business in the Northern District of

Georgia.  Jefferson Capital is a "debt collector," as defined in Section 803(6) of the

FDCPA, 15 U.S.C. § 1692a(6).

7.    Defendants CompuCredit and Jefferson Capital have acted as a

common enterprise while engaging in deceptive acts and practices, and other

3

violations of law in connection with marketing Majestic Visa credit cards and the

collection of defaulted Aspire credit card receivables.

8.     CompuCredit and Jefferson Capital are incorporated at the same

address and at relevant times have shared common officers, and CompuCredit has

formulated, directed, controlled or had authority to control, or participate in the

acts and practices of Jefferson Capital.  CompuCredit and Jefferson Capital have

marketed the Majestic Visa credit card and/or other financial products through a

unified marketing program or programs that relied on the interrelationship between

the companies.  CompuCredit's Aspire Visa program, as well as other programs in

which CompuCredit marketed high-fee credit cards, also depended on the

interrelationship between CompuCredit and Jefferson Capital, with Jefferson

Capital playing an integral role in collecting the charged-off receivables (often

including assessed fees) that CompuCredit generated through its Aspire Visa cards.

 Because CompuCredit and Jefferson Capital have acted as a common enterprise,

each of them is jointly and severally liable for the deceptive acts and practices and

other law violations alleged below that they have undertaken as a common

enterprise.  The common enterprise transacts or has transacted business in the

4

Northern District of Georgia, and a substantial part of the events or omissions giving rise to the claims asserted herein have occurred in the Northern District of Georgia.

## COMMERCE

9.     The acts and practices of Defendants alleged in this Complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' COURSE OF CONDUCT

10.     CompuCredit provides various consumer credit products and related financial services in the subprime credit market.  These products and services include, but are not limited to, credit cards, stored value cards, payday lending, auto-financing, and debt collection.  Jefferson Capital collects consumer debts it has purchased from creditors and other debt collectors and consumer debts owed to third parties.

11.     CompuCredit's credit card business consists principally of marketing, lending, servicing and debt collection activities.  Through contractual arrangements with various banks, CompuCredit has marketed subprime credit cards to

5

consumers under multiple brand names, including but not limited to "Aspire,"

"Aspire A Mas," "FreedomCard," "Tribute," "Imagine," "Majestic," "Aspen,"

"Emerge" and "Fingerhut Credit Advantage."   The banks with which

CompuCredit has contracted to market these cards include but are not limited to

Columbus Bank & Trust Company ("CB&T"), which has issued a significant

number of CompuCredit's subprime cards.  The banks with which CompuCredit

has contracted are supervised by various federal banking agencies, including but

not limited to the Federal Deposit Insurance Corporation ("FDIC"), the Office of

Thrift Supervision ("OTS"), and the Office of the Comptroller of the Currency

("OCC").

　　　12.　　Under one or more of these contracts, CompuCredit has had the sole

and exclusive right to solicit applications for certain credit cards; has created,

designed, and distributed the marketing materials; established the credit cards'

terms and conditions; developed the underwriting and credit criteria; administered

the card programs; maintained customer service functions; and purchased all

account receivables (except for a one-time sum that has been retained by the bank,

e.g., in the case of CB&T, $1 million), including fees, finance charges and

principal balances on purchases and cash advances.  CompuCredit has assumed the

6

costs and risks for administering the credit card programs, and has represented and warranted to the banks, and has assumed contractual responsibility for ensuring, that all solicitation materials and the terms and conditions for its credit cards comply with all applicable laws.

13.    The banks with which CompuCredit has contracted have been the issuers of the credit cards and have had authority to review and approve the credit cards' terms and conditions, underwriting and credit criteria, and solicitation materials.  As the issuing banks, they have initially owned the account receivables, but on a daily basis, have transferred to CompuCredit 100% of the account receivables (except for a one-time sum that has been retained by the bank, *e.g.*, in the case of CB&T, $1 million).

**Overview**

14.    Since at least 2001, CompuCredit has marketed general purpose Visa credit cards to English-speaking and Spanish-speaking consumers across the country under several brand names under agreements with one or more banks.

15.    In numerous instances, as discussed below, CompuCredit misrepresented the credit limits on its credit cards, failed to disclose the up-front fees charged for some of its credit cards, and failed to disclose how certain

7

transactions could adversely affect the available credit on the credit cards. With regard to one of its programs, CompuCredit and Jefferson Capital misrepresented that consumers would receive immediately a credit card if they agreed to transfer an existing debt to the credit card.

16.    The "Aspire" Visa and "Majestic" Visa programs, issued by CB&T, and their solicitations, discussed below, are typical and illustrative of CompuCredit's business practices.

17.    The Aspire brand comprises two or more product lines, including what CompuCredit internally has named "Little Rock" accounts and "Core" accounts. CompuCredit markets "Little Rock" accounts to consumers with credit ratings on the lower end of the subprime spectrum. CompuCredit markets "Core" accounts to consumers with credit ratings that generally are below prime, but which are higher than those of consumers who are offered the Little Rock card.

18.    CompuCredit markets its "Majestic" Visa product to consumers with unpaid debt that has been charged-off by a prior creditor.

8

**Marketing the Aspire Little Rock Visa Program**

19.    Since approximately 2001, CompuCredit has marketed its Aspire

Little Rock Visa cards through numerous direct-mail solicitations, inbound and

outbound telemarketing, and on the Internet, including at www.aspireyes.com.

20.    As described below, CompuCredit's written solicitations for the

Aspire Little Rock Visa Card misled consumers into believing that they would

receive a Visa credit card with $300 in available credit.  In addition, CompuCredit

failed to disclose adequately significant up-front fees it charged consumers.  In

fact, CompuCredit assessed approximately $185 in up-front fees and reduced the

available credit to $115.  CompuCredit's ultimate disclosure of the fees in its

accompanying Summary of Terms did not cure the deception.

21.    CompuCredit has originated more than two million Aspire Little Rock

Visa card accounts for consumers who responded to these solicitations, assessing

approximately $185 in up-front fees at origination.  More than 1.1 million

consumers activated their accounts.

**Direct Mail Solicitations**

22.     In numerous instances, CompuCredit has sent direct mail solicitations
to consumers nationwide representing that consumers who received the solicitation
had been "Pre-Qualified" for an unsecured Visa credit card with no deposit
required, no deposit fee, and/or no application fee.

23.     In a typical and illustrative direct mail solicitation package,
CompuCredit has included a one-page cover letter; a one-page document entitled
"Visa Pre-Qualified Acceptance Certificate"; a folded insert entitled "Introducing:
the Aspire Visa Card," which is a different size and on a different color paper; and
a double-sided document with one side entitled "Summary of Credit Terms" and
the other side entitled "Terms of Offer."  CompuCredit has arranged these
materials in such a way that, as they are removed from the envelope, the cover
letter faces outward in one direction and the "Visa Pre-Qualified Acceptance
Certificate" (which includes the consumer's mailing address that appears in the
envelope's address window) faces outward in the other direction, with the
remaining materials sandwiched between them.

24.     On a typical and illustrative direct mail solicitation envelope,

CompuCredit has represented, in bold text, set aside from other text, and in a font

larger than much of the text of the contents of the envelope:

**We think you <u>deserve</u> <u>more</u> credit!**

(Emphasis in original).  In addition, CompuCredit has represented on the envelope,

in bold text, set aside from other text, and in a font larger than much of the text of

the contents of the envelope:

> ‣ **You're Pre-Qualified!**
> ‣ **No Deposit Required**

*See, e.g., Attachment A* [Aspire Little Rock Visa direct mail solicitation with
August 4, 2004 return date].

25.     In a typical and illustrative direct mail solicitation package,

CompuCredit also has represented, in the cover letter, at the top of the page, set

aside from other text, and in bold:

> **You're Pre-Qualified**
> ● **Unsecured Visa card**
> ● **Credit line increase within 6 months when you make your**
> **payments on time\*\***
> ● **No deposit required**
> ● **Rebuild your credit†**

After the heading described above, CompuCredit further states, "You have been
**PRE-QUALIFIED**\* for the Aspire Visa card with a credit limit of \$300\*. . . .
And unlike a secured credit card, your Aspire Visa ***does not require a deposit.***"
(Emphasis in original.)  At the bottom of the page, in a smaller font than the
representations described above and the main text of the letter, CompuCredit has
included several disclaimers, including a disclaimer after the "\*" symbol
instructing consumers to "[s]ee the enclosed insert which is incorporated here by
reference, for a Summary of Credit Terms and Terms of Offer.  This offer is
subject to further review of financial information.  Your available credit line may
be reduced by certain fees that will be billed directly to your account, including an
annual fee, an account opening fee, and an account maintenance fee, as described
in the Summary of Credit Terms."  The disclaimers after the "\*\*" and "†" symbols
explain, respectively, that consumers who make four minimum monthly payments
on time and remain in good standing will receive a credit line increase and that
CompuCredit will report the consumer's account balance to the three major credit
bureaus.  CompuCredit makes no other mention of fees in this typical and
illustrative cover letter.  *See, e.g., Attachment A.*

12

26.    In a typical and illustrative direct mail solicitation package, CompuCredit also has represented, in the one-page document entitled "Visa Pre-Qualified Acceptance Certificate," in bold text, set aside from other text, and in a font larger than the other text:

> **No Deposit Fee**
> **No Application Fee**
> **Pre-Qualified**

CompuCredit makes no other mention of fees in this typical and illustrative document entitled "Visa Pre-Qualified Acceptance Certificate." *See, e.g., Attachment A.*

27.    In a typical and illustrative direct mail solicitation package, CompuCredit also has represented, in the insert, in bold text, set aside from other text:

> **Benefits**
>
> **No deposit required**
> **Regular account review for credit line increases**
> **Acceptance at over 25 million locations worldwide**

and at the bottom of the page, set aside from other text, in bold:

> **You're Pre-Qualified!**

CompuCredit makes no mention of fees in this typical and illustrative insert. *See, e.g., Attachment A.*

28.    The "Summary of Credit Terms" included in a typical and illustrative direct mail solicitation package has included a "Schumer box" which reflected, in a small font, and printed among other information, an "Annual Fee" (typically $150), an "Account Opening Fee" (typically $29), and a "Monthly Maintenance Fee" (typically $6.50 or $7.50). This information has not been as clear or prominent as, or in any proximity to, CompuCredit's representations set forth above about the fees that did not apply. *See, e.g., Attachment A.*

29.    As a result, CompuCredit did not inform many consumers about applicable fees, nor did they explain that the consumers' $300 credit limit would be reduced by these fees, resulting in an available credit limit of approximately $115.

30.    In a typical and illustrative direct mail solicitation, CompuCredit has instructed consumers who are interested in requesting an Aspire Visa card to complete and return the "Acceptance Certificate," or for faster processing, to call a toll-free telephone number or visit CompuCredit at www.aspireyes.com. *See, e.g., Attachment A.*

14

31.    Although CompuCredit modified certain aspects of its solicitations over time, the modifications, discussed below, did not cure the misleading and/or deceptive claims.

32.    For example, at or near the end of 2004, CompuCredit added a notation below the Schumer box that calculated the amount of available credit that would remain after CompuCredit deducted its fees.  However, the footnote was printed in small, compact text; was placed below another footnote describing an unrelated issue (the consumer's "Pre-Qualified Status"); and was "dangling"   *i.e.,* not linked to any text in the Schumer box.  The modification did not substantially alter the solicitation and did not cure the misleading impression created by the rest of the solicitation that consumers would receive $300 in available credit when they received the card.  *See, e.g., Attachment B* [Aspire Little Rock Visa direct mail solicitation with March 3, 2005 return date].

33.    At or near mid-2005, CompuCredit changed the footnotes on the cover letter so that only one larger footnote appeared, referring consumers to the reverse side of the letter for "important information," including "fee and credit limit details."  The reverse side of the cover letter, however, did not provide the promised details, but referred consumers to the "Summary of Credit Terms."

15

These modifications did not inform many consumers about the applicable fees and that the credit limit would be reduced by these fees in a manner that consumers could understand or notice. *See, e.g., Attachment C* [Aspire Little Rock Visa direct mail solicitation with June 22, 2005 return date].

34.     At or near the beginning of 2006, CompuCredit eliminated all reference to "fee and credit limit details" from the front of the cover letter, and changed the reverse side of the cover letter to state that consumers' credit lines "will" be reduced by certain fees.  These modifications did not inform many consumers about applicable fees in a manner that consumers could understand or notice. *See, e.g., Attachment D* [Aspire Little Rock Visa direct mail solicitation with April 25, 2006 return date].

**Telemarketing**

35.     For those consumers who have called the toll-free number to apply for a Little Rock card, in numerous instances, telemarketers following CompuCredit-provided scripts have not disclosed the fees that are applicable unless asked. Instead, CompuCredit telemarketers following the scripts have told consumers they were required to "send your $20 first payment in order to use your card."

36.    In some instances, even if consumers have requested that a phone agent verify the terms and conditions of the card, agents responded by providing a lengthy explanation of the APR, including how the APR is calculated based on the prime rate, where in the Wall Street Journal the prime rate is published and on what day, as well as the mechanics of calculating increases in the APR based on the prime rate in the event of serious delinquency.

**Internet**

37.    In numerous instances, consumers who have applied for the Little Rock Visa card online have been required to navigate through eight screens, provide sensitive personal information, and actually apply for the card, without ever being informed of the fees.  Only after completing these steps have the fees been disclosed on a screen that asks consumers to accept the card offer.

**Card Fulfillment Materials**

38.    In numerous instances, after consumers have completed the application process and have been approved for a Little Rock Visa card, CompuCredit has mailed them a fulfillment package including a credit card that has not been activated; a card carrier page with a perforated payment coupon at the

bottom; a return-payment envelope; and a copy of the Bank Credit Card

Agreement.

39.    In a typical and illustrative fulfillment package, CompuCredit has

represented, on the top half of the card carrier page, in boldfaced print:

**Your New Aspire Visa Gold Card Has Arrived........**

**To Begin Using it.....**

1. **Make your $20 initial payment\*...**
2. **Allow 7-10 days for payment processing.**
3. **Call to verify receipt of your card....**
4. **Your card is now fully activated and is ready to be used.**

Separate from these representations, the card carrier states, "**Activate Your Card**

**Today!**" Below these representations is a perforation line and an instruction to

detach and return the lower part with the initial payment. Although the card carrier

instructs consumers to "**Make your $20 initial payment\*,**" there is nothing on the

front of the card carrier page explaining what the asterisk means. The front of the

card carrier page does state, in small type just above the perforation line, "See

Summary of Terms and any additional disclosures on the back." The reverse side

of the card carrier page reflects, in a small font, in a box with other information, an

"Annual Fee" (typically $150), an "Account Opening Fee" (typically $29), and a

18

"Monthly Maintenance Fee" (typically $6.50 or $7.50). This information has not been as clear or prominent as, or in any proximity to, CompuCredit's representations set forth above. *See, e.g., Attachment E* [Aspire Little Rock Visa credit card carrier].

40.    In numerous instances, consumers who received this typical and illustrative card carrier were led to believe that they were obligated to make only a $20 payment, not $185 in up-front fees, for the card.

**Marketing the Aspire Core Visa Program**

41.    Since at least 2001, CompuCredit has marketed Aspire Core Visa cards through numerous direct-mail solicitations, inbound telemarketing, and on the Internet, including at www.aspireyes.com.

42.    As described below, CompuCredit's written solicitations for the Aspire Core Visa card mislead consumers into believing that they would receive credit cards with available credit up to a certain amount and that the card could be used for any purpose, including cash advances. In fact, CompuCredit withheld half of the available credit until the fourth month after card activation. Further, CompuCredit used a behavior scoring model to review cardholders' use of the card and it reduced cardholders' credit limits if the cardholders used their cards for

certain purposes, including one of the touted benefits of the card, obtaining cash advances.

43.    CompuCredit has originated more than four million Aspire Core Visa credit card accounts for consumers who responded to these solicitations.

**Direct Mail Solicitations**

44.    Since at least 1997, CompuCredit has sent to consumers nationwide Core Visa card direct mail solicitations representing that consumers were "Pre-Qualified" to receive an Aspire Visa card.

45.    In a typical and illustrative Aspire Core Visa card direct mail solicitation package sent to consumers from at least 2001 through at least early 2005, CompuCredit included a double-sided cover letter, a one-page document entitled "Visa Gold Pre-Qualified Acceptance Certificate," and a double-sided document with one side entitled "Summary of Credit Terms" and the other side entitled "Terms of Offer."  CompuCredit has arranged these materials in such a way that, as they are removed from the envelope, the cover letter faces outward in one direction and the "Visa Pre-Qualified Acceptance Certificate" (which includes the consumer's mailing address that appears in the envelope's address window) faces outward in the other direction, with the remaining materials sandwiched

between them.  *See, e.g., Attachment F* [Aspire Core Visa direct mail solicitation with April 18, 2005 return date].

46.     On a typical and illustrative Core Visa card direct mail solicitation envelope sent to consumers through at least early 2005, CompuCredit represented, in bold text, set aside from other text, and in a font larger than much of the text of the contents of the envelope:

**No Annual Fee        No Application Fee**
Credit line up to:
**$3,250**

*See, e.g., Attachment F.*

47.     In a typical and illustrative Core Visa card direct mail solicitation cover letter sent to consumers through at least early 2005, CompuCredit also represented, on the front side of the letter:

**YOU** have earned a new Aspire Visa Gold card.  It can be used at millions of places around the world, and it costs you nothing to send for your card.

- **No deposit fee***
- **No application fee**
- **Great credit line!**

Use your new credit card to buy the things you want right away, or to get money from most cash machines.

At the bottom of the page, in a smaller font than the representations described above and the main text of the letter, CompuCredit has included several disclaimers, including a disclaimer after the "*" symbol instructing consumers to "[s]ee the enclosed insert which is incorporated here by a reference for a Summary of Credit Terms and Terms of Offer. This offer is subject to further review of financial information." The only other disclaimer on the page, in a small font, after the "†" symbol, explains that certain restrictions, limitations, and exclusions may apply to promised benefits such as auto rental insurance and extended warranty service. *See, e.g., Attachment F.*

48.     On the back side of the typical and illustrative Core Visa card direct mail solicitation cover letter sent to consumers through at least early 2005, CompuCredit also represented:

> ▸     Great Credit Line    up to the total on the Acceptance Certificate. Plus, as long as you are an active customer in good standing, we will review your account for increases periodically.

At the bottom of the page, in a smaller font than the representations described above and the main text of the letter, CompuCredit has included disclaimers, including a disclaimer after the "*" symbol instructing consumers to "[s]ee the enclosed insert which is incorporated here by a reference for a Summary of Credit

Terms and Terms of Offer.  This offer is subject to further review of financial information."  The only other disclaimer on the page, in a small font, after the "†" symbol, states that certain restrictions, limitations, and exclusions may apply.  *See, e.g., Attachment F.*

49.    In a typical and illustrative Core Visa card direct mail solicitation sent to consumers through at least early 2005, CompuCredit also represented, in the one-page document entitled "Visa Pre-Qualified Acceptance Certificate," in bold text, set aside from other text, and in a font larger than the other text:

**No Annual Fee        No Application Fee**
Credit line up to:
**$3,250**

There are no disclaimers on the Acceptance Certificate.  *See, e.g., Attachment F.*

50.    None of the documents included in the typical and illustrative direct mail solicitation package sent to consumers through early 2005 disclosed that CompuCredit would permit consumers to use only half of the credit line they purportedly had been granted until the fourth month after card activation, or that CompuCredit might decrease the credit line based on how consumers used their cards.

51.    In early 2005, CompuCredit revised its Core Visa card direct mail solicitation cover letter.  In at least one revised typical and illustrative cover letter, CompuCredit represented, on the front side of the letter:

> **YOU** have earned a new Aspire Visa Gold card.  It can be used at millions of places around the world, and it costs you nothing to send for your card.
>
> - **No deposit***
> - **No application fee**
> - **Great credit line! ****
>
> Use your new credit card to buy the things you want right away, or to get money from most cash machines.

At the bottom of the page, in a smaller font than the representations described above, CompuCredit included several disclaimers, including a disclaimer after the "*" symbol instructing consumers to "[s]ee the enclosed insert which is incorporated here by a reference for a Summary of Credit Terms and Terms of Offer.  This offer is subject to further review of financial information." CompuCredit added a disclaimer on the bottom of the page, in a small font, after the "**" symbol, that "[f]ifty percent of your initial credit limit will be available to you as soon as your card is activated.  Provided that your account had been used and maintained in a satisfactory manner, your entire initial credit line will be

available to you on the first day of the fourth month following your account

opening date." *See, e.g., Attachment G* [Aspire Core Visa direct mail solicitation

with May 24, 2005 return date].

    52.    On the back side, CompuCredit also represented:

▸    No deposit    you do not have to send any money to get your Visa®
Gold card.

▸    Great Credit Line*    up to the total on the Acceptance Certificate.
Plus, as long as you are an active customer in good standing, we will
raise the amount as soon as we can.

At the bottom of the page, in a smaller font than the representations described

above, CompuCredit has included several disclaimers, including a disclaimer after

the "*" symbol, that "[f]ifty percent of your initial credit limit will be available to

you as soon as your card is activated.  Provided that your account had been used

and maintained in a satisfactory manner, your entire initial credit line will be

available to you on the first day of the fourth month following your account

opening date."  The "**" symbol instructs consumers to "[s]ee the enclosed insert

which is incorporated here by a reference for a Summary of Credit Terms and

Terms of Offer.  This offer is subject to further review of financial information."

*See, e.g., Attachment G.*

53.     On the Terms of Offer page, CompuCredit represented in a banner at the top of the page, folded to form a cover for the entire insert:

No Annual Fee • Pre-Qualified • No Hassle

The body of the revised Terms of Offer page contained dense text printed in a small font.  In the middle of the page, CompuCredit inserted a disclaimer that "[w]e reserve the right to change (to set, increase, decrease or remove) the credit limit for your account and/or for different types of account balances from time to time.  Such changes may occur without prior written notice to you and may be based upon factors including, but not limited to, anti-fraud policies and procedures, behavior scoring, your credit history with us or with other creditors and/or changes in this or other card programs or bank policy." *See, e.g., Attachment G.*

54.     Although at least one typical and illustrative cover letter revised in early 2005 included the disclaimer that CompuCredit could decrease the credit limit based on behavior scoring, the disclaimers were not made in a clear and prominent manner that consumers would understand or notice.

55.     In a typical and illustrative Aspire Core Visa card direct mail solicitation, CompuCredit has instructed consumers who are interested in requesting an Aspire Visa card to complete and return the "Acceptance

26

Certificate," or for faster processing, to call a toll-free telephone number or visit CompuCredit at www.aspireyes.com.

56.    For those consumers who called the toll-free number, CompuCredit has employed a telephone script that avoided disclosure of the fact that CompuCredit would permit consumers to use only half of the credit line they purportedly had been granted until the fourth month after card activation.  Instead, CompuCredit's phone agents have first collected all of the consumers' application information, attempted to sell consumers various services that would be billed directly to the card, and provided a lengthy explanation of the APR, the grace period, the USA Patriot Act and the method of computing finance charges, before disclosing that the consumers would have access to only half of their credit line until the fourth month.

**Card Fulfillment Materials**

57.    After consumers who have completed the Core Visa card application process have been approved, CompuCredit has mailed them a Visa card accompanied by a card carrier that sets forth, in bold print at the top of the page, the full amount of the credit limit CompuCredit purportedly has granted.  The card carrier also has instructed consumers on how to activate the card, has set forth,

often in bold print, the benefits of using the card, and has represented in prominent text set apart from other text on the page, "It's your credit     use it whenever and wherever you want!" In numerous instances, however, the card carrier has not disclosed, or has disclosed inconspicuously in fine print, that CompuCredit would permit consumers to use only half of the credit line they purportedly had been granted until the fourth month after card activation. *See, e.g., Attachment H* [Aspire Core Visa card carrier].

58.    In addition, in numerous instances, the fulfillment materials have represented, in boldface type on the front page, that the consumer would enjoy "**Instant Cash access**" as a primary "cardholder benefit[]" after activating the card. *See, e.g., Attachment H.*

**Marketing the Majestic Visa Program**

59.    Since approximately 2004, CompuCredit has marketed Visa credit cards to consumers with unpaid debts that have been charged off by prior creditors, including debts that were no longer subject to suit under the applicable statute of limitations and debts that were no longer being reported by consumer reporting agencies because they were outside the seven-year limitation period set forth in Section 605 of the FCRA, 15 U.S.C. § 1681c.

28

60.    The "Majestic" Visa program and its solicitations, discussed below,
are typical and illustrative of CompuCredit's business practices in this regard.

61.    As described below, CompuCredit's written solicitations for the
Majestic Visa program mislead consumers who had prior unpaid debts into
believing that they immediately would receive new credit cards with their prior
unpaid debts transferred to the new cards and reported to consumer reporting
agencies as paid in full.  In truth, consumers accepting these cards essentially
signed up for repayment programs for their old debt.  In fact, consumers did not
qualify for the new cards until they paid 25-50% of their old debt balances.
Further, even if they paid the required portion of the old debt balances the credit
lines received only equaled 5% of the original debt amounts.

62.    CompuCredit has marketed the Majestic Visa card with its wholly-
owned debt collection subsidiary, Jefferson Capital.  Jefferson Capital has sent
letters to more than 3.6 million consumers representing that their charged-off
"account has been placed by [a third-party debt purchaser or creditor] with us for
collection" or specifying the amount of a charged-off debt owed on a consumer's
Aspire Visa account.  In these letters, Jefferson Capital has told consumers that it is
"pleased to provide you with an opportunity to satisfy this debt and enjoy the

convenience and benefits of a new Visa card." Jefferson Capital also has represented that "[w]hen you accept the accompanying offer and are approved, the Amount Due shown above will be transferred to a new Majestic Visa account at a fixed 0% APR as the first transaction on the new account." *See, e.g., Attachment I* [Majestic Visa direct mail solicitation with July 18, 2005 return date].

63.    Enclosed with these letters has been a CompuCredit Majestic Visa solicitation insert that has told consumers to **"Sign Up Today!"** and "Get a new start with the Majestic Fresh Start Solution and pre-approved unsecured Visa card. Soon you can enjoy all the convenience and benefits Visa has to offer." The solicitation also has told consumers that the card will have "Available Credit for Purchases and Cash Advances." *See, e.g., Attachment I.*

64.    Neither the Jefferson Capital letter nor the Majestic Visa solicitation insert has disclosed to consumers that CompuCredit was both the parent company of Jefferson Capital and the company responsible for marketing the Majestic Visa card.

65.    In numerous instances, Jefferson Capital's letter and the Majestic Visa solicitation insert have led consumers to believe they would immediately receive a Majestic Visa card upon acceptance of their "Pre-Approved" application.

66.    In fact, consumers have not immediately received a Majestic Visa card.  Instead, they have been required to pay twenty-five to fifty percent of the balance on their old debt before CompuCredit provides them with a Majestic Visa card.  This process has taken anywhere from several months to a year if consumers make payments according to CompuCredit's suggested schedule.

67.    In numerous instances, the Majestic Visa solicitation package also has led consumers to believe that their old debt balance would be immediately transferred to a Majestic Visa card and reported to consumer reporting agencies as "paid in full."  Jefferson Capital's letter has told consumers that their old debt "balance will be transferred to a new Majestic Visa account as the first transaction on your new account."  The letter further has represented that "[a]s an added bonus, once you qualify to receive a Majestic Visa card, we will see to it that the credit bureaus are notified that your former account has been paid in full."  The Majestic Visa solicitation insert has reinforced this representation, stating "once

31

you qualify for a Majestic Visa card, credit bureaus will be notified that your former charged-off account has been paid in full."

68.     In fact, Jefferson Capital has not transferred consumers' debt balances to a Majestic Visa "as the first transaction on [the] new account" or reported the old debt as paid in full when consumers opened an account.  Instead, Jefferson Capital has required consumers to pay the aforementioned twenty-five to fifty percent of the old debt balance before transferring the remaining balance to a Majestic Visa card and reporting the old debt as paid in full.  The program thus has required numerous up-front debt payments prior to any balance transfer.

69.     Jefferson Capital and CompuCredit also have led consumers to believe that by accepting the Majestic Visa card offer, their formerly charged-off debt would be satisfied and they would be building new credit.  In fact, for a significant period of time, the Majestic Visa program itself has been a debt collection device, not new credit.  Consumers have been required to pay twenty-five to fifty percent of the balance on their old debt to Jefferson Capital over a period of as much as a year before CompuCredit has provided any of the benefits of a Majestic Visa card (whether by arranging for issuance of the card, transferring the old debt balance to the card, or reporting that the debt had been paid in full to

consumer reporting agencies).  During this time, the Majestic Visa program has operated as a debt repayment plan for the charged-off receivables.

**Servicing Aspire and Majestic Visa Accounts**

70.    CompuCredit has maintained and serviced Aspire and Majestic Visa accounts.  As a credit card account servicer, CompuCredit directly or indirectly collects and processes consumers' payments, including annual and monthly maintenance fees, and assesses, collects, and processes late-payment and over-the-limit fees.  In addition, CompuCredit provides customer service functions, including providing a customer service telephone number.

**Aspire Little Rock Visa Annual and Monthly Maintenance Fees**

71.    In numerous instances, shortly after a consumer has received Little Rock Visa card fulfillment materials, the consumer also has received an initial credit card account statement claiming that the consumer owes a $20 "minimum payment."  These statements also show, for the first time, that the consumer is being charged the full amount of the annual fee, the account opening fee and the first monthly maintenance fee up-front and regardless of whether the consumer has actually used the card.

33

72.    In subsequent months, CompuCredit has sent statements to consumers who have not yet made the $20 "minimum payment" showing that the payment has doubled to $40 (in the second month) and tripled to $60 (in the third month). These statements have reflected that payments are "past due."

### Denying Consumers Access to Half of Their Core Visa Credit Lines and Reducing Consumers' Core Visa Credit Lines

73.    In numerous instances, CompuCredit has denied Aspire Core Visa card holders the use of half of the credit lines they purportedly were extended until the fourth month after the account has been activated.

74.    In numerous instances, CompuCredit also has reduced Aspire Core Visa card holders' credit limits, often prior to the fourth month after activation, when CompuCredit otherwise would have given consumers access to the full credit line CompuCredit purportedly had extended.

75.    CompuCredit has based these credit line reductions on an undisclosed "behavioral" scoring model that penalized consumers for using their cards for certain types of transactions, including transactions touted in their solicitation materials such as cash advances and transactions with the following types of merchants:

34

- Direct marketing merchants

- Marriage counselors

- Personal counselors

- Automobile tire retreading and repair shops

- Bars and night clubs

- Pool and billiard establishments

- Pawn shops

- Massage parlors.

76.    In some instances, CompuCredit reduced subscribers' credit limits to levels below their existing balances and then charged over-limit fees.

**Handling Customer Service Telephone Calls**

77.    In many instances, consumers who have called CompuCredit's customer service centers could access only an automated telephone response system that asked for an account number.  Based on the number entered, consumers whose accounts had been classified as past due were not provided the option to reach a live operator.

78.    Regardless of the payment status of consumers' accounts, in numerous instances, consumers who have called CompuCredit's customer service

centers have been unable to navigate the phone system in order to reach a live

operator. As a result, consumers have complained that they have been unable to

address card-related problems, questions, or other issues, such as disputing

erroneous fees and charges, CompuCredit's failure to timely post consumers'

payments, and requesting cancellation of their cards as a result of these problems.

**Debt Collection Practices**

79.    CompuCredit's wholly-owned subsidiary, Jefferson Capital, has

purchased debt already in default and collected on that debt. Jefferson Capital also

has collected on consumer debts owed or due another, or asserted to be owed or

due another. In addition, Jefferson Capital has collected on debts owed or due to

CompuCredit, or asserted to be owed or due to CompuCredit, including using the

Jefferson Capital trade name without identifying that Jefferson Capital is affiliated

with CompuCredit.

80.    In numerous instances, Jefferson Capital, through its agents, has made

debt collection calls on behalf of itself, CompuCredit, and other creditors to

individual consumers in excess of twenty times per day, in some cases, at intervals

of only twenty to thirty minutes. Jefferson Capital, through its agents, also has

called consumers before 8:00 a.m. or after 9:00 p.m., and on Sundays. Telephone

agents have responded to requests to stop such calls by stating that they would call anytime they felt like it.

81.     In numerous instances in connection with the collection of debts on behalf of CompuCredit and other creditors, Jefferson Capital, through its agents, has called the human resources departments at consumers' places of work; has continued calling consumers after receiving notice that the consumers were represented by counsel; and has used abusive language.

## FEDERAL TRADE COMMISSION ACT VIOLATIONS

82.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." Misrepresentations of material fact constitute deceptive acts or practices prohibited by the FTC Act.

### Count I: Misrepresentation of Available Credit

83.     In the course and conduct of offering and extending credit under one or more credit card programs, including but not limited to the Aspire Core and the Aspire Little Rock Visa programs, CompuCredit has represented, expressly or by implication, that consumers have been pre-qualified to obtain a specified amount of available credit by opening a Visa credit card account.

84.    In truth and in fact, consumers who responded to the solicitations and opened a Visa credit card account did not receive the represented amount of available credit. Therefore, CompuCredit's representation as alleged in paragraph 83 is false or misleading.

85.    CompuCredit's practices constitute deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II:  Failure to Disclose Fees

86.    In the course and conduct of offering and extending credit under one or more credit card programs, including but not limited to the Aspire Little Rock Visa program, CompuCredit has represented, expressly or by implication, among other things, that consumers were "Pre-Qualified" to obtain a specified amount of available credit with "No deposit required," "No Deposit Fee," and "No Application Fee."

87.    CompuCredit has failed to disclose, or has failed to disclose adequately, that it would impose substantial up-front fees, including an annual fee, an account opening fee, and a monthly maintenance fee.

88.    In light of the representations set forth in Paragraph 86, CompuCredit's failure to disclose, or failure to disclose adequately, the material

38

information set forth in Paragraph 87, is a deceptive act or practice in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count III:  Failure to Disclose How Use of The Credit Card Adversely Affects Available Credit

89.     In the course and conduct of offering and extending credit in one or

more credit card programs, including but not limited to the Aspire Core program,

CompuCredit has represented, expressly or by implication, among other things,

that consumers have been "Pre-Qualified" to obtain credit of "up to" a specified

limit and that active customers in good standing will be considered for periodic

increases in available credit.  CompuCredit further has represented that consumers

can use the card for specified transactions and benefits.

90.     CompuCredit has failed to disclose, or has failed to disclose

adequately, that it was employing a behavioral scoring model that reduced

consumers' credit lines if they used their cards for certain types of transactions,

including transactions expressly mentioned in the solicitations.

91.     In light of the representations set forth in Paragraph 89,

CompuCredit's failure to disclose, or failure to disclose adequately, the material

information set forth in Paragraph 90, is a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV:  Misrepresentation of Debt Collection Program

92.    In the course and conduct of marketing one or more credit cards, including but not limited to the Majestic Visa card, Defendants have represented, expressly or by implication, among other things, that upon acceptance of a consumer's "Pre-Approved" application, the consumer would immediately receive a Visa Card, the consumer's old debt balance would be immediately transferred to the card and be reported to consumer reporting agencies as "paid in full," and the consumer's formerly charged-off debt would be satisfied and the consumer would build new credit.

93.    In truth and in fact, upon acceptance of consumers' pre-approved applications, Defendants have not immediately extended to consumers a Visa card, transferred consumers' old debt balances to the card, reported the old debt as "paid in full" to consumer reporting agencies, and satisfied consumers' formerly charged-off debt, allowing them to build new credit.  Therefore, Defendants' representations as alleged in Paragraph 92 are false or misleading.

94.    Defendants' practices constitute deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## FAIR DEBT COLLECTION PRACTICES ACT VIOLATIONS

95.    In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692-1692p, which became effective on March 20, 1978, and has been in force ever since that date.  Section 814 of the FDCPA, 15 U.S.C. § 1692*l*, provides that a violation of the FDCPA shall be deemed an unfair or deceptive act or practice in violation of the FTC Act.

## Count V:  Misrepresentations

96.    On numerous occasions, in connection with the collection of debts, Jefferson Capital has used false, deceptive, or misleading representations or means, in violation of Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), including, but not limited to, representing expressly or by implication, among other things, that upon acceptance of a consumer's "Pre-Approved" application, the consumer would immediately receive a Visa Card, the consumer's old debt balance would be immediately transferred to the card and be reported to consumer reporting agencies as "paid in full," and the consumer's formerly charged-off debt would be satisfied and the consumer would build new credit.

41

## Count VI:  Abusive Collection Practices

97.    In connection with the collection of debts, Jefferson Capital has

engaged in conduct the natural consequence of which is to harass, oppress, or

abuse a person, in violation of Section 806 of the FDCPA, 15 U.S.C. § 1692d,

including, but not limited to:

(a)    Using obscene or profane language or language the natural

consequence of which is to abuse the hearer, in violation of Section

806(2) of the FDCPA, 15 U.S.C. § 1692d(2); and

(b)    Causing a telephone to ring or engaging a person in telephone

conversation repeatedly or continuously with the intent to annoy,

abuse, or harass a person at the number called, in violation of Section

806(5) of the FDCPA, 15 U.S.C. § 1692d(5).

## CONSUMER INJURY

98.    Consumers have suffered, and will continue to suffer, substantial

injury as a result of Defendants' violations of Section 5(a) of the FTC Act and the

FDCPA, as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Federal Trade Commission requests that the Court, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 814 of the FDCPA, 15 U.S.C. § 1692*l*, and the Court's own equitable powers:

(a)    Enter a permanent injunction to prevent future violations of the FTC Act and the FDCPA;

(b)    Award such relief as the Court finds necessary to prevent unjust enrichment and to redress injury to consumers resulting from Defendants' violations of the FTC Act and the FDCPA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

(c)    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

DATED: *June 10, 2008*

                              Respectfully submitted,

                              William Blumenthal
                              General Counsel

                              Peggy L. Twohig
                              Associate Director for Financial Practices

                              James Reilly Dolan
Local Counsel:                Assistant Director for Financial Practices


_Chris M. Couillou_           _Mel Glassman_
Chris M. Couillou             Mark L. Glassman
Georgia Bar No. 190062        Virginia State Bar No. 42794
(404) 656-1353                District of Columbia Bar No. 463831
                              (202) 326-2826 (direct)

Southeast Region              Katherine M. Worthman
Federal Trade Commission      District of Columbia Bar No. 488800
Suite 1500                    (202) 326-2764 (direct)
225 Peachtree Street, N.E.
Atlanta, Georgia 30303        Attorneys for Plaintiff
(404) 656-1390 (general)      Federal Trade Commission
(404) 656-1379 (facsimile)    600 Pennsylvania Avenue, N.W.
                              Mail Stop NJ-3158
                              Washington, D.C.  20580
                              (202) 326-3224 (general)
                              (202) 326-3768 (facsimile)

                              44

# EXHIBIT D

FDIC Home - Federal Deposit Insurance Corporation
FDIC Home - Federal Deposit Insurance Corporation
Enter Search Text Submit Search
| Search
Advanced Search

| Skip Site Summary Navigation | Home | Deposit Insurance | Consumer Protection | Industry Analysis | Regulations & Examinations | Asset Sales | News & Events | About FDIC |

Home > Consumer Protection > Consumer News & Information > Fostering Consumer Confidence in Banking

## Fostering Consumer Confidence in Banking

Skip Left Navigation Links
0
Home
FDIC's Responsibility
Role of Consumer Affairs
How to File a Complaint
If Your Bank is Supervised by the FDIC
Regulatory Agencies
Mission Statement
En Español

**What is the Role of Consumer Affairs?**
Our statutory mandate is to promote and enforce compliance by FDIC supervised banks with federal consumer protection laws, including those relating to fair lending and unfair and deceptive practices. We carry out our mission by:

- Investigating consumer complaints involving the banks we supervise.
- Responding to inquiries from the public and from financial institutions about consumer protection and fair lending matters.
- Educating consumers about their rights under federal consumer protection laws and regulations through outreach.
- Monitoring the public's perception of banking and consumer protection matters, and identifying trends that may affect consumer rights and protections.
- Participating in the formulation of consumer related regulations, policies, and procedures.

If we determine, based on our review of an issue, that contacting an individual's bank is not required, one can expect a final response in approximately 15 days or less. If, however, a complaint necessitates contacting a bank to gather information about a complicated matter, or a matter involving illegal credit discrimination, a final response may take longer.

**Is the Role of the Consumer Affairs Branch Limited in Any Way?**
Our scope of authority does not ordinarily extend to the resolution of complaints involving factual disputes or contractual matters, or matters that have been or are in the process of being litigated.

Last Updated 04/21/2008

consumeralerts@fdic.gov

Home  Contact Us  Search  Help  SiteMap  Forms
Freedom of Information Act (FOIA) Service Center  Website Policies  USA.gov
FDIC Office of Inspector General

# EXHIBIT E



# FDIC
**Federal Deposit Insurance Corporation**
Division of Supervision and Consumer Protection
2345 Grand Boulevard, Suite 100
Kansas City, MO 64108

Consumer Response Center
1-800-378-9581

July 13, 2005

# REDACTED

Re:   Columbus Bank and Trust Company (Aspire)
        Columbus, Georgia

This letter is in response to your correspondence and documentation provided to this office by Aspire regarding a credit card solicitation you received. Columbus Bank and Trust Company issues the Aspire credit card. Aspire replied directly to our office regarding this matter on June 24, 2005. A copy of that response is enclosed.

Banking institutions routinely solicit new accounts by sending out pre-approved offers. However, these offers include a statement to the effect that offers are subject to "final approval." This statement gives the bank an opportunity for a final review of your completed application before approving your account. Documentation provided by Aspire indicates this is the type of solicitation you received.

Federal law does not restrict the type and amount of fees and service charges that a creditor may impose on a credit card account. However, the Federal Reserve Board's Regulation Z (Regulation Z) which implements the federal Truth in Lending Act, does require creditors to provide certain disclosures with a credit card offer. Documentation provided by Aspire indicates the offer you received was for a $300 credit card. This offer indicated that a $150 annual fee, $29 account opening fee, and $6.50 monthly maintenance fee would be billed on your first statement. This offer also disclosed that a minimum monthly payment of $20 was due upon receipt to activate your account.

Aspire indicates it closed your account per your request on _____. Aspire also credited all billed fees leaving your closed account with a zero balance. A copy of Aspire's credit card solicitation is enclosed.

Thank you for bring this matter to our attention. The enclosed brochures contain helpful information regarding credit cards. We trust this is responsive to your concerns.

Sincerely,

Karen Porter
Consumer Affairs Specialist

Enclosures (4)

Cc:    Columbus Bank and Trust Company (Aspire)

EXHIBIT F

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

### District of Columbia

FEDERAL TRADE COMISSION

V.

COMPUCREDIT CORPORATION
and JEFERSON CAPITAL SYSTEMS, LLC

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 1:08-cv-1976 (BBM)
U.S. District Court, Northern
District of Georgia

TO:  Executive Secretary
     FDIC
     550 17th Street, NW.
     Washington, DC 20429

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE    Kirkland & Ellis LLP, 655 15th St., N.W., Suite 1200, Washington, D.C. 20005 | DATE AND TIME    7/28/2008 5:00 pm |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE    7/3/92 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Michael F. Williams, Kirkland & Ellis LLP, 655 15th St., N.W., Suite 1200, Washington, D.C. 20005 (202) 879-5000

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 7/3/2008 | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Marguerite Sagatelian & Thomas Feeney, FDIC, WDC | Email & Federal Express - per agreement of counsel |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Brittany Whitesell | Associate, Kirkland & Ellis LLP |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___7/3/08___
DATE

_Brittany P. Whitesell_
SIGNATURE OF SERVER

Kirkland & Ellis LLP, 655 15th St., NW,
ADDRESS OF SERVER

Washington, D.C. 20005

---

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A

## DEFINITIONS

The following terms and definitions apply to these Requests for Production ("Requests"):

(a)     "CB&T" means Columbus Bank & Trust, N.A., and each of its present and former affiliates, agents, assigns, directors, representatives, employees, predecessors, successors and representatives, and each person acting or purporting to act on its behalf.

(b)     "Communication" means any oral or written utterance, notation or statement of any nature whatsoever, by and to whomever made, including, but not limited to, correspondence, conversations, dialogues, discussions, interviews, consultations and other understandings between or among two or more persons.

(c)     "CompuCredit" means CompuCredit, and each of its present and former affiliates, agents, assigns, directors, representatives, employees, predecessors, successors and representatives, and each person acting or purporting to act on its behalf.

(d)     "Document" means the original (or a copy if the original is not available) and each non-identical copy (which is non-identical because of alterations, attachments, blanks, comments, notes, underlining or otherwise) of any tangible writing or record, however described, which may include without limitation any account, agreement, amendment, article, authorization, bank statement, book, chart, check, contract, correspondence, diary, drawing, email, film, tape, graph, invoice, journal, letter, memoranda, minutes, note, work papers, studies, notebook, photocopy, photograph, projection, publication, recording, report, schedule, sketch, tape, telegram, transcript, voucher, videotape or otherwise and all retrievable data (whether encarded,

taped or encoded electrostatically, electromagnetically or otherwise) in your possession, custody or control, or known to you, wherever located, however produced or reproduced, whether draft or final version. Further, Document shall include any and all information filed or stored in SOURCE, including but not limited to, any additions, deletions or other modifications to any information that was at any time filed or stored in SOURCE as well as any information sufficient to identify such additions, deletions or other modifications.

(e)    "FBD" means First Bank of Delaware and each of its present and former affiliates, agents, assigns, directors, representatives, employees, predecessors, successors and representatives, and each person acting or purporting to act on its behalf.

(f)    "FB&T" means First Bank & Trust and each of its present and former affiliates, agents, assigns, directors, representatives, employees, predecessors, successors and representatives, and each person acting or purporting to act on its behalf.

(g)    "FDIC" means the Federal Deposit Insurance Corporation, including its agents, consultants, employees, executives, representatives and any other person(s) acting or purporting to act for or on the Federal Deposit Insurance Corporation's behalf.

(h)    "Federal Reserve" means the Board of Governors of the Federal Reserve, including its agents, consultants, employees, executives, representatives and any other person(s) acting or purporting to act for or on the Board of Governors of the Federal Reserve's behalf.

(i)    "Identification" or "identify" when used in reference to:

(i)    a natural individual, requires you to state his or her full name, address and telephone number;

2

(ii)     a corporation, requires you to state its full corporate name, any names under which it does business and its state of incorporation;

(iii)    a partnership, requires you to state its full name, any name under which it does business, the state of any certificate of partnership (or other similar document) filing and the address of its principal place of business;

(iv)    a document, requires you to state the document litigation number or Bates number, if applicable, otherwise the number of pages and the nature of the document (e.g., letter, memorandum, etc.), its title, its date, the name or names of its authors and recipients and its present location or custodian;

(v)     a communication, requires you, if any part of the communication was written, to identify the document or documents which refer to, relate to or evidence the communication, and, to the extent that the communication was non-written, to identify the persons participating in or witnessing the communication, and to state the date and substance of the communication.

(j)     "FTC" means the Federal Trade Commission, including its agents, consultants, employees, representatives and any other person(s) acting or purporting to act for or on the FTC's behalf.

(k)     "OCC" means the Office of the Comptroller of the Currency, including its agents, consultants, employees, representatives and any other person(s) acting or purporting to act for or on the Office of the Comptroller of the Currency's behalf.

3

(l)    "OTS" means the Office of Thrift Supervision, including its agents, consultants, employees, representatives and any other person(s) acting or purporting to act for or on the Office of Thrift Supervision's behalf.

(m)    "Public official" means any aide, agent, assistant, commissioner, director, employee, examiner, official (whether elected or appointed), officer, secretary, staffer or supervisor of any government agency, whether federal, state or municipal, or any legislative or executive body or agency, whether federal, state or municipal, including, without limitation, any committees, subcommittees, representatives or services of the same.

(n)    "Relate(s) to" or "relating to" means information or documents that, in whole or in part, constitute, contain, embody, evidence, reflect, concern, describe, discuss, involve, identify, support, refute, refer to, are relevant to or in any way pertain to.

(o)    The singular form of a noun or pronoun includes the plural form, and the plural form includes the singular.

(p)    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a Request all documents that otherwise might be construed to be outside of its scope.

4

# INSTRUCTIONS

(a)     The time period covered by these Requests, unless otherwise stated, is January 1, 2001 to the date of production.

(b)     These Requests are continuing in nature. In the event the FDIC obtains any additional documents that are responsive to these Requests, the FDIC shall supplement its response to each such Request and produce the additional documents promptly.

(c)     The FDIC shall produce responsive documents as they have been kept in the usual course of business or shall organize and label them to correspond to the enumerated requests. If there is no document responsive to any particular category, the FDIC shall so state in writing.

(d)     The FDIC shall produce any Electronically Stored Information ("ESI") responsive to a Request in its native format, or as searchable TIF files, and shall produce any metadata associated with the produced ESI.

(e)     If the FDIC objects to any part of a Request, it shall set forth the basis for its objection and respond to all parts of the Request to which it does not object.

(f)     If the FDIC withholds any document responsive to a Request under a claim of privilege, it shall, for each such withheld document, provide a description of the document and a statement of the basis upon which the privilege asserted is claimed. Such description(s) shall be sufficiently detailed to permit CompuCredit to evaluate the claim(s) of privilege.

(g)     In the event that any document called for hereby was formerly in the possession, custody or control of the FDIC and has been lost or destroyed, that document is to be identified in writing as follows:   (1) addressor, addressee, person who prepared or authorized the

5

document, indicated or blind copies; (2) date of preparation or transmittal; (3) subject matter; (4) number of pages, attachments or appendices; (5) all persons to whom distributed, date of loss or destruction; and (6) if destroyed, the manner of destruction, reason for destruction, persons authorizing destruction and persons destroying the document.

## DOCUMENT REQUESTS

1.      All documents referring or relating to CompuCredit.

2.      All documents referencing or relating to the FTC's purported jurisdiction over CompuCredit or the FDIC's jurisdiction over CompuCredit.

3.      All documents referencing or relating to the FTC's purported jurisdiction over any financial institutions or their service providers.

4.      All documents reflecting communications between FDIC and any other government agency regarding any and all proposed amendments or changes to Regulation Z since 2001.

5.      All communications and documents constituting, evidencing, reflecting, responding to or relating to any complaints or other communications received from consumers or other individuals relating to any credit card issued by CB&T, FB&T or FBD for which CompuCredit provided services.

6.      All documents relating to any examination, visitation or review of CompuCredit during the relevant period, including any reports, summaries, communications or work papers.

7.      All documents relating to any examination, visitation or review of each of CB&T, FB&T or FBD related in any way to CompuCredit during the relevant period.

6

8.    All documents sufficient to identify each examiner who participated in any examination, visitation or review of CompuCredit during the relevant period.

9.    All documents sufficient to identify any examiner who participated in any examination, visitation or review of each of CB&T, FB&T or FBD during the relevant period.

10.    All documents of any examiner who participated in any examination, visitation or review of CompuCredit during the relevant period or of any supervisor of such examiner, relating to the CompuCredit.

11.    All documents of any examiner who participated in any examination, visitation or review of CB&T, FB&T or FBD during the relevant period or of any supervisor of such examiner, relating in any way to CompuCredit.

12.    All documents that were sent or received by any examiner that participated in any examination, visitation or review of CompuCredit during the relevant period or by any supervisor of such examiner, relating in any way to CompuCredit.

13.    All documents that were sent or received by any examiner that participated in any examination, visitation or review of CB&T, FB&T or FBD during the relevant period or by any supervisor of such examiner, relating in any way to CompuCredit.

14.    All documents relating to any surveys, analyses or copy tests performed or commissioned by the FDIC relating to any credit card issued by CB&T, FB&T or FBOD for which CompuCredit provided services.

15.    All documents relating to any analyses of credit card solicitations or fulfillment materials of any other person or entity that markets credit cards.

16.    All documents, including policies, procedures, manuals, guidance, instructions or training materials, that FDIC has provided to its personnel, including but not limited to its

7

personnel in the Consumer Response Center, relating to the consideration and response to complaints and other communications received from consumers or other individuals, and any addition or amendment to such documents during the relevant period.

17.    All documents, including policies, procedures, manuals, guidance, instructions, statements, or training materials that FDIC has created internally or received from an outside source or other government agency to provide instruction to its examiners and compliance specialists relating to Section 5 of the Federal Trade Commission Act, and any addition or amendment to such documents during the relevant period.

18.    All documents, including policies, procedures, manuals, guidance, instructions, statements or training materials that FDIC has created internally or received from an outside source or other government agency relating to implementation of Financial Institution Letters 57-2002 (May 30, 2002) and 26-2004 (March 11, 2004), and any addition or amendment to such documents during the relevant period.

19.    All documents constituting, evidencing, reflecting or relating to any FDIC regulations, policies, guidelines, press releases or public statements concerning enforcement of the Truth in Lending Act ("TILA") or Section 5 of the FTC Act with respect to credit card solicitations, credit card practices or activities or the disclosure of credit card terms and conditions.

20.    All documents sufficient to identify all banks, bank service providers or other entities that have been accused, cited or sanctioned by the FDIC for any violations of Section 5 of the Federal Trade Commission Act.

21.    All documents referencing or relating to the FDIC's document retention policies or the FDIC's efforts to retain documents in connection with CompuCredit, CB&T, FB&T or FBD.

22.    All documents referencing or relating to meetings held from and after January 1, 2005 with any official or staff member of any federal bank regulatory agency (including without limitation the FDIC, the OCC, the OTS and the Federal Reserve) relating to credit card solicitations, credit card practices or activities, or the disclosure of credit card terms and conditions.

23.    All documents that reflect or relate to any meeting or communication by any FDIC employee, agent or official with any public official or government agency relating to CB&T, FB&T, FBD or CompuCredit.

24.    All documents that reflect or relate to any meeting or communication by any FDIC employee, agent or official with any public official relating to credit card solicitations, credit card practices or activities, the disclosure or credit card terms and conditions or subprime lending or credit financing.

25.    All documents that reflect or relate to any meeting or communication by any FDIC employee, agent or official with any other government agency relating to credit card solicitations, credit card practices or activities, the disclosure of credit card terms and conditions or subprime lending or credit financing.

26.    All documents reflecting communications or meetings between, and documents received from or provided to, any FDIC employee, agent or official and any non-governmental third party, including without limitation any political advocacy organization, consumer advocacy

9

organization, non-profit organization, private commercial entity or individual employed by or acting on behalf of the same, relating in any way to CompuCredit, CB&T, FB&T or FBD.

27.    All documents relating to CompuCredit in connection with NextBank, National Association, Phoenix, Arizona.

28.    All documents reflecting any communication between CB&T and FDIC relating to CompuCredit or the negotiation, terms and issuance of the Order to Cease and Desist and Order to Pay and the Order for Restitution issued to CB&T on June 9, 2008.

29.    All documents that relate to the determination of the amount of the civil money penalty assessed against CB&T in the Order to Cease and Desist and Order to Pay dated June 9, 2008.

30.    All documents that relate to the determination of the amount of the restitution assessed against CB&T in the Order for Restitution dated June 9, 2008.

31.    All documents that relate to the determination by the FDIC of the amount of the penalty assessed against CompuCredit in the Notice of Charges dated June 10, 2008 issued by the Federal Deposit Insurance Corporation against CompuCredit Corporation, Case Number FDIC-08-139b, FDIC-08-140k, including but not limited to documents discussing the thirteen factors enumerated in the Interagency Policy Regarding the Assessment of Civil Money Penalties, dated June 3, 1998, and Section 14.1-1 of the FDIC Risk Management Manual of Examination Policies or any civil money penalty matrix.

32.    All documents relating to the FDIC's Examination Manual for Credit Card Activities and "Third Party Relationships."

33. All documents, witness statements, affidavits, recordings or similar documents relating to or memorializing statements of individuals with credit cards issued by CB&T, FB&T or FBD or provided by such individuals.

Dated: July 3, 2008

Pat A. Cipollone
Email: pcipollone@kirkland.com
Daniel T. Donovan
Email: ddonovan@kirkland.com
Rebecca R. Anzidei
Email: ranzidei@kirkland.com
Michael F. Williams
Email: mwilliams@kirkland.com
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel: (202) 879-5000
Fax: (202) 879-5200

Brian C. McCormally
Email: Brian.McCormally@aporter.com
David B. Bergman
Email: David.Bergman@aporter.com
Robert M. Clark
Email: Robert.Clark@aporter.com
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Tel: (202) 942-5000
Fax: (202) 942-5999

*Attorneys for Defendant*

Jeffrey O. Bramlett
Georgia Bar No. 075780
Email: bramlett@bmelaw.com
Michael B. Terry
Georgia Bar No. 702582
Email: terry@bmelaw.com
Sarah M. Shalf
Georgia Bar No. 637537
Email: shalf@bmelaw.com
BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree St. NW
Suite 3900
Atlanta, GA 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

# EXHIBIT G



**FDIC**
**Federal Deposit Insurance Corporation**
Boston Area Office – Legal Division
15 Braintree Hill Office Park, Braintree, Massachusetts 02184

Tel. (781) 794-5500
Fax (781) 794-5600

July 17, 2008

Via e-mail attachment and first-class mail

Michael F. Williams, Esq.
Kirkland & Ellis, LLP
655 15th St. N.W.
Suite 1200
Washington, D.C. 20005

Re: Subpoena in *Federal Trade Commission v. CompuCredit Corporation and Jefferson Capital Systems, LLC*, 1:08-cv-1976 (BBM) N.D. Ga.

Dear Mr. Williams:

The Federal Deposit Insurance Corporation (FDIC) has received the subpoena (Subpoena), dated July 3, 2008, of CompuCredit Corporation (CompuCredit), in the above-captioned case. The Subpoena seeks communications and documents pursuant to Fed. R. Civ. P. 30(b)(2) relating to a broad range of subjects concerning CompuCredit, Columbus Bank and Trust (CBT), First Bank of Delaware (FBD), First Bank and Trust, Brookings (FBT) and the FDIC. The lawsuit at issue involves allegations by the Federal Trade Commission (FTC) against CompuCredit and Jefferson Capital Systems, LLC for, among other things, engaging in deceptive credit card marketing practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. This serves as the FDIC's preliminary objections to the Subpoena, pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure. The FDIC reserves the right to modify, amend, correct any inadvertent errors, or to otherwise supplement these objections.

The FDIC makes the following general objections to the Subpoena. The FDIC reserves these and any future objections made in response to the Subpoena requests.

1.  The FDIC objects to the Subpoena to the extent that the Subpoena, including any implied or express instructions or directions in the Subpoena, imposes or seeks to impose burdens greater than those imposed by the Federal Rules of Civil Procedure.

2.  The FDIC objects to the Subpoena to the extent that documents are available from other individuals or entities or are publicly available. The Subpoena not only seeks FDIC materials that are privileged and confidential, irrelevant, and outside the scope of the lawsuit, it requests information that is publicly available and/or readily available from other sources, including the FDIC and/or FTC websites, as well as other public sources.

Michael F. Williams
July 17, 2008

3.     The FDIC objects to the Subpoena to the extent that it seeks documents that are not in the custody or control of the FDIC and/or should be requested from other government agencies or other entities.

4.     The FDIC objects to the Subpoena in that the requests are overly broad in time and scope, unduly burdensome, not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence. The Subpoena does not merely request documents relating to matters that concern the underlying lawsuit, but seeks a wide range of documents relating generally to the supervisory and regulatory activities of FDIC over a seven-and-a-half year period.

5.     The FDIC objects to the Subpoena to the extent that it requests reports of examination and related supervisory records, commercial financial information, inter- and intra-agency memoranda, personnel files, law enforcement records, and other confidential records, which are the property of the FDIC and are exempt from disclosure under FDIC's Rules and Regulations. *See* 12 C.F.R. § 309.5. Many of the documents and information sought, including information sought from the FDIC's SOURCE computer system, concern exempt information under 12 C.F.R. § 309.5. *See also* 5 U.S.C. § 552 *et seq.* While the FDIC has discretion to release exempt records relating to such matters, it will do so only where such information is relevant to the litigation, upon a demonstration of good cause justifying disclosure, and where a protective order has been entered that adequately protects the interests of the FDIC, the depository institution and third parties. *See* 12 C.F.R. § 309.6(b)(8)(i). Even if the FDIC determines that such documents may be disclosed, such disclosure is subject to all claims of privilege described in paragraph 10 below. Parties such as your client must first follow procedures set forth in Part 309. Failure to exhaust such administrative remedies renders the Subpoena unenforceable.

6.     The FDIC objects to the Subpoena on the grounds that it is overly broad and unduly burdensome in light of CompuCredit's stated intent to file a motion to dismiss the FTC action. According to the Consent Order to Establish Briefing Schedule on the Motion to Dismiss and to Establish Other Interim Guidelines dated July 7, 2008, CompuCredit intends to file a motion to dismiss on or before July 21, 2008. Although Rule 26(b) of the Federal Rules of Civil Procedure governs the above referenced matter, the FDIC's Rules of Practice and Procedure, 12 C.F.R. Part 308, govern the parallel administrative proceedings between the FDIC and CompuCredit. Part 308 limits the scope of discovery available to CompuCredit in the administrative proceedings. If CompuCredit's motion to dismiss is granted, the FDIC will have unnecessarily committed resources and personnel to producing documents that are outside the scope of discovery under 12 C.F.R. § 308.24. Therefore, the Subpoena is overly broad and burdensome.

Michael F. Williams
July 17, 2008

7.    The FDIC objects to the Subpoena on the grounds that it is overly broad and unduly
      burdensome with respect to the request seeking communications including "any oral
      and written utterance . . . and understandings between two or more persons." To
      comply with this demand, the FDIC would be required to divert significant resources
      and personnel from their supervisory and regulatory responsibilities to: (a) search for
      all persons who may have referenced, in any conversation held over the past seven-
      and-a-half years, any communication from consumers or other individuals relating to
      any credit card issued by FBD, FBT or CBT that was marketed by CompuCredit and
      (b) document those conversations. This request will produce inherently unreliable
      evidence that is potentially incomplete; in addition, the breadth and scope of the
      request is the epitome of unduly burdensome.

8.    The FDIC objects to the Subpoena on the grounds that it is overly broad and unduly
      burdensome to the extent it requests documents and information that "concerns,"
      "refers," or "relates" to a particular topic on the grounds that gathering all documents
      containing any reference or relationship to a particular topic is unduly burdensome
      and out of proportion to the documents' potential relevance.

9.    The FDIC objects to the request for the production of any metadata associated with
      the produced Electronically Stored Information on the grounds that CompuCredit has
      not shown that the information is relevant to the subject matter in the litigation. In
      addition, to respond to the request would be unduly burdensome and the metadata
      contains privileged information of the type discussed in paragraph 10.

10.   The FDIC objects to the Subpoena to the extent that it seeks disclosure of information
      protected under any applicable privilege or immunity. The Subpoena demands a wide
      range of documents that encompasses records exempt from disclosure by law.
      Insofar as the requested records may include documents and materials prepared in
      relation to the FDIC's supervisory and examination responsibilities, they are of the
      type and nature which are protected against disclosure by privileges recognized and
      enforced by federal courts. The privileges that apply to FDIC records requested
      include, but are not limited to, the bank examination privilege, the government
      deliberative process privilege, the work product doctrine, and the attorney-client
      privilege. Such privileged information is protected from disclosure under Fed. R.
      Civ. P. 26(b)(3). In addition, disclosure of any such documents may violate protected
      privacy interests of individuals. *See* Privacy Act of 1974, 5 U.S.C. § 552A. In the
      case of the inadvertent disclosure of privileged or otherwise protected information,
      the information shall not be considered a waiver of any privilege or other protection.
      FDIC reserves the right to assert all applicable privileges and objections and to seek
      the return of any privileged or protected documents or information inadvertently
      produced.

Michael F. Williams
July 17, 2008

11.   The FDIC objects to the response date in the Subpoena of July 28, 2008. Given the
vast volume of documents sought (including Electronically Stored Information), the
many sources of potentially responsive documents, and the extent of privilege review
that will be required, the response date of July 28, 2008 is unreasonable.

12.   The FDIC objects to the Subpoena to the extent that it calls for the production of
documents that the FDIC previously received from CompuCredit.

13.   The FDIC objects to the premise of any requests in the Subpoena that claim that the
FTC has purportedly asserted jurisdiction over financial institutions.

14.   The FDIC objects to the Subpoena to the extent that it requests formal reports of
potential testifying experts that may be shared by the FTC and FDIC. Those reports
are subject to the Court ordered schedule.

15.   The FDIC reserves all objections as to the competence, relevance, materiality,
admissibility, or privileged status of any information that is provided in response to
the Subpoena.

16.   The production of any documents in response to the Subpoena does not constitute a
waiver of any of the FDIC's objections.

As we discussed, we would like to schedule a telephone conference to discuss the
foregoing general objections as well as the specific document requests. Given the broad scope of
the items requested in the Subpoena, we would also like to discuss prioritizing the requests so
that the FDIC may devote its resources to producing the documents that CompuCredit seeks
according to a workable, mutually agreeable schedule. Please contact me at your convenience at
781-794-5620.

Sincerely,

Marguerite Sagatelian
Counsel

cc:   Pat Cipollone, Esq.
Daniel Donovan, Esq.
Thomas J. Feeney, Supervisory Counsel
Heather Walters, Counsel

# EXHIBIT H

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

August 7, 2008

Karla G. Sanchez
Partner
(212) 336-2785
Direct Fax (212) 336-2788
kgsanchez@pbwt.com

**By Electronic Mail**
Michael F. Williams, Esq.
Daniel T. Donovan, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Suite 1200
Washington, DC 20005

Re:    FTC v. CompuCredit Corp., et al.
       Case Number: 1:08-cv-1976 (BBM)

Dear Dan and Michael:

We have been retained by the Federal Deposit Insurance Corporation ("FDIC") in connection with the above-referenced matter. In that role we will be coordinating the FDIC's response to the third-party discovery requests you have directed at it on behalf of your client CompuCredit Corporation ("CompuCredit"). Accordingly, please direct a copy of all future correspondence regarding these and other discovery demands in this matter to my attention.

As to the requests made, it is our understanding that to date CompuCredit has served on the FDIC a single document subpoena, dated July 3, 2008, and a single deposition subpoena for a corporate representative, dated July 18, 2008. The parties agreed to adjourn the noticed deposition date of corporate representative deposition, and a new date has not been set. In addition, we understand that CompuCredit has forwarded three notices for the individual depositions of FDIC personnel, each dated July 18, 2008, but did not issue subpoenas therewith. We also understand that CompuCredit did not provide the Federal Trade Commission ("FTC") with notice of any of the foregoing deposition demands. Please advise us whether you view these understandings to be inaccurate.

We would like to schedule a time to discuss CompuCredit's requests and the status of discussions concerning those requests. As indicated in earlier correspondence, the FDIC will provide specific objections to CompuCredit's individual document demands and the noticed topics of the corporate representative deposition, which we expect to serve by Monday. We propose therefore that a call be scheduled for Wednesday, August 13, 2008, so that we may review each of CompuCredit's demands in the context of the specific objections. In the meantime, we reserve the right to move to quash or for a protective order with respect to all aspects of the demands.

Kirkland & Ellis
August 7, 2008
Page 2

      On the call next week, in addition to the discovery requests, we would like to address the protective order that has been so ordered in the federal litigation. It does not address whether and to what extent documentation and information produced in this matter may be used in the administrative actions pending between the parties. We propose amending or supplementing the order to explicitly state that production in this matter shall not be construed to affect in any way the admissibility of the discovery during the administrative proceedings.

      Finally, with respect to the contemplated depositions of the individual FDIC personnel, we request that CompuCredit properly notice and issue subpoenas. We are authorized to accept service, as well as the required fees, on the FDIC's behalf.

      We look forward to working with you on these matters. I am generally available to discuss these issues in advance of next week's call.

      Sincerely yours,

      Karla G. Sanchez

cc:    Thomas Feeney, Esq. (by email)

# EXHIBIT I

Page 1

UNITED STATES OF AMERICA

\* \* \* \* \*

FEDERAL DEPOSIT INSURANCE CORPORATION

\* \* \* \* \*

þíííííííííííííííííííííííí»
                                    °
IN THE MATTER OF:                   °
FIRST BANK OF DELAWARE              °

FIRST BANK & TRUST                  °
COMPUCREDIT CORP.                   °
þííííííííííííííííííííííííí¼

                    Federal Deposit Insurance
                      Corporation

                    L. William Siedman Center
                    Room A-2062
                    3501 Fairfax Drive
                    Arlington, Virginia  22226

                    Thursday, July 17, 2008

                The above-entitled matter came on for

hearing, pursuant to notice, at 10:00 a.m.

BEFORE:

        C. RICHARD MISERENDINO

        Administrative Judge

f527cb43-0c14-4f25-82c4-834854d9e9af

Page 64

1            JUDGE MISERENDINO:  Well, you

2    know, just checking.

3            MR. CIPOLLONE:  Fair enough, Your

4    Honor.

5            JUDGE MISERENDINO:  Mr. Lange?

6            MR. LANGE:  Yes.

7            JUDGE MISERENDINO:  Are you

8    catching all of this, Mr. Serino?

9            MR. SERINO:  Yes, I am, Your

10   Honor.

11           JUDGE MISERENDINO:  Okay.

12           MR. FEENEY:  Your Honor, if I may?

13           JUDGE MISERENDINO:  Yes.

14           MR. FEENEY:  This is Tom Feeney.

15   As an ancillary point and another reason for

16   informing you of the FTC case in the federal

17   District Court, we think there's going to be

18   a fair overlap in the documents disclosed or

19   discovered in that case and in this case, and

20   I am assuming that we will work with Mr.

21   Cipollone to limit the double burdens that

22   potentially could happen because of that.

f527cb43-0c14-4f25-82c4-834854d9e9af

Page 65

1            JUDGE MISERENDINO:  Is that true

2    with respect to both factual discovery and

3    expert discovery?

4            MS. SAGATELIAN:  Yes.

5            MR. FEENEY:  It's quite possible

6    there will be an overlap.

7            JUDGE MISERENDINO:  And when --

8    has there been a scheduling order issued in

9    that FTC case -- in that case?

10            MS. SAGATELIAN:  Yes.

11            MR. FEENEY:  Yes.

12            JUDGE MISERENDINO:  And when is

13    the discovery cut-off date for that case?

14            MS. SAGATELIAN:  December 15th,

15    2008, Your Honor.

16            JUDGE MISERENDINO:  Okay.

17            MR. CIPOLLONE:  And Your Honor,

18    this is Pat Cipollone.  If I might add with

19    respect to the FTC case, just as a point of

20    information, so you're aware, in that it

21    impacts discovery, there, the allegation is in

22    early 2006, in terms of the pleadings of the

f527cb43-0c14-4f25-82c4-834854d9e9af

Page 68

1      in December.

2                     MS. SAGATELIAN:  Your Honor, may I

3      address that point?

4                     JUDGE MISERENDINO:  Yes, Ms.

5      Sagatelian.

6                     MS. SAGATELIAN:  I would point

7      out, first, that in the FTC discovery order or

8      the joint order that was accepted by the

9      Court, actually entered by the Court, the

10     original proposal was to have fact discovery

11     end December 15th and expert discovery end at

12     the end of January.

13                    The Court in that case took it

14     upon itself to decide that all discovery

15     should end on December 15th.

16                    I would also point out that there

17     is considerable overlap between the issues in

18     the FTC case and the three cases here and, you

19     know, while there are three administrative

20     proceedings, the most complex issue is

21     probably the Section 5 issue and that pervades

22     all three cases.

f527cb43-0c14-4f25-82c4-834854d9e9af

EXHIBIT J

FILED IN CHAMBERS
U.S.D.C. Atlanta

AUG 0 6 2008

JAMES N. HATTEN, Clerk
By: ᏢᏁᎳᎳ
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action |
| | ) No. 1:08-CV-01976-BBM-RGV |
| COMPUCREDIT CORP., *et al.*, | ) |
| | ) |
| Defendants. | ) |

**STIPULATED PROTECTIVE ORDER REGARDING CONFIDENTIAL
TREATMENT OF DOCUMENTS**

To expedite the flow of discovery material, facilitate the prompt resolution

of disputes over confidentiality, ensure that protection is afforded only to material

so designated, and protect personally identifiable and private information, Plaintiff

Federal Trade Commission ("FTC") and Defendants CompuCredit Corporation

and Jefferson Capital Systems, LLC hereby stipulate to and request that the Court

enter an Order requiring that:

1.      Documents, interrogatory answers, written responses to requests for

production, responses to requests for admission, deposition testimony, deposition

1

exhibits, recorded or graphic matter, and other materials, tangible objects, and

information (hereinafter "MATERIALS") that contain trade secret or other

confidential research, development, technical, commercial, financial, or private

information, PERSONALLY IDENTIFIABLE INFORMATION (defined in this

paragraph, below), or exempt information under 12 C.F.R. Part 309 produced,

provided, or filed in this action by any party or non-party, including but not limited

to such MATERIALS produced in response to any compulsory process served

before the entry date of this Order may be designated CONFIDENTIAL by any

party or non-party, and thereby made subject to the provisions of this Order.

Public information independently discovered by a receiving party is not subject to

the provisions of this Order. PERSONALLY IDENTIFIABLE INFORMATION

includes an individual's social security number, or an individual's name or address

or phone number in combination with one or more of the following: date of birth;

driver's license number or other state identification number, or a foreign country

equivalent; passport number; financial account number; or credit card or debit card

number. For purposes of this Order, PERSONALLY IDENTIFIABLE

INFORMATION also includes medical records and other individually identifiable

health information relating to the past, present, or future physical or mental health

2

or condition of an individual, and to the provision of or payment for health care to an individual.

2.     A designation that MATERIALS are CONFIDENTIAL shall constitute a representation by the designating party, in good faith and after careful determination, that the MATERIALS so designated are eligible for such designation pursuant to Paragraph 1.

3.     PERSONALLY IDENTIFIABLE INFORMATION shall be afforded all the protections of this Order afforded to other CONFIDENTIAL MATERIALS, but also shall be secured by any receiving party in such a manner as to minimize the possibility of unintentional disclosure, including the physical storage thereof in a secure area or law office, the electronic storage thereof on a password-protected computer or system which may be accessed only by persons qualified to have access to the PERSONALLY IDENTIFIABLE INFORMATION pursuant to the terms of this Order, and the shipment thereof only to other qualified persons by a trackable method with restricted delivery to such qualified persons.

4.     During the course of a deposition or as a result of an interrogatory, a request for production, or a request for admission, if a response calls for the disclosure of CONFIDENTIAL MATERIALS, to the extent possible, the responding party should so designate such MATERIALS as CONFIDENTIAL in

3

responding to the questions, and if the CONFIDENTIAL MATERIALS are

elicited during a deposition, the party shall instruct the court reporter that the

answers to the questions, along with any questions that incorporate

CONFIDENTIAL MATERIALS, should be marked "CONFIDENTIAL" in the

transcript. Any party or non-party who signs onto this Order may, on the record of

any deposition or by written notice to counsel for all parties no later than thirty

days after the deposition transcript is first made available to that party, designate

portions thereof as CONFIDENTIAL under the terms of this Order. Until the end

of such thirty-day period, the deposition transcript will be deemed to be designated

CONFIDENTIAL in its entirety under the terms of this Order. Thereafter, only

those portions of the deposition transcript designated CONFIDENTIAL shall be so

treated, except that, to the extent possible, all copies of deposition transcripts that

contain CONFIDENTIAL MATERIALS shall be prominently marked

"CONFIDENTIAL" on the cover thereof. This designation may be accomplished

either (a) by marking "CONFIDENTIAL" every page of the transcript that

contains CONFIDENTIAL MATERIALS or (b) by notifying all parties of the

transcript page and line numbers of the pages deemed to be CONFIDENTIAL, and

marking the first and last such pages of such ranges as "CONFIDENTIAL –

START" and "CONFIDENTIAL – END," respectively. Transcript pages

4

designated CONFIDENTIAL by either method of designation shall be entitled to

the same protections under this Order.

5.    With respect to all MATERIALS provided for inspection by a party's

counsel, all CONFIDENTIAL MATERIALS shall be stamped

"CONFIDENTIAL" by the party desiring such designation, or otherwise

designated by such party in writing, within thirty days of production.  Until the end

of such thirty-day period, the document production will be deemed to be

designated CONFIDENTIAL in its entirety under the terms of this Order.  A

designation of CONFIDENTIAL by stamping or labeling need not be made until

after counsel for the inspecting party has inspected the MATERIALS and selected

MATERIALS to be copied.  Making MATERIALS available for inspection shall

not constitute a waiver of any claim to designate such MATERIALS as

CONFIDENTIAL, and all MATERIALS provided for inspection by a party's

counsel shall be treated as though designated CONFIDENTIAL at the time of

inspection.

6.    Any party, within thirty days of the party's receipt of any

MATERIALS in this matter from any non-party in response to compulsory

process, may designate as CONFIDENTIAL under the terms of this Order any

MATERIALS that are produced in response to compulsory process served on a

non-party. This designation may be accomplished either (a) by marking every

page of CONFIDENTIAL MATERIALS "CONFIDENTIAL," or (b) by notifying

all parties of the Bates ranges of MATERIALS deemed CONFIDENTIAL, and

marking the first and last such pages of such ranges as "CONFIDENTIAL –

START" and "CONFIDENTIAL – END," respectively. MATERIALS designated

CONFIDENTIAL by either method of designation shall be entitled to the same

protections under this Order. Prior to the expiration of the thirty-day period

following the respective parties' receipt of such MATERIALS, any such

MATERIALS produced will be deemed to be CONFIDENTIAL in their entirety

under the terms of this Order. Thereafter, only those portions of the MATERIALS

designated CONFIDENTIAL through either of the above-described methods shall

be so treated.

      7.    CONFIDENTIAL MATERIALS, including any writing or

communication reproducing, paraphrasing, or otherwise disclosing such

CONFIDENTIAL MATERIALS, shall not be used for any purpose by the

receiving party except for purposes in connection with this litigation or RELATED

LITIGATION. RELATED LITIGATION shall include In the Matter of First Bank

and Trust and CompuCredit Corporation, FDIC 07-228b, FDIC 07-260k; In the

Matter of First Bank of Delaware and CompuCredit Corporation, FDIC 07-256b,

FDIC 07-257k; and In the Matter of CompuCredit Corporation, FDIC 08-139b,

FDIC08-140k.  Notwithstanding the foregoing, nothing in this Order shall impose

any restrictions on the use or disclosure of CONFIDENTIAL MATERIALS by the

FTC as provided by:  (1) the FTC's Rules of Practice and any cases construing

them; (2) Sections 6(f) and 21 of the Federal Trade Commission Act and any cases

construing them; and (3) any other legal obligation imposed upon the FTC;

provided that the FTC shall, unless otherwise prohibited by law, regulation, or

lawful court order, provide CompuCredit and/or Jefferson Capital, as the case may

be, with at least 10 days notice of the nature of any such use or disclosure of

CONFIDENTIAL MATERIALS produced by such company prior to such a use or

disclosure.

     8.     CONFIDENTIAL MATERIALS, including any writing or

communication reproducing, paraphrasing, or otherwise disclosing such

CONFIDENTIAL MATERIALS, shall not be disclosed to any person by the

receiving party except to the following persons:

     (a)     Counsel for the Parties in this action.  Legal assistants,

paralegals, secretarial and clerical employees, and outside copy services, litigation

consulting services, document management services, and graphic services that are

assisting counsel in the prosecution, defense, and/or appeal of this Action are also included as "counsel" for the purposes of this Order;

(b)    Independent experts, consultants and/or investigators retained, employed, or informally consulted by counsel in connection with the prosecution, defense, and/or appeal of this Action, including their legal assistants, paralegals, and secretarial or clerical employees that are assisting in the prosecution, defense, and/or appeal of this Action, provided that each such person executes, prior to receiving access to CONFIDENTIAL MATERIAL, an undertaking in the form attached as Exhibit A to this Order.  A Party who retains a consulting expert shall be responsible for ensuring that such consulting expert, including legal assistants, paralegals, secretarial or clerical employees of the consulting expert, sign and execute the form attached as Exhibit A to this Order.  The Party retaining the consulting expert shall be responsible for maintaining the form attached as Exhibit A to this Order after it has been signed by the consulting expert and the form shall not be discoverable by the opposing Party or Parties.  If a consulting expert is designated by a Party as a testifying expert or as an individual whose work has been reviewed by a testifying expert, the executed Exhibit A for those individuals will become discoverable.  The form attached as Exhibit A to this Order shall not be admissible into the trial of this Action;

8

(c)    The Parties, solely for the purpose of prosecuting, defending, and/or appealing this Action or RELATED LITIGATION.  For the purpose of this subparagraph, the Parties shall include:

(i)    The Defendants in this action, including the executives or other personnel of the Defendants who are participants with respect to policy decisions for the trial or pretrial preparations with reference to this action and any personnel having a good-faith, reasonable need for obtaining access to the CONFIDENTIAL MATERIALS;

(ii)    FTC Commissioners and other employees of the FTC (including consultants not covered under Subparagraph 8(b) above), the parties' respective counsel of record in this action, including the associates and paralegal, secretarial, clerical, and other regular and temporary employees of such counsel assisting such counsel and including employees of any firm retained to reproduce or store the CONFIDENTIAL MATERIALS for use in accordance with this Order;

(d)    Any person who prepared or originated the CONFIDENTIAL MATERIALS, who is indicated on the face of the CONFIDENTIAL MATERIALS as a recipient of a copy thereof, who otherwise legitimately received a copy of the CONFIDENTIAL MATERIALS other than through a document production in this litigation, or who is a witness or witness's counsel at deposition

9

or trial where the CONFIDENTIAL MATERIALS are reasonably related to the testimony of such witness, and court reporters and persons preparing transcripts of testimony.

(e)    The Court and related officials involved in this litigation or any other proceeding in which the CONFIDENTIAL MATERIALS are used, including judges, magistrates, commissioners, referees, jurors, and other personnel of the Court; provided, however, that any MATERIALS designated CONFIDENTIAL and lodged or filed with the Court are filed in accordance with the procedures for filing under seal as described in Paragraph 11 below.

(f)    Persons with prior knowledge of the CONFIDENTIAL MATERIAL, provided that such knowledge did not result from a breach of duty, obligation, or law;

(g)    Any other persons agreed to in writing by the Parties; and.

(h)    Any person designated by the Court in the interest of justice, upon such terms as the Court deems proper.

9.    Prior to disclosing CONFIDENTIAL MATERIALS to any person listed in Subparagraphs 8(b) or 8(d), the receiving party shall:

(a)    provide such person with a copy of this Order; and

10

(b)     obtain from such person a signed statement in the form attached hereto as Exhibit A.  Such statement shall be retained by counsel for the party and need not be filed with the Court or served upon opposing counsel unless requested for good cause or ordered by the Court.

10.     Any person listed in Subparagraphs 8(a) through 8(h) who receives CONFIDENTIAL MATERIALS shall:

(a)     read this Order;

(b)     use such CONFIDENTIAL MATERIALS only for purposes permitted by this Order; and

(c)     not disclose or discuss such CONFIDENTIAL MATERIALS other than as permitted by this Order.

11.     All CONFIDENTIAL MATERIALS that are lodged or filed with the Court, including any pleading or other document reproducing, paraphrasing, or otherwise disclosing such CONFIDENTIAL MATERIALS, shall be lodged or filed pursuant to this Order in a sealed envelope or other appropriate sealed container marked in the manner required by the Court for lodging and filing such MATERIALS under seal.

12.     Nothing contained herein shall be construed to prejudice any party's right to use any CONFIDENTIAL MATERIALS or other information for any purpose in this litigation.

13.     Nothing contained herein shall be construed to affect in any way the admissibility of any document, testimony, or other evidence at trial.  This Order has no effect upon, and its scope shall not extend to, any party's use of its own discovery MATERIALS.

14.     Any party who has designated any MATERIALS as CONFIDENTIAL pursuant to this Order may consent to the removal of such designation by so notifying counsel for the other parties in writing.

15.     Any party may challenge a designation of CONFIDENTIAL and request removal of the MATERIALS or their designation as CONFIDENTIAL as follows:

(a)     The party seeking such removal shall give the party who designated the MATERIALS as CONFIDENTIAL written notice thereof specifying the MATERIALS as to which such removal is sought and the reason for the request.

(b)     If the parties cannot reach agreement concerning the matter within ten days after such notice, then the party requesting the removal of such

12

MATERIALS or their designation as CONFIDENTIAL may file and serve a motion for an order of the Court directing that the MATERIALS or their designation as CONFIDENTIAL be removed.

(c)    For CONFIDENTIAL MATERIALS other than PERSONALLY IDENTIFIABLE INFORMATION, the party desiring to maintain their designation as CONFIDENTIAL shall have the burden of establishing grounds for such treatment.  The burden of establishing that any PERSONALLY IDENTIFIABLE INFORMATION should not be considered CONFIDENTIAL shall be upon the party seeking to remove the designation.

16.    Neither the taking of any action in accordance with the provisions of this Order, nor the failure to object thereto shall be construed as a waiver of any claim or defense in this action.  Moreover, the failure to designate MATERIALS in accordance with this Order and the failure to object to a designation at a given time shall not preclude the filing of a motion at a later date seeking to impose such designation or challenging the propriety thereof.  The entry of this Order shall neither be construed as a waiver of any right to object to the furnishing of MATERIALS in response to discovery nor relieve any party of the obligation of producing MATERIALS in the course of discovery.

17.    If a party through inadvertence produces or provides discovery of any

MATERIALS without designating them as CONFIDENTIAL as provided in this

Order, the party shall promptly give written notice to the receiving party that the

MATERIALS are CONFIDENTIAL and should be treated in accordance with this

Order.  The receiving party shall treat such MATERIALS as CONFIDENTIAL

from the date that such notice is received.  Disclosure of such MATERIALS prior

to receipt of such notice to persons not authorized to receive CONFIDENTIAL

MATERIALS shall not be deemed a violation of this Order; however, those

persons to whom disclosure was made are to be advised that the MATERIALS

disclosed are CONFIDENTIAL and must be treated in accordance with this Order.

18.    In the case of any accidental or inadvertent disclosure of

CONFIDENTIAL MATERIALS or any other disclosure not in accordance with

this Order, counsel for the party responsible for the disclosure shall promptly

notify counsel for the party who designated the MATERIALS as

CONFIDENTIAL (or the individual whose PERSONALLY IDENTIFIABLE

INFORMATION was disclosed) of the disclosure and make every effort to prevent

further disclosure, including attempting to retrieve all copies of the

CONFIDENTIAL MATERIALS from the recipients thereof, and attempting to

14

secure the agreement of the recipients not to further disseminate the

CONFIDENTIAL MATERIALS in any form.

19.    Inadvertent production of any document, material, or information that

a Party later claims should not have been produced because of a privilege,

including but not limited to the attorney-client privilege, deliberative process

privilege, law enforcement privilege, work product doctrine, or common interest

doctrine will not be deemed to waive any privilege.  A Party or non-Party may

request the return of any inadvertently produced privileged document, material or

information by identifying the document inadvertently produced and stating the

basis for withholding such document from production.  If a Party requests the

return, pursuant to this paragraph, of any inadvertently produced privileged

document then in the custody of another Party, the possessing Party shall within

three (3) business days return to the requesting Party the inadvertently produced

privileged item (including all attachments to that item) in its entirety (and all

copies thereof), and shall expunge from any other document or material

information reflecting the contents of the inadvertently produced privileged item.

The Party returning such item may then move the Court for an order compelling

production of the material, but said Party shall not assert as a ground for entering

such an order the fact (or circumstances) of the inadvertent production.

15

20.    Neither the taking of any action in accordance with the provisions of

this Order, nor the failure to object hereto, shall be construed as a waiver of any

claim or defense in this Action.  This Order shall not be construed as a waiver of

any right to object to the furnishing of requested information in response to

discovery or that any particular discovery is appropriate and, except as expressly

provided, shall not relieve any Party or witness of the obligation to produce

information properly sought in the course of discovery.  Nothing herein shall be

construed to affect in any way the admissibility of any document, testimony, or

other evidence at trial of this Action.  Nothing contained in this Order or any

declaration of confidentiality or restriction hereunder shall be used or characterized

by any Party, or its employees, agents, or retained experts, as an "admission" by a

Party opponent or an admission or other evidence that materials produced in

discovery are or are not, in fact, trade secrets, or other confidential or proprietary

business, technical, financial, or personal information, or are entitled to any legal

protection.  The failure of a Party to object to or to challenge a designation of

information as Confidential shall not constitute an admission that the materials so

designated are, in fact, trade secrets, or other confidential or proprietary business,

technical, or financial information, or are entitled to any legal protection.  The

failure of a Party to object to or to challenge a designation of information as

16

Confidential upon initial receipt of this material shall not constitute or be construed

as a waiver of that Party's right subsequently to object to or to challenge such

designations at any later time.

     21.    At the time that any consultant, expert, or other person retained to

assist counsel in this action concludes participation in this action, such person shall

return to counsel all copies of MATERIALS or portions thereof designated

CONFIDENTIAL that are in the possession of such person, together with notes,

memoranda, or other papers reproducing, paraphrasing, or otherwise disclosing

CONFIDENTIAL MATERIALS, or certify as to their destruction.  Furthermore,

within thirty days after the completion of this litigation all CONFIDENTIAL

MATERIALS, including any writing or communication reproducing, paraphrasing,

or otherwise disclosing such CONFIDENTIAL MATERIALS, shall be collected

by counsel for the receiving party and either destroyed or returned to the party or

non-party who produced, provided, or filed the MATERIALS; provided, however,

that attorney work product or pleadings reproducing, paraphrasing, or otherwise

disclosing CONFIDENTIAL MATERIALS may be retained in counsel's files

subject to the other paragraphs of this Order, providing that such

CONFIDENTIAL MATERIALS shall not be used for any purpose outside of those

permitted by this Order.  For purposes of this Order, this action shall be considered

completed when the entire proceeding has been resolved and any related orders have become final and non-appealable.

22.    All parties and other persons who receive CONFIDENTIAL MATERIALS shall be under a continuing duty not to disclose such MATERIALS, except as permitted in this Order, and this duty shall continue in full force and effect after the completion of this litigation.

23.    In the event additional persons or entities become parties to this litigation, they shall be bound by this Order unless and until a different Protective Order is entered with respect to such additional parties.

**IT IS SO ORDERED THIS** _6th_ **DAY OF** _August_ , 2008.

_Russell G. Vineyard_

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

**STIPULATED AND AGREED TO BY:**


 /s/ Chris M. Couillou
MARK L. GLASSMAN
GREGORY A. ASHE
KATHERINE M. WORTHMAN
DAVID WIESE
LEAH FRAZIER
Federal Trade Commission
600 Pennsylvania Ave NW
Mail Stop NJ-3158
Washington, DC 20580
Telephone: 202-326-2826
Facsimile: 202-326-3768

CHRIS M. COUILLOU (Bar No. 190062)
Federal Trade Commission
Southeast Region
225 Peachtree St NE, Ste 1500
Atlanta, GA 30303
Telephone: 404-656-1353
Facsimile: 404-656-1379

*Attorneys for Federal Trade Commission*

19

**EXHIBIT A**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action |
| ) | No. 1:08-CV-01976-BBM-RGV |
| **COMPUCREDIT CORP.,** *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ACKNOWLEDGMENT OF STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL TREATMENT OF DOCUMENTS
PRODUCED IN DISCOVERY**

This acknowledges that I have read the Protective Order entered in the

above-captioned case on [fill in the date the Court entered the Protective Order]

and I agree to be bound by the terms of that Protective Order.

As a condition precedent to my receipt or review of any MATERIALS

designated CONFIDENTIAL pursuant to that Protective Order, I hereby agree that

the Protective Order shall be deemed to be directed to and shall include me, and I shall observe and comply with all of its provisions.

I further understand and agree that I am not permitted to use, and I shall not use, CONFIDENTIAL MATERIALS for any purpose other than those permitted under this Order.

Date: _____          Signature: _____

                               Printed Name: _____

22

# EXHIBIT K

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**WASHINGTON, D.C.**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| | ) | STIPULATED |
| COMPUCREDIT CORPORATION | ) | PROTECTIVE ORDER |
| ATLANTA, GEORGIA | ) | |
| | ) | |
| An Institution-Affiliated Party of: | ) | FDIC-08-139b |
| | ) | FDIC-08-140k |
| COLUMBUS BANK AND TRUST COMPANY | ) | |
| COLUMBUS, GEORGIA | ) | |
| | ) | |
| (Insured State Nonmember Bank) | ) | |
| | ) | |
| | ) | |

IT IS STIPULATED AND AGREED by and among counsel for Respondent and

Enforcement Counsel for the Federal Deposit Insurance Corporation (FDIC), that Respondent,

the FDIC, their respective counsel, and others as described shall be bound by the following

PROTECTIVE ORDER which may be entered by the Administrative Law Judge without further

notice:

      1.     As used in this PROTECTIVE ORDER, the word "document(s)" includes any

written, printed, typed or other graphic material of any kind or nature from which information

can be obtained, including matter stored electronically or magnetically.

      2.     A party (including third parties who are served with subpoenaes) may designate as

confidential such documents produced, provided, or disclosed in response to a discovery request,

or filed in this action, that the party in good faith believes contain: (a) trade secrets, research and

development, or confidential business information, which is not already available to the public

and which if revealed to the public would likely subject the party to a competitive disadvantage;

(b) exempt records and information as defined in 12 C.F.R. Part 309; and (c) personally

identifiable information (PII). For purposes of this PROTECTIVE ORDER, PII includes: (i) an

individual's social security number, or an individual's name, address, or phone in combination

with one or more of the following: date of birth; driver's license number, passport number,

financial account number; or credit card or debit card number; and (ii) medical records and other

individually identifiable health information relating to past, present, or future physical or mental

health or condition of an individual, and to the provision of or payment for health care to an

individual. Documents designated by a party as confidential pursuant to this PROTECTIVE

ORDER shall be treated as CONFIDENTIAL DOCUMENTS for purposes of this

PROTECTIVE ORDER.

    3.    CONFIDENTIAL DOCUMENTS shall be identified by affixing a stamp reading

"CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER," or some similar

designation with reference to the case numbers, to each page of the document as well as on disks

and other media.

    4.    A party who wishes to designate as confidential portions of a transcript or

recording of hearing testimony shall do so within five business days after receiving such

transcript or recording. Until such time expires, the entire transcript shall be treated as a

CONFIDENTIAL DOCUMENT.

    5.    If a party produces CONFIDENTIAL DOCUMENTS and inadvertently fails to

mark the information as CONFIDENTIAL, it may correct its failure in writing, accompanied by

sufficient copies of the item properly marked so that the receiving parties may substitute them

for the previously unmarked copies. The receiving party shall make such substitution and return

to the designating party (or certify the destruction of) any and all unmarked copies of the item in

the party's possession, including electronic copies. The documents shall be deemed

CONFIDENTIAL DOCUMENTS, and their use and disclosure shall be subject to the terms of this PROTECTIVE ORDER, only after the designating party gives notice of the correction.

6.    Documents that are designated confidential and that subsequently become publicly available lose their status as CONFIDENTIAL DOCUMENTS unless the information was made public in violation of this PROTECTIVE ORDER.

7.    This PROTECTIVE ORDER applies to all documents referenced in paragraph 2, including also any copy, extract, and complete or partial summary of any such document; any portion of any brief, memorandum, or any other writing or exhibit thereto which discloses the contents of any such document; and any information contained in or obtained from any such document (hereafter collectively referred to as "CONFIDENTIAL DOCUMENTS").

8.    A party may object to the designation of CONFIDENTIAL DOCUMENTS by letter delivered to counsel for the designating party. The parties shall make good faith efforts to resolve their disagreement. If the disagreement is not resolved, the party may file a motion with the Administrative Law Judge for a determination as to the propriety of the designation. Until such motion is resolved, the documents shall be treated as CONFIDENTIAL DOCUMENTS.

9    For documents other than PII, the party designating a document as confidential shall bear the burden of proof with regard to its status. The burden of establishing that PII should not be considered confidential is on the party seeking to challenge the designation of PII as confidential.

10.    Failure to object to the designation of CONFIDENTIAL DOCUMENTS does not constitute an admission, or a finding by the Administrative Law Judge, that the document is in fact confidential and should be treated as a CONFIDENTIAL DOCUMENT.

3

11.    The CONFIDENTIAL DOCUMENTS shall be used by parties only in the preparation and hearing of this administrative proceeding, the civil action brought by the FTC against, *inter alia*, CompuCredit Corporation, captioned *Federal Trade Commission v. CompuCredit Corporation et al.*, 1:08-cv-1976 (BBM), U.S. District Court, Northern District of Georgia (FTC Action), the civil action captioned *First Bank of Delaware v. FDIC*, Civil Action No. 08-429, U.S. District Court, District of Delaware, and the civil action captioned *CompuCredit Corporation v. FDIC*, Civil Action No. 08-430, U.S. District Court, District of Delaware, and for no other purpose; and shall not be delivered, exhibited or disclosed to any person, except:

(a)    the Administrative Law Judge and persons employed by the Office of Financial Institution Adjudication,

(b)    the parties and their attorneys of record (including such attorneys' employees) in this proceeding;

(c)    the parties and their attorneys in the proceedings identified above;

(d)    such experts, consultants, and advisors as may be retained by the parties or their attorneys of record to assist in the preparation and hearing of this proceeding and the proceedings identified above;

(e)    such persons to whom testimony or evidence is required to be given pursuant to subpoena or other legal process in this proceeding; and

(f)    such other persons who may be called as witnesses to provide relevant testimony in connection with the CONFIDENTIAL DOCUMENTS in this proceeding.

12.    The CONFIDENTIAL DOCUMENTS shall not be copied by any party except for the purpose of delivery, exhibition and/or disclosure set forth in paragraph 11 hereof. All persons authorized to have access to the CONFIDENTIAL DOCUMENTS shall take reasonable precautions to prevent disclosure of the information in any manner inconsistent with this PROTECTIVE ORDER.

13.    Any person, other than an official or employee of the FDIC and persons listed in paragraph 11 (a) - (c) above, to whom the parties and/or their attorneys of record propose to make delivery, exhibition, or disclosure of any CONFIDENTIAL DOCUMENT described in this PROTECTIVE ORDER shall: (a) be advised of the terms of this PROTECTIVE ORDER; and (b) execute two duplicate originals of a Declaration Acknowledging Protective Order Re Confidential Information and Documents (Declaration) in the form attached hereto as Appendix A. Each such person shall be subject to and bound by the terms of this PROTECTIVE ORDER. Counsel for the parties shall not be required to produce the signed Declarations until the conclusion of this case, including all available appeals. At that time, counsel shall deliver a signed original of each Declaration to Enforcement Counsel for the FDIC.

14.    With respect to any document filed in this proceeding including, but not limited to, pleadings and memoranda, the parties shall refrain form including, or shall redact the following personally identifiable information, unless otherwise ordered:

(a) Social Security Numbers – if an individual's social security number must be included, numbers other than the last four digits shall be redacted;

(b) Dates of Birth – if an individual's date of birth must be included, the month and date shall be redacted;

5

(c) Financial Account Information – If a financial account number is relevant to the proceeding, numbers other than the last four digits of the account number shall be redacted.

15.    Any CONFIDENTIAL DOCUMENT, if filed with the Administrative Law Judge or the Office of Financial Institution Adjudication, or otherwise made a part of the record of this proceeding prior to the evidentiary hearing, shall be filed under seal and conspicuously marked "CONFIDENTIAL - NOT TO BE OPENED WITHOUT THE APPROVAL OF THE HONORABLE C. RICHARD MISERENDINO, PURSUANT TO PROTECTIVE ORDER DATED JULY 28, 2008."

16.    At the conclusion of this case, including all available appeals, any person having custody or control of CONFIDENTIAL DOCUMENTS produced by or obtained by either party in this proceeding shall forthwith return such documents to counsel for the party from whom such documents were obtained. Notwithstanding the foregoing, counsel may retain copies of all public transcripts, hearing exhibits, and public pleadings and attachments, provided that counsel maintain the confidentiality and control of such documents consistent with this PROTECTIVE ORDER. In lieu of returning the CONFIDENTIAL DOCUMENTS, counsel may, with the agreement of opposing counsel, shred or destroy such documents, and delete any electronically stored copies of the CONFIDENTIAL DOCUMENTS. In such event, counsel for the party shredding, destroying and deleting such CONFIDENTIAL DOCUMENTS shall provide written confirmation to opposing counsel that the CONFIDENTIAL DOCUMENTS have been shredded, destroyed, and deleted.

17.    Nothing in this PROTECTIVE ORDER shall be deemed to be a waiver by the FDIC, Respondents, or any institution or organization listed in 12 U.S.C. § 1818(e)(7) of any legal right or privilege applicable to the CONFIDENTIAL DOCUMENTS or information

6

contained therein or obtained therefrom, or to any other request for disclosure or discovery procedure available in this or any other action.

18.    Nothing in this PROTECTIVE ORDER shall limit access to or use of the CONFIDENTIAL DOCUMENTS by officials or employees of the FDIC in the performance of their official duties, nor preclude or limit disclosure of any document, including the CONFIDENTIAL DOCUMENTS, by the FDIC in accordance with the provisions of Part 309 of the FDIC Rules and Regulations, 12 C.F.R. Part 309.

19.    Any person granted access to the CONFIDENTIAL DOCUMENTS described herein, who uses such CONFIDENTIAL DOCUMENTS or any information contained therein or obtained therefrom for any purpose other than as provided or permitted by the terms of this PROTECTIVE ORDER, may be subject to appropriate sanctions.

20.    This PROTECTIVE ORDER does not affect the disclosure by any party of any information contained in the CONFIDENTIAL DOCUMENTS if the information has been provided or has been made available to such party from a source other than the CONFIDENTIAL DOCUMENTS, nor prevent any party from disclosing confidential information prepared by or pertaining to such party.

21.    Nothing in this PROTECTIVE ORDER shall be deemed to preclude any party from seeking and obtaining, upon an appropriate showing (i) such additional protection for any specific information; or (ii) a modification of this PROTECTIVE ORDER.

22.    Nothing contained herein shall be construed to prejudice any party's right to use any CONFIDENTIAL MATERIALS or other information for any purpose in this litigation.

23.    Nothing contained herein shall be construed to affect in any way the admissibility of any document, testimony, or other evidence at hearing.

24.     If a party through inadvertence produces or provides discovery of any CONFIDENTIAL DOCUMENTS, the party shall promptly give written notice to the receiving party that the documents are CONFIDENTIAL and should be treated in accordance with this PROTECTIVE ORDER.  The receiving party shall treat such documents as CONFIDENTIAL from the date that such notice is received.

25.     In the case of any accidental or inadvertent disclosure of CONFIDENTIAL DOCUMENTS or any other disclosure not in accordance with this PROTECTIVE ORDER, counsel for the party responsible for the disclosure shall promptly notify counsel for the party to whom the CONFIDENTIAL DOCUMENTS belong of the disclosure and make every effort to prevent further disclosure, including attempting to retrieve all copies of the CONFIDENTIAL DOCUMENTS from the recipients thereof, and attempting to secure the agreement of the recipients not to further disseminate the CONFIDENTIAL DOCUMENTS in any form.

26.     Inadvertent production of any document, material, or information that any party later claims should not have been produced because of a privilege, including but not limited to the attorney-client privilege, deliberative process privilege, law enforcement privilege, work product doctrine, or common interest doctrine will not be deemed to waive any privilege.  Any party may request the return of any inadvertently produced privileged document, material or information by identifying the document inadvertently produced and stating the basis for withholding such document from production.  If a party requests the return, pursuant to this paragraph, of any inadvertently produced privileged document then in the custody of another party, the possessing party shall within three (3) business days return to the requesting Party the inadvertently produced privileged item (including all attachments to that item) in its entirety (and all copies thereof), and shall expunge from any other document or material information

8

reflecting the contents of the inadvertently produced privileged item. If the party returning such item seeks an order to compel production of such documents, such party shall not assert as a ground for entering such an order the fact (or circumstances) of the inadvertent production.

27.    All parties and other persons who receive CONFIDENTIAL DOCUMENTS shall be under a continuing duty not to disclose such documents, except as permitted by this PROTECTIVE ORDER, and this duty shall continue in full force and effect after the completion of this litigation.

IT IS SO ORDERED.

Dated this 28th day of July, 2008.

_____
C. Richard Miserendino
Administrative Law Judge

**APPENDIX A**

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**WASHINGTON, D.C.**

---

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | DECLARATION |
| COMPUCREDIT CORPORATION | ) | ACKNOWLEDGING |
| ATLANTA, GEORGIA | ) | PROTECTIVE ORDER |
| | ) | |
| An Institution-Affiliated Party of: | ) | FDIC-08-139b |
| | ) | FDIC-08-140k |
| COLUMBUS BANK AND TRUST COMPANY | ) | |
| COLUMBUS, GEORGIA | ) | |
| | ) | |
| (Insured State Nonmember Bank) | ) | |

---

I, _____, declare as follows:

1.      [I am assisting **[name of party]** in the preparation, pre-trial and trial of this proceeding.] or [I am a potential witness in this proceeding.]

2.      I acknowledge that I will be receiving confidential information and/or reviewing confidential documents subject to a PROTECTIVE ORDER dated July____, 2008. I have read and understand the PROTECTIVE ORDER and acknowledge that the PROTECTIVE ORDER is binding upon me.

3.      I agree not to disclose any such confidential information, except under the limited conditions permitted in the PROTECTIVE ORDER.

4.      I understand that I may be subject to sanctions if I make any unauthorized disclosure of such confidential information.

10

I declare under penalty of perjury that the foregoing is true and correct and that I am executing this declaration in _____, _____, on the ___ day of _____, 2008.

                                        _____

11

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 28, 2008, the foregoing Protective Order was served by electronic mail upon the following persons:

Valerie J. Best, Assistant Executive Secretary
A.T. Dill, Esq., Heather Walters, Esq.; Andrea Fulton Toliver, Esq., Marguerite Sagatelian, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429
chammond@fdic.gov ; vbest@fdic.gov; adill@fdic.gov; hewalters@fdic.gov; atoliver@fdic.gov
msagatelian@fdic.gov

Pat Cipollone, Esq., Michael Williams, Esq., Rebecca Ruby Anzidei, Esq., Daniel T. Donovan
Kirkland Ellis LLP
655 Fifteenth Street
Washington, DC  20005
pcipollone@kirkland.com; mwilliams@kirkland.com; ranzidei@kirkland.com;
ddonovan@kirkland.com

Brian McCormally, Esq., David Bergman, Esq., Robert Clark, Esq., Erica Taylor McKinley, Esq.
Jeremy W. Hochberg, Esq.
Arnold & Porter LLP
555 12th Street NW
Washington, DC  20004
Brian.mccormally@aporter.com; David.bergman@aporter.com; Robert.clark@aporter.com;
Erica.mckinley@aporter.com; Jeremy.hochberg@aporter.com

Gerald J. Langan
Office of Financial Institution Adjudication
3501 N. Fairfax Drive Suite D8116
Arlington, Virginia 22226-3500
ofia@fdic.gov (e-mail), (703) 562-2762 (telephone)
(703) 562-2775 (fax)

12

## CERTIFICATE OF SERVICE

I certify that, on August 15, 2008, I served a true and correct copy of the foregoing **COMPUCREDIT CORPORATION'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY THE FEDERAL DEPOSIT INSURANCE CORPORATION, MEMORANDUM OF POINTS AND AUTHORITIES OF COMPUCREDIT IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION,** and the proposed **ORDER ON COMPUCREDIT CORPORATION'S MOTION TO COMPEL THE FEDERAL DEPOSIT INSURANCE CORPORATION TO PRODUCE DOCUMENTS RESPONSIVE TO COMPUCREDIT'S SUBPOENA** on the following by electronic mail and U.S. Mail per an agreement of counsel (additionally Karla Sanchez was served by hand-delivery):

Mark L. Glassman
mglassman@ftc.gov
Leah Frazier
lfrazier@ftc.gov
Seena Gressin
sgressin@ftc.gov
David M. Wiese
dwiese@ftc.gov
Katherine Worthman
kworthman@ftc.gov
Federal Trade Commission

Thomas Feeney
TFeeney@fdic.gov
Marguerite Sagatelian
msagatelian@fdic.gov
Heather Walters
hewalters@fdic.gov
Federal Deposit Insurance Corporation

Karla G. Sanchez
(also served by hand-delivery)
ksanchez@pbwt.com
Patterson Belknap Webb & Tyler, LLP

Respectfully submitted, this 15th day of August, 2008.

Brittany P. Whitesell

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

COMPUCREDIT CORPORATION and
JEFFERSON CAPITAL SYSTEMS,
LLC, Five Concourse Parkway, Suite
400, Atlanta, GA 30328

     Defendants.

On Motion to Compel Enforcement
of Subpoena *Duces Tecum*

U.S. District Court for the Northern
District of Georgia, Atlanta Division
No. 1:08-CV-1976

**ORDER ON COMPUCREDIT CORPORATION'S**
**MOTION TO COMPEL THE FEDERAL DEPOSIT INSURANCE CORPORATION TO**
**PRODUCE DOCUMENTS RESPONSIVE TO COMPUCREDIT'S SUBPOENA**

This matter came before the Court on CompuCredit Corporation's Motion to Compel Production of Documents by the Federal Deposit Insurance Corporation. The Court has reviewed the motion, the opposition thereto, and the accompanying submissions by the parties. The Court has heard argument of counsel and is otherwise apprised in the premises. Accordingly, it is

ORDERED AND ADJUDGED as follows:

The Federal Deposit Insurance Corporation is ordered to produce all non-privileged documents responsive to CompuCredit's subpoena.

ORDERED, this ___ day of August 2008.

_____