**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

COMPUCREDIT CORPORATION and
JEFFERSON CAPITAL SYSTEMS,
LLC, Five Concourse Parkway, Suite
400, Atlanta, GA 30328

     Defendants.

On Motion to Compel Enforcement
of Subpoena *Duces Tecum*

U.S. District Court for the Northern
District of Georgia, Atlanta Division
No. 1:08-CV-1976

**REPLY IN SUPPORT OF COMPUCREDIT CORPORATION'S MOTION TO
COMPEL PRODUCTION OF DOCUMENTS**

As detailed in its opening brief, the documents sought by CompuCredit Corporation

("Corporation") in its subpoena seek plainly relevant information and should be produced. The

Federal Deposit Insurance Corporation ("FDIC") and Federal Trade Commission's ("FTC")

respective opposition motions do not undermine this conclusion. Rather than dispute the

discoverability of the documents, the FDIC's opposition raises meritless procedural issues such

as the meet and confer obligation, which was met, and the need for a protective order, which had

already been entered. While CompuCredit addresses these arguments below, CompuCredit

prefers to focus on the relevance of the documents it seeks. For example, CompuCredit seeks

documents relating to the FTC's purported jurisdiction over CompuCredit, an issue on which the

FDIC just today submitted a letter to the court in the Northern District of Georgia. CompuCredit

also seeks documents relating to the FDIC's review of CompuCredit's solicitations, and its

repeated findings that the very solicitations claimed to be deceptive by the FTC do in fact

comply with federal consumer protection laws. For its part, the FTC appears to oppose

production of such documents because they would be harmful to its case. Clearly then, the documents CompuCredit seeks from the FDIC are relevant, and the FDIC should be ordered to produce all responsive, non-privileged documents immediately.

**ARGUMENT**

**I.    COMPUCREDIT'S MOTION IS TIMELY AND THE FDIC'S DELAY IN PRODUCING DOCUMENTS PREJUDICES COMPUCREDIT.**

The FDIC argues that CompuCredit's motion is premature. In support of this argument, the FDIC puts forth three primary arguments detailed below. Each of the FDIC's arguments are misplaced. As CompuCredit explained in its motion, the expedited schedule set in the underlying FTC action against CompuCredit necessitates the FDIC fulfill its obligations and produce all responsive documents immediately.

**A.    CompuCredit Met and Conferred Extensively With FDIC Counsel.**

The FDIC first argues that CompuCredit disregarded its offer to meet and confer regarding the production. That is wrong. CompuCredit counsel met and conferred with FDIC counsel on repeated occasions -- as memorialized in numerous letters attached to both parties' briefs. In the six weeks between CompuCredit's service of its subpoena on the FDIC and CompuCredit's filing of this motion to compel, CompuCredit conferred with the FDIC for several hours about each of the requests in the subpoena and the FDIC's responses and objections, including conference calls on:

- July 21, 2008 Conference Call, in which Marguerite Sagatelian and Heather Walters participated on behalf of the FDIC;

- July 22, 2008 Conference Call, in which Marguerite Sagatelian, Tom Feeney, and Heather Walters participated on behalf of the FDIC;

- July 24, 2008 Conference Call (in which Marguerite Sagatelian, Tom Feeney, and Heather Walters also participated on behalf of the FDIC).

In addition, CompuCredit and FDIC counsel had other telephone conversations and exchanged correspondence regarding the requested documents. (*See* July 23, 2008 Ltr. from M. Sagatelian to M. Williams (Ex. A); July 24, 2008 Ltr. from M. Williams to M. Sagatelian (Ex. B); July 25, 2008 Ltr. from H. Walters to M. Williams (Ex. C); July 31, 2008 Ltr. from H. Walters to M. Williams (Ex. D); Aug. 1, 2008 Ltr. from M. Williams to H. Walters (Ex. E).) In its opposition brief, the FDIC even concedes that CompuCredit and the FDIC had met and conferred. (Aug. 26, 2008 FDIC Opp'n Br. at 4 ("As early as July 21 and 22, 2008, Marguerite Sagatelian, enforcement counsel for the FDIC, engaged in a meet-and-confer session with CompuCredit's counsel regarding CompuCredit's document subpoena.").) These "meet-and-confer sessions" as well as CompuCredit's extensive communications with the FDIC by letter, email, and telephone—which were outlined in CompuCredit's motion to compel—clearly fulfill the requirement that parties meet and confer about discovery disputes before seeking the Court's intervention.

Not only did CompuCredit meet and confer with the FDIC on numerous occasions *after* serving the subpoena and before filing the motion to compel, counsel for CompuCredit discussed the subpoena with FDIC counsel multiple times *before* the subpoena was ever issued. To put CompuCredit's subpoena in context, CompuCredit has responded to document requests from the FDIC for over 18 months and has produced over a 100,000 pages of documents and 20 discs of raw data to the FDIC. CompuCredit's production to the FDIC concerns the very same issues and topics as CompuCredit's subpoena to the FDIC. Indeed, given these discussions, the FDIC knew that a subpoena would be issued and in fact, agreed to accepted service.

B.    **The FDIC's Request for An Amendment To The Already Court-Entered Protective Order Was Merely A Delay Tactic.**

The FDIC next argues that it was precluded from producing documents because no sufficient protective order had been entered in the underlying action, *FTC v. CompuCredit Corp, et al.* That is incorrect -- and regardless, should not have stopped the FDIC from readying all responsive documents for production upon entry of the protective order.

On July 30, 2008, Magistrate Judge Vineyard entered a protective order in the underlying matter, *FTC v. CompuCredit Corp.* Significantly, the FDIC participated in the drafting of the protective order. The FDIC reviewed and commented on the protective order as CompuCredit and the FTC were drafting the order. (*See* Email thread between M. Glassman (FTC) and R. Anzidei (counsel for CompuCredit) (Ex. F).) The FTC implemented the FDIC's changes, CompuCredit agreed to them, and they were incorporated into the protective order entered by the Court.

Nonetheless, after the protective order was entered, the FDIC sought additional amendments as a pretext to delay its production of documents. The FDIC demanded the addition of seven words to the protective order that did nothing to change its scope or meaning. Specifically, the FDIC demanded that paragraph 13 be amended to add the bold words so it now reads "Nothing contained herein shall be construed to affect in any way the admissibility of any document, testimony or other evidence at trial **or hearing or in the RELATED LITIGATION.**" (*See* Aug. 28, 2008 Am. Protective Order at 1 (emphasis added).) This amendment hardly justified the FDIC's refusal to produce documents, and in no way posed any obstacle to the collection and preparation for production of all responsive documents. The fact that the FDIC did not produce all responsive documents upon the entry of the amended protective order on August 6, 2008 makes it clear that this was nothing more than a delay tactic.

### C.    The FDIC Has Repeatedly Refused to Produce Documents.

Based on the expedited schedule in *FTC v. CompuCredit Corp.* and the FDIC's and FTC's attempts to impede CompuCredit's discovery efforts, the discovery disputes between the FDIC and CompuCredit are ripe for judicial resolution.  For example, the FDIC has issued 18 pages of objections to CompuCredit's subpoena, agreeing to produce only documents that "constitute consumer complaints or communications concerning CompuCredit's credit card products." (Aug. 11, 2008 FDIC Resps. & Objs. at 8.)  The FDIC has also refused to provide CompuCredit with even an estimation of when the small number of documents they have agreed to produce will actually be produced.  The FDIC's refusal to produce scores of responsive documents, or to give a date certain for production of documents, is prejudicial to CompuCredit given the impending close of *all* discovery —fact and expert—on December 15, 2008.  (July 7, 2008 Consent Order at 5.)  Moreover, the FDIC has moved to strike several of the same document requests CompuCredit made in the FDIC's administrative proceeding.  Against this background, CompuCredit's motion to compel is anything but premature.

## II.    THE FDIC SHOULD BE ORDERED TO PRODUCE ALL NON-PRIVILEGED DOCUMENTS REQUESTED BY THE SUBPOENA AND PRODUCE ALL PRIVILEGED DOCUMENTS IN REDACTED FORM.

The FDIC should be ordered to produce all non-privileged documents sought by CompuCredit's subpoena as well as redacted versions of any privileged documents and identify any documents withheld on the basis of privilege.

"In general, a party is entitled to discover information if the information sought appears 'reasonably calculated to lead to the discovery of admissible evidence.' Additionally, a party may discover information that is not privileged and 'is relevant to the claim or defense of any party.'" *Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 21 (D.D.C. 2005) (quoting Fed. R. Civ. P. 26(b)(1)).  For purposes of discovery, the term "relevant" encompasses "any

5

matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). The scope of discovery is broadly construed. *Washington*, 230 F.R.D. at 21. Furthermore, "the burden of showing that the requested discovery is not relevant to the issues in this litigation is clearly on the party resisting discovery." *Spell v. McDaniel*, 591 F. Supp. 1090, 1114 (E.D.N.C. 1984). Against these standards, CompuCredit's requests are plainly relevant and the FDIC should produce documents immediately.

### A.     Documents Related to Jurisdiction (Requests 2-4, 20 and 32).

CompuCredit seeks documents related to the issue of whether the FTC has jurisdiction to bring the asserted § 5 claims against CompuCredit under these circumstances. These documents may reveal admissions that the FTC told the FDIC that the FTC lacked jurisdiction. Or the documents may demonstrate a pattern and practice of the FDIC acting as if it has exclusive jurisdiction to enforce § 5 against bank service providers such as CompuCredit. Indeed, neither the FDIC nor the FTC can or do argue that such documents are not relevant to CompuCredit's pending motion to dismiss for lack of subject matter jurisdiction.

Instead, the FTC argues that because the FDIC has delayed for so long and the briefing on CompuCredit's motion is close to completion, the FDIC should not have to produce such documents. (Aug. 28, 2008 FTC Opp'n Br. at 6 n2.) But that argument turns the FDIC's obligations (not to mention the FTC's obligations as officers of the court in the *FTC v. CompuCredit* matter) on its head. Moreover, it is incredible that the FTC would make such an argument when just today, the FDIC submitted a letter to the court in the underlying litigation supporting the FTC's claim that it has jurisdiction over CompuCredit. (Sept. 3, 2008 Ltr. from J. Thomas (FDIC Deputy General Counsel) to U.S. District Court for the N.D. Ga. (Ex. G).)

Clearly these documents are relevant and the Court should order these documents be produced *without delay.*

Significantly, the FDIC previously agreed to produce these documents. In the July 22, 2008 meet-and-confer, the FDIC agreed to search for documents relating to the jurisdictional issue. In a follow-up letter, the FDIC acknowledged that the jurisdictional documents were CompuCredit's top priority in terms of the FDIC's document production. (*See* Ltr. from M. Sagatelian to M. Williams at 1 (July 23, 2008) (Ex. A).) In another meet-and-confer on July 24, 2008, the FDIC stated that it was searching the Division of Supervision and the Division of Consumer Protection for the jurisdictional documents, and that it expected to produce responsive documents within two weeks. It is more than five weeks later, and CompuCredit still has not received responsive documents on these topics. The FDIC's decision to renege on its prior agreement to produce such documents highlights further the need for judicial intervention.

## B.   Documents Related to the Consumer Response Center (Request 5).

The FDIC has also reneged on its prior agreement to produce all relevant documents from the Consumer Response Center. The only category of documents the FDIC now agrees to produce are documents that "constitute consumer complaints or communications concerning CompuCredit's credit card products," which is far more narrow in scope than what the FDIC originally agreed to produce during their meet-and-confers. On July 22, 2008, the FDIC agreed to produce all relevant *Consumer Response Center files in their entirety*, instead of just the consumer complaints or communications themselves. (*See* July 23, 2008 Ltr. from M. Sagatelian to M. Williams at 1 (Ex. A).) Five weeks later and this still has not happened. Just last Friday, the FDIC finally produced consumer complaints and communications, but other categories of documents that should be in the Consumer Response Center files are noticeably absent, like supporting documentation from banks.

These documents, which relate to inquiries and complaints the FDIC received concerning marketing or solicitation materials or credit cards at issue in the FTC action, go to the heart of the issues raised in this case. By way of illustration, the FTC's own opposition brief states that its lawsuit is based principally upon allegations that CompuCredit:

> (1) misrepresented the amount of available credit consumers would receive on credit cards; [and] (2) failed to disclose or disclose adequately that it would impose substantial up-front fees on certain credit card accounts . . . .

(Aug. 28, 2008 FTC Opp'n Br. at 4-5.) But the FDIC resolved a consumer complaint on July 13, 2005, by pointing out that the very credit card solicitation and marketing materials at issue in this case adequately disclosed all of the fees referenced by the FTC:

> Documentation provided by Aspire indicates the offer you received was for a $300 credit card. This offer indicated that a $150 annual fee, $29 account opening fee, and $6.50 monthly maintenance fee would be billed on your first statement. This offer also disclosed that a minimum monthly payment of $20 was due upon receipt to activate your account."

(July 13, 2005 Ltr. from K. Porter (Ex. H) (redacted).) Simply put, the FDIC's contemporaneous findings with respect to the disclosures of available credit and fees flatly contradict the FTC's core allegations in this case. There is no conceivable basis for arguing that documents relating to these findings are not relevant or should not be produced.

By its own admission, the FDIC reviewed and analyzed the relevant solicitation and marketing materials for compliance with federal consumer protection laws. In a March 16, 2004 letter to a consumer, the FDIC stated: "As part of its supervisory responsibility, the FDIC assists consumers with complaints by informing them of their rights under federal consumer protection laws and by reviewing the bank's actions to assess whether the bank has complied with such rules." (Mar. 16, 2004 Ltr. from K. Porter (Ex. I) (redacted).) It reviewed credit card programs for compliance with consumer protection laws on a broad range of subjects, including credit

report requests, billing disputes, adverse action notices, collection practices, and terms and conditions. (*See, e.g.*, Apr. 16, 2003 Ltr. from J. Kincaid (FDIC) to G. Clark at 2 (Ex. J.).)

If this case proceeds to trial, the FTC will presumably argue, through expert testimony, that the credit card solicitations and marketing materials are deceptive. At the same time, however, the FTC seeks to exclude from discovery documents relating to determinations by federal government officials with statutory responsibility for reviewing the same credit card solicitations and marketing materials that contradict their theory on the grounds that they are not relevant. That argument misapprehends the concept of "relevance" under the Federal Rules. Just because documents are harmful to one's case does not make them irrelevant or immune from production. Moreover, the FTC's position on relevance is contradicted by the position taken by the FTC in other cases where it sought to move the very same Consumer Response Center documents into evidence. *See, e.g.*, *Federal Trade Comm'n v. Ameridebt, Inc.*, No. PJM03-3317, 2005 WL 3569652, at *1 (D. Md. Oct. 26, 2005). Simply because the FDIC repeatedly found that the materials were not deceptive does not justify a change of the discovery standard. The Consumer Response Center files are relevant, and the FDIC should be ordered to produce them in their entirety.

### C.    Requests Relating to FDIC Examinations (Requests 6-13).

CompuCredit seeks documents which relate to the examinations and visitations of CompuCredit and the banks that actually approved the solicitation and marketing materials and issued the credit cards at issue in the FTC case that took place during the relevant time period. Upon information and belief, those examinations involved extensive reviews of the solicitation and marketing materials as well as other credit card practices at issue in the FTC case. Like the Consumer Response Center files, if the federal government—indeed, the expert banking regulators—reviewed these materials and found they complied with federal law that is plainly

relevant to rebut the FTC's allegations that the very same solicitations violated the same federal law. These documents are plainly relevant and should be produced.

During the July 22 meet-and-confer, the FDIC actually agreed not only to produce examination and visitation reports and associated work papers, but also to inquire about examiner files that may exist separate from the work papers. (*See* July 23, 2008 Ltr. from M. Sagatelian to M. Williams at 1 (Ex. A).) On July 24, 2008, the FDIC further agreed to confirm the scope of such documents kept in regional offices and confirmed that responsive documents would be produced. Despite the FDIC's agreements to produce, CompuCredit has not yet received a single document related to the examinations and visitations.

### D.    Documents Related to Scope of the FDIC's Review (Requests 16-19 and 32).

As discussed above, the FDIC has repeatedly reviewed the very solicitations and marketing materials at issue in this case, and have likely been subject to the FDIC's examinations and visitations. Therefore, the training manuals and policy statements regarding the scope of the FDIC's Consumer Response Center review and its examinations and visitations are clearly relevant. Here, again, the FDIC originally agreed to produce these documents. Despite this prior agreement, the FDIC now claims that it does not have to produce them because the training manuals are publicly available. (Aug. 26, 2008 FDIC Opp'n Br. at 9.) However, the one training manual produced by the FDIC is marked "Confidential Pursuant To Stipulated Protective Order," which would be improper if this document is in fact publicly available. Furthermore, even if they are publicly available, the FDIC is not relieved of its discovery obligations. During the July 22 meet-and-confer, the FDIC agreed to provide the specific location of any publicly available documents it considers responsive to CompuCredit's requests, yet it has not done so. (*See* July 23, 2008 Ltr. from M. Sagatelian to M. Williams at 1 (Ex. A).) In addition, CompuCredit does not only seek the public versions of the training manuals and

10

policy statements; it also seeks internal FDIC documents related to the training manuals and policy statements.  These documents are highly relevant, and the FDIC should be ordered to produce them.

### E.     Documents Related to Surveys, Analyses and Copy Tests (Requests 14-15).

CompuCredit seeks documents relating to any surveys, analyses or copy tests of the solicitations or marketing materials or credit cards that the FDIC may have conducted during the relevant time period.  These reviews are commonly conducted by government agencies. For instance, during the relevant time period, the Federal Reserve Board conducted focus groups and other consumer surveys on how well consumers understand credit cards, credit card marketing and solicitation materials, and credit card fee disclosures within those solicitations.  Any such surveys, analyses or copy tests done by the FDIC are relevant to this case.  Indeed, the FTC officially advises that such information is relevant in FTC Act § 5 cases in its Statement on Deception. (*FTC Policy Statement on Deception,* 103 F.T.C. 174 (1984) (appended to *In re Cliffdale Assocs.*) (Ex. K).)  Accordingly, the FDIC should be ordered to conduct a reasonable search for any such surveys, analyses or copy tests and produce them to CompuCredit.

### F.     Documents Related to the FDIC's Document Retention (Request 21).

Document retention polices are produced as a matter of course in litigation, and this litigation should be no exception.  Neither the FTC nor the FDIC can dispute the relevance of these documents, as the FTC issued the exact same request to both CompuCredit and Jefferson Capital in the underlying litigation.  Moreover, it is critical that CompuCredit be able determine if any documents were destroyed, when they were destroyed, why they were destroyed, and on whose orders they were destroyed.  The FDIC should be ordered to produce such documents.

### G. Documents Related to Meetings and Communications About CompuCredit or the Issues Covered by the FTC Complaint (Requests 22-26).

CompuCredit seeks documents related to any meetings or other communications that the FDIC has had with the FTC, other governmental agencies, public officials, or various other entities regarding credit card solicitations, practices or activities, or the disclosure of credit card terms or conditions. These documents are relevant to the FTC's claims against CompuCredit in light of the highly coordinated litigation efforts of the FTC and the FDIC. Notably, the FTC and the FDIC filed their respective cases on the very same day, and held a joint press conference announcing the filings. These documents may reveal the bases for the FTC's claims as well as identify any individual or entity that disagreed with the FTC's position. Moreover, these documents will reveal the FTC's evidentiary sources because information obtained by the FDIC was ultimately passed on to the FTC when the agencies coordinated their efforts against CompuCredit. Notably, the FTC claims that it has no independent evidence, but rather relies on documents obtained from others as the basis for its allegations. Accordingly, the FDIC should be ordered to produce all non-privileged documents or redacted versions of privileged documents that reflect any meetings that it had with the FTC or any third-party relating to the issues raised in this enforcement action.

### H. Documents Related to Communications with CB&T (Requests 28-30).

Columbus Bank & Trust ("CB&T") is the bank that actually issued the credit cards and ultimately approved the solicitation and marketing materials now being challenged by the FTC. Given CB&T's prominent role in the events central to the FTC action, and the fact that any information the FDIC received is transmitted directly to the FTC, any communications between the FDIC and CB&T are highly relevant and should be produced. It is undisputed that the FDIC is CB&T's exclusive regulator because the FTC lacks jurisdiction over banks. It is also

undisputed that the FDIC reached a settlement with CB&T relating to its role in issuing the credit cards and approving the solicitation and marketing materials that are now being challenged. Any information provided by CB&T to the FDIC, whether before or after the settlement, that was provided to the FTC could have been used to form the basis for the FTC's claims against CompuCredit. Therefore, the FDIC should be ordered to produce to CompuCredit documents reflecting its communications with CB&T.

### I.     Documents Related to NextBank, N.A., Phoenix, Arizona (Request 27).

CompuCredit seeks documents relating to NextBank, N.A., Phoenix, Arizona, because NextBank came under the control of the FDIC, during which time the FDIC contracted with CompuCredit to provided marketing and servicing for NextBank's credit cards. Through this contractual relationship, the FDIC gained extensive knowledge of CompuCredit's credit card practices. Indeed, CompuCredit was engaged in the same credit card practices on behalf of the FDIC that are now at issue in the FTC action. Thus, documents in the FDIC's possession relating to CompuCredit's services for NextBank are plainly relevant to the FTC's claims against CompuCredit. Accordingly, the FDIC should be ordered to produce these documents.

### III.    THE FTC'S CONCERN THAT THE FDIC'S DOCUMENTS WILL UNDERMINE ITS CLAIMS IS NOT A BASIS TO AVOID PRODUCTION OF RESPONSIVE DOCUMENTS.

The FTC is concerned that the FDIC's documents will undermine its claims against CompuCredit, and rightly so. However, attempting to block discovery of responsive documents simply because they are harmful for one's case is an improper litigation tactic.[1] The FTC has already taken the untenable position that CompuCredit is not entitled to any deposition discovery from the FTC, despite being the plaintiff in a civil action in federal court. (Aug. 15, 2008 Mot.

---

[1] To the extent the FTC opposes CompuCredit's motion to compel on the grounds that the documents sought are not relevant, the FTC lacks standing and their opposition should be disregarded. *Washington,* 230 F.R.D. at 21.

for a Protective Order Against FTC Dep. at 3-4.)  The FTC has also argued that CompuCredit is not entitled to any deposition discovery from the FDIC either.  (Aug. 28, 2008 FTC Opp'n Br. at 9; Aug. 15, 2008 FTC Mot. for a Protective Order Against FDIC Deps.)  Now, the FTC is trying to block CompuCredit's ability to get even document discovery from the FDIC.  At base, the FTC is attempting to block all of CompuCredit's efforts to discover any information that could be harmful to the FTC's claims.

The FTC even goes so far as to argue that the FDIC does not have any documents that are relevant to the FTC's claims against CompuCredit.  Yet, in its initial disclosures, the FTC identified documents that it has obtained or will obtain from the FDIC as the chief category of documents that it intends to use to prosecute its case against CompuCredit. (July 7, 2008 FTC Initial Disclosures at 8.)

Moreover, the FTC admits in its opposition brief the meaning or interpretation ascribed to a solicitation is "fundamentally a question of fact." (Aug. 28, 2008 FTC Opp'n Br. at 5.) Notwithstanding that, the FTC seeks to block discovery into the very facts that bear on the meaning and interpretation of the solicitation and marketing materials.  The FDIC's role as reviewer of the solicitation and marketing materials placed it in a good position to determine whether there was a pattern of deception.  Clearly documents in the FDIC's possession are an excellent source of facts regarding the meaning and interpretation of these materials.  Therefore, the FDIC is a vital source of information for CompuCredit and should be ordered to produce documents in response to CompuCredit's subpoena.  The FTC acknowledges that the FDIC has relevant information, which is why the FTC wants to use FDIC documents in its own case. Indeed, the FTC has utilized documents obtained from the FDIC in other FTC Act § 5 cases. *See,*

*e.g.*, *Ameridebt, Inc.*, 2005 WL 3569652, at *1.  If the FTC is permitted discovery of and access to, documents in the possession of the FDIC, then CompuCredit should be as well.

The FTC's claim that discovery should be limited to just solicitations is wrong.  The solicitations were not misleading or deceptive on their own. Accordingly, they cannot be viewed in isolation. As the FDIC makes clear, the entire process through which consumers go to obtain a credit card needs to be considered, along with each and every disclosure the consumers received— from the acceptance certificate to the cardholder agreement. (*See* Aug. 18, 2006 Ltr. from K. Porter (Ex. L).)  This is the process that the FDIC reviewed repeatedly, and determined time and time again that CompuCredit's practices complied fully with all applicable laws. Accordingly, the FDIC clearly has relevant documents and CompuCredit is entitled to discovery of such information.

## CONCLUSION

The FDIC should be ordered to produce all responsive, non-privileged documents immediately.

Dated: September 3, 2008                    Respectfully Submitted,

                                            /s/ Daniel T. Donovan
                                            Daniel T. Donovan
                                            Rebecca R. Anzidei
                                            Michael F. Williams
                                            KIRKLAND & ELLIS LLP
                                            655 Fifteenth Street, N.W.
                                            Washington, D.C.  20005
                                            Tel: (202) 879-5000
                                            Fax: (202) 879-5200

                                            ***Attorneys for CompuCredit Corporation***

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2008, I electronically filed the REPLY IN SUPPORT OF COMPUCREDIT CORPORATION'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Gregory A. Ashe
Dorothy Ashley Doherty

/s/ Daniel T. Donovan_____
Daniel T. Donovan
***Attorney for CompuCredit Corporation***

Exhibit A

**FDIC**

**Federal Deposit Insurance Corporation**
Boston Area Office - Legal Division                    Tel. (781) 794-5500
15 Braintree Hill Office Park, Braintree, MA  02184    Fax (781) 794-5600

July 23, 2008

VIA E-MAIL ATTACHMENT

Michael F. Williams, Esq.
Kirkland & Ellis LLP
655  Fifteenth Street, N.W.
Washington, DC 20005

Re:    *FTC v. CompuCredit, et al.*, 1:08-cv-1976 (BBM)
       Subpoena Duces Tecum

Dear Michael:

        This letter is to confirm our telephonic discussions of July 21 and 22, 2008 with respect to the Subpoena Duces Tecum (Subpoena) issued by CompuCredit Corporation (CompuCredit) to the Federal Deposit Insurance Corporation (FDIC) on July 3, 2008.

        You indicated that CompuCredit's priorities for production included the document requests that relate to the following three areas:

  (1) FDIC and the FTC jurisdiction over CompuCredit and financial institutions for
      Section 5 violations.  We agreed to reasonably search for documents relating to the
      FDIC's position, if any, on FTC jurisdiction.  We also agreed to search for
      background documents related to the FDIC's public policy statements on these
      jurisdictional issues.

  (2) The FDIC's Consumer Response Center and consumer complaints.  We agreed to
      produce relevant consumer complaint files, and search for any relevant complaints
      that might be identified in the supervisory files of the three banks and CompuCredit.

  (3) Columbus Bank and Trust and CompuCredit examinations and visitation work papers
      and materials.  We agreed to produce relevant examination and visitation reports, and
      associated work papers.  We also agreed to inquire about examiner files that may exist
      separate from the work papers.

        You requested specific location identification of publicly available documents and we agreed to provide that identification.  Without waiving any of the FDIC's objections as stated in our letter dated July 17, 2008, will begin production of documents according to your priorities

Michael F. Williams, Esq.
July 23, 2008
Page 2 of 2

once an appropriate protective order is in place, subject to any applicable privileges and appropriate relevancy restrictions.

Given the large production required by your subpoena, as well as the current lack of an appropriate protective order, we do not anticipate completing production by July 28, 2008, as requested by the subpoena. As we discussed, we will give you an estimated time frame to begin a rolling production of the priority documents during our scheduled call on Thursday, July 24, 2008 at 10:00 a.m. We appreciate your cooperation in this matter.

If you have any questions concerning the foregoing, please feel free to contact me at 781-794-5620 or Tom Feeney at 202-898-3690.

Sincerely,

Marguerite Sagatelian
Enforcement Counsel
msagatelian@fdic.gov

cc:    Pat Cipollone, Esq.
       Robert Clark, Esq.
       Thomas J. Feeney, Supervisory Counsel
       Heather Walters, Enforcement Counsel

Exhibit B

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Michael F. Williams
To Call Writer Directly:
(202) 879-5123
mwilliams@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

July 24, 2008

**BY ELECTRONIC MAIL**

Marguerite Sagatelian
Senior Counsel
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, DC 20249

> Re: *FTC v. CompuCredit Corp., et al., No. 08-1976 (N.D. Ga.)*

Dear Marguerite:

I am writing to follow up on our conference call of earlier this morning.

*1. Request for a Date Certain to Begin Producing Documents.* During our call, we asked when we could expect the FDIC to begin producing documents responsive to CompuCredit's subpoena. Although you represented that the FDIC was looking into what documents it has, you would not provide us a date certain by which the FDIC will begin production. We again request a date certain that the FDIC will begin to produce documents responsive to the subpoena. As you are aware, the discovery schedule in this matter provides for the close of all discovery—document, depositions, and expert discovery—by December 15, 2008. Accordingly, we need the responsive documents produced immediately.

We want to emphasize that we identified certain categories of documents as priority categories in an effort to facilitate the FDIC's response to the subpoena. Our identification of priorities should not be interpreted as an agreement to narrow or to limit CompuCredit's requests. Rather, CompuCredit is requesting that the FDIC provide all non-privileged, responsive documents as soon as practicable. As I mentioned, we also ask that you not place any implicit or unspoken limits on the FDIC's document production—*e.g.*, withholding categories of exam-related documents based on your view that they may not be relevant to this case.

*2. The FDIC's Objections to the Document Subpoena.* During the call, you stated that the FDIC objects to the subpoena to the extent that it would require the production of documents that would not be available to CompuCredit in the FDIC's administrative proceeding and to the extent that CompuCredit's requests do not satisfy the procedural burdens of 12 C.F.R. § 309.5. As we explained, under applicable case law and the Federal Rules of Civil Procedure, we are under no obligation to justify our requests under the FDIC's "material relevancy" standard. The

Chicago     Hong Kong     London     Los Angeles     Munich     New York     San Francisco

Stephen M. Colangelo
July 24, 2008
Page 2

**KIRKLAND & ELLIS LLP**

FDIC's internal procedures are simply not applicable in this federal court proceeding. In the interest of clarifying our areas of disagreement and resolving your objections, we asked that you provide written objections to our requests, and you agreed to provide those objections today.

    ***3. The FDIC's Objections to Depositions.*** During the call, you also indicated that the FDIC would not agree to produce for depositions two of the Consumer Response Center employees whom we have noticed, and that the FDIC would not agree to produce a witness or witnesses to testify about Topics Nos. 3, 4, 5, 6, or 9 of our Rule 30(b)(6) deposition. Your stated basis for not producing the witnesses was that the testimony would not be relevant in this case. As with the FDIC's objections to the document subpoena, you agreed to set forth your objections in writing, so that we may resolve the dispute with the Court if necessary.

    We look forward to receiving your written objections and to working with you to develop search terms for electronic documents. Please do not hesitate to contact me if you have questions or comments in the meantime.

                                        Very truly yours,

                                        Michael F. Williams /adn

                                        Michael F. Williams

Enclosures

cc:    Thomas Feeney
       Heather Walters
       Daniel Donovan
       Robert Clark

Exhibit C



**FDIC**
**Federal Deposit Insurance Corporation**
550 17th Street, N.W.
Washington, DC 20429

Legal Division
Enforcement Unit

July 25, 2008

<u>Via e-mail attachment</u>
Michael F. Williams, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005

     Re:   *FTC v. CompuCredit, et al.*, 1:08-cv-1976 (BBM)

Dear Michael:

     This letter is a follow up to our telephonic discussions of the week of July 21, 2008 and your letter to Marguerite Sagatelian dated July 24, 2008.

     Regarding document production, as we previously stated, we will begin document production when an appropriate protective order is in place. To our knowledge, that has not yet occurred. Once the protective order is in place and without waiving any objections, we will begin producing documents according to the priorities that you previously identified.

     We reserve all objections to the production of documents, or categories of documents, to be identified later. Regarding our objections to the document subpoena, we are conferring with our Litigation Division and will provide you with specific objections to the individual requests as soon as possible.

     With respect to the noticed depositions of Janet Kincaid, Karen Porter, and Emi Prindle, we object to the date, time, and location, as indicated of the Notices of Deposition. We will produce all three witnesses for deposition in Washington, D.C. on dates to be agreed upon. As we previously stated, we request that Janet Kincaid be deposed first to avoid any unnecessary inconvenience to Ms. Porter and Ms. Prindle; if Ms. Kincaid provides the information you seek, we would like to avoid any unnecessarily duplicative testimony. We reserve all objections to questions these witnesses may be asked, as well as objections to production of other witnesses.

     Regarding the 30(b)(6) notice, we designate Janet Kincaid as the individual most knowledgeable regarding topic two. We request that Ms. Kincaid's 30(b)(6) testimony be taken concurrently with her individual deposition to avoid any duplication of testimony. Given the broad topic designations, we are conferring to determine appropriate designees for the other topics. We are also conferring with our Litigation Division regarding potential objections to the requested testimony and we reserve all objections to questions that may be asked of Ms. Kincaid or any other 30(b)(6) witness designated in the future. We will provide you with additional details as soon as possible.

Michael F. Williams, Esq.
July 25, 2008

      If you have any questions concerning the foregoing, please feel free to contact me at 202-898-6729 or Tom Feeney at 202-898-3690.

Sincerely,

Heather Walters
Counsel
HeWalters@fdic.gov

cc:    Pat A. Cipollone, Esq.
       Robert A. Clark, Esq.
       Charles L. Cope, Senior Counsel
       Thomas Feeney, Supervisory Counsel
       Marguerite Sagatelian, Counsel

2

Exhibit D



**FDIC**
**Federal Deposit Insurance Corporation**
550 17th Street, N.W.
Washington, DC 20429

Legal Division
Enforcement Unit

July 31, 2008

<u>Via e-mail attachment</u>
Michael F. Williams, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005

Re:    *FTC v. CompuCredit, et al.*, 1:08-cv-1976 (BBM)

Dear Michael:

This letter is in response to a telephonic message from Dan Donovan on July 29, 2008 and your letter of the same date.

Regarding document production, as we previously stated, we will begin document production when an appropriate protective order is in place. As you note, the administrative law judge issued a protective order in the administrative proceedings. Your subpoena, however, was issued in the FTC's federal court proceeding and we are informed that, as of today, no protective order had been issued in that case.

Your artificial deadline of July 24, 2008 for specific objections, in writing, to the document requests is not well taken. We complied with the Federal Rules of Civil Procedure, which required us to file our objections to the document requests by July 17, 2008 and we complied with those requirements. We also requested in multiple telephone calls that you explain the relevance of a number of the requests so that we can understand what you need and possibly reach a mutual accommodation that avoids imposing undue burden or expense on the FDIC as a third-party.

With respect to the noticed depositions of Janet Kincaid, Karen Porter, and Emi Prindle, we appreciate your agreement to depose these individuals in the Washington, D.C. area, and prefer that they be deposed at the FDIC's offices in Virginia Square. We also appreciate your willingness to be flexible in scheduling these depositions and are consulting with the deponents regarding their availability on your suggested dates.

We are currently gathering documents for production according to your priorities and without waiving any objections, will begin producing documents after the proper protective order is entered in the FTC litigation.

Michael F. Williams, Esq.
July 31, 2008

        We will provide you with additional details as soon as possible.  If   you have any
questions concerning the foregoing, please feel free to contact me at 202-898-6729 or Tom
Feeney at 202-898-3690.

                                            Sincerely,

                                            Heather Walters
                                            Counsel
                                            HeWalters@fdic.gov

cc:      Pat A. Cipollone, Esq.
         Robert A. Clark, Esq.
         Charles L. Cope, Senior Counsel
         Thomas Feeney, Supervisory Counsel
         Marguerite Sagatelian, Counsel

Exhibit E

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

(202) 879-5000

www.kirkland.com

Michael F. Williams
To Call Writer Directly:
(202) 879-5123
mwilliams@kirkland.com

Facsimile:
(202) 879-5200
Dir. Fax: (202) 879-5200

August 1, 2008

**BY ELECTRONIC MAIL**

Heather M. Walters
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, DC 20429

Re:    *FTC v. CompuCredit Corp., et al., No. 08-1976 (N.D. Ga.)*

Dear Heather:

I am writing in response to your letter of yesterday afternoon regarding the subpoenas to the FDIC in the above-referenced matter.

*1.    The Protective Orders in the FTC Action and the FDIC Proceedings.* As you know, the FTC and CompuCredit have agreed upon a protective order in this case—a protective order that incorporated input from the FDIC. In fact, the FDIC sought and received reassurances just yesterday that the protective order in this case would not prevent the FTC from sharing any documents that it receives with the FDIC. That agreed-upon protective order has been filed with the Court. Is it your position that the FDIC cannot produce any responsive documents until the Court actually issues an order entering the agreed-upon protective order? Please let us know. If that is your position, we will file a motion with the Court and make clear the FDIC's position and why we needed to file the motion.

Moreover, there is a protective order in place for the FDIC proceedings. As counsel for the FDIC stated before Judge Miserendino, there is likely to be a high degree of overlap in discovery between the FTC action and the FDIC administrative proceedings—as might be expected when two federal agencies seek the same relief on behalf of the same consumers based on the same facts and legal theories. Based on the position in your letter, we will serve document requests in the FDIC actions seeking the same documents we have requested in the FTC action. We are disappointed that the FDIC would make it necessary for us to take that course, as we were hoping to be able to make the discovery process more efficient..

*2.    The FDIC's Failure to Provide Specific Objections as Agreed.* The FDIC has complied with its obligations concerning timely objections to the subpoena. At this point, the FDIC has not even advised CompuCredit what documents it intends to produce. We have spent more than two hours on conference calls meeting-and-conferring about each of the requests in

Chicago        Hong Kong        London        Los Angeles        Munich        New York        San Francisco

# KIRKLAND & ELLIS LLP

Heather M. Walters
August 1, 2008
Page 2

the subpoena. During our conference call on July 24, 208, Ms. Sagatelian agreed to send an email that day providing the FDIC's specific responses and objections to the requests in the subpoena. Then on July 25, 2008, you sent me a letter stating you would provide "specific objections to the individual requests as soon as possible." But yesterday, your letter indicated that, despite our agreement with Ms. Sagatelian and your earlier representation, the FDIC does not intend to provide specific objections and responses to CompuCredit's requests.

     **3.**     ***Date Certain for Production of Documents.*** Please provide us with a date certain when responsive documents will be produced. Ms. Sagatelian advised in her July 22, 2008 letter that the FDIC would give us "an estimated time frame to begin a rolling production of the priority documents during our scheduled call on Thursday, July 24, 2008." On the July 24, 2008 call, the FDIC stated that they could not even provide an estimate with respect to most of the documents we requested. At this point, the FDIC is simply delaying. We understand that CompuCredit produced documents to the FDIC over the past two years, but CompuCredit has not been able to review the support for the FDIC's allegations. We suggest that you begin producing documents immediately, so that both sides can review the same information.

     Please do not hesitate to contact me if you have any questions.

Very truly yours,

Michael F. Williams

cc:    Thomas Feeney
       Marguerite Sagatelian
       Charles Cope
       Robert Clark

Exhibit F

**"Glassman, Mark"**
**<mglassman@ftc.gov>**          To   "Rebecca Anzidei" <ranzidei@kirkland.com>

07/25/2008 09:54 AM              cc

                                 Subje   RE: Protective Order
                                 ct

Sure, sorry about the oversight.  It is attached.  The only change is the phrase in Paragraph 1 addressing "12 C.F.R. Part 309."

> **From:** Rebecca Anzidei [mailto:ranzidei@kirkland.com]
> **Sent:** Friday, July 25, 2008 9:41 AM
> **To:** Glassman, Mark
> **Subject:** RE: Protective Order
>
> Great - thanks.  Can you send the revised version of the Protective Order that reflect the FDIC edits?
>
> Thanks,
>
> Rebecca

**"Glassman, Mark" <mglassman@ftc.gov>**

07/25/2008 09:39 AM                            To "Rebecca Anzidei" <ranzidei@kirkland.com>
                                               cc

                                               Subject RE: Protective Order

Rebecca,

        Yes, 10:00 a.m. would be fine.

Mark

**From:** Rebecca Anzidei [mailto:ranzidei@kirkland.com]
**Sent:** Thursday, July 24, 2008 8:47 PM
**To:** Glassman, Mark
**Subject:** RE: Protective Order

Mark,
    Can you talk tomorrow at 10 about the Protective Order?  Let me know and I'll call you then.

Thanks,

Rebecca

**"Glassman, Mark"**
**<mglassman@ftc.gov>**

07/22/2008 10:13 AM

|   |   |
|---|---|
| To | "Rebecca Anzidei" <ranzidei@kirkland.com> |
| cc | <pcipollone@kirkland.com>, <ddonovan@kirkland.com>, "Michael Williams" <MWilliams@kirkland.com>, "Ashe, Gregory" <GASHE@ftc.gov> |
| Subject | RE: Protective Order |

Rebecca,


    Per our exchange of messages yesterday, attached is a markup in response to your revisions to the Protective Order.  Perhaps we can talk through these in an effort to resolve any remaining differences.  Mechanically speaking, the markup accepts all changes proposed by you, and then makes changes to that version, which are reflected in track changes.

2

Mark

**From:** Rebecca Anzidei [mailto:ranzidei@kirkland.com]
**Sent:** Friday, July 18, 2008 12:56 PM
**To:** Glassman, Mark
**Cc:** pcipollone@kirkland.com; ddonovan@kirkland.com; Michael Williams
**Subject:** Protective Order

Mark,
    Attached is a slightly revised draft of the Protective Order.  Please let us know as soon as possible about these changes so that we can move forward with our document production.


Thanks so much,

Rebecca

```
**********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
**********************************************************

**********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
**********************************************************
```

3

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Exhibit G

# FDIC®

**Federal Deposit Insurance Corporation**
550 Seventeenth Street, NW, Washington, DC 20490

Legal Division

September 3, 2008

U.S. District Court for the Northern District of Georgia
Richard B. Russell Federal Building and Courthouse
75 Spring Street SW, Room 2211
Atlanta, Georgia  30303-3361

Re: *FTC v. CompuCredit*, Civ. No. 08-1976 (N.D. Ga.)

Dear Sir/Madam:

This letter addresses jurisdictional questions with respect to the Federal Trade Commission's (FTC) authority to bring the above action against CompuCredit Corporation ("CompuCredit") and the district court's authority to hear the action. We agree that the FTC may pursue this action and that the district court may entertain it. We disagree with the contrary views expressed by CompuCredit.

CompuCredit argues that section 5(a) of the Federal Trade Commission (FTC) Act, coupled with the federal banking agencies' authority to regulate and examine the performance of services for banks under section 7 of the Bank Service Company Act (BSCA), precludes the FTC from suing those who perform such services (bank service providers), including CompuCredit, for violations of section 5(a).

The FTC Act exempts "banks" from FTC's enforcement authority and expressly defines the term "bank." FTC Mem. at 10-11, *citing* 15 U.S.C. §§ 45(a), 44, 57a(f)(2). The definition of "bank" does not include bank service providers. Therefore, the FTC Act does not preclude the FTC from exercising jurisdiction over such providers. Section 7 of the BSCA, in turn, provides that

> whenever a depository institution that is regularly examined by *an appropriate Federal banking agency* or any subsidiary or affiliate of such a depository institution that is subject to examination *by that agency,* causes to be performed for itself, by contract or otherwise, any services authorized under this chapter, whether on or off its premises—(1) such performance shall be subject to regulation and examination *by such agency* to the same extent as if such services were being performed by the depository institution itself on its own premises.

12 U.S.C. § 1867(c)(emphasis added). This provision expands the regulatory and examination authority of the federal banking agencies, including the Federal Deposit Insurance Corporation (FDIC), over bank service providers. It does not limit the jurisdiction of any other federal agency, including the FTC, over such providers.

CompuCredit also argues that section 1818(i)(1) of Title 12 of the U.S. Code, which grants to the federal courts only limited jurisdiction over administrative notices and orders issued

by federal banking agencies, necessarily implies that a federal court may not exercise jurisdiction over a suit by the FTC against a bank service provider. That section provides that

> except as otherwise provided in this section or under section 1821*o* or 1831p-1 of this title, no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order.

The language of this statutory provision limits collateral attacks on administrative proceedings before the federal banking agencies but does not divest the Court of jurisdiction over CompuCredit. Nor does it preclude the FTC from exercising its statutory authority to bring an action against bank service providers that violate that FTC Act.

Finally, CompuCredit raises the specter of "untenable consequences" that would allegedly arise if this suit were to proceed along with the pending FDIC administrative proceeding against First Bank of Delaware and CompuCredit. In addition to being mistaken, this argument fails to inform the Court that CompuCredit is simultaneously arguing in another forum that it is immune from regulation and suit by the federal banking agency, *viz.*, the FDIC, that regulates the banks to which CompuCredit provides service.[1] CompuCredit is not trying to avoid a "bizarre redundancy of proceedings," *id.*,—CompuCredit is trying to avoid federal oversight altogether.

Sincerely yours,

*John V. Thomas*

John V. Thomas
Deputy General Counsel

---

[1] Complaint (D.I. 1), *CompuCredit Corp. v. FDIC*, No. 08-430 (D.Del.)(July 11, 2008) at ¶ 10 ("CompuCredit is an independent contractor of the Bank, and strongly denies that it is an 'institution-affiliated party' of the Bank within the meaning of 12 U.S.C. § 1813(u)"); *see also* Plaintiff CompuCredit Corporation's Memorandum of Points and Authorities in Opposition to Defendant FDIC's Motion to Dismiss Complaint and Stay Proceedings (D.I. 12)(Aug. 11, 2008) at 1 ("CompuCredit is *not* an institution-affiliated party" of the Bank.")(emphasis in original).

Exhibit H

 **FDIC**

**Federal Deposit Insurance Corporation**
Division of Supervision and Consumer Protection
2345 Grand Boulevard, Suite 100
Kansas City, MO 64108

Consumer Response Center
1-800-378-9581

July 13, 2005

**REDACTED**

Re:    Columbus Bank and Trust Company (Aspire)
Columbus, Georgia

        This letter is in response to your correspondence and documentation provided to this office by Aspire regarding a credit card solicitation you received. Columbus Bank and Trust Company issues the Aspire credit card. Aspire replied directly to our office regarding this matter on June 24, 2005. A copy of that response is enclosed.

        Banking institutions routinely solicit new accounts by sending out pre-approved offers. However, these offers include a statement to the effect that offers are subject to "final approval." This statement gives the bank an opportunity for a final review of your completed application before approving your account. Documentation provided by Aspire indicates this is the type of solicitation you received.

        Federal law does not restrict the type and amount of fees and service charges that a creditor may impose on a credit card account. However, the Federal Reserve Board's Regulation Z (Regulation Z) which implements the federal Truth in Lending Act, does require creditors to provide certain disclosures with a credit card offer. Documentation provided by Aspire indicates the offer you received was for a $300 credit card. This offer indicated that a $150 annual fee, $29 account opening fee, and $6.50 monthly maintenance fee would be billed on your first statement. This offer also disclosed that a minimum monthly payment of $20 was due upon receipt to activate your account.

        Aspire indicates it closed your account per your request on May 15, 2005. Aspire also credited all billed fees leaving your closed account with a zero balance. A copy of Aspire's credit card solicitation is enclosed.

        Thank you for bring this matter to our attention. The enclosed brochures contain helpful information regarding credit cards. We trust this is responsive to your concerns.

                                    Sincerely,

                                    Karen Porter
                                    Consumer Affairs Specialist

Enclosures (4)

Cc:    Columbus Bank and Trust Company (Aspire)

Exhibit I



**FDIC**
**Federal Deposit Insurance Corporation**
Division of Supervision and Consumer Protection
2345 Grand Boulevard, Suite 100
Kansas City, MO 64108

Consumer Response Center
1-800-378-9581

March 16, 2004

**REDACTED**

Re:    Columbus Bank and Trust Company
       Columbus, Georgia

We completed our review of your correspondence and information provided to this office by Aspire regarding the Aspire credit card account established in your name. Columbus Bank and Trust Company (bank) issues the Aspire credit card.

As part of its supervisory responsibility, the FDIC assists consumers with complaints by informing them of their rights under federal consumer protection laws and by reviewing the bank's actions to assess whether the bank has complied with such rules. The FDIC is not authorized to intervene, however, when the dispute relates to the terms and conditions of the consumer's contractual agreement with the bank.

The Federal Reserve Board's Regulation Z, which implements the federal Truth in Lending Act, requires creditors to disclose certain terms and conditions of credit card accounts to new accountholders. The required disclosures must be made in accordance with timeframes and other guidelines prescribed by the regulation. Aspire routinely provides a Bank Credit Card Agreement to its accountholders when a card is issued. The agreement contains the terms and conditions of the account, including notice of an annual fee, account opening fee, and account maintenance fee. A copy of the pertaining section of the Bank Credit Card Agreement is enclosed for your review.

It appears Aspire responded directly to you regarding this matter on December 23, 2003. Aspire assessed the fees in question on your account in accordance with the Bank Credit Card Agreement. Aspire closed your account per your request. Additionally, Aspire waived the fees in question.

Thank you for bringing this matter to our attention. The enclosed brochure provides helpful information about credit cards. We trust this addresses your concerns.

Sincerely,

Karen Porter

Karen Porter
Consumer Affairs Specialist

Enclosures (3)

Exhibit J



**FDIC**
Federal Deposit Insurance Corporation
2345 Grand Boulevard, Suite 100
Kansas City, MO 64108

Division of Compliance and Consumer Affairs
1-800-378-9581

April 16, 2003

Columbus Bank and Trust Company
Ms. Gwen Clark
Executive Correspondence Staff
Card Services
Post Office Box 105555
Columbus, Georgia 30348-5555

RE~ ~ ~ C   RECEIVED
A~ ~ ~ ~ ~   APR 2 1 2003

Re:    FDIC Consumer Response Center Report

Dear Ms. Clark:

Enclosed for your reference is quarterly statistical information for your institution as noted by the FDIC's Consumer Response Center (CRC). One page provides a comparison of several factors for the CRC – Kansas City location to the bank's information. The second includes various statistics related only to your institution. Regulations restrict us from sharing with you detailed comparisons to other institutions handled by the CRC.

We trust you will appreciate receiving this information on a quarterly basis. Please feel free to contact me with any comments at (800) 378-9581.

Sincerely,

Janet Kincaid

Janet R. Kincaid
Senior Consumer Affairs Officer

Enclosures

**Columbus Bank and Trust Company**
**First Quarter 2003**

| | Consumer Response Center KC Activity | Bank | |
|---|---|---|---|
| | | Number | Percentage* |
| Written Correspondence  First Quarter | 1,074 | 16 | 1% |
| Telephone Calls          First Quarter | 303 | 17 | 6% |
| Violations Cited         First Quarter | 13 | 0 | N/A |
| Adjustments              First Quarter | $30,325 | $6,142 | .5% |
| Average Response Time - for the Quarter | 30# | 43 | --- |

\* Percentage of total cases attributed to the bank
\# Targeted Number of Days (5 to reach Bank, 20 to work case, and 5 for return to FDIC)

| Consumer Response Center – KC Top Issues Based on First Qtr Activity | Consumer Response Center - KC Activity | | Bank | |
|---|---|---|---|---|
| Written Correspondence | Number | Percent* | Number | Percent+ |
| Referred to Bank | 236 | 20% | 0 | N/A |
| Credit Report Request | 182 | 15% | 0 | N/A |
| Billing Disputes | 123 | 10% | 5 | 31% |
| Adverse Action Notices | 122 | 10% | 0 | N/A |
| Terms and Conditions | 49 | 4% | 0 | N/A |
| **Telephone Calls** | Number | Percent* | Number | Percent+ |
| Billing Disputes | 46 | 15% | 7 | 41% |
| Terms and Conditions | 18 | 6% | 0 | N/A |
| Fees and Service Charges | 16 | 5% | 2 | 12% |

Note:  One case may have multiple issues.
\*    Represents percentage of the total cases handled by the
     Consumer Response Center – KC location for the quarter designating that issue.
+    Represents percentage of the bank's total cases received by the
     Consumer Response Center – KC location for the quarter designating that issue.



## CONSUMER RESPONSE CENTER

### FDIC
### Division of Supervision and Consumer Protection

### Quarterly Update, March 2003

# Columbus Bank & Trust Company

Activity this quarter:
- 16 correspondence items
- 17 telephone calls
- 100 percent of the written items sent to bank for a response
- 6 correspondence items closed

**WRITTEN CORRESPONDENCE**

**TELEPHONE CALLS**



Average days for Bank to Respond to FDIC

43





| Violations Cited | |
|---|---|
| Qtr 1 | 2002 |
| 0 | 0 |

| Account Adjustments | |
|---|---|
| Qtr 1 | 2002 |
| $57 | $1,070 |

Columbus Bank and Trust Company
First Quarter 2003

| | Consumer Response Center KC Activity | Bank Number | Bank Percentage* |
|---|---|---|---|
| Written Correspondence First Quarter | 1,074 | 16 | 1% |
| Telephone Calls        First Quarter | 303 | 17 | 6% |
| Violations Cited       First Quarter | 13 | 0 | N/A |
| Adjustments            First Quarter | $30,325 | $6,142 | .5% |
| Average Response Time - for the Quarter | 30# | 43 | --- |

\* Percentage of total cases attributed to the bank

\# Targeted Number of Days (5 to reach Bank, 20 to work case, and 5 for return to FDIC)

| Consumer Response Center – KC Top Issues Based on First Qtr Activity | Consumer Response Center – KC Activity | | Bank | |
|---|---|---|---|---|
| Written Correspondence | Number | Percent* | Number | Percent+ |
| Referred to Bank | 236 | 20% | 0 | N/A |
| Credit Report Request | 182 | 15% | 0 | N/A |
| Billing Disputes | 123 | 10% | 5 | 31% |
| Adverse Action Notices | 122 | 10% | 0 | N/A |
| Terms and Conditions | 49 | 4% | 0 | N/A |
| Telephone Calls | Number | Percent* | Number | Percent+ |
| Billing Disputes | 46 | 15% | 7 | 41% |
| Terms and Conditions | 18 | 6% | 0 | N/A |
| Fees and Service Charges | 16 | 5% | 2 | 12% |

Note: One case may have multiple issues.

\* Represents percentage of the total cases handled by the
Consumer Response Center – KC location for the quarter designating that issue.

+ Represents percentage of the bank's total cases received by the
Consumer Response Center – KC location for the quarter designating that issue.



*Quarterly Update, March 2003*

# Columbus Bank & Trust Company

Activity this quarter:
- 16 correspondence items
- 17 telephone calls
- 100 percent of the written items sent to bank for a response
- 6 correspondence items closed







Average days for Bank to Respond to FDIC

43



| Violations Cited | |
|---|---|
| Qtr 1 | 2002 |
| 0 | 0 |

| Account Adjustments | |
|---|---|
| Qtr 1 | 2002 |
| $57 | $1,070 |

Exhibit K



103 F.T.C. 110, 1984 WL 565319 (F.T.C.)                                                      Page 1

**H**
103 F.T.C. 110, 1984 WL 565319 (F.T.C.)

FEDERAL TRADE COMMISSION (F.T.C.)

IN THE MATTER OF
CLIFFDALE ASSOCIATES, INC., ET AL.

ORDER, OPINION, ETC., IN REGARD TO ALLEGED VIOLATION OF THE
FEDERAL TRADE COMMISSION ACT

Docket 9156.

Complaint, July 7, 1981
Order, March 23, 1984

This order requires a Westport, Conn. firm and two individuals engaged in the advertising, sale and distribution of an automobile retrofit device variously known as the Ball-Matic, the Ball-Matic Valve, the Ball-Matic Gas Saver Valve and the Gas Saver Valve, among other things, to cease representing that the device is a unique or new product; and that it is needed on every vehicle except Volkswagens, diesels and fuel-injection vehicles. The company is barred from making fuel economy improvement claims for the device unless it can reasonably support those claims with competent and reliable substantiation. The order further prohibits the firm from representing that a consumer endorsement is a typical experience of a user of the product; using any endorsement unless they have good reason to believe that the endorser subscribes to the facts and opinions set forth in that endorsement; and failing to disclose any material relationship existing between the endorser and respondents. Additionally, the company may not make any unsubstantiated energy savings claims for any product or misrepresent the results of any test or survey.

*Appearances*

For the Commission: *William Haynes* and *Wendy Kloner*.

For the respondents: *Solomon H. Friend* and *Jerold Dorfman, Friend, Dorfman & Marks*, New York City.

COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act, and by virtue of the authority vested in it by said Act, the Federal Trade Commission, having reason to believe that Cliffdale Associates, Inc., a corporation, Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, hereinafter sometimes referred to as 'respondents,' have violated the provisions of the said Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint, stating its charges as follows:

   PARAGRAPH 1. Respondent Cliffdale Associates, Inc., is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Connecticut, with its office and principal place of business located at 180 Post Road, East, Westport, Connecticut.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Respondent Jean-Claude Koven is President of the corporate respondent Cliffdale Associates, Inc. He formulates, directs, and controls the acts and practices of the corporate respondent, including the acts and practices hereinafter set forth. His address is the same as that of said corporation.

Respondent Arthur N. Sussman has been a consultant to Cliffdale Associates, Inc., and has participated in the acts and practices hereinafter set forth. His address is Tamarack Road, Pomona, New York.

The aforementioned respondents cooperate and act together in carrying out the acts and practices hereinafter set forth. [2]

PAR. 2. Respondents are now and for sometime last past have been engaged in the advertising, offering for sale, sale, and distribution of a product variously known as the Ball-Matic, the Ball-Matic Gas Saver Valve and the Gas Saver Valve (hereinafter sometimes referred to as 'Ball-Matic' or 'product'), which product is advertised as a means of improving fuel economy in automobiles. Said product is an automobile retrofit device as 'automobile retrofit device' is defined in Section 511 of the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. 2011. Respondents, in connection with the marketing of said product, have disseminated, published and distributed, and now disseminate, publish and distribute advertisements and promotional materials for the purpose of promoting the sale of said product.

PAR. 3. In the course and conduct of their business, the respondents have disseminated and caused the dissemination of certain advertisements for the product through the United States mail and by various means in or affecting commerce, as 'commerce' is defined in the Federal Trade Commission Act, including, but not limited to, the insertion of advertisements in magazines and newspapers with national circulations for the purpose of inducing, and which have induced, directly or indirectly, the purchase of said product in commerce.

PAR. 4. Among the advertisements and other sales promotional materials disseminated by respondents are the materials identified as Exhibits A-F which are attached hereto.

PAR. 5. Through the use of the advertisements referred to in Paragraph Four, and other advertisements and sales promotional materials, respondents represented and now represent, directly or by implication, that

a. the Ball-Matic is an important, significant, and unique new invention;

b. The Ball-Matic is needed on every motor vehicle except Volkswagens, diesel vehicles, or fuel injection vehicles;

c. the Ball-Matic when installed in a typical automobile and used under normal driving conditions will significantly improve fuel economy;

d. under normal driving conditions, a typical driver can usually obtain a fuel economy improvement of 20% (or more) or an improvement that will approximate or equal four miles per gallon when the Ball-Matic is installed in his/her automobile;

e. competent scientific tests prove the fuel economy claims made for the Ball-Matic;

f. results of consumer usage, as evidenced by consumer endorsements, prove that the Ball-Matic significantly improves fuel economy; [3]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

g. the consumer endorsements that appear in advertisements and sales promotional materials for the Ball-Matic are statements of persons who have used the Ball-Matic in the recent past or are currently using the Ball-Matic and who have given permission for the publication of these statements;

h. all consumer endorsements which appear in advertisements and sales promotional materials for the Ball-Matic were obtained from individuals or other entities who, at the time of providing their endorsements, were independent from all of the individuals and entities that have marketed the Ball-Matic;

i. the consumer endorsements that appear in advertisements and sales promotional materials for the Ball-Matic reflect the typical or ordinary experience of members of the public who have used the Ball-Matic.

PAR. 6. In truth and in fact, contrary to respondents' representations set forth in Paragraph Five:

a. the Ball-Matic is not an important, significant, or unique new invention;

b. the Ball-Matic is not needed on every motor vehicle except Volkswagens, diesel vehicles, or fuel injection vehicles.

c. the Ball-Matic when installed in a typical automobile will not significantly improve fuel economy;

d. under normal conditions, a typical driver cannot usually obtain a fuel economy improvement that will approximate or equal 20% or four miles per gallon when the Ball-Matic is installed in his/her automobile;

e. no competent scientific tests prove the fuel economy claims for the Ball-Matic;

f. results of consumer usage, as evidenced by consumer endorsements, do not prove that the Ball-Matic significantly improves fuel economy;

g. some individuals whose endorsements appeared in advertisements and sales promotional materials for the Ball-Matic did not give prior permission for the use of their endorsements, did not use the [4] Ball-Matic at the time of the publication of their endorsements, and had not used the device in the recent past;

h. some consumer endorsements that appeared in advertisements and sales promotional materials for the Ball-Matic were obtained from individuals who, at the time they provided the endorsements, were not independent of all individuals and entities that have marketed the Ball-Matic.

i. the consumer endorsements and sales promotional materials do not reflect the typical or ordinary experience of members of the public who have used the Ball-Matic.

Therefore, said advertisements and sales promotional materials are deceptive or unfair.

PAR. 7. At the time respondents made the representations alleged in Paragraph Five of the complaint, they did not possess and rely upon a reasonable basis for such representations. Therefore, said advertisements and sales promotional materials are deceptive or unfair.

PAR. 8. The advertisements referred to in Paragraph Four and other advertisements and sales promotional materials represent, directly and by implication, that respondents had a reasonable basis for making, at the time they were made, the representations alleged in Paragraph Five. In truth and in fact, respondents had no reasonable basis for such representations. Therefore, said advertisements and sales promotional materials are deceptive or unfair.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PAR. 9. In the course and conduct of their business, and at all times mentioned herein, respondents have been, and now are, insubstantial competition in or affecting commerce with corporations, firms and individuals engaged in the sale of automobile retrofit devices.

PAR. 10. The use by respondents of the aforesaid unfair or deceptive statements, representations, acts and practices, directly or by implication, has had and now has the capacity and tendency to mislead members of the public into the erroneous and mistaken belief that said statements and representations were and are true and complete, and into the purchase of substantial quantities of respondents' product by reason of said erroneous and mistaken belief.

PAR. 11. The acts and practices of respondents, as herein alleged, including the dissemination of the aforesaid false advertisements, were and are all to the prejudice and injury of the public and of respondents' competitors, and constituted and now constitute unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce in [5] violation of Section 5 of the Federal Trade Commission Act. The acts and practices of respondents, as herein alleged, are continuing and will continue in the absence of the relief herein requested.

EXHIBIT A
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

EXHIBIT B
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

EXHIBIT C
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

EXHIBIT D
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

EXHIBIT E
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

EXHIBIT F
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

INITIAL DECISION BY

MILES J. BROWN, ADMINISTRATIVE LAW JUDGE

OCTOBER 8, 1982

INTRODUCTION

The Federal Trade Commission issued its complaint in this matter on July 7, 1981 (mailed August 5, 1981), charging respondents Cliffdale Associates, Inc. ('Cliffdale') and Jean-Claude Koven and Arthur N. Sussman with unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. 45).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

More particularly, the Commission charged that respondents, in connection with the advertising, offering for sale, sale, and distribution of an 'automobile retro fit' device known as the Ball-Matic Gas Saver Valve ('Ball-Matic' or 'Ball-Matic Valve'), had misrepresented that (Complaint ¶¶5, 6): [2]

    a. the Ball-Matic is an important, significant, and unique new invention;

    b. the Ball-Matic is needed on every motor vehicle except Volkswagens, diesel vehicles, or fuel injection vehicles;

    c. the Ball-Matic, when installed in a typical automobile and used under normal driving conditions, will significantly improve fuel economy;

    d. under normal driving conditions, a typical driver can usually obtain a fuel economy improvement of 20% (or more) or an improvement that will approximate or equal four miles per gallon when the Ball-Matic is installed in his/her automobile;

    e. competent scientific tests prove the fuel economy claims made for the Ball-Matic;

    f. results of consumer usage, as evidenced by consumer endorsements, prove that the Ball-Matic significantly improves fuel economy;

    g. the consumer endorsements that appear in advertisements and sales promotional materials for the Ball-Matic are statements of persons who have used the Ball-Matic in the recent past or are currently using the Ball-Matic and who have given permission for the publication of these statements;

    h. all consumer endorsements which appear in advertisements and sales promotional materials for the Ball-Matic were obtained from individuals or other entities who, at the time of providing their endorsements, were independent from all of the individuals and entities that have marketed the Ball-Matic;

    i. the consumer endorsements that appear in advertisements and sales promotional materials for the Ball-Matic reflect the typical or ordinary experience of members of the public who have used the Ball-Matic. [3]

The Commission also charged that, in their advertisements and promotional material, respondents misrepresented that they had a reasonable basis for making the above enumerated claims about fuel economy (Complaint ¶8).

The Commission also charged that because respondents did not have a reasonable basis for making such claims, the advertisements and promotional materials were deceptive or unfair (Complaint ¶7).

In their answer to the complaint filed September 29, 1981, respondents admitted only that (1) Cliffdale is a Connecticut corporation and that its office and principal place of business is located at 180 Post Road East, Westport, Connecticut; (2) that respondent Jean-Claude Koven ('Koven') is its president; (3) that for a period of time, until approximately December 1979, Cliffdale marketed a product known as the Ball-Matic Valve; and (4) that in the course and conduct of its business, prior to December 1979, Cliffdale disseminated advertisements for the Ball-Matic Valve (Answer ¶¶1-3). Respondents denied all other allegations of the complaint and further alleged as follows (Answer ¶¶12-14):

    The complaint fails to state claim against Respondents upon which relief can be granted;

    The Federal Trade Commission has failed to demonstrate that a formal proceeding with respect to the alleged violations is in the public interest; and

    The Federal Trade Commission lacks jurisdiction over the subject matter and the Respondents with respect to the matters alleged in the complaint.

Accompanying the complaint was an eight part notice order setting forth the form of order 'the Commission has reason to believe should issue if the facts are found to be as alleged in the complaint' (Complaint, Notice Order). The Commission also stated (Complaint, Notice):

    Moreover, the Commission has reason to believe that, if the facts are found as alleged in the complaint, it may be necessary and appropriate for the Commission to seek relief to redress injury to consumers, or other persons, partnerships or corporations, in the form of restitution and refunds [4] for past, present, and future consumers and such other types of relief as a rest forth in Section 19(b) of the Federal Trade Commission Act. The Commission will determine whether to apply to a court for such relief on the basis of the adjudicative proceedings in this matter and such other factors as are relevant to consider the necessity and appropriateness of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)

such action.

On January 5, 1982, following most of the pretrial discovery conducted by both parties, the Administrative Law Judge scheduled adjudicative hearings to commence on February 2, 1982, in Los Angeles, California.

On January 25, 1982, respondents filed a motion for consideration of a proposed consent agreement and to withdraw the matter from adjudication pursuant to Section 3.25 of the Commission's Rules of Practice ('Motion, Docket 9156'). The consent order proposed by respondents was substantially the same as the consent order issued against the manufacturer and distributor of the Ball-Matic Valve (*Compare* Agreement Containing Order to Cease and Desist, File No. 812-3182, Motion, Docket 9156, Exhibit 2 with Proposed Agreement Containing Consent Order, Motion, Docket 9156, Exhibit 4).

At a prehearing conference held January 25, 1982, complaint counsel opposed respondents' motion (*see* PHC tr. 46-72). Complaint counsel argued that the proposed consent order was not adequate and that any disposition of this matter by consent procedures would preclude the Commission from seeking consumer redress under Section 19 of the Act (*see* PHC tr. 74). After the Administrative Law Judge refused to certify the matter to the Commission because he could not make the required finding as to the likelihood of a settlement on the basis of any order other than the notice order that accompanied the complaint (PHC tr. 89, 92), respondents, on January 27, 1982, filed a supplemental submission to their motion which included a form of order identical to the notice order. On January 28, 1982, the Administrative Law Judge certified respondents' motion, as supplemented, to the Commission stating: 'Notwithstanding complaint counsel's opposition to any consent order, I find that there is a 'likelihood of settlement', if the Commission is willing to forego the possibility of seeking consumer redress in federal court.' On January 29, 1982, the Commission denied respondents' motion.

Thereafter, nine days of adjudicative hearings were held: February 2, 3 and 4 in Los Angeles, and February 23 and 24, [5] March 2, 3, and 4, and April 14, 1982, in New York, New York. After rulings were made on certain evidentiary matters and the transcript of the last day of hearings was received from the Office of the Secretary, the record was closed for the receipt of evidence on May 28, 1982. The parties filed their proposed findings and conclusions of law on July 14, 1982, and their answering briefs on July 28, 1982. On August 17, 1982, the Commission granted the Administrative Law Judge's request for an extension of time until September 24, 1982, in which to file the initial decision in this matter, and on September 24, 1982, further extended the time to file the initial decision until October 8, 1982.

On July 14, 1982, the Administrative Law Judge advised the Office of the Secretary that certain documentary exhibits were missing from the official documentary exhibit binders in Docket No. 9156. On September 28, 1982, the Office of the Secretary advised the Administrative Law Judge that they had located all but four of those exhibits. On October 5, 1982, the Administrative Law Judge issued an order certifying his bench copies of CX 141, RX 7, RX 243A-D and RX 257F to the Office of the Secretary for incorporation into the official record.

Any motions appearing on the record not heretofore specifically ruled upon either directly or by the necessary effect of this initial decision are hereby denied.

## PRELIMINARY STATEMENT

The principal issues presented in this matter go to whether respondents made the representations challenged in the complaint, whether such representations, if made, were false, and whether respondents had a reasonable basis for the fuel economy claims that were contained in the advertisements.

The evidence of record in this case demonstrates that owners of some vehicles (other than Volkswagens and vehicles containing diesel and fuel injection engines) may experience fuel economy of up to 11% by installing a Ball-Matic

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Valve. The controversy in this matter evolves from respondents' advertising claims that owners of all vehicles (except Volkswagens and vehicles containing diesel and fuel injection engines) could expect to obtain up to 20% or more fuel economy or 4 extra miles per gallon from the use of the Ball-Matic Valve and Commission counsel's position that no significant savings can be expected from use of the product. [6]

In this respect, respondents rely heavily on consumer testimonials which report fuel economy savings of up to 20% or more and up to 4 miles per gallon or more, whereas Commission counsel rely upon the testimony of their expert witnesses to the effect that consumers cannot measure the fuel consumption of their automobiles accurately enough to determine whether the Ball-Matic Valve does effect fuel economy. They also rely on an engine dynomometer laboratory test which demonstrated that the fuel economy to be expected from use of the Ball-Matic Valve was, under conditions favorable for its operation, quite small, *i.e.* less than 5%.

According to respondents, the actual performance of the Ball-Matic Valve must be determined by actual use on an automobile, and that laboratory tests using chassis dynamometers or engine dynamometers do not duplicate or represent the driving conditions under which the Ball-Matic Valve will work.

I have considered the entire record in this matter as well as the demeanor of the witnesses, and the proposed findings of fact submitted by counsel and their arguments. All proposed findings that are not adopted in form or substance by the effect of this initial decision are rejected as being argumentative, irrelevant to the issues in this matter, or not supported by the record.

## FINDINGS AS TO THE FACTS

1. Cliffdale is a Connecticut corporation with its office and principal place of business at 180 Post Road East, Westport, Connecticut (Answer ¶1). It was established in 1977 by respondent Koven and his wife, Beth Koven, who are the sole shareholders of the corporation (CX 153A, ¶1 (Stip.); tr. 889 (Koven)). It is a marketing company that has engaged in the mail order sale of products (tr. 889-891 Koven)). Among the products that have been marketed by Cliffdale is the Ball-Matic Valve (Answer ¶2). Total net sales of Cliffdale for the year ending December 31, 1979, was $692,998 (tr. 963 (Stip.)).

2. Respondent Koven has been president of Cliffdale since its incorporation in 1977 (tr. 889 (Koven)). He has directed the marketing and advertising activities of Cliffdale, and has shared responsibility for the administrative and bookkeeping aspects of the corporation's operation with Mrs. Koven (tr. 892 (Koven)). Koven has been engaged in various mail order and marketing businesses since 1970 (*see* tr. 887-893, 972 (Koven)).

3. Respondent Sussman acted as a consultant to Cliffdale from January 6, 1979, to July 1, 1979 (Sussman Admission No. 28). [7] His responsibility as consultant was to 'bring in new products' to be sold by mail order by Cliffdale (tr. 804-806 (Sussman); tr. 894 (Koven)). Sussman had an agreement with Cliffdale that if Cliffdale's profits from the mail order sale of products that he 'brought in' reached $25,000, a separate corporation would be established of which he would be half owner and from which he would receive half of the profits (*see* CX 153A-B ¶4 (Stip.); tr. 804 (Sussman); tr. 999 (Koven)). Sussman met Koven in 1976 when they both worked for Film Corporation of America (tr. 804, 836 (Sussman); tr. 893 (Koven)). Sussman had been employed by various mail order businesses since 1970 (tr. 800-803 (Sussman)). One of the products Sussman 'brought' to Cliffdale was the Ball-Matic Valve (tr. 806-808 (Sussman)).

4. Sherwood Marketing ('Sherwood'), also a Connecticut corporation (not a respondent), was established in October 1978. The original shareholders were Martin Howard and Mrs. Koven, each owning 50%. In July 1979, Sherwood acquired Cliffdale's mail order business pursuant to the agreement between Cliffdale and Sussman (*see* Finding 3, *supra*). At that time Sherwood acquired the assets and liabilities of Cliffdale's mail order business. The major assets acquired were the advertisements for the Ball-Matic Valve and the right to receive income from mail order sales

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

prior to July 1, 1979; the major obligations assumed were the obligations to pay suppliers, the obligation to pay for prior advertisements, and the obligation to make refunds when requested regardless of when the sales were made. In September 1979, Sussman acquired Howard's 50% interest in Sherwood. From July 1, to September 14, 1979, Sussman was an employee of Sherwood and was primarily responsible for implementing Sherwood's acquisition of Cliffdale's mail order operation (CX 153A-B ¶4 (Stip.)). After the transfer of Cliffdale's mail order business to Sherwood, Sussman and Koven received equal salaries from Sherwood at the rate of $75,000 annually (tr. 837-39 (Sussman); tr. 998 (Koven)). Koven withdrew from Sherwood in the spring of 1980 (tr. 999 (Koven)). Sherwood filed a voluntary petition for bankruptcy under Chapter 7 of the U.S. Bankruptcy laws in November 1980, was liquidated in bankruptcy and no longer exists as a corporation (tr. 1591-92 (Sussman)).

5. Koven and Sussman were actively involved in all aspects of the mail order marketing of the Ball-Matic Valve by Cliffdale and Sherwood. Along with Howard, they created the advertisements which are the subject of this proceeding (tr. 816 (Sussman); tr. 924-38 (Koven)). They both benefited from the sale of the Ball-Matic Valve (*see* Finding 4 *supra*). It is found that respondents, as individuals, were both responsible [8] for the activities of Cliffdale and Sherwood in the marketing of the Ball-Matic Valve.

6. In the course and conduct of their business, respondent Cliffdale and respondents Koven and Sussman (through Cliffdale and Sherwood) have disseminated advertisements for the Ball-Matic Valve in interstate commerce by publishing them in newspapers and magazines with national circulation (tr. 1491 (Stip.); Cliffdale and Koven Admission No. 21; Sussman Admission No. 21). Total advertising expenditures by Cliffdale and Sherwood for the Ball-Matic Valve have been substantial, a total of $549,973 having been expended from April 1979 through November 1979 (*see* CXs 18-25). In the further course of their businesses, Cliffdale and Sherwood have disseminated through the mail in interstate commerce promotional materials for the Ball-Matic Valve such as CX 13 through CX 17 (Sussman Admission Nos. 16, 17 and 19; Koven Admission Nos. 15, 16, 17, 19, 20, 22; tr. 860-62 (Sussman)). In the further course and conduct of their businesses, sales of the Ball-Matic Valve were made by Cliffdale and Sherwood by sending Ball-Matic Valves through the mail to consumers located in various parts of the United States (CX 153 D ¶25). Revenue from the sale of Ball-Matic Valves totaled $1,781,876 (CXs 66, 67). In marketing the Ball-Matic Valve the respondents were in competition with the sellers of other products marketed to improve gasoline consumption (Koven Admission No. 25; Sussman Admission No. 25).

7. It is found, on the basis of the facts set forth in Finding 6, *supra*, that respondents Cliffdale, Koven and Sussman have engaged in commerce as 'commerce' is defined in the Federal Trade Commission Act, and their business activities relating to the matters alleged in the complaint have been 'in commerce' and 'affect commerce' within the meaning of these terms as set forth in the Federal Trade Commission Act.

8. The Ball-Matic Valve is what is called an 'air-bleed' device (tr. 444 (Patterson); CX 49A; RX 244A). Its purpose is to admit additional air into a vehicle's engine to lean the air-fuel mixture, thus improving gasoline mileage (tr. 172 (Smith); tr. 509 (Patterson)). It is inserted into the positive crankcase ventilation line ('PCV Line') of an engine (CX 99C; *see* CX 99K reproduced at page 8a, *infra*). The Ball-Matic Valve consists of a ball, spring, filter, and metal case (CX 99C, K). The ball, in combination with the casing, serves as a valve, which is designed to open when the vacuum in the engine is low thus admitting additional air into the engine. When the vacuum rises, the valve shuts (CX 99C; *see* CX 99K, reproduced at p. 8a, *infra*). Relatively lower vacuum is experienced in an engine [8a]

*Figure 1*

Schematic of Ball-Matic Installation

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

*Figure 2*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)                                                 Page 9

Ball-Matic Construction

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

[9] during rapid acceleration or 'floor boarding' of the foot pedal, while negotiating steep grades and hills, or while pulling trailers or campers (tr. 515-16, 518, 521, 524 (Patterson)).

9. The opening and closing of the Ball-Matic Valve is determined by the interplay of the strength of the spring in the Ball-Matic Valve and the vacuum of the engine (tr. 509 (Patterson); CX 99C). The ball is kept pulled against the casing of the device by the vacuum so long as the vacuum exerts enough force to overcome the strength of the spring in the valve. When the vacuum is not strong enough, the spring forces the ball up and air is admitted into the PCV system (*id.*). The amount of air that can be physically admitted into the PCV system is limited by the size of the opening when the ball is in the 'open' position (*see* RX 41C, D; *see also* tr. 1090 (Korth)).

10. An internal combustion engine produces power by processing fuel mixed with air in its combustion chambers (tr. 372 (Patterson)). The amount of fuel reaching the engine is expressed as an 'air-fuel' ratio showing the number of pounds of air delivered to the engine for each pound of fuel that is delivered (tr. 387 (Patterson)). Gasoline engines are usually most efficient at air-fuel ratios slightly above the stoichiometric (chemically correct) value; in non-stoichiometric mixtures, there is either excess fuel (a rich mixture) or excess air (a lean mixture) in the combustion chamber (RX 212J). The excess fuel or excess air does not enter into the combustion process (*Id.*). The air and fuel entering the engine are mixed in the carburetor, which has a fuel metering system consisting of cruise circuits (providing fuel for normal operating conditions), idle jets (providing additional fuel when the vehicle is idling), and power jets (providing additional fuel when high power output is necessary) (tr. 390, 515 (Patterson); tr. 1092 (Korth)). In addition, the choke richens the mixture when the engine is cold (tr. 390 (Patterson)). Typically, carburetors are set according to normal operating conditions (cruise conditions) (tr. 387-90 (Patterson)). The actual carburetion of a particular model of vehicle is determined by the manufacturer (*id.*). The carburetor can be set to operate 'rich' (low air fuel ratios), 'lean' (high air-fuel ratios), or at a level anywhere in between. The carburetor setting is permanent and is not expected to change over time. Devices such as the Ball-Matic Valve admit air into the engine in addition to the air entering through the carburetor and the air which would normally enter through the PCV line (CX 99C). This additional air will dilute the air-fuel mixture. Depending upon the 'air-fuel' ratio of the carburetor of a particular vehicle, the admission of additional air will [10] lead to an improvement in fuel economy, no change in fuel economy, or an actual decline in fuel economy (CX 99E, L). If the 'air-fuel' ratio is 'rich', improvement in fuel economy may result (CX 99; *see* ALJX 120).

11. The designed carburetion of vehicles on the road has been changed by manufacturers over the years. A number of factors, including government regulations concerning emissions and fuel economy, the increasing public demand for fuel efficient vehicles, and major technological advances in regulating emission, have led to frequent changes in carburetion systems in recent years (tr. 388-89 (Patterson)). However, in deciding how to set the carburetor for a particular vehicle, manufacturers are always faced with balancing the need to optimize fuel economy with the need to have a vehicle that is 'drivable' (*i.e.*, that runs smoothly, is responsive, and does not hesitate or stumble), that meets the emission requirements set by law, and that does not experience excessive engine 'knocking' (tr. 388-90, 506-07 (Patterson); RX 212 J). Typically, rich carburetion will lead to better driveability characteristics; however, this may also lead to unacceptable levels of hydrocarbon and carbon monoxide emissions (*id.*). Cars carbureted on the lean side have less power, and thus may have driveability problems (*id.*); however, they have better hydrocarbon and carbon monoxide emission characteristics (*id.*). Cars with leaner carburetion also tend to experience engine knocking (*id.*). In the 1950's and earlier, cars were typically carbureted on the rich side. However, in the late 1950's and early 1960's concern about air pollution led to changes in carburetion and vehicles were then carbureted with leaner air-fuel ratios. Typically, 1960 to 1974 vehicles were carbureted chemically correct or leaner. From 1975 to 1980, vehicles were typically carbureted at or near the point of best fuel economy which occurs at an even leaner air-fuel ratio. This change was made possible by the use of the catalytic converter to control emissions (CX 99F, U).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In 1979, when respondents made their advertising claims, there were 44,399,000 vehicles on the road manufactured from 1975 through 1979 and 60,264,000 vehicles manufactured before 1975 (RX 106C).

12. The record contains twelve advertisements for the Ball-Matic Valve (CXs 1-12) and five pieces of promotional material (CXs 13-17). The record also contains the publication schedules of the advertisements covering a period from April 17, 1979, to November 12, 1979 (CXs 18-25). Cliffdale placed the advertisements prior to July 1, 1979, and Sherwood placed advertisements from July 1 to approximately July 15, 1979 (Respondents' Admission No. 3). Certain promotional materials [11] were disseminated by Cliffdale during the period April 17 to December 3, 1979 (CXs 13, 15, 17) and by Sherwood (CXs 16, 17) during the period July 1 to December 3, 1979 (Cliffdale and Koven Admissions Nos. 16, 17; Sussman Admission No. 20).

13. With some minor language differences and different headlines, the advertisements are substantially similar. For example some of the headlines state:
SAVE MONEY SAVE MONEY SAVE MONEY SAVE MONEY Without the Ball-Matic you're wasting up to $200 or more on gasoline EVERY CAR NEEDS ONE! (CX 1; *see* CX 5).

\* \* \*

STRIKE BACK AT RISING GAS PRICES! GET UP TO 4 EXTRA MILES PER GALLON-100 EXTRA MILES BETWEEN FILL-UPS-SAVE UP TO $200 A YEAR ON GAS OR DOUBLE YOUR MONEY BACK (CX 2; *see* CXs 3, 4).

\* \* \*

GET UP TO 4 EXTRA MILES PER GALLON-100 EXTRA MILES BETWEEN FILL-UPS-SAVE UP TO $200 A YEAR ON GAS (CXs 7, 8; *see* CXs 10, 11).

In most of the advertisements language similar to the following paragraphs appears somewhere in the text:
Think of it! Thanks to an important automobile invention, every single car owner, every fleet operator, every truck or camper owner . . . everyone who operates a gas-powered combustion engine, may now be able to save up to 20% and more on their gasoline bills! (CX 8; *see* CXs 2, 3, 4, 6, 7, 10, 11, 12).

\* \* \*

The BALL-MATIC fits all American and foreign cars except Volkswagens. Do not use on diesel or fuel injection models (CX 8; *see* CXs 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12). [12]

\* \* \*

. . . [T]he carburetor is pre-set at the factory for idle conditions. This means that it is most efficient in regulating the gas-to-air mixture when the car is standing still and up to speeds of 35 mph. When you drive over that speed . . . or start up from a dead stop . . . or negotiate grades and steep hills . . . or pull a trailer or camper . . . or carry a full load of passengers, too much gas feeds into the carburetor and you get incomplete combustion. Every time that happens, it's just like pouring money down the drain (CX 10; *see* CXs 1, 2, 3, 4, 5, 6, 7, 8, 11, 12).

\* \* \*

GUARANTEED SAVINGS

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)                              Page 11

We firmly believe the Ball-Matic to be one of the best investments you can make to save money this year. The exact saving you will receive may vary significantly depending on the kind of car you drive, the condition of your engine, weather, your driving habits and the amount of driving you do; however we guarantee that you MUST SAVE AT LEAST FIVE TIMES the amount you paid for your BALL-MATIC in the first year or you may return it for a full refund (CX 5; *see* CX 6, 7, 8, 9, 10, 11, 12; *see also* CXs 2, 3, 4 ('double your money back')).

\* \* \*

Test the BALL-MATIC yourself entirely at our risk. Install it in your own family or company car and if it doesn't deliver everything we say it will-starting with the first tankful, just return it and we'll refund your purchase price (CX 7; *see* CXs 1, 5, 6, 8, 11, 12; *see also* CXs 2, 3, 4, 10 ('double your money')). [13]

### CONTROLLED TESTS CONFIRM BIG DOLLAR SAVING

In the Spring of 1978, we arranged for a local Shell Service Station to conduct a controlled, supervised, test using seven different cars owned and driven by non-professional drivers. Each car was fitted with a locked gas cap and the keys kept in the possession of the testers.

After establishing base mileage consumption data for the various cars, the BALL-MATIC was installed and miles-per-gallon figures were re-checked. Every single car in the test showed meaningful improvement.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

IMPROVEMENT RANGE . . . 8% to 40% (CX 7; *see* CXs 1-6, 8, 10-12).

\* \* \*

Yes, you can actually get up to 70 . . . 80 . . . 90 . . . even 100 extra miles from every single tankful. No matter how old or rundown your car may be . . . no matter how many gallons of gas it now devours each week . . . FROM THE VERY INSTANT YOU INSTALL THE BALL-MATIC GAS SAVER VALVE IN YOUR CAR, YOU MUST EXPERIENCE A DRAMATIC DECREASE IN GAS CONSUMPTION (CX 6; *see* CXs 2, 3, 4, 7, 8, 10, 11, 12). [14]

\* \* \*

### READ THE RESULTS FOR YOURSELF!

The BALL-MATIC (gas saver) that I purchased has proven itself. I drive a 1970 Oldsmobile, now I get four miles more per gallon.
C.T.-Orange, California
Just a short note to inform you of the performance of your BALL-MATIC unit that I have installed in my 1972 Ford station wagon. Prior to using your device, I averaged 12 to 13 MPG, now that I have installed your unit my mileage has gone up to 16 MPG around town.
A. Coutts
Sherriff, Orange County, California
Before it was installed on my 1973 Ford L.T.D. I was getting 9 miles to the gallon, since installation of the BALL-MATIC I am getting almost 15 miles to the gallon.
R.B.-Hickman, Nebraska
After installing the BALL-MATIC on my 1972 Oldsmobile Toronado I increased from 7.5 to 10.5 miles to the gallon.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Seeing this I took my station on as a BALL-MATIC dealer and within the first week sold over 100 valves.
This kind of extra income producer that other service stations should consider during this energy crisis to
service their customers.
Louis Michaud
Mobile Service, New Britain, Connecticut
I want to express my thanks for the BALL-MATIC. Since it has been installed in my car, my gas mileage has
not been under 18 miles per gallon. This is an increase of 5.5 miles per gallon.
Rev. R.N. Claremont, California (CX 4; *see* CXs 2, 3, 6, 10; see also CXs 1, 5, 7, 8, 11, 12). [15]

14. In addition to the statements quoted above in Finding 13, *supra*, respondents' advertisements and promotional
materials contain a statement that consumers can save fuel 'thanks to an amazing automobile discovery' (CXs 2-6,
10; 13-15). Other advertisements describe the Ball-Matic as an 'important automobile invention' (CX 7). Many of
the advertisements and promotional materials also contain bold type headlines in the text stating that the Ball-Matic
is 'the Most Significant Automotive Breakthrough of the Last Ten Years' (CXs 2-6, 10, 13-15). Some
advertisements liken the Ball-Matic to a 'minicomputer brain' (CXs 2-4, 6, 8, 10-12), and in one instance the Ball-
Matic is referred to as a 'unique, patented' valve (CX 9).

15. Through the above representations set forth in Finding 14, *supra*, respondents have represented to the public that
the Ball-Matic is an important, significant and unique new invention.

16. Several of respondents' advertisements and promotional materials contain headlines that 'EVERY CAR NEEDS
ONE'. (CXs 1, 5, 15, 17). Many of the respondents' advertisements and promotional materials contain the statement
that 'every single car owner, every fleet operator, every truck or camper owner . . . can now save up to 20% and
more on their gasoline bills' (CXs 2-4, 6, 10, 13-15). Other ads contain the same statement but with the word 'can'
changed to 'may' (CXs 7, 8, 11, 12). In addition, in the 'guarantee' contained in most of the advertisements,
respondents state that users will save fuel. All of the advertisements and promotional materials include a statement
that Volkswagens, diesels, and fuel injection vehicles cannot use the Ball-Matic.

17. Through the statements set forth in Finding 16, *supra*, respondents have represented to the consumer that the
Ball-Matic valve is needed on every car except Volkswagens, diesels, and fuel injection vehicles.

18. Most of respondents' advertisements contain the following statement in bold type (CXs 1-8; 10-12): 'you
experience a significant saving with the very first tankful.' Many of the advertisements and promotional materials
claim that consumers will 'save up to 20% and more' (CXs 1-8; 10-15). A number of advertisements claim that
consumers will save up to $200 a year on gas (CXs 6-8; 10-12). Almost all of respondents' advertisements and
promotional materials claim that consumers will 'get up to . . . 4 extra miles per gallon' (CXs 2-4; 6-15). Other
representations contained in these advertisements and promotional materials are: 'Get up to . . . 100 extra miles [16]
between fill-ups' (CXs 2-4, 6-9; 12-15). Most advertisements report the results of the Shell Service Station test
showing savings from 11% to 40% or 8% to 40% (*see* CXs 1-8, 10-15). The consumer testimonials report savings of
from 2 to 6 miles per gallon (CXs 1-8, 10-15). Most of the advertisements also describe the type of driving under
which the Ball-Matic Valve will effect fuel efficiency and that the actual fuel saving will depend on the type of car
driven or the amount of miles driven, the condition of the engine, weather, and driving habits (CXs 1-8; 10-15).

19. Through the claims set forth in Finding 18, *supra*, as well as the lay-out of the advertisements and promotional
materials, respondents have represented to consumers that the Ball-Matic Valve, when installed in a typical
automobile and used under normal driving conditions, will significantly improve fuel economy.

20. Through the claims set forth in Finding 18, *supra*, as well as the lay-out of the advertisements and promotional
materials, respondents have represented to consumers that under normal driving conditions a typical driver can
usually obtain a fuel economy improvement of up to 20% or more or an improvement that will approximate or equal

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

up to four miles per gallon when the Ball-Matic is installed in his or her car.

21. In most of respondents' advertisements and promotional materials, respondents refer to a 'controlled, supervised, test' (CX 1-8, 10-15). The text of the advertisement explains that this test (the Orange Hill Shell Service Station test) used seven different automobiles owned and driven by non-professional drivers where each car was fitted with a locked gas cap and the keys were kept in the possession of the testers. The advertisements refer to the results as 'dramatic' and contain a chart showing the results for each automobile and representing an overall average gas saving of 18% (*i.e.*, 8 to 40%). Several brochures that do not contain the results of the Orange Hill Shell Service Station test, represent the Ball-Matic Valve as 'Tested and Proven up to 20% increase in fuel economy' (CXs 16, 17). Several advertisements and promotional materials refer to 'several years of tests to prove the Ball-Matic Gas Saver Valve in the field under actual day-to-day driving conditions' as a preface to the Orange Hill Service Station Test segment of the advertisements (CXs 1, 5, 13-15). One advertisement states '[f]ield tests for over seven years and lab tests at an Accredited Eastern University confirm that the Gas Saver Valve really works' (CX 9). The existence of tests to support the claims made in respondents' advertisements and promotional [17] materials is referred to in the following: '[i]f after reading this ad you still have any doubts whatsoever, just drop [m]e a note and I'll [We'll] gladly forward a copy of my [our] test reports for your inspection' (CXs 1, 3-5, 7, 8, 10, 11, 13-17).

22. Through the representations set forth in Finding 21, *supra*, respondents have represented that competent tests prove the fuel economy claims made for the Ball-Matic Valve.

23. With one exception (CX 9), all of respondents' advertisements and promotional materials feature a black bordered box containing excerpts from consumer testimonials (CXs 1-8, 10-17). This box is captioned 'Read the results for yourself.' In each testimonial excerpt, the testimonialist reports a significant increase in fuel economy after the Ball-Matic Valve was installed on his or her vehicle. The range of fuel economy improvement reported by the testimonialists is from over 2 miles per gallon to 6 miles per gallon.

24. Through the publication of consumer testimonials including the gas saving claims as set forth in Finding 23, *supra*, respondents have represented that the use of the Ball-Matic Valve by consumers, and the results reported by them, proves that the device significantly improves fuel economy.

25. The respondents' advertisements and promotional materials for the Ball-Matic Valve do not provide any information concerning when the consumer testimonials were written or whether the testimonialists were currently using the device when the advertising materials were published (*see* CXs 1-8, 10-17). For example, the quotations from the testimonials themselves imply that the testimonialists were currently using the Ball-Matic Valve: C.T. (Clare Thorenson, Orange, California): '. . . now I get four miles more per gallon' (CXs 1-6, 10, 13-17); A. Coutts, (Sheriff, Orange County, California): 'been what I have installed your unit . . .' (CXs 1-8, 10-17). The testimonials also imply that permission has been given for their use: A. Coutts: '[j]ust a short note to inform you of the performance of your Ball-Matic' (CXs 1-8, 10-17); Gene Suprenant: 'I have recommended the BALL-MATIC to other RV owners . . . (CXs 13-15); B. L. (Billy Largent, Certified Public Accountant, Santa Ana, California): 'It gives me great pleasure to express to you my satisfaction' (CXs 1, 7, 13-17).

26. Through the representations set forth in Finding 25, *supra*, respondents have represented that the consumer endorsements in their advertisements and promotional materials are statements of persons who have used the Ball-Matic in the [18] recent past or are currently using the Ball-Matic and who have given permission for the publication of their testimonials.

27. None of the testimonials used in the respondents' advertisements and promotional materials indicate that at the time of their writing, the testimonialists personally knew the manufacturers or various marketers of the Ball-Matic Valve or were connected with them in any way (CXs 1-8, 10-17). The advertisements contain claims that thousands of consumers have purchased the Ball-Matic Valve (*see* CXs 1-5). Moreover, the testimonials used in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

advertising and promotional materials are from different cities and different parts of the country (CX 1-8, 10-17).

28. Through the use of testimonials in the manner set forth in Finding 27, along with other representations stated therein, respondents have represented that the testimonials that they used were from individuals independent of all marketers of the Ball-Matic Valve.

29. The consumer endorsement section of the advertisements and promotional brochures contain testimonials from persons living in various parts of the country, driving a wide variety of cars and representing a variety of professions (*e.g.* sheriff, service station owner, accountant, minister) (CXs 1-8, 10-17). In their endorsements, consumers claim the same type of fuel economy improvements from using the Ball-Matic Valve as the respondents do in the text of their advertisements. For example, the endorsers claim fuel economy improvements ranging from over two to six miles per gallon. These claims are similar to the claims in the narrative text of the respondents' advertising and promotional material that the use of the Ball-Matic Valve can lead to improvements of up to four miles per gallon or up to 20% or more. The endorsers' claims are also similar to the results for the Orange Hill Shell Service Station test reported in the respondents' advertisements (CXs 1-8, 10-17). Moreover, the testimonials are presented in the box captioned 'Read the results for yourself' or 'Letters we've received' (CXs 1-8, 10-17). Every advertisement and almost all of the promotional materials contain the prominent caption 'Over 100,000 already in Use' (CX 1-15). Almost all of the advertising and promotional materials include the statement that '[a]s of now, tens of thousands of motorists all over the country have [installed]' the Ball-Matic (CXs 1-8, 10-15).

30. Through the representations set forth in Finding 29, *supra*, as well as by the overall format of their advertisements and promotional material, respondents have [19] represented that the consumer endorsements that they used in their advertisements and promotional materials reflect typical or ordinary experiences of users of the Ball-Matic Valve.

31. As set forth above in Findings 21 and 22, *supra*, respondents represented in most of their advertisements and promotional material that they have test evidence to support their claims as to gas economy to be realized from the use of the Ball-Matic Valve. In addition, the advertisements and promotional material contain many explicit claims that the use of the Ball-Matic can lead to significant fuel savings (*see* Finding 18).

32. Through the use of the claims set forth in Finding 31, as well as the general format of their advertisements and promotional material, respondents have represented that they have a reasonable basis for the claims that they have made.

33. On the basis of the record in this case, it is found that respondents' performance claims for the Ball-Matic Valve as contained in their advertisements and promotional materials and as challenged in the complaint, are false. On the basis of Professor Patterson's engine dynamometer test of the Ball-Matic Valve and the testimony of Professor Patterson and Mr. Korth, it is apparent that under the most favorable conditions for the operation of the Ball-Matic Valve, it cannot effect fuel economy anywhere near 'up to 20% or more' or '4 extra miles per gallon'.

Professor Patterson's engine dynamometer tests were conducted on a small, 1.3 litre Ford engine that was carbureted at '13.1 to 1' which is considered to be a very rich fuel to air ratio (tr. 392 (Patterson); *see* CX 99). In an engine dynamometer test the engine is tested independently of the automobile chassis. Although used in certain European model Ford cars, this 1.3 litre Ford engine was not sold in the United States because the engine's emission control system could not meet EPA's 50,000 mile durability requirement and because its fuel economy was relatively low, both deficiencies being attributable to its rich carburetion (tr. 391-92 (Patterson)). Professor Patterson selected this engine for his test in order to maximize the effects of the Ball-Matic Valve and to obtain results that could be qualified and used to determine the effect of the Ball-Matic Valve on typical vehicles on the road in 1979, at the time respondents' advertisements were published (tr. 390-91, 409-10 (Patterson)).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Professor Patterson modeled his test after the tests performed by the Environmental Protection Agency, which uses a [20] chassis dynamometer test. In a chassis dynamometer test the entire vehicle is used, the drive wheels exerting the power to the dynamometer. The EPA procedures are based on an established driving pattern (*see* RX 221E-F). Professor Patterson selected six test points from that pattern which represented approximately 75% of the energy used in the EPA test (tr. 408, 525-26, 547-48 (Patterson)).

Professor Patterson tested two Ball-Matic Valves. The results of the test on Physical CX 115 (a black Ball-Matic Valve containing a relatively weak spring) showed small increases and declines in fuel economy within the test's range of experimental uncertainty and, according to Professor Patterson, these results demonstrated that the Ball-Matic Valve was ineffective as far as fuel economy was concerned (CX 99E, G).

The results of the tests on Physical CX 116 (a silver Ball-Matic Valve containing a relatively stiff spring) showed a measurable change in fuel economy, an average improvement of 6.2 percent in fuel consumption (CX 99F, J; tr. 416 (Patterson)). One test run, which was not reproduced, showed an improvement of 11 percent in fuel consumption (tr. 544 (Patterson)).

34. On the basis of the test results on Physical CX 116, Professor Patterson calculated the effect of the use of this Ball-Matic Valve on vehicles on the road in 1979, considering the general weight of those vehicles and their carburetor settings (tr. 416-17 (Patterson); CX 99S, T, U). He considered that pre-1975 vehicles generally weighed between 4000 and 6000 pounds loaded, whereas vehicles manufactured from 1975 to 1979 were generally lighter, weighing 3000 to 4000 pounds loaded (CX 99). The results of these calculations are set forth at CX 99 J as follows: [21]

Case A represents the 1.3 litre Ford test engine with a 13.1-1 fuel-air ratio, Case B represents vehicles manufactured from 1975 to 1979 and Case C represents the vehicles manufactured before 1975 (*see* CX 99 U). Professor Patterson concluded that 'the effect on fuel economy [of Physical CX 116] was judged to be both positive and negative with a maximum effect of less than 2% [fuel economy] for vehicles with carburetion typical of today's U.S. vehicle population' (CX 99G). He was of the opinion that the use of the Ball-Matic Valve in actual on-the-road driving would lead to results similar to those that he had calculated in Table 2 (tr. 550 (Patterson)). Dr. Patterson was of the opinion that under a hypothetical situation, where the effects of the Ball-Matic Valve would be maximized, an improvement could be expected of from approximately 2 1/2 percent for a large vehicle to approximately 4 percent for a small vehicle (tr. 496-97 (Patterson)).

TABLE 2

EFFECT OF GROSS VEHICLE WEIGHT AND WEIGHT/POWER RATIO ON FUEL ECONOMY CHANGE WITH DILUTION PROVIDED BY BALL-MATIC DEVICE

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

* Measured on Ford 1.3 litre engine-U of M Auto Lab.

35. Mr. Korth testified that EPA has tested or evaluated 14 air-bleed devices, including the Ball-Matic Valve. On older engines carbureted to relatively rich fuel-air ratios, the devices reduced hydrocarbon and carbon monoxide emissions, but did not improve fuel economy (tr. 1050-51 (Korth)). He also testified that, when EPA first started looking into the effect of enleanment on fuel economy and emission, EPA conducted a wide range of engine dynamometer tests and found that enleanment affected emission but did not improve fuel economy in normal operating ranges (tr. 1092-93 (Korth)). A change in fuel economy was obtained when the engine was operating under rich conditions, such as when the carburetor was intentionally [22] altered to enrich the air-fuel mixture. In those situations, EPA found that it was possible to get as much as 5% improvement in fuel economy. These conditions, however, would not represent normal operating conditions (tr. 1092-93).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

36. Mr. Korth was of the opinion that the Ball-Matic Valve could not bleed much air into an engine compared to the overall amount of air that the engine uses, especially during heavy acceleration periods when the Ball-Matic Valve is open and admitting air (tr. 1090). He concluded that, given the basic principles of engineering and combustion theory, an air enleanment device such as the Ball-Matic Valve cannot give any significant improvement in fuel economy and that an actual loss in fuel economy could be expected on vehicles operating near the point of best engine efficiency, as in the 1975 to 1979 vehicles (tr. 1090-91).

37. Respondents' representation that 'Every car needs one' (except Volkswagens, diesels and fuel injection vehicles) is false. Most of the automobiles manufactured after 1974 have such lean fuel-air mixture setting on their carburetors that no fuel economy could be expected by adding a air-bleed valve to the PCV line (*see* Findings 8-11, 33-36).

38. Respondents' representation that the use of the Ball-Matic Valve would significantly improve fuel economy when installed in a typical automobile and used under normal driving conditions is false. Except in unusual automobiles that are carbureted for rich fuel air mixtures and driven under power conditions (such as 'floor boarding') a large portion of the driving time, most automobiles will not experience significant fuel economy from using the Ball-Matic Valve (*see* Findings 8-11, 33-36).

39. Respondents' representation that under normal driving conditions a typical driver could usually obtain a fuel economy of up to 20% or more or an improvement that would approximate or equal four miles per gallon with the Ball-Matic installed in the automobile is false. The record shows that even under the most ideal situations favorable to the Ball-Matic Valve the fuel economy represented by respondents could not be realized (*see* Findings 33-36).

40. The record contains the results of other laboratory tests on the Ball-Matic Valve. In 1976, the EPA performed its test, using standard procedures (now set forth in the Code of Federal Regulations (40 C.F.R. 610)) on a black Ball-Matic Valve (containing a relatively weak spring (tr. 1572 (Stip.)). The EPA test used a 1970 Plymouth Valiant powered by a 225 cubic [23] inch 6 cylinder engine and equipped with an automatic transmission (CX 57C). Based on the test results (*see* CX 57D), EPA concluded that although the Ball-Matic Valve caused reductions in emission of unburned hydrocarbons and carbon monoxide due to the enleanment of the air-fuel ration and also caused an increase in oxides of nitrogen emission, it had no significant effect upon fuel economy (CX 57E; tr. 1082-84 (Korth)). The EPA's conclusions can be considered quantitatively valid only for the specific type of vehicle used in the chassis dynomometer test; however, similar results are likely to be achieved on other types of vehicles (CX 57B; tr. 1157 (Korth)).

A test conducted by the Vernon, California Emission Test Laboratory in February 1979, using single runs with a Ball-Matic Valve and without the Ball-Matic Valve on a 1950 Chrysler with automatic transmission obtained a fuel economy of almost 7 percent (*see* RXs 43A, 44).

An Engine dynamometer test conducted by Professor Kishibay at the University of Bridgeport in May 1979 on the Ball-Matic Valve using a V-8 Oldsmobile engine obtained results indicating a range of a .2 to 4.58 percent reduction in fuel consumption for regular gas and a range of 2.64 to 6.01 percent reduction in fuel consumption for high test gasoline (RX 217D).

On August 1 and 2, 1979, a test was performed by Scott Environmental Technology Inc ('Scott') on the Ball-Matic Valve on a 1978 Plymouth Volare equipped with a standard 318 cubic inch V-8 engine with automatic transmission ('Scott Test I'). This was a chassis dynamometer test using the EPA urban cycle with some test runs using modified acceleration rates for hard acceleration (RX 221C, E). The greatest increase in fuel economy measured during this test was 3.9 percent (RX 221J).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)

On August 22 and 30, 1979, a second series of tests were performed by Scott ('Scott Test II'). The first test was a chassis dynamometer test performed on the 1978 Plymouth Volare (used in Scott Test I) and using the EPA urban test cycle as well as certain portions of that cycle. The results of these tests showed slight increases in fuel economy (RX 225M). The second series of tests, using the same procedures, as in the second test on the Plymouth Volare, were conducted on a 1976 Toyota Corolla equipped with a standard 96.9 cubic inch, four-cylinder engine and a four speed manual transmission. In the first two comparative tests on the Toyota there was a 10.9 percent increase in fuel economy; however, it was suspected that [24] during later tests, which showed no fuel economy, a leak had developed in the manifold vacuum system of the Toyota, which could possibly account for the lack of increased fuel economy (RX 225M).

On September 26 and 27, 1979, an engine dynamometer test was conducted by Automotive Testing Laboratories ('ATL'), East Liberty, Ohio, on the Ball-Matic Valve using a Toyota similar to that used in the second part of the Scott Test II. Unlike other dynomometers used in testing the Ball-Matic Valve, the flywheel loads at ATL were directly coupled to the drive shaft, instead of connected through a system of pullies and belts. Two test runs, one without the Ball-Matic Valve and one with the Ball-Matic Valve obtained an 11.7% increase in fuel economy. Subsequent test runs showed only minor fuel economy, but during those runs there was no drop in manifold vacuum when the Ball-Matic should have opened (CX 87F, K, L; *see* tr. 879-80 (Sussman)).

Although the record contains much debate over the validity of any of these tests, primarily because none of the results which showed fuel economy in the 10 to 12% range could be duplicated, and because the test results were introduced into evidence in this case only as notice to respondents rather than for the truth of the facts reported, it is apparent that no laboratory test indicated that the Ball-Matic Valve, under the most ideal conditions for its operation, would produce the fuel economy represented by respondents in the challenged advertisements and promotional materials.

41. The remaining evidence about the performance of the Ball-Matic Valve consists of fuel economy reports by drivers who had installed the Ball-Matic Valve on their vehicles. With one exception (*see* CX 87A, G), the results reported were not supported by statistical data. Such reports consisted of testimonials of consumers, the experience of individuals involved with the merchandising of the Ball-Matic Valve, and tests referred to as the 'Orange Hill Service Station' test and the 'Orange County *Register*' test. The results of such tests were obtained by measuring fuel placed in the gasoline tank of the vehicle and noting the change in the odometer reading of those vehicles. These consumers reported fuel economy of up to 20% and over and up to 4 extra miles per gallon, as represented by respondents.

Professor Patterson testified that such consumer tests were not a generally recognized way of testing fuel economy (tr. 393). He was of the opinion that the reproduceability of such [25] consumer tests could vary by 20 to 30 percent due to the attitude of the driver and the conditions of the road and the vehicle (tr. 394-96, 550-51). He also testified that measuring fuel consumer by 'topping off the tank' is not an adequate control for a fuel consumption test (tr. 577).

Mr. Korth testified that the consumer is not in a position to judge whether a device such as the Ball-Matic Valve works or not (tr. 1064). He considered testimonials essentially meaningless (tr. 1063), and all consumer tests to be invalid. Dr. Wouk did not consider consumer tests, including the Orange Hill Shell Service Station test and the Orange County *Register* test to be scientific tests (tr. 1413, 1428).

The record contains much evidence of the variable in driving habits as well as road and vehicle conditions that can effect fuel economy. By altering driving habits, an individual can effect a fuel saving of as much as 20%. It is possible that a change in air temperature could change fuel economy by 10% or more. The record contains reference to the Hawthorn effect which recognizes that when a person, such as a driver of an automobile, knows he or she is in a test situation he or she will attempt to make the experiment work, in the case of a driver by altering his or her driving habits (*see* tr. 393-96 (Patterson)).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)

It is found that the so-called consumer tests are not reliable enough to offset the other evidence of record upon which it has been determined that the Ball-Matic Valve will not produce the amount of fuel economy as represented by respondents.

42. It is also found, for the reasons set forth in Finding 41, *supra*, that respondents' use of testimonials to represent performance claims for the Ball-Matic Valve were deceptive. Their representation that the results of consumer usage as evidenced by consumer endorsements proved that the Ball-Matic Valve significantly improved fuel economy was false. Their representation that the consumer endorsements that appeared in advertisements and promotional materials for the Ball-Matic Valve reflect the typical or ordinary experience of members of the public who have used the device, was false.

43. None of the tests relied upon by respondent actually proved the performance claims made for the Ball-Matic Valve. It is found that none of these tests was competent tests. Accordingly, respondents' claim in their advertisements and promotional materials that they had competent tests that proved the fuel economy claims made for the Ball-Matic Valve was false. [26]

44. The Ball-Matic Valve was not a 'new invention' when respondents marketed it in 1979. It had been marketed since 1973 by the Ball-Matic Corporation (tr. 175-78 (Smith)). Moreover, the evidence also shows that the Ball-Matic Valve was not an important, significant and unique new invention in 1973, when it was first marketed by Ball-Matic Corporation. Devices like the Ball-Matic Valve are commonly called 'air bleed' devices (tr. 444, (Patterson); tr. 1139 (Korth); tr. 173 (Smith); CX 99C; RX 244). Such devices have been in existence for many years and the EPA and its predecessor agencies have tested them since 1960 (tr. 1050 (Korth)). The patent for the Ball-Matic Valve covered the fins, not the valve mechanism (tr. 284 (Smith)). Professor Patterson testified that these cooling fins were merely cosmetic and had no effect upon the operation of the Ball-Matic Valve (tr. 378 (Patterson)). Accordingly, also considering the evidence that shows the limit to the effect that some consumers could obtain in fuel economy from using the Ball-Matic Valve, it is found that respondents' representations that the Ball-Matic Valve is an important, significant and unique new invention was false.

45. Except for CX 9, all of respondents' advertisements and promotional materials which are the subject of this proceeding contain consumer endorsements (*see* CXs 1-8, 10-17). Overall there are 18 different endorsements, although only eight different endorsements appear in the advertisements (*see* CXs 1-8, 10-17). Of these 18 testimonials, only six of the individuals are named, respondents having used initials and their town of residence to identify them. The record also contains the testimonial letters of 16 of these testimonialists. There is no dispute that the letters are genuine and reflect the experience that the consumers themselves perceived from the use of the Ball-Matic Valve. Four of the testimonialists were relatives of persons associated with the Ball-Matic Valve (Robert Ness, son of Al Ness, a Ball-Matic Valve distributor (CX 33; tr. 240-41 (Smith)); Ray Barker, brother-in-law of Hugh Harron, Ball-Matic Valve salesman (CXs 31, 134A); Vincent Currieri, nephew of Al Hess (CXs 32, 134A) and Fred Bray, brother-in-law of Al Ness (CX 134B)). One testimonialist was a distributor of Ball-Matic Valves (CX 36 (Michaud)) and one was a salesman for a supplier of the Ball-Matic Corporation (CX 35 (Genoway), CX 134B; tr. 242 (Smith)).

Four of the testimonialists testified and a stipulation relating to another is contained in the record (CX 133 (Thoreson)). [27]

Mr. Michaud testified that he had installed the Ball-Matic Valve on his 1972 Oldsmobile Toronado in 1974. He sold that automobile in 1976 (tr. 940). He currently uses the Ball-Matic Valves in his automobiles (tr. 948, 951). On May 4, 1979, Mr. Michaud signed a form granting Cliffdale permission to use his 1974 testimonial (CX 106; tr. 946).

Mr. Largent testified that he was the accountant for the Ball-Matic Corporation and that in 1974 Mr. Smith installed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

a Ball-Matic Valve on his automobile (tr. 593-94; *see* tr. 241-42 (Smith)). At the request of Mr. Smith he wrote the testimonial letter (CX 29; tr. 595). He 'traded in' that automobile in 1977 (tr. 597). He further testified that it probably occurred to him at the time he wrote the letter that it might be used for promotional purposes and that he would not have objected to its use (tr. 600-01).

Mr. Suprenant testified that he bought a Ball-Matic Valve from the 'daughter of the inventor' who was his co-worker and installed it on his Dodge Motor Home in 1974 (tr. 602-04, 610). He wrote a testimonial letter at the request of his co-worker (tr. 606, CX 37). He sold the motor home in 1976 (tr. 609). He gave Cliffdale permission to use his testimonial on May 9, 1979 (CX 93; tr. 608-09).

It was stipulated that Mrs. Thoreson would have testified that she had a Ball-Matic Valve on her 1970 Oldsmobile '98' from 1972 until 1977 when it was sold (CX 133A). She wrote the testimonial at Mr. Smith's request knowing that he was going to use it for promotional purposes (CX 38; CX 133A-B). Mrs. Thoreson never received a request from Cliffdale for permission to use her testimonial in their advertising and promotional material (CX 133B).

Mr. Coutts, an Investigator for the Orange County Sheriff's Office, and who was once a Deputy Sheriff with that office, testified that he purchased a Ball-Matic Valve from Tex Smith in 1974 and had it on his automobile for several months (tr. 619-20). He wrote a letter about the product at Mr. Smith's request (CX 39; tr. 621). In 1979, he became aware of the advertisements in which his testimony appeared (tr. 623). He had never been contacted about permission to use his testimonial in advertising (tr. 624). The use of his name with the title 'Sheriff' caused him much embarrassment (tr. 625-27).

46. Most of the testimonials were written in 1973 or 1974. Except for the details related by the four testimonialist [28] witnesses and in the stipulation (*see* Finding 45, *supra*) there is no evidence of record as to the length of time the Ball-Matic Valve was used by these consumers or if the facts related about the Ball-Matic Valve changed over time. However, based on the five reports used in the record, it is found that respondents' implied representation that in 1979 the statements were from persons who had used the Ball-Matic Valve in the recent past was false.

47. Most of the testimonials were solicited or received by Mr. Smith and were given to respondents at the time they were negotiating to become the distributor of the Ball-Matic Valve. From the contents of the letters, and the limited testimony of record, it would appear that the testimonialists either expressly, or at least tacitly, granted Mr. Smith permission to use such testimonials for promotional purposes and respondents' representation that permission was given was not false (*see* tr. 243-44 (Smith)).

48. Although some of the testimonialists were relatives of persons involved in sales or promotion of the Ball-Matic Valve, I find that no evidence that any relationship, involving family or business, was such that makes false respondents' implied representation that the testimonials and the statements contained therein were independently made.

49. In February 1979, Sussman contacted Mr. Tex Smith, the President of the Ball-Matic Corporation, to see if he was still marketing the Ball-Matic Valve (tr. 807-08 (Sussman); tr. 183 (Smith): *see* RX 4). Sussman had learned of that product when he worked at American Consumer Inc. ('ACI'), ACI having marketed the Ball-Matic Valve for a short time in 1978, discontinuing it when the Federal Trade Commission began an investigation of ACI's marketing practices involving the G.R. Valve, another automobile retro-fit device (tr. 806-07 (Sussman); tr. 175, 178, 181, 285 (Smith); *see* CX 41)). [*American Consumer, Inc., et al.*, 94 F.T.C. 648 (1979)] After Smith sent Sussman some material about the product, including some promotional flyers and the results of the Orange Hill Shell Service Station test, Sussman recommended that Koven go to California to meet with Smith (tr. 808-811 (Sussman); tr. 897-98, 903 (Koven); tr.3 11 (Smith); *see* RXs 6A-B, 8, 42A-C).

50. In March of 1979, Koven traveled to California to meet Smith (tr. 899 (Koven); tr. 184-87, 294 (Smith)). At that

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)

time Koven signed the marketing agreement with the Ball-Matic Corporation (CX 42; *see* tr. 261-65 (Smith); tr. 902 (Koven)). The contract was actually written on a copy of a draft of a letter agreement between Ball-Matic Corporation and ACI (CX 42). While in [29] California, Koven obtained copies of a number of consumer testimonials which he selected from the approximately 100 testimonials that Smith had on file (tr. 907 (Koven); CXs 29-39; RXs 9-40)). Smith also delivered to Koven at that time or by mail shortly thereafter, a reprint of an article by James Brock of the Orange County *Register* (CX 27, RXs 46, 47; tr. 211 (Smith); tr. 907 (Koven)), a copy of the patent for the Ball-Matic Valve (RX 41A-D; tr. 283 (Smith)), and the exemption certificate for the Ball-Matic Valve from the California Air Resources Board (CX 40A-B; tr. 197-99, 304 (Smith); *see* tr. 917 (Koven); tr. 808-09 (Sussman)). Smith showed Koven an evaluation made by the California Air Resources Board dated September 19, 1977, and the result of a test done by a Chrysler laboratory in Vernon, California (tr. 203-07 (Smith); tr. 985-87, 1008 (Koven); RXs 44, 63A-C; *but see* CX 117A-E). Smith and Koven discussed a report by the Department of California Highway Control (CX 61A-B; tr. 218 (Smith); tr. 952, 980 (Koven)). While in California, Koven contacted Mr. Lockwood of the Shell Station and was satisfied that the Shell Service Station test had been conducted as stated in the test report (904, 991 (Koven)). Later, in July 1979, Barnett talked to Brock about the Orange County *Register* article (tr. 907 (Koven); tr. 723 (Barnett); CX 28).

51. In early 1979, Mr. Howard and Mr. Barnett installed Ball-Matic Valves on their private automobiles and reported favorable results (tr. 898-89, 988, 1004, 1018 (Koven)). Barnett obtained a 10 percent improvement or 1 1/2 miles per gallon (tr. 710-17, 721 (Barnett)). Howard obtained 2 miles per gallon increase in fuel economy, from 12 to 14 miles per gallon (tr. 1532-33 (Howard)). Sussman also had experienced an increase in fuel economy from 19.8 miles per gallon to 22.4 miles per gallon by installing the Ball-Matic Valve on his automobile when he worked for ACI (tr. 877 (Sussman)).

52. Respondents relied upon the material received from Smith in the preparation of the two prototype advertisements which contain the representations challenged in the complaint (*see* CXs 1, 2; tr. 924-29, 933-35 (Koven); tr. 818, 884 (Sussman); tr. 351-54 (Smith); tr. 1548-49 (Howard)). The format of the Cliffdale advertisements for the Ball-Matic Valve was similar to the advertising disseminated by ACI for the G. R. Valve (tr. 1480-81, 1538 (Howard); tr. 811-12 (Sussman)). Respondents also relied upon the experience of their employees who used the Ball-Matic Valve and, later relied on the Kishibay test results which were published May 18, 1979 (tr. 988-89 (Koven); tr. 741 (Barnett); tr. 1548-49 (Howard)). [30]

53. When respondents began marketing the Ball-Matic Valve in 1979, they were award of a November 1978 article in *Consumer Reports* magazine which reported that there were no statistically significant changes in gasoline mileage from use of air-bleed devices such as the Ball-Matic Valve (CX 49A; *see* CX 50; tr. 708-09 (Barnett)). They were also aware of the EPA test on the Ball-Matic Valve (CX 57A-I; tr. 249 (Smith); tr. 919, 981 (Koven)), but had been informed by Smith that the EPA test was not a fair test of the Ball-Matic Valve because it was a dynamometer test and that the Ball-Matic Valve only worked when installed on an automobile and used under actual driving conditions (tr. 252, 334 (Smith); tr. 981 (Koven)). They were also aware of the Federal Trade Commission's investigation of ACI (tr. 900 (Koven)).

54. After preparing 'paste ups' of the original advertisements, respondents, pursuant to the requirements of their agreement with Ball-Matic Corporation, submitted copy of the advertisements to Smith in early April 1979 (*see* tr. 349-50 (Smith); tr. 882, 884 (Sussman)). Smith approved the advertising copy without change (*see* RXs 49-53; tr. 882, 884 Sussman)).

55. The first Ball-Matic Valve advertisements disseminated by respondents were published in mid-April 1979 (*see* CX 18).

56. It is found that respondents, at the time they disseminated the Ball-Matic Valve advertisements, did not have a reasonable basis for the economy claims contained therein, as 'reasonable basis' is understood for purposes of advertising substantiation under Section 5 of the Federal Trade Commission Act, and that, accordingly, their

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

representation that they had such a 'reasonable basis' was false.

57. In the last week of May 1979, Respondents secured the services of Dr. Wouk. He reviewed the advertisements already published and suggested numerous changes, most of which was adopted in later advertisements (*see* RXs 230A-C; 231, 232, 235, 236; tr. 746, 749-50 (Barnett)). He advised respondents that consumer testimonials were not a scientific basis for fuel economy claims and recommended that they begin a testing program to corroborate, in a laboratory setting, the fuel economy shown by the consumer tests supplied by Smith (tr. 956 (Koven); tr. 876 (Sussman)).

58. On July 11, 1979, the *Wall Street Journal* carried a front page story on 'gas saving devices' which included statements made by the Commission staff as well as by Barnett of Cliffdale [31] (RX 244A-B; tr. 775-76 (Barnett)). On or about July 16, 1979, Cliffdale received an investigational subpoena from the Federal Trade Commission relating to the marketing of the Ball-Matic Valve (tr. 844-45 (Sussman)). About that same time respondents decided to stop advertising the Ball-Matic Valve and attempted to cancel all advertising that had been placed but not published (tr. 956, 975, 1000 (Koven); tr. 1550-51 (Howard); tr. 845, 871, 875 (Sussman)).

59. Respondents' attempt to cancel all advertising for the Ball-Matic Valve was not successful because many magazines had closing dates well in advance of publication and advertisements appeared in many magazines in August, September and October. Only two advertisements appeared in November (CX 18-25; *see* tr. 1491-93 (Howard)). Respondents filled orders placed in response to their advertising until early December when they entered into a settlement with the Post Office Department (*see* tr. 956, 975 (Koven); CXs 45A-J; 67). After that time respondents returned the orders with a letter permitting the consumer to reorder only upon certification that the consumer was not relying upon respondents' advertising claims about the product (CXs 101, 102; tr. 725 (Barnett); tr. 855-56, 870-71 (Sussman)).

60. During the period of his employment by Cliffdale, from May until November 1979, Dr. Wouk conducted research and testing of the Ball-Matic Valve to develop a protocol and test results that would satisfy the government that the valve worked as respondents had claimed (tr. 956, 1000 (Koven)).

61. In all of their advertisements respondents offered a money back guarantee and honored all requests made by consumers for refunds (CX 153D, Item 27 (Stip.)). The Ball-Matic Valves returned to respondents were in turn returned to Ball-Matic Corporation (tr. 330-31 Smith).

62. Although complaint counsel admit that 'the exact date on which the spring configuration [from a weak spring to a stiff spring] was made' on the Ball-Matic Valves manufactured by the Ball-Matic Corporation has not been established, they request a finding that it was not until sometime in August 1979 that Ball-Matic Valves containing the 'stiff' spring were delivered to Cliffdale (CSCPF Nos. 98, 102). Complaint counsel take the position, and argue throughout their proposed findings, memorandum and reply brief, that the Ball-Matic Valves sold by Cliffdale to consumers from April through July 1979 were ineffective due to the use of a spring that was too weak to permit operation of the valve (*See* CSCPF No. 102). Complaint counsel contend that, accordingly, all of respondents' fuel [32] economy claims for the Ball-Matic Valve disseminated before August 1, 1979, were patently false, not withstanding subsequent laboratory tests on the Ball-Matic Valve with the so-called 'stiff' spring which might demonstrate that it does effect some fuel economy.

Respondents argue (Reply Br. p. 24) that this case does not involve any allegation that respondents had shipped a product with an inherent defect and had not honored their money back guarantee, but rather involves the question of whether 'the Ball-Matics which respondents sold, assuming they had been manufactured properly, are capable of effecting the fuel savings claimed in the advertisements, and whether respondents had a reasonable basis and reasonable substantiation for the claims in the advertisements'.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The parties appear to agree that the 'black' Ball-Matic Valve which was manufactured before Cliffdale became a purchaser from the Ball-Matic Corporation had a 'weak' and ineffective spring and that 'black' Ball-Matic Valves were supplied to Cliffdale for a short time, at the outset of its marketing program, most of them having been returned to the Ball-Matic Corporation. The results of the tests performed on the 'black' Ball-Matic Valve (including the EPA test in 1976), which did not demonstrate any fuel economy, have been attributed to the 'weak' spring. Tests which ostensibly demonstrated fuel economy including the consumer type tests performed in 1974 were apparently performed on 'silver' Ball-Matic Valves which presumably contained a 'stiff' spring.

Complaint counsel's contention, that 'silver' Ball-Matic Valves delivered to Cliffdale before August 1979 actually contained 'weak' springs like the black Ball-Matic Valve, is based on the testimony of Dr. Wouk concerning his visit to the Ball-Matic Corporation's product quality control facility in California and his observations during the first Scott test, as contained in his recommendation, among others, that a stiffer spring be used on the Ball-Matic Valve (tr. 1214-15, 1427 (Wouk); CXs 75, 80).

The significance of the 'weak' spring in the so-called 'black' Ball-Matic Valve was not developed before the hearings and the possible difference in the 'springs' in the 'silver' Ball-Matic Valve was not developed until after the hearings. It is not clear whether Dr. Wouk's concerns in September 1979 related to development of a Ball-Matic Valve that would admit air into the engine in amounts necessary to theoretically achieve the fuel economy claimed in the advertisements, rather [33] than to insure that the Ball-Matic Valve was not 'defective'. In my opinion, Dr. Wouk was suggesting the possible use of a 'stiffer' spring and not that the valve was inherently defective.

In the circumstances, complaint counsel's proposed finding that Ball-Matic Valves with the 'stiff' spring were not sold by Cliffdale until August 1979 is rejected and for purposes of this case it is found that the silver Ball-Matic Valves which were delivered to Cliffdale soon after the start of the Cliffdale marketing program were manufactured properly.

63. Respondents request findings that they are not responsible for any misrepresentations that may be adjudicated on the basis of the advertisements and promotional materials challenged in this case because they relied solely on information supplied to them by the manufacturer and supplier of the Ball-Matic Valve. In this respect they point out that they had obtained specific approval of such advertising claims from the supplier and from Dr. Wouk, an eminent scientist. They also note that the Commission issued a complaint against the Ball-Matic Corporation covering the identical advertisements challenged in this docket, and has issued an order to cease and desist against the Ball-Matic Corporation.

The record shows that Koven and Sussman prepared the challenged advertisements and promotional material and were responsible for its dissemination. Howard, an employee of Cliffdale, selected certain testimonials for inclusion in the advertisements and prepared the 'lay out' of the advertisements. Koven and Sussman also planned the marketing of the Ball-Matic Valve and dictated the operations of both Cliffdale and Sherwood in marketing the product.

Whatever responsibility Smith and the Ball-Matic Corporation may have had in supplying information, approving the advertising copy or supplying the means for respondents advertising claims and marketing program does not lessen respondents' responsibility for their own actions.

Finally, Dr. Wouk's approval of the advertising copy, after it had been disseminated, does not lessen respondents' legal responsibility under Section 5 of the Federal Trade Commission Act. The requested finding that respondents were not responsible for the challenged practices is rejected.

64. Respondents contend that Professor Patterson's test should be disregarded (RPF No. 90). They argue that his test does not fairly reflect typical drivers, typical automobiles and typical [34] driving conditions. They point out that

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)

Professor Patterson used an engine which is not used in automobiles manufactured in the United States, that he employed and engine dynomometer instead of the chassis dynamometer used by the EPA, that he varied the test points of the EPA test, and that he used a set of test points that were for a different engine than the one he used in his test of the Ball-Matic Valve. They argue further that if the numerous field tests, consumer usage reports and other data they relied upon, including the Kishibay chassis dynamometer test, are not reliable because, as complaint counsel contend, they do not fairly reflect typical driving conditions, then the Patterson test is not reliable for the same reasons.

The record shows that consumer type tests should not be used to support fuel economy claims because there are so many variables that can effect differences in fuel consumption that it is impossible to determine whether changes in fuel consumption are attributable to the variable being tested, here the installation of the Ball-Matic Valve. Engine dynamometer tests, such as Professor Patterson's test, eliminate all other variables. Accordingly, such laboratory testing is more reliable than consumer type testing, notwithstanding that extrapolations of such test results to the results that any single individual may experience under actual driving conditions would not be expected to be entirely accurate.

Professor Patterson's laboratory test demonstrated that under conditions most favorable to the operation of the Ball-Matic Valve, the maximum benefit any vehicle could experience would be far less than the maximum claimed in respondents' advertising and promotional materials. In the absence of any non-consumer test to the contrary, Professor Patterson's test is the best evidence. In fact, all laboratory tests confirm Professor Patterson's results. Respondents' request that Professor Patterson's test and his accompanying testimony be disregarded is denied.

65. Respondents contend (*see* RPF, pp. 3, 61, 62) that insofar as the complaint alleges that respondents are *now* engaged in the practices challenged therein, it must be dismissed because they have not engaged in any advertising for the Ball-Matic Valve since 1979, and have not sold any Ball-Matic Valves since early in 1980. I agree. That portion of the complaint issued July 7, 1981, that alleges that respondents were then currently engaged in the challenged practices is dismissed for failure of proof (Complaint ¶¶2, 5, 9, 10, 11). [35]

### DISCUSSION

The Federal Trade Commission has jurisdiction over Cliffdale, Koven and Sussman. They are engaged in commerce within the meaning of the Federal Trade Commission Act, and the challenged acts and practices are in commerce and affect commerce within the meaning of the Act. Respondents' contentions that the Commission lacks jurisdiction over them or the subject matter of the complaint or that the complaint fails to state a claim against them upon which relief can be granted, as pleaded in their answer, must be rejected.

It has been found that the advertisements contained the representations alleged in the complaint. This determination has been made from carefully considering the advertisements, including the format and the emphasis placed on certain words and phrases contained therein. It is well settled that the meaning of an advertisement may be determined by an examination of the advertisement itself. *See Federal Trade Commission* v. *Colgate-Palmolive Co.*, 380 U.S. 374 (1965); *J. B. Williams Co., Inc.* v. *Federal Trade Commission*, 381 F.2d 884 (6th Cir. 1967).

It has been found that respondents' advertising representations as contained in their advertisements and as alleged in the complaint are, with several minor exceptions, false. This determination has been made on the facts of this record as set forth in the findings of fact. It is well settled that any advertising representation that has the tendency and capacity to mislead or deceive a prospective purchaser is an unfair and deceptive practice which violates the Federal Trade Commission Act. *Chrysler Corp.* v. *Federal Trade Commission*, 561 F.2d 357, 363 (D.C. Cir. 1977); *Charles of the Ritz Distr. Corp.* v. *Federal Trade Commission*, 143 F.2d 676, 679-80 (2d Cir. 1944).

Determination as to whether an advertiser possessed and relied upon a 'reasonable basis' for believing a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

representation to be true requires evaluation of 'both the reasonableness of an advertiser's action and the adequacy of the evidence upon which such actions were based' *Pfizer, Inc.*, 81 F.T.C. 23, 64 (1972). The basic question is whether the advertiser 'acted upon information which would satisfy a reasonable prudent businessman' that the representations are true and that he thus acted in 'good faith'. *National Dynamics Corp.*, 82 F.T.C. 488, 553, 557.

Although the record is clear that the materials relied upon [36] by respondents as basis for the performance claims made for the Ball-Matic Valve were merely consumer type tests and reports which should not form the basis for fuel economy claims, the question of the respondents' reasonableness in relying upon such material should be considered as a factual matter apart from the adequacy of the materials themselves. The record shows that there were materials available to respondents before and at the time that they published the first advertisements which indicated that the value of the Ball-Matic Valve and other such 'air bleed' devices for effective fuel economy was limited. Respondents should have made further investigation into the matter instead of merely relying on the consumer tests. The steps which they took to become informed occurred after the publication of the challenged advertisements.

In support of their contention that respondents' represented that they had competent, scientific tests to support their performance claims for the Ball-Matic Valve, complaint counsel point to the statements in the advertisements about the Shell Service Station Test. In their advertisements, respondents detailed how the test was conducted and the results thereof. In support of their contention that respondents falsely represented that they had scientific tests to support their performance claims for the Ball-Matic Valve, complaint counsel argue, based on the expert testimony of record, that consumer type tests such as the Shell Service Station test, are not scientific tests. Respondents question complaint counsel logic, arguing that if the test as detailed in the advertisement is not a scientific test, it could not be an implied representation that it is. I agree with respondents. But there are other representations in each advertisement that can be interpreted as representing that such scientific tests supporting the claims did exist, whereas, as the record shows, none did.

Respondents contend that statements attributed to others containing only initials of the testimonialist and no other identifying personal characteristic are not testimonials and not governed by the Federal Trade Commission's guidelines concerning endorsements and testimonials (16 C.F.R. 255.1 (1982)).

In my opinion, respondents are correct, because the Guidelines appear to be directed at protecting the privacy of the testimonialist. Initials are not such identifying material, without more, to bring the Guidelines into operation.

Complaint counsel's contention that respondents must get direct permission from each testimonialist before they can use their statements in advertising, even though, as found in this [37] case, the testimonialists gave Mr. Smith such permission, must be rejected. Such a general proposition restricts a seller from permitting a buyer to use testimonials in the resale of products. It is sufficient that the buyer be assured that permission has been granted. The Coutts situation, which is the only matter of record where there is a question of whether permission was granted to Mr. Smith, really involves the misuse of the title 'Sheriff'. This one situation, where respondents did, in good faith, understand from Mr. Smith that permission was granted, is not sufficient, in my opinion to support a finding of an unfair and deceptive practice or an unfair method of competition or to support a general prohibition in an order to cease and desist.

Although it appears that the Guidelines were substantially amended in January 1980, and may not be directly applicable to this proceeding, the Commission, could, nevertheless invoke Section 5 of the Federal Trade Commission Act to find certain practices unfair and deceptive. But where the Guidelines limit or define certain practices that will be considered unfair, those practices apparently permitted by the Guidelines should not be the subject of adjudicative proceedings.

In this respect, I do not think that the undisclosed relationships between certain testimonialists quoted in respondents advertising and the marketers of the Ball-Matic Valve are the type of relationships which might affect the weight or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

credibility of the endorsement so as to invoke the requirement that such relationships be fully disclosed.

Finally, respondents contend that this entire proceeding, including any order to cease and desist, is not in the public interest. They show that they ceased their advertising as soon as questions arose as to the merits of the Ball-Matic Valve, that they attempted to cancel advertising already placed, that the Post Office has an outstanding consent order against them, and that there is no possibility that they will again publish advertisements about the Ball-Matic Valve. They argue that their entire endeavor was short-lived and was undertaken and terminated in good faith. In this respect, respondents emphasize the matters challenged in this case took place in 1979, and that they voluntarily started to terminate their business in the Ball-Matic Valve before the Federal Trade Commission investigation and did terminate their business in the Ball-Matic Valve more than a year before the complaint issued (*see* RPF pp. 91-94; Resp. Reply Br. 37-38). [38]

In my opinion, respondents' actions do not bar the Commission proceeding as a matter of law. The violations of Section 5 of the Federal Trade Commission Act took place. The Commission has the responsibility to seek an order to cease and desist against the use of unfair and deceptive practices, such as false fuel economy claims and misuse of testimonials, in the future. The fact that respondents *will* never sell Ball-Matic Valves again is not relevant. The record shows that respondents are still in the mail order business.

Moreover, there is nothing improper in the Commission's proceeding under Section 5 of the Federal Trade Commission Act in areas already covered by Post Office Department orders. There are many basic and material differences in the laws administered by the two public agencies. *See Reilly* v. *Pinkus*, 338 U.S. 269, 277 (1949); *Damar Products, Inc.*, 59 F.T.C. 1263 (1961), aff'd. *Damar Products, Inc.* v. *Federal Trade Commission*, 309 F.2d 323 (3d Cir. 1962).

## CONCLUSIONS

1. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of respondents Cliffdale, Koven and Sussman.

2. This proceeding is in the public interest. The Commission so determined upon the assumption of jurisdiction through the issuance of the complaint. *American Airlines, Inc.* v. *North American Airlines, Inc.*, 351 U.S. 79, 83 (1956): Nothing in the record of findings requires a different determination. *See Federal Trade Commission* v. *Klesner*, 280 U.S. 19 (1929).

3. The individual respondents formulated, directed and controlled the acts and practices of the corporate respondent and other entities of which they were officers or employees, including the acts and practices found herein, and are responsible, individually for such acts and practices.

4. Respondents have disseminated unfair, false, misleading and deceptive advertisements and sales promotional materials in the promotion, marketing and sale of the Ball-Matic Valve and the respondents' advertisements and sales promotional material constitute 'false and deceptive' advertisements as those terms are defined in the Federal Trade Commission Act.

5. At the time respondents made the false representations about the fuel economy that could be expected to result from use of the Ball-Matic Valve, they did not possess a 'reasonable basis' on which to make such claims. Failure to have such a [39] 'reasonable basis' is a violation of Section 5 of the Federal Trade Commission Act.

6. Respondents' dissemination of such false and deceptive advertisements had the tendency and capacity to mislead and deceive the public and constitute unfair methods of competition and unfair and deceptive acts and practices in commerce or affecting commerce in violation of the Federal Trade Commission Act.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

REMEDY

The Commission is vested with broad discretion in determining the type of order necessary to insure discontinuance of the unlawful practices found. *Federal Trade Commission* v. *Colgate-Palmolive Co.*, 380 U.S. 374, 392 (1965). The Commission's discretion is limited only by the requirement that the remedy be reasonably related to the unlawful practices found. *Jacob Siegel Co.* v. *Federal Trade Commission*, 327 U.S. 608, 613 (1946); *Warner-Lambert Co.* v. *Federal Trade Commission*, 562 F.2d 749, 762 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 950 (1978); *Niresk Industries Inc.* v. *Federal Trade Commission*, 278 F.2d 337, 343 (7th Cir. 1960), *cert. denied*, 364 U.S. 883. The Commission is not limited to prohibiting the illegal practices in the exact form in which they were found to have been employed in the past and may close all roads to the prohibited goal. *Federal Trade Commission* v. *Ruberoid Co.*, 343 U.S. 470, 473 (1952); *Federal Trade Commission* v. *National Lead Co.*, 352 U.S. 419 (1957).

Complaint counsel's proposed order is identical to the notice order that accompanied the complaint. Except for the two provisions relating to challenged representations concerning the testimonials that I have found not to be false on the basis of this record, and the scope of one of the ministerial provisions of the proposed order, the proposed order is 'reasonably related' to the violations found and meets the requirements of the case law.

Respondents challenge Part II of the proposed order as presenting them with an impossible situation. They contend that if they rely upon an engine dynamometer test, as complaint counsel relied on Dr. Patterson's test, they could not use it as support for fuel economy claims because the order requires either an appropriate EPA test chassis dynamometer test or an appropriate track test. They also contend that if they used an EPA chassis dynommometer test they would still be precluded from using the test results for advertising because, as is reflected [40] on the record in this case, such results cannot be represented as being achievable by typical drivers under typical conditions, such results being useful only for comparative purposes as between cars of different manufacture.

I do not read the proposed order as being so restrictive. The record shows that there are procedures for testing retro-fit devices or other fuel savings devices such as additives which require 'before' and 'after' test results for comparisons (*see* CX 57B; n. 1; RX 227). The tests described in the order are examples. The point of the order is to require respondents to have a reasonable basis for fuel economy claims founded on 'a competent and reliable test that is one in which persons qualified to do so conduct the test and evaluate its results in an objective manner using procedures that insure accurate and reliable results' (*see* Part II, order *infra* p. 43). I do not agree with respondents that the tests detailed in the proposed order would be less of a reasonable basis for substantiation of fuel economy representations than the consumer type tests upon which they did rely.

I agree with respondents that Part IV of the order must be limited to 'gas saving products'. To require the file retention of post-purchase materials of all advertised products is beyond the scope of this case and would impose an undue burden on respondents.

Part VII of the order, which requires respondent to notify the Commission, for a period of 10 years, of the discontinuance of any past employment and affiliation with any new business, is entirely proper.

ORDER

PART I

*It is ordered*, That respondents Cliffdale Associates, Inc., a corporation, its successors and assigns, Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, and respondents' agents, representatives, and employees, directly or through any corporation, subsidiary, division, or other device, in connection [41] with the advertising, offering for sale, sale or distribution of the automobile retrofit

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit K

device variously known as the Ball-Matic, the Ball-Matic Valve, the Ball-Matic Gas Saver Valve and the Gas Save Valve, or of any other automobile retrofit device (as 'automobile retrofit device' is defined in Section 511 of the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. 2011) having substantially similar properties, in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

 a. representing, directly or by implication, that such device is a unique product or new invention; and

 b. representing, directly or by implication, that such device is needed on every vehicle except Volkswagens, diesel vehicles and fuel injection vehicles. [42]

## PART II

*It is further ordered*, That respondents Cliffdale Associates, Inc., a corporation, its successors and assigns, and its officers, and Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, and respondents' agents, representatives, and employees, directly or through any corporation, subsidiary, division, or other device, in connection with the advertising, offering for sale, sale or distribution of any automobile gasoline additive, engine oil additive, or automobile retrofit device (as 'automobile retrofit device' is defined in Section 511 of the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. 2011), in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from representing, directly or by implication, that such device will or may result in fuel economy improvement when installed in an automobile, truck, recreational vehicle, or other motor vehicle unless, and only to the extent, respondents possess and rely upon a reasonable basis which substantiates such representation at the time of its initial and each subsequent dissemination. This reasonable basis shall consist of competent and reliable tests, such as:

 a. chassis dynamometer tests done according to procedures that simulate typical [43] urban and highway driving patterns, such as the then current urban and highway driving test schedules established by the Environmental Protection Agency; or

 b. track or road tests done according to procedures that simulate urban and highway driving patterns, such as the then current procedures established in the Society of Automobile Engineers' J1082b test protocol.

A competent and reliable test means one in which persons qualified to do so conduct the test and evaluate its results in an objective manner using procedures that insure accurate and reliable results.

Respondents shall, when using the results of any tests required by this Part, clearly and conspicuously disclose any limitations upon the applicability of the results to any automobile, truck, recreational vehicle, or other motor vehicle. Where the results of such tests are used in connection with a representation of fuel economy improvement expressed in miles per gallon (or liter), miles per tankful, or percentage, [44] or where the representation of the benefit is expressed as a monetary saving in dollars or percentages, all advertising and other sales promotional materials that contain the representation must also clearly and conspicuously disclose the following disclaimer: 'REMINDER: Your actual saving may vary. It depends on the kind of driving you do, how you drive and the condition of your car.'

## PART III

*It is further ordered*, That respondents Cliffdale Associates, Inc., a corporation, its successors and assigns, and its officers, Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, and respondents' agents, representatives, and employees, directly or through any corporation, subsidiary, division, or other device, in connection with the advertising, offering for sale, sale or distribution of any product or service in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

 a. using, publishing, or referring to any endorsement unless respondents have good reason to believe that at the time of [45] such use, publication, or reference, the person or organization named subscribes to the facts and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

opinions therein contained;

b. representing, directly or by implication, any energy savings or energy consumption characteristics of any product, other than any gasoline additive, engine oil additive, or automobile retrofit device (as 'automobile retrofit device' is defined in the Automobile Information and Cost Savings Act, 15 U.S.C. 2011), unless, at the time of making the representation, respondents possess and reasonably rely upon competent and reliable evidence that substantiates such representation;

c. representing, directly or by implication, that any consumer endorsement of a product or service represents the typical or ordinary [46] experience of members of the public who use the product unless this is the case;

d. misrepresenting, in any manner, the purpose, procedure, results, or conclusion of any test or survey pertaining to the energy saving or energy consumption characteristics of any product.

## PART IV

*It is further ordered*, That respondents Cliffdale Associates, Inc., a corporation, its successors and assigns, and its officers, and Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, and respondents' agents, representatives, and employees, directly or through any corporation, subsidiary, division, or other device, in connection with the advertising, offering for sale, sale or distribution of any fuel saving product in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from failing to maintain accurately the following records which may be inspected by Commission staff members upon fifteen (15) days' [47] notice: copies of dissemination schedules for all advertisements, sales promotional materials, and post-purchase materials; documents relating to the use or publication of endorsements; records of the number of pieces of direct mail advertising sent in each direct mail advertisement dissemination; documents which substantiate, contradict, or otherwise relate to any claim which is a part of the advertising, sales promotional materials, or post-purchase materials disseminated by respondents directly or through any business entity. Such documentation shall be retained by respondents for a period of three (3) years from the last date any such advertising, sale promotional materials, or post-purchase material is disseminated.

## PART V

*It is further ordered*, That the corporate respondent shall forthwith distribute a copy of this order to all operating divisions of said corporation, and to all present and future personnel, agents, or representatives having sales, advertising or policy responsibilities with respect to the subject matter of this order and that the corporate respondent shall secure from each such person a signed statement acknowledging receipt of the order. [48]

## PART VI

*It is further ordered*, That the corporate respondent notify the Commission at least thirty (30) days prior to any proposed change in the corporate respondent such as dissolution, assignment, or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries or any other change in the corporation which may affect compliance obligations arising out of the order.

## PART VII

*It is further ordered*, That the individual respondents named herein promptly notify the Commission of the discontinuance of their present business or employment and of their affiliation with each new business or employment for a period of ten years from the effective date of this order. Each such notice shall include the respondents' new business address and a statement of the nature of the business or employment in which the respondent is newly engaged as well as a description of respondent's duties and responsibilities in connection with the business or employment. The expiration of the notice provision of this paragraph shall not affect any other obligation arising under this order. [49]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PART VIII

*It is further ordered,* That the respondents shall, within sixty (60) days after service upon them of this order, and also one (1) year thereafter, file with the Commission a report, in writing, setting forth in detail the manner and form in which they have complied with this order.

OPINION OF THE COMMISSION

BY MILLER, *Chairman:*

Cliffdale Associates, Jean-Claude Koven, and Arthur N. Sussman were charged with unfair methods of competition and unfair or deceptive acts or practices in violation of Section 5 of the Federal Trade Commission Act.[FN1] Specifically, the complaint charged that respondents misrepresented the value and performance of an automobile engine attachment known as the Ball-Matic Gas Saver Valve ('Ball-Matic'). (Complaint ¶¶5, 6.) The complaint also charged that respondents lacked a reasonable basis [2] for their performance claims for the Ball-Matic. (Complaint ¶¶7, 8).

Administrative Law Judge Miles J. Brown held that respondents had engaged in false and deceptive advertising and had lacked a reasonable basis for the claims made in their advertisements and promotional materials, in violation of Section 5 of the FTC Act. (ID 38-9.)[FN2] Both sides appeal from the ALJ's initial decision. We generally agree with the ALJ's findings and conclusions and, except as noted in this opinion, we adopt them as our own.

I. BACKGROUND

A. *The Respondents*

1. Cliffdale Associates

Cliffdale is a Connecticut corporation headquartered in Westport, Connecticut. The company is engaged in mail order marketing of different products, including the Ball-Matic. Company sales for the year ending December 31, 1979, were $692,998.

2. Jean-Claude Koven and Arthur N. Sussman

Jean-Claude Koven and his wife own 100% of Cliffdale's [3] stock. Koven has been president of the company since its incorporation. He directed the marketing and advertising activities of Cliffdale and shared the administrative duties with his wife. Koven has been engaged in a number of mail order businesses since 1970.

Arthur N. Sussman has been involved in various mail order businesses since 1971. Sussman was a consultant to Cliffdale from January 6, 1979, to July 1, 1979. Sussman was to find new products to be sold by Cliffdale, and it was Sussman who brought the Ball-Matic to the company. Both Koven and Sussman were actively involved in marketing the Ball-Matic and were responsible for placing the advertisements at issue in this proceeding.

B. *The Product*

The Ball-Matic was marketed as a gasoline conservation automobile retrofit device. The Ball-Matic is one of a number of 'air bleed' devices designed to allow additional air to enter a car's engine in order to improve gasoline mileage.[FN3]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

C. *The Allegations*

The complaint charges respondents with ten law violations arising from their placement of advertisements and distribution of sales materials that made false and misleading claims concerning the performance and value of the Ball-Matic. The charges can be divided into four classes. [4]

a. The first class relates to claims descriptive of the Ball-Matic and its performance. The claims are:
    1. the Ball-Matic is an important, significant, and unique new invention;
    2. the Ball-Matic is needed on every motor vehicle except Volkswagens, diesel vehicles, or fuel injected vehicles;
    3. the Ball-Matic, when installed in a typical automobile and used under normal driving conditions, will significantly improve fuel economy; and
    4. under normal driving conditions, a typical driver can usually obtain a fuel economy improvement of 20 percent (or more) or an improvement that will approximate or equal four miles per gallon when the Ball-Matic is installed in an automobile. (Complaint ¶5.)

b. The second class arises from respondent's claims that competent scientific tests establish the fuel economy claims made for the Ball-Matic. (*Id.*)

c. The third class relates to the use of consumer endorsements that appeared in ads and sales materials. According to the complaint, the advertisements represented that the endorsements:
    1. prove that the Ball-Matic significantly improves fuel economy;
    2. were obtained from individuals or other entities who, at the time of providing their endorsements, were independent from all of the individuals and entities that have marketed the Ball-Matic;
    3. are statements of persons who have recently used or are currently using the Ball-Matic; and
    4. reflect the typical or ordinary experience of members of the public who have used the Ball-Matic.
(*Id.*) [5]

d. Finally, the complaint charges that respondents lacked a reasonable basis for making the advertised performance claims for the Ball-Matic. (Complaint ¶ 8.)

D. *The Issues Raised on Appeal*

The ALJ held that respondents' claims constituted unfair or deceptive acts or practices and entered an order requiring respondents to cease and desist from making them unless they have a reasonable basis for such claims. Pursuant to the order, a reasonable basis must consist of competent empirical tests, such as chassis dynamometer tests or road tests, performed under established test protocols. The ALJ also prohibited respondents from making misrepresentations through consumer endorsements in future advertisements.

Respondents appeal from the ALJ's findings as to liability, submitting their proposed findings of fact and law as their appeal brief. Complaint counsel appeal from the ALJ's holding that respondents' failure to disclose their relationship to endorsers of the product was not deceptive. Complaint counsel also appeal from the ALJ's decision not to require retention of certain business records to insure compliance with the order. Finally, complaint counsel appeal from a number of specific ALJ findings, that they believe inadequately address the nature of respondents' conduct.

With respect to complaint counsel's appeal from specific findings of the ALJ, except as noted in the opinion below, we reject all but their proposed finding Nos. 45(a), (b), and (c), which correct erroneous record citations and tabulations by the [6] ALJ. We also reject complaint counsel's appeal with respect to the retention of business records. We agree with the ALJ that such a requirement would impose an undue burden on respondents. (ID 40.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

At trial, the charge of unfair methods of competition was not specifically addressed. The ALJ ruled there was liability but made no separate findings supporting this conclusion. Our review of the record reveals that it does not contain sufficient evidence to support a finding of liability on this charge. Accordingly we reverse those portions of the ALJ's decision that relate to unfair methods of competition, and dismiss that count of the complaint. We reject all of respondents' other contentions.

## II. LEGAL STANDARD FOR DECEPTION

The complaint pleads both an unfairness and a deception theory for each alleged violation of Section 5. (Complaint ¶¶6, 7, 8, 11.) However, deception was the standard under which the claims were actually tried, and it is the Commission's view that this was the appropriate approach.

In finding the representations in respondents' advertisements to be deceptive the ALJ accepted complaint counsel's articulation of the standard for deception. He concluded that 'any advertising representation that has the tendency and capacity to mislead or deceive a prospective purchaser is an unfair and deceptive practice which violates the Federal Trade Commission Act.' (ID 35, citing _Chrysler Corp. v. FTC_, 561 F.2d 357, 363 (D.C. Cir. 1977); _Charles of the Ritz_ [7] _Distributors Corp. v. FTC_, 143 F.2d 676, at 679-80 (2d Cir. 1944).) We find this approach to deception and violations of Section 5 to be circular and therefore inadequate to provide guidance on how a deception claim should be analyzed. Accordingly, we believe it appropriate for the Commission to articulate a clear and understandable standard for deception.

Consistent with its Policy Statement on Deception, issued on October 14, 1983,[FN4] the Commission will find an act or practice deceptive if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material. These elements articulate the factors actually used in most ealier Commission cases identifying whether or not an act or practice was deceptive, even though the language used in those cases was often couched in such terms as 'a tendency and capacity to deceive'.[FN5]

The requirement that an act or practice be 'likely to mislead', for example, reflects the long established principle that the Commission need not find _actual_ deception to hold that a [8] violation of Section 5 has occurred.[FN6] This concept was explained as early as 1964, when the Commission stated:

> In the application of [the deception] standard to the many different factual patterns that have arisen in cases before the Commission, certain principles have been well established. One is that under Section 5 actual deception of particular consumers need not be shown.[FN7]

Similarly, the requirement that an act or practice be considered from the perspective of a 'consumer acting reasonably in the circumstances' is not new. Virtually all representations, even those that are true, can be misunderstood by some consumers. The Commission has long recognized taht the law should not be applied in such a way as to find that honest representations are deceptive simply because they are misunderstood by a few.[FN8] Thus, the Commission has noted that an advertisement would not be considered deceptive merely because it could be 'unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons whom the [9] representation is addressed. '[FN9] In recent cases, this concept has been increasingly emphasized by the Commission.[FN10]

The third element is materiality. As noted in the Commission's policy statement, a material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product. Consumers thus are likely to suffer injury from a material misrepresentation.[FN11] A review of past Commission deception cases shows that one of the factors usually considered, either directly or indirectly, is whether or not a claim is material.[FN12]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Although the ALJ in this case used the phrase 'tendency and capacity to deceive' in his initial decision, we find after reviewing the record that his underlying analysis shows that the three elements necessary for a finding of deception are present in this case.

## III. THE QUESTION OF LIABILITY

The obvious first step in analyzing whether a claim is [10] deceptive is for the Commission to determine what claim has been made. When the advertisement contains an express claim, the representation itself establishes its meaning.[FN13] When the claim is implied, the Commission will often be able to determine the meaning through an examination of the representation, including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction.[FN14]

In other situations, the Commission will require extrinsic evidence that reasonable consumers interpret the implied claims in a certain way.[FN15] The evidence can consist of expert opinion, consumer testimony, copy tests, surveys, or any other reliable evidence of consumer interpretation. In all instances, the Commission will carefully consider any extrinsic evidence that is introduced.[FN16] [11]

### A. Descriptive Claims

#### 1. Important New Invention

##### a. Were the Claims Made?

Most of respondents' advertisements refer to the Ball-Matic as an 'amazing automobile discovery.' (CX 2-6, 10, 13-15.) The same advertisements also describe the product as 'the most significant automotive breakthrough in the last ten years.' Other ads term the Ball-Matic an 'important automobile invention' and a 'unique, patented' valve. The Ball-Matic is even compared to a 'mini-computer brain.' (CX 2-4, 6, 8, 10-12.)

The ALJ found these advertisements expressly claim that the Ball-Matic is an important, significant, and unique new invention (IDF 15.) We agree.

##### b. Needed in Every Car

Respondents' advertisements also state the 'EVERY CAR NEEDS ONE.' (CX 1, 5, 15, 17.) Most ads state that each and every car owner, truck owner, etc. can save up to 20 percent in gasoline costs by using the Ball-Matic (CX 2-4, 6, 7, 8, 10, 11, 12-15.) All of the advertisements and promotional materials include a disclaimer that Volkswagens, diesels, and fuel injected vehicles cannot profit from the Ball-Matic. As the ALJ concluded, these are express claims and their meaning is clear from the ads themselves.

##### c. Enhanced Efficiency

The alleged claims for 'significant' fuel economy and specific levels of improvement are less direct. Most of respondents' advertisements state that consumers will 'get up to [12] . . . four extra miles per gallon,' or 'up to . . . 100 extra miles between fillups.' (CX 2-4, 6-9, 12-15.) The ads claim that significant savings will start with the first tankful. (CX 1-8, 10-12.) Savings of up to 20 percent and more are promised. (CX 1-8, 10-15.) Other advertisements present test results claiming savings of 8 to 40 percent or provide consumer testimonials of savings from 2 to 6 miles per gallon. (CX 1-8, 10-15.)

We find, as did the ALJ, that respondents expressly claimed a 'significant improvement of fuel economy' and that under normal driving conditions a typical driver could usually obtain a fuel economy improvement of 20 percent (or more) or an improvement that would approximate four miles per gallon. (IDF 19.) We do not conclude that a consumers would interpret these ads as claiming a specific fuel savings from use of the Ball-Matic.[FN17] Nor do we conclude that consumers would believe that by using the Ball-Matic they would be assured of savings close to the higher end of the spectrum. We do find that a consumer would be reasonable in expecting the average savings from the Ball-Matic to be within the stated range, and, together with the claims for universal applicability of the device, expect the variance from that average to be relatively small.

## 2. Were The Claims Deceptive?

[13] Having determined that respondents made the claims as charged, we must next determine whether the claims were false in a material respect, and thus likely to injure consumers.

### a. *Ball-Matic as an Important New Invention*

The evidence presented at trial amply documented that the Ball-Matic is a simple air-bleed device similar to many other such devices that have been marketed over the years. Clearly the Ball-Matic is not new. In fact, the Commission has already issued and desist orders against various marketers of two such devices, the Albano Air Jet and the G.R. Valve, both of which are virtually identical in design to the Ball-Matic.[FN18] Air-bleed devices have been around a long time and, as the ALJ found, are considered to be of little value by the automobile industry.

The claim that the Ball-Matic was a new invention was expressly made. Having found such a claim to have been made, and that the claim is false, the Commission may infer, within the bounds of reason, that it is material.[FN19] We therefore conclude that the ALJ was correct in holding that this claim was deceptive.

### b. *Ball-Matic Needed in Every Vehicle*

The ALJ correctly concluded from the evidence presented at [14] trial that most automobiles manufactured after 1974 have carburetors set to perform at such a lean air/fuel mixture that little, if any, fuel economy could be expected by using an air-bleed valve such as the Ball-Matic. (IDF 8-11.) There are, therefore, a significant number of consumers as to whom the claim of increased fuel economy is untrue. Accordingly, we agree with the ALJ that the claim that every car and truck needs the Ball-Matic is an express statement contrary to fact. (IDF 37.)

As with the 'new invention' claim, this misrepresentation concerned a material aspect of the product. In the first place the claim was expressly made, and the Commission may infer materiality.[FN20] In any event, the claim that the Ball-Matic is needed on every car would tend to induce all consumers (including those owning cars for which it has no utility) to buy the device. Those consumers who cannot in fact profit from the Ball-Matic will have relied on the representation to their detriment. Thus, the ALJ was correct in concluding that this claim was deceptive.

### c. *Efficiency Claims*

The ALJ found the representation that the Ball-Matic would significantly improve fuel economy when installed in a typical car and used under normal driving conditions to be false. (IDF 38.) We agree. The record discloses that even under conditions most likely to produce benefits from the Ball-Matic, the fuel savings do not approach those claimed by respondents. Respondent's consumer tests and testimonials also fail to support [15] these claims and, as the ALJ found, are not a recognized way of testing fuel economy. (IDF 41.)

Claims about enhanced fuel efficiency resulting from use of the Ball-Matic are clearly material to consumers.[FN21] While consumers will not necessarily expect to achieve the specific fuel economy level represented in a particular

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

advertisement, the performance claimed in the ads should be representative of consumers' expected savings from the Ball-Matic. It was not, and the advertisements were therefore deceptive.

B. *Representation that Competent Scientific Tests Prove the Fuel Economy Claims Made for the Ball-Matic*

### 1. Was the Claim Made?

Most of respondents' advertisements refer to a 'controlled, supervised test.' (CX 1-8, 10-15.) The text of some ads details the procedure used in the test, *i.e.*, use of cars equipped with the Ball-Matic driven by non-professional drivers with mileage and fuel consumption monitored by 'testers.' (IDF 21.) We find that descriptions of these types of consumer 'tests' in advertisements cannot, alone, reasonably be interpreted as representing that the device was tested scientifically.

However, other advertisements simply state that the Ball-Matic was 'tested and proven [to yield] up to [a] 20 percent increase in fuel economy.' (CX 16, 17.) Still other advertisements cite 'field tests for over seven years and lab tests at an Accredited Eastern University.' (CX 9.) Additional tests results are suggested through respondents' invitation that [16] consumers send for test reports if in doubt about the Ball-Matic's performance. (CX 1, 3-5, 7, 8, 10, 11, 13-17.) These advertisements can be reasonably understood to imply that competent scientific tests support the performance claims made for the Ball-Matic.

### 2. Was the Claim Deceptive?

Respondents introduced a number of test results with varying evaluations of the Ball-Matic. These include a test conducted by the Vernon, California Emission Test Laboratory, an engine dynamometer test by a University of Bridgeport professor, and a series of tests by Scott Environmental Technology, Industries (RX 43A, 44; RX 217D; RX 221C, E, I; RX 225M.) However, the ALJ found the tests did not prove the fuel economy claims made for the Ball-Matic. (IDF 43. *See also* IDF 40, 41.) We agree.

First, although the tests did indicate some improvement in fuel economy arguably attributable to the Ball-Matic, none revealed improvement even close to that claimed by respondents. While respondents claim up to 20 percent savings in fuel economy, the highest savings and of the 'scientific' tests established was 11 percent. (IDF 40.) Thus, even assuming that respondents' tests were competent, the claim that they support the representation made for the Ball-Matic's performance is false.

Moreover, the evidence presented by complaint counsel casts serious doubt on the validity of the results obtained in respondent's tests. Particularly telling, none of the results showed that gasoline savings of even 11 percent could be duplicated. (IDF 40.) Indeed, tests conducted by complaint [17] counsel's experts-under laboratory conditions most conducive to improving gasoline mileage by using the Ball-Matic-showed results substantially lower than those claimed by respondents. The highest fuel savings complaint counsel's experts were able to achieve were approximately 5 percent. (*Id.*, IDF 33-35.)

Finally, complaint counsel's expert witness testified that, given the basic theory of engineering and combustion, a device such as the Ball-Matic could never result in any significant improvement in fuel economy. In fact, he testified that a *loss* in fuel economy was likely on 1974 or later model vehicles, which are designed to operate near peak engine efficiency. (Tr. 1090-1 (Korth).) The ALJ further noted a November 1978 article in *Consumer Reports* magazine disclosing that there is no statistically significant effect on gasoline mileage from the use of air-bleed devices such as the Ball-Matic. (CX 49A; *see* CX 50; Tr. 708-09 (Barnett).) The ALJ also noted an EPA test on the Ball-Matic Valve which gave similar results. (CX 57A-I; Tr. 249 (Smith); Tr. 919, 981 (Koven).)

With respect to materiality, the performance capability of the Ball-Matic is difficult for consumers to evaluate for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

themselves. Accordingly, consumers will tend to rely more heavily on the scientific support claims made by respondents. Clearly these false claims injured consumers by misleading them on a material point. We thus agree with the ALJ's conclusion that respondents' claim of scientific support is false and deceptive. [18]

### C. *Representations Based on Consumer Endorsements.*

#### 1. Were the Claims Made?

The complaint charges that respondents used consumer testimonials to make claims of 'significant' fuel economy for the Ball-Matic, that these endorsements appeared to be by persons who have used the Ball-Matic in the recent past or are currently using the Ball-Matic, that the experiences presented in the endorsements were typical of all consumers who have used the Ball-Matic, and that the consumer endorsements were presented as freely given by individuals who were unrelated to the marketers of the Ball-Matic.

There is no doubt that respondents made substantial use of testimonials to make performance claims for the Ball-Matic. Numerous advertisements contained a black bordered box with statements by users about their fuel saving experiences, inviting the consumer to 'read the results for yourself.' (CX 1-8, 9, 10-17.) The improvement in fuel economy reported in the testimonials ranged from two to six miles per gallon. (IDF 23.)

The clear impression created was that the quotes came from actual, current users of the Ball-Matic. (IDF 25, 26 CX 1-8, 10-17.) For example, several advertisements quote phrases such as 'Now I get four miles more per gallon,' and, 'Now that I have installed your unit . . . .' (CX 1-8, 10-17.) Further, the ALJ found that the wording conveyed a sense that the testimonials were given voluntarily: 'It gives me great pleasure to express to you my satisfaction,' and 'Just a short note to inform you of the performance of your Ball-Matic.' (IDF 25; CXs 1-8, 10-17.) [19]

The advertisements also gave the impression that the testimonials were fairly representative of Ball-Matic users. The consumers quoted appeared to represent a variety of locations nationwide, a wide range of cars, and various occupations (*e.g.*, sheriff, service station owner, accountant, minister). Almost all the ads state 'over 100,000 in use'. (CX 1-15.)

The ALJ concluded, and we agree, that consumers could reasonably interpret these advertisements as claiming that the Ball-Matic would produce significant fuel economy improvement, that the testimonials were unrestrained and unbiased, that the endorsements were from recent or actual users of the Ball-Matic, and that the experiences were typical of all users.

#### 2. Were the Claims Deceptive?

##### a. *Performance Claims in Testimonials*

By printing the testimonials, respondents implicity made performance claims similar to those express claims found to be false and deceptive at pages 11-15, *supra*. Thus, irrespective of the veracity of the individual consumer testimonials, respondents' use of the testimonials to make underlying claims that were false and deceptive was, itself, deceptive. Accordingly, we agree with the ALJ that use of these endorsements constituted a law violation. (IDF 42.) [20]

##### b. *Unrevealed Relationship of Endorsers to Seller*

The ALJ found that a good number of the testimonials used in the Ball-Matic advertisements were by business associates of the marketers of the product. Nevertheless, he concluded that the failure to disclose these relationships

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)

did not constitute either an unfair or a deceptive practice. Complaint counsel appeal from this holding, and we hold for complaint counsel on this issue.[FN22]

In its 'Guides Concerning the Use of Endorsements and Testimonials in Advertising,' the Commission's policy is clear that whenever 'there exists a connection between the endorser and the seller of the advertised product which might materially affect the weight or credibility of the endorsement' it should be disclosed.[FN23] In a case such as this, where it is difficult for a consumer to evaluate the effectiveness of the product on his or her own, the consumer is likely to rely more heavily on endorsements by other users, particularly if the consumer believes such endorsements are independent and unbiased. Failure to disclose the relationship, and therefore the bias, will materially affect the weight given to the endorsement. Thus, having determined that the implied claim of impartiality is false and that the failure to disclose the relationship is a material fact to consumers, we conclude that respondents are guilty of making a deceptive claim. [21]

### c. Claim That Endorsers were Current Users

The ALJ found that most of the testimonials were written in 1973 or 1974. (IDF 46.) Testimony on the record from four endorsers of the Ball-Matic, plus one stipulation, indicated that the experiences of the endorsers of the product did not extend beyond 1976 or 1977. (IDF 45.) Based upon this evidence, the ALJ found that respondents' implied representation in 1979 that the statements were from persons who were current or recent users was false. (IDF 46.) We agree.

As we found in subsection b, *supra*, consumers are likely to rely heavily on the endorsements for the Ball-Matic. Misrepresenting the dates of the experiences presented will materially affect the weight given the endorsement. The claim that the testimonials were recent experiences was both false and material to consumers. We therefore find the claim deceptive.

### d. Claim That Endorsements Were Typical Experiences

Complaint counsel did not directly challenge the accuracy of the endorsements, and the ALJ found no dispute that the consumer statements used in respondents' ads were genuine and reflected the perceived experiences of those consumers. (IDF 45.) The ALJ nevertheless found that respondents' claim that these experiences were typical of all users of the Ball-Matic was false, relying primarily on testimony that consumers cannot accurately measure fuel economy themselves. (IDF 42.) We agree the claim was false, but for a slightly different reason.

We have already found that no competent scientific test supports respondents' performance claims. Based upon the [22] evidence in this record, the typical expected fuel economy improvement appears to be at most half that claimed in the endorsements. Therefore, even if the individual experiences were accurate, they cannot be typical experiences and are at best statistical outliers. For the same reasons as in subsection b, *supra*, we find respondents' claim to be false and material to consumers. It was thus deceptive.

### D. Complaint Allegation that Respondents Lacked a Reasonable Basis for their Performance Claims

In addition to the charges discussed above, the complaint alleges that respondents lacked a reasonable basis for the performance claims they made for the Ball-Matic. A reasonable basis allegation commonly arises in two situations. First, a seller may expressly advertise that his claims are supported by tests. Rather than attacking the veracity of the representation, the Commission may challenge the claim as unsubstantiated and, therefore, deceptive.[FN24] Second, the Commission may determine that a performance claim made for a product contains an implied representation of substantiation. Again, the Commission might challenge the existence of the substantiation rather than the validity of the performance claim.[FN25] This latter approach is particularly useful where the validity of the claim is uncertain, but the lack of substantiation is clear. [23]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Here, we already have determined that the underlying performance claims were false. Moreover, our previous discussion regarding the validity of respondents' test claims makes manifest the inadequacy of their substantiation efforts.[FN26] Accordingly, we need go no further to conclude that respondents did not have a reasonable basis for their claims, and any representation either implied or express, that they did, was false and deceptive.

IV. ORDER

We adopt the Order as issued by the ALJ with the following exception. In Part III of the Order a new subsection is added to read as follows:

> b. failing to disclose a material connection, where one exists, between an endorser of any product or service and any of the respondents. A 'material connection' shall mean, for purpose of this order, any relationship between an endorser of any product or service and any individual or other entity marketing such product or service which relationship might materially affect the weight or credibility of the endorsement and which relationship would not reasonably be expected by consumers.

Existing subsections in Part III are renumbered accordingly.

FN1 15 U.S.C. 45.

FN2 The following abbreviations are used in this opinion:
  ID-initial decision page number
  IDF-initial decision finding number
  Tr.-transcript of testimony page number
  CX-complaint counsel's exhibit number
  CAP-complaint counsel's appeal brief page number
  CAB-complaint counsel's answering brief page number
  CMF-complaint counsel's memorandum supporting proposed findings of fact and conclusions of law page number
  RX-respondents exhibit number

FN3 A more detailed discussion of air bleed devices can be found at IDF 8-11.

FN4 Commission letter on deception to Hon. John D. Dingell, Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, October 14, 1983, hereinafter cited as 'DS'. The letter to Chairman Dingell is attached as an appendix to this opinion.

FN5 *Sears Roebuck and Co.*, 95 F.T.C. 406 (1980), *aff'd*, 676 F.2d 385 (9th Cir. 1982).

FN6 *See generally*, DS 4-7 (and cases cited therein for a more detailed discussion of the 'likely to mislead' principle.

FN7 Statement of Basis and Purpose, *Cigarette Advertising and Labeling Rule*, p. 84, 29 FR 8324 (1964).

FN8 *Heinz W. Kirchner*, 63 F.T.C. 1282 (1963). However, if there is an affirmative showing that a representation or practice is directed at a distinctive garget group, the Commission will determine the effect of the representation on a reasonable member of that group. *Ideal Toy Co.*, 64 F.T.C. 297, 310 (1964). *See* DS 7-14.

FN9 *Heinz W. Kirchner*, at 1290.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN10 *See, e.g., American Home Products,* D. 8918 (1981) [98 F.T.C. 136]; *Sterling Drug,* D. 8919 (July 5, 1983) [102 F.T.C. 395]; *Bristol-Myers,* D. 8917 (July 5, 1983) [102 F.T.C. 21], appeal docketed, No. 83-4167 (2d Cir. Sept. 12, 1983). This concept also is discussed at DS 7-15 and the cases cited therein.

FN11 The policy statement specifically recognized that an act or practice need only be likely to cause injury to be considered deceptive. Actual injury is not required. DS 16.

FN12 *American Home Products; Ford Motor Co.,* 84 F.T.C. 729 (1974) (consent), *modified,* 547 F.2d 954 (6th Cir. 1976), *reissued,* May 16, 1977 (slip opinion). *See* Statement of Basis and Purpose, *Cigarette Advertising and Labeling Rule;* DS 15.

FN13 *Bristol-Myers, Sterling Drug.*

FN14 *Bristol-Myers; National Dynamics,* 82 F.T.C. 488, 548 (1972), *aff'd,* 492 F.2d 1333 (2d Cir.), *cert. denied,* 419 U.S. 993 (1974).

FN15 *E.g., Pfizer, Inc.* 81 F.T.C. 23, 59 (1972); *Sears, Roebuck & Co.,* 95 F.T.C. 406, 510-11 (1980).

FN16 *Cinderella Career and Finishing Schools, Inc. v. FTC,* 425 F.2d 583, 588 (D.C. Cir. 1970).

FN17 Evidence as to how consumers actually interpreted these advertisements was not introduced into the record. While such evidence would have been useful, the Commission believes it can, in this case, interpret the claims as a reasonable consumer would have.

FN18 *Albano Enterprises Inc.,* 89 F.T.C. 523 (1977); *American Consumer, Inc.,* 94 F.T.C. 648 (1979); *R.R. International, Inc.,* 94 F.T.C. 1312 (1979); *Admarketing, Inc.,* 94 F.T.C. 664 (1979); *C.I. Energy Development, Inc.,* 94 F.T.C. 1337 (1979); and *Leroy Gordon Cooper, Jr.,* 94 F.T.C. 674 (1979).

FN19 *American Home Products Corp., et al,* 98 F.T.C. 136, at 386 (1981); *Central Hudson Gas and Electric Co. v. PSC,* 447 U.S. 557, 567 (1980). *See,* DS 16.

FN20 *Id., see* DS 16.

FN21 *See* DS 17.

FN22 Specifically, we accept complaint counsels' proposed finding Nos. 48 and 53, contained in CAP 17.

FN23 16 C.F.R. 225.5 (1982).

FN24 *Litton Industries, Inc.,* 97 F.T.C. 1 (1981), *modified,* 676 F.2d 364 (9th Cir. 1982).

FN25 *Fedders Corp.,* 85 F.T.C. 38 (1975), *aff'd* 529 F.2d 1398 (2nd Cir.) *cert. denied,* 429 U.S. 818 (1976).

FN26 *See* p. 14-17 *supra.*

APPENDIX

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FEDERAL TRADE COMMISSION WASHINGTON, D.C. 20580

October 14, 1983

The Honorable John D. Dingell

Chairman

Committee on Energy and Commerce

U.S. House of Representatives

Washington, D.C. 20515

Dear Mr. Chairman:

This letter responds to the Committee's inquiry regarding the Commission's enforcement policy against deceptive acts or practices.[FN1] We also hope this letter will provide guidance to the public.

Section 5 of the FTC Act declares unfair or deceptive acts or practices unlawful. Section 12 specifically prohibits false ads likely to induce the purchase of food, drugs, devices or cosmetics. Section 15 defines a false ad for purposes of Section 12 as one which is 'misleading in a material respect.'[FN2] Numerous Commission and judicial decisions have defined and elaborated on the phrase 'deceptive acts or practices' under both Sections 5 and 12. Nowhere, however, is there a single definitive statement of the Commission's view of its authority. The Commission believes that such a statement would be useful to the public, as well as the Committee in its continuing review of our jurisdiction. [2]

We have therefore reviewed the decided cases to synthesize the most important principles of general applicability. We have attempted to provide a concrete indication of the manner in which the Commission will enforce its deception mandate. In so doing, we intend to address the concerns that have been raised about the meaning of deception, and thereby attempt to provide a greater sense of certainty as to how the concept will be applied.[FN3]

## I. SUMMARY

Certain elements undergird all deception cases. *First*, there must be a representation, omission or practice that is likely to mislead the consumer.[FN4] Practices that have been found [3] misleading or deceptive in specific cases include false oral or written representations, misleading price claims, sales of hazardous or systematically defective products or services without adequate disclosures, failure to disclose information regarding pyramid sales, use of bait and switch techniques, failure to perform promised services, and failure to meet warranty obligations.[FN5]

*Second*, we examine the practice from the perspective of a consumer acting reasonably in the circumstances. If the representation or practice affects or is directed primarily to a particular group, the Commission examines reasonableness from the perspective of that group.

*Third*, the representation, omission, or practice must be a 'material' one. The basic question is whether the act or practice is likely to affect the consumer's conduct or decision with regard to a product or service. If so, the practice is material, and consumer injury is likely, because consumers are likely to have chosen differently but for the deception. In many instances, materiality, and hence injury, can be presumed from the nature of the practice. In other instances, evidence of materiality may be necessary. [4]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Thus, the Commission will find deception if there is a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. We discuss each of these elements below.

## II. THERE MUST BE A REPRESENTATION, OMISSION, OR PRACTICE THAT IS LIKELY TO MISLEAD THE CONSUMER.

Most deception involves written or oral misrepresentations, or omissions of material information. Deception may also occur in other forms of conduct associated with a sales transaction. The entire advertisement, transaction or course of dealing will be considered. The issue is whether the act or practice is likely to mislead, rather than whether it causes actual deception.[FN6]

Of course, the Commission must find that a representation, omission, or practice occurred. In cases of express claims, the representation itself establishes the meaning. In cases of implied claims, the Commission will often be able to determine meaning through an examination of the representation itself, including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction.[FN7] In other [5] situations, the Commission will require extrinsic evidence that reasonable consumers reach the implied claims.[FN8] In all instances, the Commission will carefully consider any extrinsic evidence that is introduced.

Some cases involve omission of material information, the disclosure of which is necessary to prevent the claim, practice, or sale from being misleading.[FN9] Information may be omitted from written[FN10] or oral[FN11] representations or from the commercial transaction.[FN12] [6]

In some circumstances, the Commission can presume that consumers are likely to reach false beliefs about the product or service because of an omission. At other times, however, the Commission may require evidence on consumers' expectations.[FN13]

Marketing and point-of-sales practices that are likely to mislead consumers are also deceptive. For instance, in bait and switch cases, a violation occurs when the offer to sell the product is not a bona fide offer.[FN14] The Commission has also found deception where a sales representative misrepresented the purpose of the initial contact with customers.[FN15] When a product is sold, there is an implied representation that the product is fit for the purposes for which it is sold. When it is not, deception occurs.[FN16] There may be a concern about the way a product or service is marketed, such as where inaccurate or [7] incomplete information is provided.[FN17] A failure to perform services promised under a warranty or by contract can also be deceptive.[FN18]

## III. THE ACT OR PRACTICE MUST BE CONSIDERED FROM THE PERSPECTIVE OF THE REASONABLE CONSUMER

The Commission believes that to be deceptive the representation, omission or practice must be likely to mislead reasonable consumers under the circumstances.[FN19] The test is whether the consumer's interpretation or reaction is reasonable.[FN20] When representations or sales practices are targeted to a specific audience, the Commission determines the effect of the practice on a reasonable member of that group. In evaluating a particular practice, the Commission considers the totality of the practice in determining how reasonable consumers are likely to respond. [8]

A company is not liable for every interpretation or action by a consumer. In an advertising context, this principle has been well-stated:

An advertiser cannot be charged with liability with respect to every conceivable misconception, however

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

outlandish, to which his representations might be subject among the foolish or feeble-minded. Some people, because of ignorance or incomprehension, may be misled by even a scrupulously honest claim. Perhaps a few misguided souls believe, for example, that all 'Danish pastry' is made in Denmark. Is it therefore an actionable deception to advertise 'Danish pastry' when it is made in this country? Of course not. A representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed. *Heinz W. Kirchner, 63 F.T.C. 1282, 1290 (1963)*.

To be considered reasonable, the interpretation or reaction does not have to be the only one.[FN21] When a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation.[FN22] An interpretation will be presumed reasonable if it is the one the respondent intended to convey.

The Commission has used this standard in its past decisions. '. . . The test applied by the Commission is whether the interpretation is reasonable in light of the claim.'[FN23] In the Listerine case, the Commission evaluated the claim from the perspective of the 'average listener.'[FN24] In a case involving the sale of encyclopedias, the Commission observed '[i]n determining the meaning of an advertisement, a piece of promotional material [9] or a sales presentation, the important criterion is the net impression that it is likely to make on the general populace.'[FN25] The decisions in *American Home Products, Bristol Myers*, and *Sterling Drug* are replete with references to reasonable consumer interpretations.[FN26] In a land sales case, the Commission evaluated the oral statements and written representations 'in light of the sophistication and understanding of the persons to whom they were directed.'[FN27] Omission cases are no different: the Commission examines the failure to disclose in light of expectations and understandings of the typical buyer[FN28] regarding the claims made.

When representations or sales practices are targeted to a specific audience, such as children, the elderly, or the terminally ill, the Commission determines the effect of the practice on a reasonable member of that group.[FN29] For instance, if a company markets a cure to the terminally ill, the practice [10] will be evaluated from the perspective of how it affects the ordinary member of that group. Thus, terminally ill consumers might be particularly susceptible to exaggerated cure claims. By the same token, a practice or representation directed to a well-educated group, such as a prescription drug advertisement to doctors, would be judged in light of the knowledge and sophistication of that group.[FN30]

As it has in the past, the Commission will evaluate the entire advertisement, transaction, or course of dealing in determining how reasonable consumers are likely to respond. Thus, in advertising the Commission will examine 'the entire mosaic, rather than each tile separately.'[FN31] As explained by a court of appeals in a recent case: [11]
> The Commission's right to scrutinize the visual and aural imagery of advertisements follows from the principle that the Commission looks to the impression made by the advertisements as a whole. Without this mode of examination, the Commission would have limited recourse against crafty advertisers whose deceptive messages were conveyed by means other than, or in addition to, spoken words. *American Home Products*, 695 F.2d 681, 688 (3d Cir. Dec. 3, 1982).[FN32]

Commission cases reveal specific guidelines. Depending on the circumstances, accurate information in the text may not remedy a false headline because reasonable consumers may glance only at the headline.[FN33] Written disclosures or fine print may be [12] insufficient to correct a misleading representation.[FN34] Other practices of the company may direct consumers' attention away from the qualifying disclosures.[FN35] Oral statements, label disclosures or point-of-sale material will not necessarily correct a deceptive representation or omission.[FN36] Thus, when the first contact between a seller and a buyer occurs through a [13] deceptive practice, the law may be violated even if the truth is subsequently made known to the purchaser.[FN37] *Pro forma* statements or disclaimers may not cure otherwise deceptive messages or practices.[FN38]

Qualifying disclosures must be legible and understandable. In evaluating such disclosures, the Commission

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

recognizes that in many circumstances, reasonable consumers do not read the entirety of an ad or are directed away from the importance of the qualifying phrase by the acts or statements of the seller. Disclosures that conform to the Commission's Statement of Enforcement Policy regarding clear and conspicuous disclosures, which applies to television advertising, are generally adequate, [14] CCH *Trade Regulation Reporter*, ¶ 7569.09 (Oct. 21, 1970). Less elaborate disclosures may also suffice.[FN39]

Certain practices, however, are unlikely to deceive consumers acting reasonably. Thus, the Commission generally will not bring advertising cases based on subjective claims (taste, feel, appearance, smell) or on correctly stated opinion claims if consumers understand the source and limitations of the opinion.[FN40] Claims phrased as opinions are actionable, however, if they are not honestly held, if they misrepresent the qualifications of the holder or the basis of his opinion or if the recipient reasonably interprets them as implied statements of fact.[FN41]

The Commission generally will not pursue cases involving obviously exaggerated or puffing representations, *i.e.*, those that the ordinary consumers do not take seriously.[FN42] Some exaggerated claims, however, may be taken seriously by consumers and are actionable. For instance, in rejecting a respondent's argument that use of the words 'electronic miracle' to describe a television antenna was puffery, the Commission stated:

> Although not insensitive to respondent's concern that the term miracle is commonly used in situations short of changing [15] water into wine, we must conclude that the use of 'electronic miracle' in the context of respondent's grossly exaggerated claims would lead consumers to give added credence to the overall suggestion that this device is superior to other types of antennae. *Jay Norris*, 91 F.T.C. 751, 847 n.20 (1978), *aff'd*, 598 F.2d 1244 (2d Cir.), *cent. denied*, 444 U.S. 980 (1979).

Finally, as a matter of policy, when consumers can easily evaluate the product or service, it is inexpensive, and it is frequently purchased, the Commission will examine the practice closely before issuing a complaint based on deception. There is little incentive for sellers to misrepresent (either by an explicit false statement or a deliberate false implied statement) in these circumstances since they normally would seek to encourage repeat purchases. Where, as here, market incentives place strong constraints on the likelihood of deception, the Commission will examine a practice closely before proceeding.

In sum, the Commission will consider many factors in determining the reaction of the ordinary consumer to a claim or practice. As would any trier of fact, the Commission will evaluate the totality of the ad or the practice and ask questions such as: how clear is the representation? how conspicuous is any qualifying information? how important is the omitted information? do other sources for the omitted information exist? how familiar is the public with the product or service?[FN43]

## IV. THE REPRESENTATION, OMISSION OR PRACTICE MUST BE MATERIAL

The third element of deception is materiality. That is, a representation, omission or practice must be a material one for deception to occur.[FN44] A 'material' misrepresentation or practice is one which is likely to affect a consumer's choice of or [16] conduct regarding a product.[FN45] In other words, it is information that is important to consumers. If inaccurate or omitted information is material, injury is likely.[FN46]

The Commission considers certain categories of information presumptively material.[FN47] First, the Commission presumes that express claims are material.[FN48] As the Supreme Court stated recently, '[i]n the absence of factors that would distort the decision to advertise, we may assume that the willingness of a business to promote its products reflects a belief that consumers are interested in the advertising.'[FN49] Where the seller knew, or should have known, that an ordinary consumer would need omitted information to evaluate the product or service, or that the claim was false, materiality will be presumed because the manufacturer intended the information or omission to have an effect.[FN50] [17] Similarly, when evidence exists that a seller intended to make an implied claim, the Commission will infer materiality.[FN51]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The Commission also considers claims or omissions material if they significantly involve health, safety, or other areas with which the reasonable consumer would be concerned. Depending on the facts, information pertaining to the central characteristics of the product or service will be presumed material. Information has been found material where it concerns the purpose,[FN52] safety,[FN53] efficacy,[FN54] or cost[FN55] of the product or service. [18] Information is also likely to be material if it concerns durability, performance, warranties or quality. Information pertaining to a finding by another agency regarding the product may also be material.[FN56]

Where the Commission cannot find materiality based on the above analysis, the Commission may require evidence that the claim or omission is likely to be considered important by consumers. This evidence can be the fact the product or service with the feature represented costs more than an otherwise comparable product without the feature, a reliable survey of consumers, or credible testimony.[FN57]

A finding of materiality is also a finding that injury is likely to exist because of the representation, omission, sales practice, or marketing technique. Injury to consumers can take many forms.[FN58] Injury exists if consumers would have chosen differently but for the deception. If different choices are likely, the claim is material, and injury is likely as well. Thus, injury and materiality are different names for the same concept. [19]

## V. CONCLUSION

The Commission will find an act or practice deceptive if there is a misrepresentation, omission, or other practice, that misleads the consumer acting reasonably in the circumstances, to the consumer's detriment. The Commission will not generally require extrinsic evidence concerning the representations understood by reasonable consumers or the materiality of a challenged claim, but in some instances extrinsic evidence will be necessary.

The Commission intends to enforce the FTC Act vigorously. We will investigate, and prosecute where appropriate, acts or practices that are deceptive. We hope this letter will help provide you and the public with a greater sense of certainty concerning how the Commission will exercise its jurisdiction over deception. Please do not hesitate to call if we can be of any further assistance.

By direction of the Commission, Commissioners Pertschuk and Bailey dissenting, with separate statements attached and with separate response to the Committee's request for a legal analysis to follows.

/s/James C. Miller III

Chairman

cc: Honorable James T. Broyhill

Honorable James J. Florio

Honorable Norman F. Lent

FN1 S. Rep. No. 97-451, 97th Cong., 2d Sess. 16; H.R. Rep. No. 98-156, Part I, 98th Cong., 1st Sess. 6 (1983). The Commission's enforcement policy against unfair acts or practices is set forth in a letter to Senators Ford and Danforth, dated December 17, 1980.

FN2 In determining whether an ad is misleading, Section 15 requires that the Commission take into account 'representations made or suggested' as well as 'the extent to which the advertisement fails to reveal facts material in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

light of such representations or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.' 15 U.S.C. 55. If an act or practice violates Section 12, it also violates Section 5. *Simeon Management Corp.*, 87 F.T.C. 1184, 1219 (1976), *aff'd*, 579 F.2d 1137 (9th Cir. 1978); *Porter & Dietsch*, 90 F.T.C. 770, 873-74 (1977), *aff'd*, 605 F.2d 294 (7th Cir. 1979), *cert. denied*, 445 U.S. 950 (1980).

FN3 Chairman Miller has proposed that Section 5 be amended to define deceptive acts. Hearing Before the Subcommittee for Consumers of the Committee on Commerce, Science, and Transportation, United States Senate, 97th Cong., 2d Sess. *FTC's Authority Over Deceptive Advertising*, July 22, 1982, Serial No. 97-134, p. 9. Three Commissioners believe a legislative definition is unnecessary. *Id.* at 45 (Commissioner Clanton), at 51 (Commissioner Bailey) and at 76 (Commissioner Pertschuk). Commissioner Douglas supports a statutory definition of deception. Prepared statement by Commissioner George W. Douglas, Hearing Before the Subcommittee for Consumers of the Committee on Commerce, Science and Transportation, United States Senate, 98th Cong. 1st Sess. (March 16, 1983) p. 2.

FN4 A misrepresentation is an express or implied statement contrary to fact. A misleading omission occurs when qualifying information necessary to prevent a practice, claim, representation, or reasonable expectation or belief from being misleading is not disclosed. Not all omissions are deceptive, even if providing the information would benefit consumers. As the Commission noted in rejecting a proposed requirement for nutrition disclosures, 'In the final analysis, the question whether an advertisement requires affirmative disclosure would depend on the nature and extent of the nutritional claim made in the advertisement.' *ITT Continental Baking Co. Inc.*, 83 F.T.C. 865, 965 (1976). In determining whether an omission is deceptive, the Commission will examine the overall impression created by a practice, claim, or representation. For example, the practice of offering a product for sale creates an implied representation that it is fit for the purposes for which it is sold. Failure to disclose that the product is not fit constitutes a deceptive omission. [*See* discussion below at 5-6] Omissions may also be deceptive where the representations made are not literally misleading, if those representations create a reasonable expectation or belief among consumers which is misleading, absent the omitted disclosure.
Non-deceptive omissions may still violate Section 5 if they are unfair. For instance, the R-Value Rule, 16 C.F.R. 460.5 (1983), establishes a specific method for testing insulation ability, and requires disclosure of the figure in advertising. The Statement of Basis and Purpose, 44 FR 50,242 (1979), refers to a deception theory to support disclosure requirements when certain misleading claims are made, but the rule's general disclosure requirement is premised on an unfairness theory. Consumers could not reasonably avoid injury in selecting insulation because no standard method of measurement existed.

FN5 Advertising that lacks a reasonable basis is also deceptive. *Firestone*, 81 F.T.C. 398, 451-52 (1972), *aff'd*, 481 F.2d 246 (6th Cir.), *cert. denied*, 414 U.S. 1112 (1973). *National Dynamics*, 82 F.T.C. 488, 549-50 (1973); *aff'd and remanded on other grounds*, 492 F.2d 1333 (2d Cir.), *cert. denied*, 419 U.S. 993 (1974), *reissued*, 85 F.T.C. 391 (1976). *National Comm'n on Egg Nutrition*, 88 F.T.C. 89, 191 (1976), *aff'd*, 570 F.2d 157 (7th Cir.), *cert. denied*, 439 U.S. 821, *reissued*, 92 F.T.C. 848 (1978). The deception theory is based on the fact that most ads making objective claims imply, and many expressly state, that an advertiser has certain specific grounds for the claims. If the advertiser does not, the consumer is acting under a false impression. The consumer might have perceived the advertising differently had he or she known the advertiser had no basis for the claim. This letter does not address the nuances of the reasonable basis doctrine, which the Commission is currently reviewing. 48 FR 10,471 (March 11, 1983).

FN6 In *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976), the court noted 'the likelihood or propensity of deception is the criterion by which advertising is measured.'

FN7 On evaluation of the entire document:
      The Commission finds that many of the challenged Anacin advertisements, when viewed in their entirety, did convey the message that the superiority of this product has been proven [footnote omitted]. It is immaterial that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the word 'established', which was used in the complaint, generally did not appear in the ads; the important consideration is the net impression conveyed to the public. *American Home Products*, 98 F.T.C. 136, 374 (1981), *aff'd*, 695 F.2d (3d Cir. 1982).

On the juxtaposition of phrases:

> On this label, the statement 'Kills Germs By Millions On Contact' immediately precedes the assertion 'For General Oral Hygiene Bad Breath, Colds and Resultant Sore Throats' [footnote omitted]. By placing these two statements in close proximity, respondent has conveyed the message that since Listerine can kill millions of germs, it can *cure*, prevent and ameliorate colds and sore throats [footnote omitted]. *Warner Lambert*, 86 F.T.C. 1398, 1489-90 (1975), *aff'd*, 562 F.2d 749 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 950 (1978) (emphasis in original).

On the nature of the claim, *Firestone* is relevant. There the Commission noted that the alleged misrepresentation concerned the safety of respondent's product, 'an issue of great significance to consumers. On this issue, the Commission has required scrupulous accuracy in advertising claims, for obvious reasons.' 81 F.T.C. 398, 456 (1972), *aff'd*, 481 F.2d 246 (6th Cir.), *cert. denied*, 414 U.S. 1112 (1973).

In each of these cases, other factors, including in some instances surveys, were in evidence on the meaning of the ad.

FN8 The evidence can consist of expert opinion, consumer testimony (particularly in cases involving oral representations), copy tests, surveys, or any other reliable evidence of consumer interpretation.

FN9 As the Commission noted in the Cigarette rule, 'The nature, appearance, or intended use of a product may create an impression on the mind of the consumer . . . and if the impression is false, and if the seller does not take adequate steps to correct it, he is responsible for an unlawful deception.' Cigarette Rule Statement of Basis and Purpose, 29 FR 8324, 8352 (July 2, 1964).

FN10 *Porter & Dietsch*, 90 F.T.C. 770, 873-74 (1977), *aff'd*, 605 F.2d 294 (7th Cir. 1979), *cert. denied*, 445 U.S. 950 (1980); *Simeon Management Corp.*, 87 F.T.C. 1184, 1230 (1976), *aff'd*, 579 F.2d 1137 (9th Cir. 1978).

FN11 *See, e.g., Grolier*, 91 F.T.C. 315, 480 (1978), *remanded on other grounds*, 615 F.2d 1215 (9th Cir. 1980), *modified on other grounds*, 98 FTC 882 (1981), *reissued*, 99 F.T.C. 379 (1982).

FN12 In *Peacock Buick*, 86 F.T.C. 1532 (1975), *aff'd*, 553 F.2d 97 (4th Cir. 1977), the Commission held that

> absent a clear and early disclosure of the prior use of a late model car, deception can result from the setting in which a sale is made and the expectations of the buyer . . . *Id*. at 1555.

> [E]ven in the absence of affirmative misrepresentations, it is misleading for the seller of late model used cars to fail to reveal the particularized uses to which they have been put . . . When a later model used car is sold at close to list price . . . the assumption likely to be made by some purchasers is that, absent disclosure to the contrary, such car has not previously been used in a way that might substantially impair its value. In such circumstances, failure to disclose a disfavored prior use may tend to mislead. *Id*. at 1557-58.

FN13 In *Leonard Porter*, the Commission dismissed a complaint alleging that respondents' sale of unmarked products in Alaska led consumers to believe erroneously that they were handmade in Alaska by natives. Complaint counsel had failed to show that consumers of Alaskan craft assumed respondents' products were handmade by Alaskans in Alaska. The Commission was unwilling, absent evidence, to infer from a viewing of the items that the products would tend to mislead consumers.

> By requiring such evidence, we do not imply that elaborate proof of consumer beliefs or behavior is necessary, even in a case such as this, to establish the requisite capacity to deceive. However, where visual inspection is inadequate, some extrinsic testimonial evidence must be added. 88 F.T.C. 546, 626, n.5 (1976).

FN14 *Bait and Switch Policy Protocol*, December 10, 1975; Guides Against Bait Advertising, 16 C.F.R. 238.0 (1967). 32 FR 15,540.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN15 *Encyclopedia Britannica*, 87 F.T.C. 421, 497 (1976), *aff'd*, 605 F.2d 964 (7th Cir. 1979), *cert. denied*, 445 U.S. 934 (1980), *modified*, 100 F.T.C. 500 (1982).

FN16 *See* the complaints in *BayleySuit*, C-3117 (consent agreement) (September 30, 1983) [102 F.T.C. 1285]; *Figgie International, Inc.*, D. 9166 (May 17, 1983).

FN17 The Commission's complaints in *Chrysler Corporation*, 99 F.T.C. 347 (1982), and *Volkswagen of America*, 99 F.T.C. 446 (1982), alleged the failure to disclose accurate use and care instructions for replacing oil filters was deceptive. The complaint in *Ford Motor Co.*, D. 9154, 96 F.T.C. 362 (1980), charged Ford with failing to disclose a 'piston scuffing' defect to purchasers and owners which was allegedly widespread and costly to repair. *See also* *General Motors*, D. 9145 (provisionally accepted consent agreement, April 26, 1983). [102 F.T.C. 1741]

FN18 *See* *Jay Norris Corp.*, 91 F.T.C. 751 (1978), *aff'd with modified language in order*, 598 F.2d 1244 (2d Cir. 1979), *cert. denied*, 444 U.S. 980 (1979) (failure to consistently meet guarantee claims of 'immediate and prompt' delivery as well as money back guarantees); *Southern States Distributing Co.*, 83 F.T.C. 1126 (1973) (failure to honor oral and written product maintenance guarantees, as represented); *Skylark Originals, Inc.*, 80 F.T.C. 337 (1972), *aff'd*, 475 F.2d 1396 (3d Cir. 1973) (failure to promptly honor moneyback guarantee as represented in advertisements and catalogs); *Capitol Manufacturing Corp.*, 73 F.T.C. 872 (1968) (failure to fully, satisfactorily and promptly meet all obligations and requirements under terms of service guarantee certificate).

FN19 The evidence necessary to determine how reasonable consumers understand a representation is discussed in Section II of this letter.

FN20 An interpretation may be reasonable even though it is not shared by a majority of consumers in the relevant class, or by particularly sophisticated consumers. A material practice that misleads a significant minority of reasonable consumers is deceptive. *See* *Heinz W. Kirchner*, 63 F.T.C. 1282 (1963).

FN21 A secondary message understood by reasonable consumers is actionable if deceptive even though the primary message is accurate. *Sears, Roebuck & Co.*, 95 F.T.C. 406, 511 (1980), *aff'd*, 676 F.2d 385, (9th Cir. 1982); *Chrysler*, 87 F.T.C. 749 (1976), *aff'd*, 561 F.2d 357 (D.C. Cir.), *reissued* 90 F.T.C. 606 (1977); *Rhodes Pharmacal Co.*, 208 F.2d 382, 387 (7th Cir. 1953), *aff'd*, 348 U.S. 940 (1955).

FN22 *National Comm'n on Egg Nutrition*, 88 F.T.C. 89, 185 (1976), *enforced in part*, 570 F.2d 157 (7th Cir. 1977); *Jay Norris Corp.*, 91 F.T.C. 751, 836 (1978), *aff'd*, 598 F.2d 1244 (2d Cir. 1979).

FN23 *National Dynamics*, 82 F.T.C. 488, 524, 548 (1973), *aff'd*, 492 F.2d 1333 (2d Cir.), *cert. denied*, 419 U.S. 993(1974), *reissued* 85 F.T.C. 391 (1976).

FN24 *Warner-Lambert*, 86 F.T.C. 1398, 1415 n.4 (1975), *aff'd*, 562 F.2d 749 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 950 (1978).

FN25 *Grolier*, 91 F.T.C. 315, 430 (1978), *remanded on other grounds*, 615 F.2d 1215 (9th Cir. 1980), *modified on other grounds*, 98 F.T.C. 882 (1981), *reissued*, 99 F.T.C. 379 (1982).

FN26 *American Home Products*, 98 F.T.C. 136 (1981), *aff'd*, 695 F.2d 681 (3d Cir. 1982). '. . . consumers may be led to expect, quite reasonably . . .' (at 386); '. . . consumers may reasonably believe . . .' (*Id.* n.52); '. . . would reasonably have been understood by consumers . . .' (at 371); 'The record shows that consumers could reasonably have understood this language . . .' (at 372). *See also*, pp. 373, 374, 375. *Bristol-Myers*, D. 8917 (July 5, 1983),

appeal docketed, No. 83-4167 (2nd Cir. Sept. 12, 1983). '. . . ads must be judged by the impression they make on reasonable members of the public . . .' (Slip Op. at 4); '. . . consumers could reasonably have understood . . .' (Slip Op. at 7); '. . . consumers could reasonably infer . . .' (Slip Op. at 11) [102 F.T.C. 21 (1983)]. *Sterling Drug, Inc.,* D. 8919 (July 5, 1983), appeal docketed, No. 83-7700 (9th Cir. Sept. 14, 1983). '. . . consumers could reasonably assume . . .' (Slip Op. at 9); '. . . consumers could reasonably interpret the ads . . .' (Slip Op. at 33). [102 F.T.C. 395 (1983)]

FN27 *Horizon Corp.,* 97 F.T.C. 464, 810 n.13 (1981).

FN28 *Simeon Management,* 87 F.T.C. 1184, 1230 (1976).

FN29 The listed categories are merely examples. Whether children, terminally ill patients, or any other subgroup of the population will be considered a special audience depends on the specific factual context of the claim or the practice.
The Supreme Court has affirmed this approach. 'The determination whether an advertisement is misleading requires consideration of the legal sophistication of its audience.' *Bates v. Arizona,* 433 U.S. 350, 383 n.37 (1977).

FN30 In one case, the Commission's complaint focused on seriously ill persons. The ALJ summarized:
    According to the complaint, the frustrations and hopes of the seriously ill and their families were exploited, and the representations had the tendency and capacity to induce the seriously ill to forego conventional medical treatment worsening their condition and in some cases hastening death, or to cause them to spend large amounts of money and to undergo the inconvenience of traveling for a non-existent 'operation.' *Travel King,* 86 F.T.C. 715, 719 (1975).
In a case involving a weight loss product, the Commission observed:
    It is obvious that dieting is the conventional method of losing weight. But it is equally obvious that many people who need or want to lose weight regard dieting as bitter medicine. To these corpulent consumers the promises of weight loss without dieting are the Siren's call, and advertising that heralds unrestrained consumption while muting the inevitable need for temperance, if not abstinence, simply does not pass muster. *Porter & Dietsch,* 90 F.T.C. 770, 864-865 (1977), *aff'd,* 605 F.2d 294 (7th Cir. 1979), *cert. denied,* 445 U.S. 950 (1980).
Children have also been the specific target of ads or practices. In *Ideal Toy,* the Commission adopted the Hearing Examiner's conclusion that:
    False, misleading and deceptive advertising claims beamed at children tend to exploit unfairly a consumer group unqualified by age or experience to anticipate or appreciate the possibility that representations may be exaggerated or untrue. *Ideal Toy,* 64 F.T.C. 297, 310 (1964).
*See also, Avalon Industries Inc.,* 83 F.T.C. 1728, 1750 (1974).

FN31 *FTC v. Sterling Drug,* 317 F.2d 669, 674 (2d Cir. 1963).

FN32 Numerous cases exemplify this point. For instance, in *Pfizer,* the Commission ruled that 'the net impression of the advertisement, evaluated from the perspective of the audience to whom the advertisement is directed, is controlling.' 81 F.T.C. 23, 58 (1972).
In a subsequent case, the Commission explained that '[i]n evaluating advertising representations, we are required to look at the complete advertisement and formulate our opinions on them on the basis of the net general impression conveyed by them and not on isolated excerpts.' *Standard Oil of Calif.,* 84 F.T.C. 1401, 1471 (1974), *aff'd as modified,* 577 F.2d 653 (9th Cir. 1978), *reissued,* 96 F.T.C. 380 (1980).
The Third Circuit stated succinctly the Commission's standard. 'The tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context.' *Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3d Cir. 1976), *cert. denied,* 430 U.S. 983 (1977).

FN33 In *Litton Industries,* the Commission held that fine print disclosures that the surveys included only 'Litton

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

authorized' agencies were inadequate to remedy the deceptive characterization of the survey population in the headline. 97 F.T.C. 1, 71, n.6 (1981), aff'd as modified, 676 F.2d 364 (9th Cir. 1982). Compare the Commission's note in the same case that the fine print disclosure 'Litton and one other brand' was reasonable to qualify the claim that independent service technicians had been surveyed. '[F]ine print was a reasonable medium for disclosing a qualification of only limited relevance.' 97 F.T.C. 1, 70, n.5 (1981).

In another case, the Commission held that the body of the ad corrected the possibly misleading headline because in order to enter the contest, the consumer had to read the text, and the text would eliminate any false impression stemming from the headline. D.L. Blair, 82 F.T.C. 234, 255-256 (1973).

In one case, respondent's expert witness testified that the headline (and accompanying picture) of an ad would be the focal point of the first glance. He also told the administrative law judge that a consumer would spend '[t]ypically a few seconds at most' on the ads at issue. Crown Central, 84 F.T.C. 1493, 1543 nn. 14-15 (1974).

FN34 In Giant Food, the Commission agreed with the examiner that the fine-print disclaimer was inadequate to correct a deceptive impression. The Commission quoted from the examiner's finding that 'very few if any of the persons who would read Giant's advertisements would take the trouble to, or did, read the fine print disclaimer.' 61 F.T.C. 326, 348 (1962).

Cf. Beneficial Corp. v. FTC, 542 F.2d 611, 618 (3d Cir. 1976), where the court reversed the Commission's opinion that no qualifying language could eliminate the deception stemming from use of the slogan 'Instant Tax Refund.'

FN35 'Respondents argue that the contracts which consumers signed indicated that credit life insurance was not required for financing, and that this disclosure obviated the possibility of deception. We disagree. It is clear from consumer testimony that oral deception was employed in some instances to cause consumers to ignore the warning in their sales agreement . . .' Peacock Buick, 86 F.T.C. 1532, 1558-59 (1974).

FN36 Exposition Press, 295 F.2d 869, 873 (2d Cir. 1961); Gimbel Bros., 61 F.T.C. 1051, 1066 (1962); Carter Products, 186 F.2d 821, 824 (1951).

By the same token, money-back guarantees do not eliminate deception. In Sears, the Commission observed:

A money-back guarantee is no defense to a charge of deceptive advertising. . . . A money-back guarantee does not compensate the consumer for the often considerable time and expense incident to returning a major-ticket item and obtaining a replacement.

Sears, Roebuck and Co., 95 F.T.C. 406, 518 (1980), aff'd, 676 F.2d 385 (9th Cir. 1982). However, the existence of a guarantee, if honored, has a bearing on whether the Commission should exercise its discretion to prosecute. See Deceptive and Unsubstantiated Claims Policy Protocol, 1975.

FN37 See American Home Products, 98 F.T.C. 136, 370 (1981), aff'd, 695 F.2d 681, 688 (3d Cir. Dec. 3, 1982). Whether a disclosure on the label cures deception in advertising depends on the circumstances:

. . . it is well settled that dishonest advertising is not cured or excused by honest labeling [footnote omitted]. Whether the ill-effects of deceptive nondisclosure can be cured by a disclosure requirement limited to labeling, or whether a further requirement of disclosure in advertising should be imposed, is essentially a question of remedy. As such it is a matter within the sound discretion of the Commission [footnote omitted]. The question of whether in a particular case to require disclosure in advertising cannot be answered by application of any hard-and-fast principle. The test is simple and pragmatic: Is it likely that, unless such disclosure is made, a substantial body of consumers will be misled to their detriment? Statement of Basis and Purpose for the Cigarette Advertising and Labeling Trade Regulation Rule, 1965, pp. 89-90. 29 FR 8325 (1964).

Misleading 'door openers' have also been found deceptive (Encyclopedia Britannica, 87 F.T.C. 421 (1976), aff'd, 605 F.2d 964 (7th Cir. 1979), cert. denied, 445 U.S. 934 (1980), as modified, 100 F.T.C. 500 (1982)), as have offers to sell that are not bona fide offers (Seekonk Freezer Meats, Inc., 82 F.T.C. 1025 (1973)). In each of these instances, the truth is made known prior to purchase.

FN38 In the Listerine case, the Commission held that pro forma statements of no absolute prevention followed by promises of fewer colds did not cure or correct the false message that Listerine will prevent colds. Warner Lambert,

86 F.T.C. 1398, 1414 (1975), *aff'd*, 562 F.2d 749 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 950 (1978).

FN39 *Chicago Metropolitan Pontiac Dealers' Ass'n*, C. 3110 (June 9, 1983). [101 F.T.C. 854 (1983)]

FN40 An opinion is a representation that expresses only the belief of the maker, without certainty, as to the existence of a fact, or his judgment as to quality, value, authenticity, or other matters of judgment. American Law Institute, *Restatement on Torts, Second* ¶538 A.

FN41 *Id.* ¶539. At common law, a consumer can generally rely on an expert opinion. *Id.* ¶542(a). For this reason, representations of expert opinion will generally be regarded as representations of fact.

FN42 '[T]here is a category of advertising themes, in the nature of puffing or other hyperbole, which do not amount to the type of affirmative product claims for which either the Commission or the consumer would expect documentation.' *Pfizer, Inc.*, 81 F.T.C. 23, 64 (1972).
> The term 'puffing' refers generally to an expression of opinion not made as a representation of fact. A seller has some latitude in puffing his goods, but he is not authorized to misrepresent them or to assign to them benefits they do not possess [cite omitted]. Statements made for the purpose of deceiving prospective purchasers cannot properly be characterized as mere puffing. *Wilmington Chemical*, 69 F.T.C. 828, 865 (1966).

FN43 In *Avalon Industries*, the ALJ observed that the "ordinary person with a common degree of familiarity with industrial civilization' would expect a reasonable relationship between the size of package and the size of quantity of the contents. He would have no reason to anticipate slack filling.' 83 F.T.C. 1728, 1750 (1974) (I.D.).

FN44 'A misleading claim or omission in advertising will violate Section 5 or Section 12, however, only if the omitted information would be a material factor in the consumer's decision to purchase the product.' *American Home Products Corp.*, 98 F.T.C. 136, 368 (1981), *aff'd*, 695 F.2d 681 (3d Cir. 1982). A claim is material if it is likely to affect consumer behavior. 'Is it likely to affect the average consumer in deciding whether to purchase the advertised product-is there a material deception, in other words?' Statement of Basis and Purpose, *Cigarette Advertising and Labeling Rule*, 1965, pp. 86-87. 29 FR 8325 (1964).

FN45 Material information may affect conduct other than the decision to purchase a product. The Commission's complaint in *Volkswagen of America*, 99 F.T.C. 446 (1982), for example, was based on provision of inaccurate instructions for oil filter installation. In its *Restatement on Torts, Second*, the American Law Institute defines a material misrepresentation or omission as one which the reasonable person would regard as important in deciding how to act, or one which the maker knows that the recipient, because of his or her own peculiarities, is likely to consider important. Section 538(2). The Restatement explains that a material fact does not necessarily have to affect the finances of a transaction. 'There are many more-or-less sentimental considerations that the ordinary man regards as important.' Comment on Clause 2(a)(d).

FN46 In evaluating materiality, the Commission takes consumer preferences as given. Thus, if consumers prefer one product to another, the Commission need not determine whether that preference is objectively justified. *See Algoma Lumber*, 291 U.S. 54, 78 (1933). Similarly, objective differences among products are not material if the difference is not likely to affect consumer choices.

FN47 The Commission will always consider relevant and competent evidence offered to rebut presumptions of materiality.

FN48 Because this presumption is absent for some implied claims, the Commission will take special caution to ensure materiality exists in such cases.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN49 *Central Hudson Gas & Electric Co. v. PSC*, 447 U.S. 557, 567 (1980).

FN50 *Cf. Restatement on Contracts, Second* ¶162(1).

FN51 In *American Home Products*, the evidence was that the company intended to differentiate its products from aspirin. 'The very fact that AHP sought to distinguish its products from aspirin strongly implies that knowledge of the true ingredients of those products would be material to purchasers.' *American Home Products*, 98 F.T.C. 136, 368 (1981), *aff'd*, 695 F.2d 681 (3d. Cir. 1982).

FN52 In *Feders*, the ads represented that only Fedders gave the assurance of cooling on extra hot, humid days. 'Such a representation is the raison d'etre for an air conditioning unit-it is an extremely material representation.' 85 F.T.C. 38, 61 (1975) (I.D.), *petition dismissed*, 529 1398 (2d Cir.), *cert. denied*, 429 U.S. 818 (1976).

FN53 'We note at the outset that both alleged misrepresentations go to the issue of the safety of respondent's product, an issue of great significance to consumers.' *Firestone*, 81 F.T.C. 398, 456 (1972), *aff'd*, 481 F.2d 246 (6th Cir.), *cert. denied*, 414 U.S. 1112 (1973).

FN54 The Commission found that information that a product was effective in only the small minority of cases where tiredness symptoms are due to an iron deficiency, and that it was of no benefit in all other cases, was material. *J.B. Williams Co.*, 68 F.T.C. 481, 546 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967).

FN55 As the Commission noted in *MacMillan, Inc.*:
> In marketing their courses, respondents failed to adequately disclose the number of lesson assignments to be submitted in a course. These were material facts necessary for the student to calculate his tuition obligation, which was based on the number of lesson assignments he submitted for grading. The nondisclosure of these material facts combined with the confusion arising from LaSalle's inconsistent use of terminology had the capacity to mislead students about the nature and extent of their tuition obligation. *MacMillan, Inc.*, 96 F.T.C. 208, 303-304 (1980).

*See also, Peacock Buick*, 86 F.T.C. 1532, 1562 (1975), *aff'd*, 553 F.2d 97 (4th Cir. 1977).

FN56 *Simeon Management Corp.*, 87 F.T.C. 1184 (1976), *aff'd*, 579 F.2d 1137, 1168, n.10 (9th Cir. 1978).

FN57 In *American Home Products*, the Commission approved the ALJ's finding of materiality from an economic perspective:
> If the record contained evidence of a significant disparity between the prices of Anacin and plain aspirin, it would form a further basis for a finding of materiality. That is, there is a reason to believe consumers are willing to pay a premium for a product believed to contain a special analgesic ingredient, but not for a product whose analgesic is ordinary aspirin. *American Home Products*, 98 F.T.C. 136, 369 (1981), *aff'd*, 695 F.2d 681 (3d Cir. 1982).

FN58 The prohibitions of Section 5 are intended to prevent injury to competitors as well as to consumers. The Commission regards injury to competitors as identical to injury to consumers. Advertising and legitimate marketing techniques are intended to 'injure' competitors by directing business to the advertiser. In fact, vigorous competitive advertising can actually benefit consumers by lowering prices, encouraging product innovation, and increasing the specificity and amount of information available to consumers. Deceptive practices injure both competitors and consumers because consumers who preferred the competitor's product are wrongly diverted.

COMMISSIONER PERTSCHUK, CONCURRING IN PART AND DISSENTING IN PART

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit K

I concur in the majority's findings that respondents violated Section 5. However, I disagree entirely with the legal analysis in the majority opinion and I dissent from the denial of complaint counsel's appeal on the issue of the order's record retention requirements.

Respondents' misrepresentations in this case were unambiguous and undoubtedly material. To put it simply, respondents grossly exaggerated the sole performance feature of their product, the Ball-Matic Gas Saver Valve. Normally, there would be little more to say. However, this is the first deception case the Commission has decided since the announcement of the dubious Policy Statement on Deception of October 14, 1983. Since the validity of the bare majority vote on the Statement is open to question, apparently the new majority feels compelled to establish the Statement's legitimacy now by jumping this case through the hoops of its analytical framework for deception cases, regardless of how unhelpful that exercise may be.

Under the guise of making the law more 'clear and understandable,' the majority has actually raised the evidentiary threshold for deception cases. In this unusually simple case, the majority's approach does not affect the outcome. One has little difficulty in concluding that consumers reasonably relied on respondents' claims and suffered significant monetary loss as [2] a direct result. However, in other cases the harm from the majority's legal analysis will be palpable and painful.

The majority opinion acknowledges that the Commission need not find actual deception to conclude that Section 5 has been violated. Furthermore, it admits that the courts have traditionally and recently recognized this fact by requiring the Commission to find only that an act or practice has the 'tendency or capacity' to mislead consumers. So far, so good. However, three commissioners have found it necessary to improve on language long understood by the courts and previous commissioners, by substituting the word 'likely' for 'tendency or capacity.' 'Likely to mislead,' they insist, expresses more clearly the notion that actual deception need *not* be found!

The avowed intentions of the majority are admirable, but the *results* of their effort to 'fix' an unbroken legal standard are not. Their choice of language is unfortunate, because the word 'likely' suggests that some particular degree of likelihood of actual deception must be found. Therefore, it may create the impression, intentionally or not, that the burden of proof is higher than it has always been under the traditional 'tendency or capacity' standard.

The new deception analysis has a more serious effect that is clearly not unintentional. That is to withdraw the protection of Section 5 from consumers who do not act 'reasonably.'

There is, of course, no support in the case law or academic literature for the proposition that deception cannot occur unless reasonable consumers are misled. In a few deceptive advertising [3] cases in which the Commission has determined that Section 5 was violated, it has premised its determination on a finding that consumers could 'reasonably' interpret the advertiser's claims in a certain way.[FN1] Such findings do not mean that consumers must be 'reasonable' in order to enjoy the protection of Section 5, just as findings that the 'clear import'[FN2] of an advertisement was false do not mean that ads violate Section 5 only if they 'clearly' express a falsity. A finding that consumers could reasonably be misled is a sufficient, but not necessary, way to establish deception.[FN3] Neither the Commission nor the courts have ever before mandated this method of analysis. [4]

One recent Commission opinion suggests that the Commission must judge ads according to their impression on 'reasonable members of the public.'[FN4] However, the correct interpretation of that statement is that the Commission cannot, when an ad is directed to the general public, hold the advertiser to an outlandish interpretation.[FN5] [5]

In other opinions relied on by the majority, the Commission has stated that its interpretation of ad claims must be 'reasonable.'[FN6] Such cases simply convey the Commission's recognition that the *Commission* must act reasonably (*i.e.*, not in an arbitrary or capricious fashion), in determining, in light of the evidence before it, whether an ad could

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

mislead a substantial number of consumers.[FN7] In none of those cases did the Commission speak of 'reasonable consumers.' [6]

In this particular case, there is no real dispute as to the meaning of respondents' representations about their product. Further, it is clear that consumer would be 'reasonable' in accepting the scientific-sounding, plausible-seeming explanations of respondents as to how (and how well) the product performed. However, this is an easy case, and the majority opinion offers no guidance as to how more difficult matters will be decided.

How will the Commission judge the conduct of consumers who succumb to sales pitches for worthless or grossly over-valued investments? Do 'reasonable consumers' buy diamonds or real estate, sight unseen, from total strangers? Is a consumer 'acting reasonably' when he or she falls for a hard-sell telephone solicitation to buy 'valuable' oil or gas leases from an unknown corporation? Can a consumer 'reasonably' rely on oral promises that are expressly repudiated in a written sales contract?

The sad fact is that a small segment of our society makes its livelihood preying upon consumers who are very trusting and unsophisticated. Others specialize in weakening the defenses of especially vulnerable, but normally cautious, consumers. Through skillful exploitation of such common desires as the wish to get rich quick or to provide some measure of security for one's old age, professional con men can prompt conduct that many of their victims will readily admit-in hindsight-is patently unreasonable. [7]

Of course, what strikes me as 'unreasonable' consumer behavior may not seem so to other commissioner. The vary subjective nature of the 'reasonable consumer' standard is cause for concern. How can consumer conduct be measured for reasonableness? I know of no test for it, and I am fearful of the *ad hoc* determinations that will be made in the future.

Consumers are much better protected by the traditional test for deception, which requires only that a substantial number of consumers could be misled.[FN8] This standard does not put the Commission in the position of passing judgment on the credulity, impetuousness, or inattentiveness of the victims of alleged [8] misconduct. Furthermore, the traditional standard allows the Commission to recognize that sellers frequently design their promotional efforts to appeal to specific groups of consumers, even when their conduct is ostensibly directed to the public at large. In such cases, the Commission need only find that a substantial number of consumers in the target group could be misled,[FN9] considering the sophistication of the persons in that group,[FN10] their mental state,[FN11] and their mental [9] capabilities.[FN12] Thus, a fraudulent scheme may yield relatively few victims in absolute numbers but nevertheless satisfy the legal standard for deception, because the pool of potential buyers is small. The case law has made it clear that Section 5 protects unthinking and credulous consumers as well as those who act 'reasonably' in all their commercial transactions.[FN13]

The third element of deception is materiality. As the Supreme Court has explained, Section 5 prohibits the misrepresentation of 'any fact which would constitute a material [10] factor in a purchaser's decision whether to buy.'[FN14] Heretofore, any fact that is important to consumers has been considered material, regardless of whether consumer choices would actually turn on that fact. As the Commission has previously said, '[t]he fact that consumers were not harmed because they would have purchased the product anyway . . . is not relevant.'[FN15] The Commission has not required a showing of reliance or injury to establish deception.[FN16]

The Majority opinion in this case, however, suggests somewhat ambiguously that a misrepresentation is not material unless it is 'likely to affect' consumers' conduct and '[c]onsumers thus are likely to suffer injury.'[FN17] Similarly, the October 14, 1983, Policy Statement on Deception states: 'a finding of materiality is also a finding that injury is likely to exist. . . . Injury exists if consumers would have chosen differently but for the deception.'[FN18]

Respondents here misrepresented the sole performance feature of their product, and it is reasonable to assume in this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

case that their misrepresentations caused consumers to buy the product [11] and suffer monetary loss. However, this is an unusually simple case. What if this case had concerned misrepresentations about a product with many important performance and design features, such as an automobile? If respondents had, for example, made a false fuel efficiency claim for an automobile, would complaint counsel have been required to show that that particular claim would have 'tipped the scales' for consumers in their weighing of the many features of automobiles that are important to them? Such a requirement of proof would be exceedingly difficult, if not impossible, to meet in that and many other cases. Indeed, it could effectively preclude the Commission from challenging misrepresentations about complex products.

If the majority commissioners intend to require proof of actual or likely reliance on the misrepresentations of respondents in future cases, they have changed the meaning of materiality and made it more difficult to establish violations of Section 5. In any event, they have certainly not made the standard for deception more clear and understandable.

Finally, although I support the order adopted by the majority, I would not limit the recordkeeping requirements of Part IV to the promotion of fuel saving products. Part III of the order governs the use of endorsements for any product as well as any representations consumption characteristics of is justified, and I believe it is, any product.' If this part of the order is justified, and I believe it is, then respondents should be required to maintain records that evidence compliance with it.

### COMMISSIONER PATRICIA P. BAILEY CONCURRING IN THE RESULT IN PART AND DISSENTING IN PART

The issues pertaining to liability in this case are not complicated. Indeed, the application of established law to the facts in *Cliffdale* can lead to only one conclusion: these respondents have violated Section 5 of the Federal Trade Commission Act in a number of ways, as set forth in this opinion, in their marketing of the Ball-Matic Gas Saver Valve. Thus, I concur fully in the findings of liability. However, I must disassociate myself from the confusing and wholly unorthodox reformulation of the traditional test for finding deception, which has been announced in this opinion as the relevant legal standard.[FN19] Additionally, I dissent from the Commission's failure to adopt a more expansive order provision concerning the retention of business records. [2]

### *Legal Standard for Deception*

This is an uncomplicated case involving a number of advertising claims, which are clearly false and deceptive, that could have been addressed with swift and sure justice under existing law. Unfortunately, a majority of the Commission has chosen to use the case as a vehicle to set forth a new legal standard which has little to do with the case and much to do with an ill-advised undertaking to rewrite the law of deception.

Applying a shorthand variant of the oft-repeated standard for deception, Administrative Law Judge Miles J. Brown concluded in the Initial Decision that 'any representation that has a tendency or capacity to mislead or deceive a prospective purchaser is an unfair or deceptive practice which violates the Federal Trade Commission Act.'[FN20] The Commission's opinion dismisses this articulation as being 'circular and therefore inadequate to provide guidance on how a deceptive claim should be analyzed.'[FN21] In its place is substituted a new formulation, promoted as 'a clear and understandable standard', which states that the Commission will find deception where 'first, there is a representation, omission, or practice that is likely to mislead, second, consumers acting reasonably under the circumstances, and third, the representation, omission or practice is material.'[FN22] [3]

Notwithstanding assertions to the contrary, none of these three elements, as defined in the opinion, (or for that matter in the appended Policy Statement) correctly states the factors expressly relied upon in prior Commission cases and by reviewing courts to determine whether a deceptive representation or practice has occurred. Rather, a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

complete and accurate statement of the elements of deception has typically and traditionally included the three-part formula that an act or practice have the tendency or capacity to mislead a substantial number of consumers in a material way.[FN23] While the two statements may at first glance seem semantically similar, the fact is that this reformulation departs from current law in several significant respects, all of which have the potential to geighten the Commission's evidentiary burden considerably and thereby limit the time-honored reach of its deception authority. For this reason, I dissent from the legal standard employed in the opinion and believe it is important to examine each of these new elements separately.

The majority's first criterion for deception is that there be a claim, omission or practice that is 'likely to mislead' consumers. It is true that the courts have occasionally used this or similar phrasing, such as 'the likelihood or propensity' [4] of deception, interchangeable with tendency or capacity.[FN24] I certainly do not object to and indeed am sympathetic with such usage where the primary goal appears to be to avoid the repetitious use of standard phraseology in the discussion of well-grounded legal principles. Here, however, the majority makes unmistakable its intent to *exchange* he phrase tendency or capacity for the term likely, with only the brief explanation that it is meant to convey an understanding that 'actual' deception need not be shown. As that was never in doubt, it does not explain the use of the term likely generally, and it certainly does not make clear how its use will be more instructive in assessing deception.

Unfortunately, neither the opinion nor the appended Policy Statement offers additional explanation for this stated preference, leaving us all to guess as to any real or intended distinction from the 'tendency or capacity' analysis. A standard Webster's definition of likely, 'having a high probability of occurring or being true', suggests, however, that the purposeful substitution of this term for tendency or capacity may well be intended to raise, or may be construed so as to raise, the burden of proof the Commission must meet in demonstrating that deception has occurred. A careful reading of the opinion and the Policy Statement lends support to this inference; recurring references are made to the need for extrinsic evidence of consumer [5] interpretations in many instances where it is not presently required, suggesting a need for the Commission to establish a higher level of probability that deception may have occurred in any particular instance.

Although the Commission has often admitted and relied in the past upon evidence about the effect of an act or practice on consumers, such a showing has not been required by reviewing courts, which have regularly affirmed that such matters are committed to the discretion of the FTC.[FN25] Thus, use of the term 'likely' here may be fairly perceived to be at least a partial retreat from the Commission's traditional position that it may on the basis of its own expertise determine what representations a seller has made to the public. [6]

The second requirement is that an act or practice be likely to mislead consumers 'acting reasonably under the circumstances.' Of the three newly introduced elements, I believe this is on its face the most divorced from prior precedent and also the most likely to produce troubling results.

While the precise wording has varied a bit from decision to decision, the concept underlying the existing analytical construct has remained constant: a claim or practice must deceive a 'substantial number' of consumers in order to trigger a finding of deception.[FN26] Importantly, this standard affords protection to consumers and business merchants alike. Thus, it is well recognized that, if a claim is directed at a particular audience, the test is whether it could deceive a significant portion of that group.[FN27] At the same time, while it is clear that a practice need not mislead all or even a majority of consumers, the Commission will not base findings of law violations on the [7] idiosyncratic interpretations or the unreasonable misunderstandings of an insignificant and unrepresentative segment of a seller's audience.[FN28]

The substantial numbers test is not intended to lead to the strict quantification of the number of consumers who have been misled by a claim or practice and has, therefore, never required the introduction of external evidence concerning such numbers. Rather the concept provides the Commission with a flexible sliding scale upon which it can typically infer whether or not a significant number of consumers could be deceived from its own examination of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the conduct at hand and surrounding circumstances,[FN29] often based on general information concerning the size and composition of a specific target audience.[FN30] Even when extrinsic evidence is available, the Commission does not rely exclusively on such documentation in reaching its decision.[FN31] [8]

Despite the forty-odd year application by the Commission and the courts of a substantial numbers formula, the opinion injects this alternative precept and unknown quantity, the 'reasonable consumer,' into the law of deception. Again, there is little helpful explanation as to why.

While the opinion states that the concept of a 'consumer acting reasonably in the circumstances' is not new, and the Policy Statement includes citations to recent Commission cases which employ the term 'reasonable', reliance on prior FTC decisions for that proposition is misplaced. For example, in several recent deceptive advertising cases, the Commission has based a finding of liability under Section 5 on its determination that consumers could 'reasonably interpret' the advertiser's claims in a particular fashion.[FN32] While this language describes one approach among many available to the Commission in the exercise of its authority to determine whether or not a representation is deceptive, it by no means established a legal requirement that consumers *act* reasonably or that the Commission must examine consumer behavior in those cases in which it was used, nor was it intended to circumscribe, much less preclude, the continued use of other long-accepted methods for finding [9] deception in Commission cases generally.[FN33] I believe other citations to recent Commission matters are equally inapposite.[FN34]

The consequences of this hastily constructed house of cards, devoid as it is of any support in Commission precedent, accompanying explanation, or meaningful application in this particular case, may be far reaching. Practically speaking, one obvious result may be to complicate and delay Commission trial proceedings. If the reasonableness of consumer interpretations becomes a litigable issue-and there is every reason to believe that future respondents' counsel will assure that it will be under the new standard-survey evidence or expert testimony regarding consumer attitudes and actions may be mandated in even the simplest Commission cases.[FN35] The introduction of such evidence will, in turn, raise difficult questions about related evidentiary issues, such as whether new discovery and cross-[10] examination rights concerning survey methodology and results have been created.[FN36] It does not take a seer to predict that the real beneficiaries of these procedural complications and the ensuing delay will be FTC respondents and their counsel, and not the Commission or the public.

Another unfortunate but foreseeable consequence of the introduction of a reasonable consumer standard is to cast the courts adrift in their efforts to understand and apply to Commission cases what is clearly a departure from prior law. What, for example, are the elements of a reasonable consumer test? Without more, the courts may logically turn for guidance to certain common law principles, such as the standard of 'ordinary prudence or care' attributable to the hypothetical 'reasonable man' in tort law.[FN37] Although principles such as these are useful tools to establish objective standards for judging individual conduct which may result in physical or emotional harm to others, comparable concepts have no place in the examination of *consumer* behavior in the marketplace, as the [11] Commission has made clear in the past.[FN38] Thus, while the Commission has indicated that it will not subject sellers to every interpretation made by an 'insubstantial and unrepresentative segment' of the seller's audience, it has at the same time faithfully adhered to the enduring proposition that consumers are entitled to take commercial representations at face value and need not mistrust them.[FN39] I believe the imposition of a 'reasonable consumer' test as an element of the legal standard for deception may seriously jeopardize this guiding principle of deception law, which has permitted and encouraged the Commission to spread its protective mantle over the uninformed and [12] credulous,[FN40] those with understandable but often unreasonable hopes,[FN41] those with limited reasoning abilities, such as children,[FN42] and the opinion carefully and correctly disavows any requirement of a specific finding that actual injury has occurred.[FN46]

Just when all appears to be going well, however, the opinion (and at greater length the Policy Statement) introduces a series of new concepts which appear to qualify standard principles of [15] materiality in a restrictive fashion. At one point the opinion seems to equate materiality with the actual effects of claims or practices on consumer conduct,[FN47] and the Policy Statement expressly states that 'injury and materiality are different names for the same

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

concept' and that deception will be found where an act or practice 'misleads . . . to the consumer's detriment.'[FN48] (Detriment is, of course, legally defined as injury.) The Policy Statement also notes that injury exists if consumers would have chosen differently 'but for' the misleading act or practice, suggesting that reliance and causation are elements of materiality.[FN49]

While I don't pretend to understand the full import of these statements, they certainly imply the possible imposition in at least some cases of new evidentiary requirements that are contrary to current law. Because Section 5 protects consumer preferences generally, including subjective preferences, materiality can be found without reference to objective injury or 'detriment.'[FN50] Moreover, because purchasers may be influenced by a combination or variety of factors, it may be virtually [16] impossible to establish that a particular misrepresentation caused consumers to choose differently, much less that they were 'injured' in some respect by the selection made. Hence, under the law, '(t)he fact that consumers were not harmed because they would have purchased the product anyway . . . is not relevant.'[FN51]

Opinion and Policy Statement conclusions that injury and materiality are synonymous, that causation and reliance must be shown, or even that the likelihood of consumer detriment must be demonstrated in every case do not square with these accepted understandings of materiality. Like the other elements of the new deception standard, the effects of such requirements may well be to raise the burden of proof regarding materiality generally in FTC cases, while at the same time seriously jeopardizing more complicated cases in which specific consumer harm is not easily demonstrated. I am particularly concerned that a restrictive materiality test may serve to undermine the Commission's ad substantiation doctrine. If actual injury or even the likelihood of harm must be shown in all events, the Commission may, in addition to demonstrating a lack of substantiation, be forced to [17] prove falsity in many advertising cases where it is not presently required, in order to establish the necessary link to concrete consumer detriment.

The effort to apply the new deception standard to the instant case is, I believe, a particularly confusing and profitless effort. As I noted at the outset, this case is unusually clearcut, involving as it does a variety of false performance claims, the meaning and import of which can be readily discerned from an examination of respondents' advertisements and the record generally. Nevertheless, the opinion strains valiantly at several junctures to introduce specific findings concerning the 'reasonableness' of consumer behavior and the presence of materiality or 'detriment' in *Cliffdale*. Again, I have no quarrel with the conclusions reached in this case, but analyzing it by applying these new elements is a wholly unnecessary exercise which demonstrates, I fear, the serious evidentiary difficulties and the exercise of even greater analytical gymnastics that will be necessary in future, more complicated Commission cases.

For the most part, however, the opinion concedes that this case precludes application of this purported new legal standard in any meaningful fashion, and, as a result, the lengthy discussion of it in the opinion and appended Policy Statement is a largely academic exercise. Rather than clarifying the law of deception, the opinion attempts to write new law which is destined to confound its readers. If applied literally, the new three part definition could narrow the Commission's authority to [18] prosecute a range of dishonest or deceptive conduct, while creating complications and uncertainty about the cases we do bring. In the absence of further practical guidance from the Commission and the courts, however, I believe interested parties would be well advised to adhere to tried and true legal strictures governing deception in the conduct of their commercial affairs.

*Record Retention Requirements*

I also dissent from the failure to require that the record keeping provisions set forth in Part IV of the order be extended to apply to the marketing of all products, to the extent they are covered by the order. This omission seriously undermines the reach of Part III of the order which applies to non-fuel saving products marketed by Cliffdale.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Significantly, Part III expands order coverage to 'all products' marketed by the respondents by requiring that they not misrepresent or misuse testimonials, misrepresent tests or survey results concerning energy savings or consumption, or use energy savings claims without a reasonable basis. In the circumstances of this case, this is a reasonable and justifiable order provision and the opinion does not contest the burden of imposing it on these respondents.

However, the majority has refused to include in the order parallel provisions requiring the retention of records with respect to the product coverage set forth in Part III. Unless records are retained, the Commission will be unable to monitor respondents' compliance with the order in an efficient or [19] effective manner. As discussed by complaint counsel, under these circumstances a more expansive retention requirement is entirely consistent with the record keeping provisions contained in a number of recent Commission orders.[FN52] It is also consistent with the broad record keeping provisions of consent orders concerning other marketers of gas-saving products.[FN53]

## ORDER

### PART I

*It is ordered,* That respondents Cliffdale Associates, Inc., a corporation, its successors and assigns, Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, and respondents' agents, representatives, and employees, directly or through any corporation, subsidiary, division, or other device, in connection with the advertising, offering for sale, sale or distribution of the automobile retrofit device variously known as the Ball-Matic, the Ball-Matic Valve, the Ball-Matic Gas Saver Valve and the Gas Saver Valve, or any other automobile retrofit device (as 'automobile retrofit device' is defined in Section 511 of the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. 2011) [2] having substantially similar properties, in or affecting commerce as 'commerce is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

a. representing, directly or by implication, that such device is a unique product or new invention; and

b. representing, directly or by implication, that such device is needed on every vehicle except Volkswagens, diesel vehicles and fuel injection vehicles.

### PART II

*It is further ordered,* That respondents Cliffdale Associates, Inc, a corporation, its successors and assigns, and its officers, and Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, and respondents' agents, representatives, and employees, directly or through any corporation, subsidiary, division, or other device, in connection with the advertising, offering for sale, sale or distribution of any automobile gasoline additive, engine oil additive, or automobile retrofit device (as 'automobile retrofit device' is defined in Section 511 of the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. 2011), in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from representing, directly or by implication, that such device will or may result in fuel economy improvement when installed in an automobile, truck, recreational vehicle, or other motor vehicle unless, and only to the extent, respondents possess and rely upon a reasonable basis which substantiates such representation at the time of its initial and each subsequent dissemination. This [3] reasonable basis shall consist of competent and reliable tests, such as:

a. chassis dynamometer tests done according to procedures that simulate typical urban and highway driving patterns, such as the then current urban and highway driving test schedules established by the Environmental Protection Agency; or

b. track or road tests done according to procedures that simulate urban and highway driving patterns, such as the them current procedures established in the Society of Automobile Engineers' J1082b test protocol.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

A competent and reliable test means one in which persons qualified to do so conduct the test and evaluate its results in an objective manner using procedures that insure accurate and reliable results.

Respondents shall, when using the results of any tests required by this Part, clearly and conspicuously disclose the limitations upon the applicability of the results to any automobile, truck, recreational vehicle, or other motor vehicle. Where the results of such tests are used in connection with a representation of fuel economy improvement expressed in miles per gallon (or liter), miles per tankful, or percentage, or where the representation of the benefit is expressed as a monetary saving in dollars or percentages, all advertising and other sales promotional materials that contain the representation must also clearly and conspicuously disclose the following disclaimer: 'REMINDER: Your actual saving may vary. It depends on the kind of driving you do, how you drive and the condition of your car.' [4]

## PART III

*It is further ordered*, That respondents Cliffdale Associates, Inc., a corporation, its successors and assigns, and its officers, Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, and respondents' agents, representatives, and employees, directly or through any corporation, subsidiary, division, or other device, in connection with the advertising, offering for sale, sale or distribution of any product or service in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from:

a. using, publishing, or referring to any endorsement unless respondents have good reason to believe that at the time of such use, publication, or reference, the person or organization named subscribes to the facts and opinions therein contained;

b. failing to disclose a material connection, where one exists, between an endorser of any product or service and any of the respondents. A 'material connection' shall mean, for purpose of this order, any relationship between an endorser of any product or service and any individual or other entity marketing such product or service which relationship might materially affect the weight or credibility of the endorsement and which relationship would not reasonably be expected by consumers.

c. representing, directly or by implication, any energy savings or energy consumption characteristics of any product, other than any gasoline additive, engine oil additive, or automobile retrofit device (as 'automobile retrofit device' is defined in the Automobile Information and Cost Savings Act, 15 U.S.C. 2011), unless, at the time of making the representation, respondents possess and [5] reasonably rely upon competent and reliable evidence that substantiates such representation;

d. representing, directly or by implication, that any consumer endorsement of a product or service represents the typical or ordinary experience of members of the public who use the product unless this is the case;

e. misrepresenting, in any manner, the purpose, procedure, results, or conclusion of any test or survey pertaining to the energy saving or energy consumption characteristics of any product.

## PART IV

*It is further ordered*, That respondents Cliffdale Associates, Inc., a corporation, its successors and assigns, and its officers, and Jean-Claude Koven, individually and as an officer of Cliffdale Associates, Inc., and Arthur N. Sussman, an individual, and respondents' agents, representatives, and employees, directly or through any corporation, subsidiary, division, or other device, in connection with the advertising, offering for sale, sale or distribution of any fuel saving product in or affecting commerce as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from failing to maintain accurately the following records which may be inspected by Commission staff members upon fifteen (15) days' notice: copies of and dissemination schedules for all advertisements, sales promotional materials, and post-purchase materials; documents relating to the use of or publication of endorsements; records of the number of pieces of direct mail advertising sent in each direct mail advertisement dissemination; [6] documents which substantiate, contradict, or otherwise relate to any claim which is a part of the advertising, sales promotional materials, or post-purchase materials disseminated by respondents

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

directly or through any business entity. Such documentation shall be retained by respondents for a period of three (3) years from the last date any such advertising, sale promotional materials, or post-purchase material is disseminated.

## PART V

*It is further ordered,* That the corporate respondent shall forthwith distribute a copy of this order to all operating divisions of said corporation, and to all present and future personnel, agents, or representatives having sales, advertising or policy responsibilities with respect to the subject matter of this order and that the corporate respondent shall secure from each such person a signed statement acknowledging receipt of the order.

## PART VI

*It is further ordered,* That the corporate respondent notify the Commission at least thirty (30) days prior to any proposed change in the corporate respondent such as dissolution, assignment, or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries or any other change in the corporation which may affect compliance obligations arising out of the order.

## PART VII

*It is further ordered,* That the individual respondents named herein promptly notify the Commission of the discontinuance of [7] their present business or employment and of their affiliation with each new business or employment for a period of ten years from the effective date of this order. Each such notice shall include the respondents' new business address and a statement of the nature of the business or employment in which the respondent is newly engaged as well as a description of respondent's duties and responsibilities in connection with the business or employment. The expiration of the notice provision of this paragraph shall not affect any other obligation arising under this order.

## PART VIII

*It is further ordered,* That the respondents shall, within sixty (60) days after service upon them of this order, and also one (1) year thereafter, file with the Commission a report, in writing, setting forth in detail the manner and form in which they have complied with this order.

*It is so ordered.*

Commissioners Pertschuk and Bailey concurred in part and dissented in part.

FN1 *E.g., American Home Products Corp.,* 98 F.T.C. 136, 367, 371-72, 386 *aff'd as modified,* 695 F.2d 681 (3d Cir. 1982); *Bristol-Myers Co.,* 102 F.T.C. 21, slip op. at 7, 11 (Docket No. 8917, July 5, 1983), *appeal filed,* No. 83-4167 (2d Cir., Sept. 12, 1983).

FN2 *E.g., American Home Products,* 98 F.T.C. at 367. Similarly, a finding that a company intended to create a certain impression among consumers (*Id.* at 368), does not imply that the Commission must find intentional misconduct to rule that Section 5 has been violated.

FN3 The *American Home Products* case illustrates several ways in which the Commission can reach the conclusion that an advertiser's claims are deceptive. In finding that the company falsely claimed that Anacin contains a pain reliever other than aspirin, to Commission concluded that this was the 'clear import' of some ads. *Id.* at 367. As to other ads, it concluded that consumers would 'reasonably have understood' such a claim to have been made. *Id.* at

367, 371-72. A third analysis was applied in finding that claims for tension relief had been made. That conclusion was based in large part on expert testimony and a copy test of one advertisement showing that 22% of viewers identified that claim as having been made. *Id.* at 393-94. (The Commission's analysis of tension relief claims was similar in *Bristol-Myers*, slip op. at 44-45).

FN4 *Bristol-Myers*, slip op. at 4-5 ('[T]he Commission may not inject novel meanings into ads and then strike them down as unsupported; ads must be judged by the impression they make on reasonable members of the public.')

FN5 This statement of the law is supported by the cases cited in *Bristol-Myers* as authority for the language quoted in note 4. The first case cited is *Ward Laboratories, Inc. v. FTC*, 276 F.2d 952, 954 (2d Cir.), *cert. denied*, 364 U.S. 827 (1960). There the court upheld the Commission's decision to protect 'the average male, of which there are millions, who because of masculine vanity will grasp at any straw [to] save his hair. . . .' The court went on to declare that advertisements should be judged by their effect on 'the average member of the public who more likely will be influenced by the impression gleaned from a quick glance at the most legible words.' *Id.* The second case cited is *International Parts Corp. v. FTC*, 133 F.2d 883, 886 (7th Cir. 1943), in which the court vacated the Commission's order forbidding the company from claiming that the finish on its mufflers permanently prevented rust or corrosion. The court concluded that the company had not claimed that its finish prevented rust permanently, finding that the common meaning of the word 'prevents' carries no connotation of permanency. The law of this case is that a company 'will be presumed to have used [a] word in its ordinary and commonly accepted understanding, in the absence of any showing to the contrary.' The other cited case is *Kirchner*, 63 F.T.C. 1282, 1290 (1963), *aff'd*, 337 F.2d 751 (9th Cir. 1964), which provides that the Commission will not interpret an ad as it would be unreasonably misunderstood by only an 'insignificant and unrepresentative' segment of consumers.

FN6 *Sears, Roebuck and Co.*, 95 F.T.C. 406, 511 (1980), *aff'd*, 676 F.2d 385 (9th Cir. 1982) (Commission overturned the administrative law judge's interpretation of some ads, noting the rule that ads must be 'reasonably subject to some interpretation that is false' in order for deception to be found); *Pfizer, Inc.*, 81 F.T.C. 23, 59 (1972) (Commission affirmed the administrative law judge's dismissal of the complaint because alleged implied representations could not 'reasonably be found' in the ads). *See also, National Dynamics Corp.*, 82 F.T.C. 488, 548 (1973), *aff'd as modified*, 492 F.2d 1333 (2d Cir.), *cert. denied*, 419 U.S. 993 (1974) (Commission overturned the administrative law judge's holding that an implied representation that the advertiser had substantiation for its claims could not reasonably be found).

FN7 The Commission explained this obligation in *The Kroger Co.*, 98 F.T.C. 639, 728 (1981), *modified*, 100 F.T.C. 573 (1982) (citations omitted):

> It is settled that the Commission has sufficient expertise to determine an advertisement's meanings-express and implied-without necessarily resorting to evidence of consumer perceptions. This is not to say that an advertisement is susceptible to every reading that it may technically support, no matter how tenuous it might be; rather, the interpretation must be reasonable in light of the claims made in the advertisement, taken as a whole. In many cases, the Commission has refused to accept particular interpretations urged by complaint counsel because the advertisements themselves did not imply them and no extrinsic evidence had been offered to prove their apprehension by some reasonably significant number of consumers.

FN8 *Statement of Basis and Purpose for the Funeral Industry Practices Rule*, 47 FR 42260, 42274 (1982) ('A statement is deceptive under Section 5 of the FTC Act if it actually misleads consumers, or has the tendency or capacity to deceive a substantial segment of the purchasing public in some material respect.'); *The Kroger Co.*, 98 F.T.C. 639, 728 (1981), *modified*, 100 F.T.C. 573 (1982) ('In many cases, the Commission has refused to accept particular interpretations urged by complaint counsel because the advertisements themselves did not imply them and no extrinsic evidence had been offered to prove their apprehension by some reasonably significant number of consumers.'); *Raymond Lee Organization, Inc.*, 92 F.T.C. 489, 649 (1978), *aff'd*, 679 F.2d 905 (D.C. Cir. 1980) (Section 5 is violated if 'substantial numbers of the public are likely to make purchasing decisions based on false beliefs'); *Bristol-Myers Co.*, 85 F.T.C. 688, 744 (1975) ('we agree that a substantial number of consumers surveyed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(probably somewhere between 14 percent and 33 percent) understood Dry Ban to be 'dry'); *Statement of Basis and Purpose for the Cigarette Rule*, 29 FR 8325, 8350 (1964) ('[T]he test of unlawful deception under Section 5 is whether the advertisement in question is likely to deceive a substantial segment of the purchasing public, or of that part of the purchasing public to whom the representation is directed. . . .'); *see also, Firestone Tire & Rubber Co. v. FTC*, 481 F.2d 246, 249 (6th Cir.), *cert. denied*, 414 U.S. 1112 (1973); *Travel King, Inc.*, 86 F.T.C. 715, 759-60 (1975) (initial decision); *Benrus Watch Co., Inc. v. FTC*, 352 F.2d 313, 319-20 (8th Cir. 1965), *cert. denied*, 384 U.S. 939 (1966).

FN9 *Statement of Basis and Purpose for the Cigarette Rule (see* quotation *supra* note 8); *Kirchner*, 63 F.T.C. 1282, 1290 (1963), *aff'd*, 337 F. 2d 751 (9th Cir. 1964) ('If . . . advertising is aimed at a specially susceptible group of people (*e.g.*, children), its truthfulness must be measured by the impact it will make on them, not others to whom it is not primarily directed.'); *Bates v. State Bar of Arizona*, 433 U.S. 350, 383 note 37 (1977) (dictum) ('The determination whether an advertisement [for legal services] is misleading requires consideration of the legal sophistication of its audience.')

FN10 *Horizon Corp.*, 97 F.T.C. 464, 810 note 13 (1981); *Raymond Lee Organization, Inc.*, 92 F.T.C. 489, 628 (1978), *aff'd*, 679 F.2d 905 (D.C. Cir. 1980); *Tashof*, 74 F.T.C. 1361, 1401 (1968), *aff'd*, 437 F.2d 707 (D.C. Cir. 1970).

FN11 *Travel King, Inc.*, 86 F.T.C. 715, 757, 759-60 (1975) (initial decision); *Porter & Dietsch, Inc.*, 90 F.T.C. 770, 865 (1977), *aff'd as modified*, 605 F.2d 294 (7th Cir. 1979), *cert. denied*, 445 U.S. 950 (1980); *Stauffer Laboratories, Inc. v. FTC*, 343 F.2d 75, 83 (9th Cir. 1965); *Ward Laboratories Inc. v. FTC*, 276 F.2d 952, 954 (2d Cir.) *cert. denied*, 364 U.S. 827 (1960); *Savitch*, 50 F.T.C. 828, 834 (1954), *aff'd*, 218 F.2d 817 (2d Cir. 1955).

FN12 *Cigarette Statement, supra* note 8, 29 FR at 8358; *Ideal Toy Co.*, 64 F.T.C. 297, 310 (1964) (initial decision) ('False, misleading and deceptive advertising claims beamed at children tend to exploit unfairly a consumer group unqualified by age or experience to anticipate or appreciate the possibility that representations may be exaggerated or untrue.'); *ITT Continental Baking Co.*, 83 F.T.C. 865 (1973), *modified*, 83 F.T.C. 1105 (1973), *aff'd*, 532 F.2d 207 (2d Cir. 1976); *Avalon Indus., Inc.*, 83 F.T.C 1728, 1750 (1974); *Stupell Originals Inc.*, 67 F.T.C. 173, 186-87 (1965); Notice of Proposed Trade Regulation Rulemaking and Public Hearing on Children's Advertising, 43 FR 17967, 17969 (1978).

FN13 *FTC v. Standard Education Society*, 302 U.S. 112, 116 (1937) ('Laws are made to protect the trusting as well as the suspicious.'); *Doherty, Clifford, Steers & Shenfield, Inc. v. FTC*, 392 F.2d 921, 926 (6th Cir. 1968) ('the Commission is bound to protect the public in general, the unsuspecting as well as the skeptical'); *Aronberg v. FTC*, 132 F.2d 165, 167 (7th Cir. 1942) ('The law is not made for experts but to protect the public-that vast multitude which includes the ignorant, the unthinking, and the credulous. . . .'); *Feil v. FTC*, 285 F.2d 879, 887 (9th Cir. 1960); *Gold Bullion International, Ltd.*, 92 F.T.C. 196, 221 (1978), *modified*, 92 F.T.C. 667 (1978); *Niresk Indus., Inc. v. FTC*, 278 F.2d 337, 342 (7th Cir.), *cert. denied*, 364 U.S. 883 (1960) ('[T]he Commission's determination is not restricted to a consideration of what impression an expert or careful reader would draw from the advertisements.'); *Indep. Directory Corp. v. FTC*, 188 F.2d 468, 470 (2d Cir. 1951) ('It was reasonably to be expected that a busy business man might . . . [be misled]. Such a misconception is more probable in the case of the careless business man who is also entitled to protection from deception.')

FN14 *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 386 (1965).

FN15 *Firestone Tire & Rubber Co.*, 81 F.T.C. 398, 451 (1972), *aff'd*, 481 F.2d 246 (6th Cir.), *cert. denied*, 414 U.S. 1112 (1973).

FN16 *Id. See also, Simeon Management Corp.*, 87 F.T.C. 1184, 1229 (1976), *aff'd*, 579 F.2d 1137 (9th Cir. 1978);

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Travel King, Inc.*, 86 F.T.C 715, 774 (1975).

FN17 Slip op. at 9.

FN18 Deception Statement at 18.

FN19 In May 1983, the Committee of Energy and Commerce of the U.S. House of Representatives asked the Federal Trade Commission to prepare and submit 'an analysis of the law of its deception jurisdiction as presently applied by the Commission and interpreted in case law.' In response to that request, on October 21, 1983, Chairman Miller forwarded the appended 'Policy Statement on Deception' to the Honorable John D. Dingell, Chairman of the Committee. I dissented from the issuance of that statement. This case represents the first public pronouncement that the principles set forth in that policy statement are intended to be not just current agency enforcement policy, but also the legal standard for future Commission deception cases.

FN20 ID 35, citing *Chrysler Corp. v. FTC*, 561 F.2d 357, 363 (D.C. Cir. 1977); *Charles of the Ritz Distrib. Corp. v. FTC*, 143 F.2d 676, 679-80 (2d Cir. 1944).

FN21 Slip op. at 7.

FN22 *Id.*

FN23 An early version of this standard appeared in a 1919 Commission decision. *See Iron Clad Tire*, 1 F.T.C. 380, 385 (1919). The standard was affirmed by the Seventh Circuit the same year. *See Sears, Roebuck & Co. v. FTC*, 258 F. 307, 311 (7th Cir. 1919). Application of the tendency or capacity standard has continued regularly up to the present. *See American Home Products Corp. v. FTC*, 695 F.2d 681, 686-87 (3d Cir. 1982).

FN24 *See, e.g., Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976); *Montgomery Ward & Co. v. FTC*, 379 F.2d 666, 670 (7th Cir. 1967); *Feil v. FTC*, 285 F.2d 879, 886, 896 (9th Cir. 1960).

FN25 *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 391-92 (1965) ('Nor was it necessary for the Commission to conduct a survey of the viewing public before it could determine that the commercials had a tendency to mislead.'). *See also American Home Products Corp. v. FTC*, 695 F.2d 681, 687-88 & n.10 (3d Cir. 1982); *Resort Car Rental System, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir.), *cert. denied sub nom. MacKenzie v. United States*, 423 U.S. 827 (1975) (Commission could have reached conclusions regarding deceptive nature of ads without consumer witnesses 'whose testimony merely supported the inferences which can logically be drawn by scrutinizing the advertising alone'); *J.B. Williams Co. v. FTC*, 381 F.2d 884, 890 (6th Cir. 1967) (the Commission need not 'take a random sample to determine the meaning and impact of the advertisements'); *Carter Products, Inc. v. FTC*, 323 F.3d 523, 528 (5th Cir. 1963); *Exposition Press, Inc. v. FTC*, 295 F.2d 869, 872 (2d Cir. 1961), *cert. denied*, 370 U.S. 917 (1962) ('Actual consumer testimony is in fact not needed to support an inference of deceptiveness by the Commission.'); *Zenith Radio Corp. v. FTC*, 143 F.2d 29, 31 (7th Cir. 1944) ('The Commission was not required to sample public opinion to determine what the petitioner was representing to the public.'); *The Kroger Co.*, 98 F.T.C. 639, 728 (1981), *modified*, 100 F.T.C. 573 (1982); *National Dynamics Corp.*, 82 F.T.C. 488, 548 (1973), *aff'd*, 492 F.2d 1333 (2d Cir.), *cert. denied*, 419 U.S. 993 (1974).

FN26 This element of the deception test has been variously described as requiring: a 'substantial segment,' *see Statement of Basis and Purpose for the Funeral Industry Practices Rule*, 47 FR 42,260, 42,274 (1982); *Statement of Basis and Purpose for the Cigarette Rule*, 29 FR 8325, 8350 (1964); a 'substantial percentage,' *see Benrus Watch Co., Inc. v. FTC*, 252 F.2d 313, 319-20 (8th Cir. 1965), *cert. denied*, 384 U.S. 939 (1966); 'substantial numbers,' *see Raymond Lee Organization, Inc.*, 92 F.T.C. 489, 649 (1978), *aff'd*, 679 F.2d 905 (D.C. Cir. 1980); *Bristol-Myers Co.*, 85 F.T.C. 688, 744 (1975); *Travel King, Inc.*, 86 F.T.C. 715, 759 (1975); or 'some reasonably significant

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

number,' *see The Kroger Co.*, 98 F.T.C. 639, 728 (1981), *modified*, 100 F.T.C. 573 (1982).

FN27 *Cigarette Statement, supra* note 8, 29 FR at 8350. *See Heinz W. Kirchner*, 63 F.T.C. 1282, 1290 (1963), *aff'd*, 337 F.2d 751 (9th Cir. 1964). *See also Bates v. State Bar of Arizona*, 433 U.S. 350, 383 n.37 (1977).

FN28 *Heinz W. Kirchner*, 63 F.T.C. 1282 (1963), *aff'd* 377 F.2d 751 (9th Cir. 1964). *See also The Kroger Co.*, 98 F.T.C. 639, 728 (1981), *modified*, 100 F.T.C. 573 (1982).

FN29 *See, e.g., The Kroger Co.*, 98 F.T.C. 639, 728 (1981), *modified*, 100 F.T.C. 573 (1982).

FN30 *See, e.g., Travel King, Inc.*, 86 F.T.C. 715, 759-60 (1975) ('Many thousands of ill persons from all over the world' constituted 'substantial numbers' in finding deception where both physical harm (from the interruption of proper medical care and the rigors of international travel) and substantial loss of time and money resulted from trip to the Philippines for 'psychic surgery.')

FN31 *See, e.g., American Home Products Corp.*, 98 F.T.C. 136, 393-94 (1981), *aff'd as modified*, 695 F.2d 681 (3d Cir. 1982); *Bristol-Myers Co.*, 102 F.T.C. 21, slip op. at 44-45 (Docket No. 8917, July 5, 1983), *appeal filed*, No. 83-4167 (2d Cir., Sept. 12, 1983).

FN32 *See, e.g., American Home Products Corp.*, 98 F.T.C. 136, 367, 371-72, 386 (1981), *aff'd as modified*, 695 F.2d 681 (3d Cir. 1982); *Bristol-Myers*, 102 F.T.C. 21, slip op. at 7, 11 (Docket No. 8917, July 5, 1983), *appeal filed*, No. 83-4167 (2d Cir., Sept. 12, 1983).

FN33 For a description of several different approaches used by the Commission to determine whether an advertiser's claims have a tendency to deceive, *see American Home Products Corp.*, 98 F.T.C. 136, 367, 371-72, 393-94 (1981), *aff'd as modified*, 695 F.2d 681 (3d Cir. 1982).

FN34 For example, in *National Dynamics Corp.*, 82 F.T.C. 488, 548 (1973), *aff'd as modified*, 492 F.2d 1333 (2d Cir.), *cert. denied*, 419 U.S. 993 (1974), the use of the term 'reasonable' refers to the requirement that the *Commission* act in a reasonable (as opposed to arbitrary or capricious) way in determining that consumers could be misled by a claim or practice. For a general explanation of this obligation, *see The Kroger Co.*, 98 F.T.C. 639, 728 (1981), *modified*, 100 F.T.C. 573 (1982).

FN35 Even in the instant matter, a particularly uncomplicated Commission case, the majority specifically notes that, while it is able to 'interpret the claims as a reasonable consumer would have', evidence as to how consumers actually interpreted respondents' ads 'would have been helpful.' Slip op. at 12.

FN36 *See* Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 Harv. L. Rev. 661, 679 (1977).

FN37 *See, e.g.*, Restatement (Second) of Torts §§ 281-328D (1965).

FN38 *Exposition Press, Inc. v. FTC*, 295 F.2d 869 (2d Cir. 1961), *cert. denied*, 370 U.S. 917 (1962) ('[W]e think it plain that a deviation of one digit in the date on a coin is not likely to distinguish it sufficiently from the original to alert an 'unsuspecting person of ordinary observation and care' whom the criminal counterfeit law protects, let alone the 'ignorant, unthinking and credulous' who are not excluded from the protection of civil consumer law.').
The Commission has, however, applied an analogous concept to determine whether a *seller* possessed and relied upon a 'reasonable basis' for believing a representation to be true. *See National Dynamics Corp.*, 82 F.T.C. 488, 553, 557 (1973), *aff'd as modified*, 492 F.2d 1333 (2d Cir.), *cert. denied*, 419 U.S. 993 (1974) (finding was based on

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

whether the advertiser 'acted upon information which would satisfy a reasonably prudent businessman' that the representation is true and that he thus acted in 'good faith'). *See also Pfizer Inc.*, 81 F.T.C. 23, 64 (1972). While the Commission has not applied this standard often, it rightfully reflects, I think, society's general determination that the seller assumes certain risks and responsibilities in making product offerings-burdens which should not be shifted unfairly to consumers.

FN39 *See FTC v. Standard Education Society*, 302 U.S. 112, 116 (1937).

FN40 *See, e.g., Aronberg v. FTC*, 132 F.2d 165, 167 (7th Cir. 1942) ('The law is not made for experts but to protect the public-that vast multitude which includes the ignorant, the unthinking, and the credulous. . . .'); *Feil v. FTC*, 285 F.2d 879, 887 (9th Cir. 1960); *Gold Bullion International, Ltd.*, 92 F.T.C. 196, 221 (1978), *modified*, 92 F.T.C. 667 (1978).

FN41 *See, e.g., Travel King, Inc.*, 86 F.T.C. 715, 757, 759-60 (1975); *Porter & Dietsch, Inc.*, 90 F.T.C. 770, 865 (1977), (1977), *aff'd as modified*, 605 F.2d 294 (7th Cir. 1979), *cert. denied*, 445 U.S. 950 (1980); *Stauffer Laboratories, Inc. v. FTC*, 343 F.2d 75, 83 (9th Cir. 1965); *Ward Laboratories, Inc.*, 276 F.2d 952, 954 (2d Cir.), *cert. denied*, 364 U.S. 827 (1960).

FN42 *See, e.g., Cigarette Statement, supra* note 8, 29 FR at 8358 (quoting *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 313 (1934)). *See also Ideal Toy Co.*, 64 F.T.C. 297, 310 (1964) (initial decision); *ITT Continental Baking Co.*, 83#e even 'average' consumers whose guard may be down or who may behave somewhat carelessly in the face of deceptive conduct.[FN43] [13]

Although the Policy Statement promises to continue the traditional protections afforded such groups, a reasonable consumer standard, like the rejected doctrine of caveat emptor, is analytically unsuited for such purposes. By definition the term reasonable means 'possessing sound judgment.' Thus, while the Commission may logically continue to consider 'reasonable consumer interpretations' in instances where it may be one acceptable approach, such as in cases involving major national advertising campaigns aimed at mass audiences, traditional Commission fraud cases, focusing as they generally do on seller exploitation of *unreasonable* consumer judgments and actions, will never lend themselves in an appropriate way to such an analysis. Unlike the 'substantial numbers' test, which by design encompasses both types of cases by focusing on the likely reactions of a seller's intended audience-whatever human frailties the group may exhibit-to a marketing message, the majority's approach will, I believe, require much analytical sleight of hand if the protections long promised and provided by the FTC to vulnerable consumers is to continue.

The third and last element of the new deception triumvirate is a requirement that the representation, practice, or omission [14] be 'material'. Of the new requirements, this has the potential to be the wolf in sheep's clothing. The Commission has long held that a challenged act or practice must be misleading in a material respect in order to be found deceptive. Additionally, the opinion accurately states that materiality has been generally defined to include any sort of consumer preference which is likely to affect the purchasing decision[FN44] or post-purchase use of the product.[FN45] And, perhaps most significantly, F.T.C. 865, *modified*, 83 F.T.C. 1105 (1973), *aff'd*, 532 F.2d 207 (2d Cir. 1976); *Avalon Indus., Inc.*, 83 F.T.C. 1728, 1750 (1974); *Stupell Originals, Inc.*, 67 F.T.C. 173, 186-87 (1965); *Notice of Proposed Trade Regulation Rulemaking and Public Hearing on Children's Advertising*, 43 FR 17,967, 17,969 (1978).

FN43 *See, e.g., Independent Directory Corp. v. FTC*, 188 F.2d 468, 470 (2d Cir. 1951) ('It was reasonably to be expected that a busy business man might . . . [be misled]. Such a misconception is more probable in the case of the careless business man who is also entitled to protection from deception.'); *American Home Products Corp. v. FTC*, 695 F.2d 681, 689 (3d Cir. 1982) ('If accepted, AHP's position [on the meaning of its advertisements] might well preclude the Commission from taking action against advertisements that, when read with scrupulous care by vigilant

and literal-minded consumers, could be seen to be making true claims.'); *Colgate-Palmolive Co. v. FTC*, 310 F.2d 89, 91 (1st Cir. 1962), *rev'd on other grounds*, 380 U.S. 374, 391-92 (1965) ('It should be obvious by now to anyone that advertisements are not judged by scholarly dissection in a college classroom.'); *Ward Laboratories, Inc. v. FTC*, 276 F.2d 952, 954 (2d Cir.) *cert. denied*, 364 U.S. 827 (1960) ( '[A]dvertisements are not to be judged by their effect upon the scientific or legal mind which will dissect and analyze each phrase but rather by their effect upon the average member of the public who more likely will be influenced by the impression gleaned from a quick glance at the most legible words.'); *Stupell Originals, Inc.*, 67 F.T.C. 173, 186 (1965) ('[W]hile the risk of injury [from respondent's product] . . . may be obvious to the person who pauses to consider such possibility, we seriously doubt that the ordinary purchaser would dwell on this eventuality.')

FN44 *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 387 (1965); *American Home Products Corp.*, 98 F.T.C. 136, 368 (1981), *aff'd as modified*, 695 F.2d 681 (3d Cir. 1982).

FN45 Care Labeling of Textile Wearing Apparel Rule, 16 C.F.R. 423 (1983) (requiring the disclosure of proper instructions for the laundering and cleaning of clothing).
Also, in the last several years the Commission has alleged in numerous settled cases that information pertaining to the use or care of a product is material to consumers. *See, e.g., American Motors Corp.*, 100 F.T.C. 229 (1982) (safe use of Jeeps in on-pavement driving); *Chrysler Corp.*, 99 F.T.C. 347 (1982) (use and care information pertaining to the replacement of oil filters in vehicles). The Commission has also issued complaints in matters still in litigation alleging the materiality of use and care information. *Volkswagen of America*, Docket No. 9154 (complaint issued Apr. 1, 1981) (use and care of Volkswagen and Audi vehicles); *International Harvester Co.*, Docket No. 9147 (complaint issued Oct. 10, 1980) (use and care of tractors).

FN46 *See Colgate-Palmolive Co.*, 380 U.S. 374, 391-92 (1965); *Simeon Management Corp.*, 87 F.T.C. 1184, 1229 (1976), *aff'd*, 579 F.2d 1137 (9th Cir. 1978).

FN47 *See* Slip op. at 9.

FN48 Deception Policy Statement at 19.

FN49 *Id.*

FN50 *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 391-92 (1965); *Simeon Management Corp.*, 87 F.T.C. 1184, 1229 (1976), *aff'd*, 579 F.2d 1137 (9th Cir. 1978) (quoting *Resort Car Rental System, Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir.), *cert. denied sub. nom. Mackenzie v. United States*, 423 U.S. 827 (1975) ( 'Neither actual damage to the public nor actual deception need be shown.')).

FN51 *Firestone Tire & Rubber Co.*, 81 F.T.C. 398, 451 (1972), *aff'd*, 481 F.2d 246 (6th Cir.), *cert. denied*, 414 U.S. 1112 (1973). *See also Travel King, Inc.*, 86 F.T.C. 715, 774 (1975) ('it need not be shown that even one consumer actually relied on a particular false claim.')

FN52 *See, e.g., Grolier, Inc.*, 91 F.T.C. 315 (1978), *remanded on other grounds*, 615 F.2d 1215 (9th Cir. 1980), *modified on other grounds*, 99 F.T.C. 379 (1982); *Sears, Roebuck and Co.*, 95 F.T.C. 406 (1980), *aff'd*, 676 F.2d 385 (9th Cir. 1982); *Jay Norris Corp.*, 91 F.T.C. 751 (1978), *aff'd*, 598 F.2d 1244 (2d Cir.), *cert. denied*, 444 U.S. 980 (1979); *Porter & Dietsch, Inc.*, 90 F.T.C. 770 (1977), *aff'd*, 605 F.2d 294 (7th Cir. 1979), *cert. denied*, 445 U.S. 950 (1980).

FN53 *See, e.g., American Consumer, Inc.*, 94 F.T.C. 648 (1979); *R.R. International, Inc.*, 94 F.T.C. 312 (1979); *C.I. Energy Development, Inc.* 94 F.T.C. 1337 (1979).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)

FTC

103 F.T.C. 110, 1984 WL 565319 (F.T.C.)
END OF DOCUMENT

Exhibit L



**FDIC**
**Federal Deposit Insurance Corporation**
Division of Supervision and Consumer Protection
2345 Grand Boulevard, Suite 100
Kansas City, MO 64108

Consumer Response Center
1-800-378-9581
Fax number 703-812-1020

August 18, 2006

# REDACTED

Re:    Columbus Bank and Trust Company (Aspire)
       Columbus, Georgia

# REDACTED

We have completed our review of your correspondence and information provided to our office by Aspire regarding the Pre-Qualified Acceptance Certificate you received and the terms of the credit card account established in your name. Columbus Bank and Trust Company issues the Aspire credit card. Aspire responded to our office regarding your concerns on July 25, 2006. We will enclose a copy of Aspire's response for your reference.

The Federal Reserve Board's Regulation Z (Regulation Z) implements the federal Truth in Lending Act. Regulation Z does not restrict the type or amount of fees and service charges that a creditor may impose of a credit card. Regulation Z requires creditors to disclosure certain terms of credit card accounts in their solicitations. It appears to comply with Regulation Z; Aspire provided a Summary of Credit Terms (Summary) and Terms of Offer (Offer) with its Pre-Qualified Acceptance Certificate (Certificate). The Offer disclosed, once Aspire approved your application, you needed to submit a $20 payment before you could activate your card. The Summary disclosed information regarding the various fees Aspire would assess on your account. The Summary also disclosed your available credit would be $141 after the assessment of the $150 annual fee, $29 account opening fee, and receipt of your $20 payment. We will enclose a copy of the Certificate, Summary, and Offer for your reference.

Regulation Z also requires creditors to disclose certain terms and conditions of credit card accounts to new accountholders within specific timeframes and other guidelines. It appears to comply with Regulation Z; Aspire provided a Bank Credit Card Agreement (Agreement) and a Summary of Terms when it issued your credit card. These documents contained the terms and conditions of your account, including notice of the assessment of various fees. We will enclose a copy of the Agreement for your reference.

Mr. Mark E. Stean                   Page 2                    August 18, 2006

Information provided by Aspire indicates on June 5, 2006, it received your authorization via the telephone to withdraw the $20 payment due from your checking account. On June 8, 2006, Aspire received notice that your bank was unable to locate an account in your name with the information you provided. Aspire did not receive .      payment from your bank for your credit card account. Upon receiving your bank's notice, Aspire removed the payment from your account. The billing statement you received dated June 5, 2006, reflected the $20 payment because Aspire had yet to receive notice from your bank regarding the payment. If you still believe Aspire removed $20 from your checking account, please provide our office with a copy of your bank statement reflecting the removal of $20 so that our office can investigate this matter further.

On June 8, 2006, Aspire also received a request to authorize a        . purchase for your account. Aspire denied the request because it exceeded the amount of available credit for your account. After it denied your purchase, Aspire received your closure request. Aspire closed your account that day per your request. Aspire also credited the $150 annual fee and the $29 account opening fee, leaving your closed account with a zero balance. Your concerns regarding the information exchanged between you and an Aspire representative is a factual matter. The FDIC cannot intervene in factual matters without clarifying documentation.

Thank you for bringing this matter to our attention. The FDIC takes the concerns of consumers very seriously. Complaints such as yours are a vital component of the examination process and help the FDIC to tailor its examinations to areas of concern, and also to provide comment to banks on practices and policies. Your complaint regarding the terms of the Aspire credit card will become part of the bank file that will be made available during our next examination of the bank. We trust this is responsive to your concerns.

**REDACTED**

Sincerely,

*Karen Porter*

Karen Porter
Consumer Affairs Specialist

Enclosures (5)

Cc:    Columbus Bank and Trust Company (Aspire)